DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

ELGIN SEPARATION
SOLUTIONS, LLC,

               Plaintiff,

v.

DAVID CHADWICK DILLON, DILLON
INDUSTRIES, INC., and DONALD
RITCHIE,

               Defendants.

Case No. _2:23-cv-00440_

Jury Trial Demanded

### VERIFIED COMPLAINT

Plaintiff Elgin Separation Solutions, LLC ("Elgin"), by its undersigned attorneys, complains against Defendants David Chadwick Dillon ("Dillon"), Dillon Industries, Inc. ("Dillon Industries"), and Donald Ritchie ("Ritchie"), as follows.

### NATURE OF THE ACTION

1. This lawsuit seeks damages and injunctive relief arising from Defendants' willful, repeated misappropriations of Elgin's trade secrets and confidential information, Dillon's copyright infringement and breaches of contract, and his and Ritchie's breach of their fiduciary duties, to further their unlawful competition against Elgin for business and employees.

2. Elgin and its subsidiaries trace their history back to 1864 with the founding of Elgin Equipment Group in Elgin, Illinois. Dillon is the former president of Elgin's division in Poca, West Virginia. While still employed at Elgin, Dillon began a campaign to divert Elgin's intellectual property and business to his newly created entity, Dillon Industries, using Elgin's copyrights, trade secrets, and confidential information, which he both personally misappropriated and directed others to misappropriate on his behalf, all while soliciting Elgin's customers and

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

employees. Dillon's actions violate the restrictive covenants and confidentiality requirements of his employment agreement and asset purchase agreement, his statutory obligations not to infringe upon Elgin's copyrights or misappropriate its trade secrets, and his fiduciary duty of loyalty to Elgin.

3.      As part of this scheme, Ritchie, Elgin's senior draftsman, downloaded thousands of Elgin's files before resigning from Elgin and going to work for Dillon and Dillon Industries, and used Elgin's highly confidential, proprietary, and trade secret information while working for Dillon Industries.

4.      Elgin's business and workforce have suffered greatly as a result of Defendants' wrongful conduct, which shows no signs of ceasing even after Elgin sent cease-and-desist demands. Elgin seeks both damages for the significant harm it has already sustained as a result of Defendants' actions, as well as equitable relief to protect its business and stop Defendants' unlawful conduct.

## THE PARTIES

5.      Elgin is in the business of designing, manufacturing, and servicing specialized processing equipment. Elgin's customers operate in industries relating to natural resources processing, water intake, industrial power and lighting, oil and gas, and pipeline construction.

6.      Elgin is a limited liability company organized under the laws of Delaware with its principal place of business in St. Louis, Missouri.

7.      Elgin is a wholly owned subsidiary of Terrasource Holdings, LLC, a limited liability company organized under the laws of Delaware. None of Terrasource's members are citizens of West Virginia.

8.      Defendant David Chadwick Dillon is the former president of Elgin's Poca, West

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

Virginia location. Dillon resides in Nitro, West Virginia and is a citizen of West Virginia.

9.      Defendant Dillon Industries, Inc. is a West Virginia Corporation incorporated on October 19, 2021. Its principal place of business is in Nitro, West Virginia. Dillon Industries does business using the trade name "Dillon Decanter and Machine."

10.      Defendant Dillon is the president of Dillon Industries, Inc. and, upon information and belief, its sole owner.

11.      Defendant Donald Ritchie is the former draftsman and production administrator at Elgin's Poca, West Virginia location. Ritchie resides in Huntington, West Virginia and is a citizen of West Virginia.

## JURISDICTION AND VENUE

12.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (actions arising under the laws of the United States) as this action arises, in part, under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.* and the Copyright Act, 17 U.S.C. § 501.

13.      The Court has supplemental jurisdiction over the state-law claims in this action pursuant to 28 U.S.C. § 1367, as each of the claims in this action are so closely related that they form part of the same case or controversy.

14.      Additionally, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). Complete diversity of citizenship exists between Elgin and Defendants, and the matter in controversy exceeds the sum or value of $75,000, as the wrongful actions of Defendants have damaged Elgin in an amount in excess of this sum.

15.      The Court has personal jurisdiction over Defendant Dillon, as he is (and was at all relevant times of the allegations in this Complaint) a resident of West Virginia, and performed his

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

wrongful conduct in West Virginia.

16.     The Court has personal jurisdiction over Defendant Dillon Industries, as it is incorporated in West Virginia, its principal place of business is located in West Virginia, it conducts business in West Virginia for West Virginia-based customers, and it performed its wrongful conduct in West Virginia, including through Dillon's and Ritchie's misappropriation of Elgin's trade secrets on its behalf.

17.     The Court has personal jurisdiction over Defendant Ritchie, as he is (and was at all relevant times of the allegations in this Complaint) a resident of West Virginia, and performed his wrongful conduct in West Virginia.

18.     Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(b)(2), as a substantial portion of the acts, omissions, and transactions giving rise to Elgin's injury occurred in this district and division, where Defendants hatched and executed their unlawful misappropriation and solicitation scheme.

## FACTUAL BACKGROUND

### A.  Plaintiff's Business and Its Expansion to Poca, West Virginia

19.     Elgin and its subsidiaries trace their history back to 1864 with the founding of Elgin Equipment Group in Elgin, Illinois. They have long enjoyed a substantial presence in West Virginia. The Mining/Aggregate Product Division operates a location in Princeton, West Virginia, focusing on vibrating screens and fabrication services.

20.     In 2017, Elgin acquired Spinner Equipment Group Holdings, LLC, the owner of Centrifugal Services, LLC, an Illinois company, an existing rendering/centrifuge repair business.

21.     Elgin's facility in Poca specializes in the manufacture and repair of industrial equipment – typically, high speed decanter centrifuges. Elgin also supports its customers by

designing and drafting operations and maintenance manuals for this specialized equipment.

22.     A decanter centrifuge is a piece of heavy machinery (commonly used in the wastewater treatment, chemical, oil, and food processing industries) that is designed to separate fine solids from liquid slurry.

23.     Part of Elgin's operation in Poca focuses on the repair of hammer mills, which are designed to pulverize solid materials into tiny pieces.

24.     This manufacturing and repair business in West Virginia existed for many years before Elgin acquired it.

25.     In 2013, Defendant David Chadwick Dillon owned and operated two corporations (Industrial Process Equipment, Inc. and Eagle One Corp.), which he sold to Spinner Equipment Group Holdings, LLC, and Centrifugal Services, LLC – Elgin's predecessors in interest – via an Asset Purchase and Contribution Agreement (the "APC Agreement"). A copy of the APC Agreement is attached to this complaint as **Exhibit 1**.

26.     Section 1.1 of the APC Agreement lists the assets that Dillon and his companies sold to the purchasers. They include "all fixed assets," "all inventory," "all of the Company's Intellectual Property" (including "all goodwill associated therewith"), and "all goodwill and going concern value associated with the Company's operation of the Business." As such, any intellectual property that Dillon owned or created prior to 2013 was sold and is now owned by Elgin.

27.     Section 6.2 of the APC Agreement provides:

6.2.     Confidentiality.     Sellers and the Shareholder will treat and hold as such all of the Confidential Information, refrain from using any of the Confidential Information except in connection with this Agreement, and deliver promptly to Purchaser or destroy, at the request and option of Purchaser, all tangible embodiments (and all copies) of the Confidential Information that are in such party's possession. In the event that either a Seller or the Shareholder is requested or required (by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process)

5

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

to disclose any Confidential Information, such Seller or the Shareholder will notify Purchaser promptly of the request or requirement so that Purchaser may seek an appropriate protective order or waive compliance with the provisions of this Section 6.2. Notwithstanding anything herein to the contrary, each party to this Agreement (and each employee, representative, and other agent of such party) may disclose to any and all Persons, without limitation of any kind, the Agreement and the transactions contemplated hereby for Tax reporting, legal advice and other similar purposes.

28.     Article VII of the APC Agreement includes the following definition of "Confidential Information":

"Confidential Information" means any information with respect to the Business that the Company treats as proprietary and that it does not in the Ordinary Course of Business disclose to any Person outside the Company concerning the businesses and affairs of the Company excluding any information that (a) was in the public domain at the time of disclosure, (b) is published or otherwise comes into the public domain after its disclosure through no violation of this Agreement, (c) is disclosed to the recipient by a third party not under an obligation of confidence, or (d) is already known by the recipient at the time of its disclosure as evidenced by written documentation of the recipient existing prior to such disclosure.

29.     In return for the assets he sold to the purchasers and the covenants contained in the APC Agreement, Dillon and his companies received $3,470,000 on top of several other benefits, including an additional $250,000 for contributed assets and the assumption of over $450,000 of debt.

**B. Dillon's Employment Agreement with Elgin (and Elgin's Predecessors in Interest)**

30.     On the same day that the APC Agreement was executed, Dillon and Centrifugal Services, LLC executed an Employment Agreement, pursuant to which Dillon agreed to become president of the company's Industrial Process Equipment Division. A copy of the Employment Agreement is attached to this complaint as **Exhibit 2**.

31.     Pursuant to the Employment Agreement, Dillon's initial base salary in this position was $110,000 per year.

32.     Pursuant to the Employment Agreement, after the first two years of Dillon's

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

employment, his employment became at will.

33.     By signing the Employment Agreement, Dillon agreed to "abide by the 'Confidential Information, Non-Competition and Non-Solicitation Terms'" attached to the Agreement as Exhibit A and explicitly incorporated therein by reference.

34.     Section (a) of Exhibit A to the Employment Agreement provides:

> (a)     Confidential Information.     Employee acknowledges that in the course of Employee's employment with the Company, Employee will occupy a position of trust and confidence. Employee will not, except in the course of the good faith performance of Employee's duties to the Company and its affiliates or as required by applicable law, without limitation in time and whether directly or indirectly, disclose to any person or entity, or use, any Confidential Information. "Confidential Information" will mean information about the Company, its affiliates, or their respective clients, customers or business relations, that was learned by Employee in the course of Employee's employment by or services for the Company, its affiliates or otherwise, including (without limitation) any proprietary knowledge, trade secrets, data, formulae, information and client and customer lists and all paper, resumes, and records (including, without limitation, computer records) containing such Confidential Information, but Confidential Information excludes information that Employee can demonstrate (i) is in the public domain through no act or omission of Employee in violation of any agreement that Employee is party to with the Company or any of its affiliates or any policy of the Company or any of its affiliates or (ii) has become available to Employee on a non-confidential basis from a source other than the Company or its affiliates without breach of such source's confidentiality or non-disclosure obligations to the Company or any affiliate. Employee agrees to deliver or return to the Company at the Company's request at any time or upon termination or expiration of Employee's employment or as soon thereafter as possible, (A) all documents, computers, computer tapes and disks, records, lists, data, drawings, prints, notes, written information, keys and other personal property furnished by the Company or its affiliates, or prepared by Employee during the term of Employee's employment by the Company or its affiliates, and (B) all notebooks and other data relating to research or experiments or other work conducted by Employee in the scope of employment, and all copies thereof.

35.     The Employment Agreement also contains several restrictive covenants covering "the period of Employee's employment by the Company and continuing until the first anniversary of the date that Employee ceases to be employed with the Company for any reason (the 'Applicable Period')."

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

36.     Section (b) of Exhibit A to the Employment Agreement contains a non-compete

provision, which provides that, during the Applicable Period:

> Employee will not, directly or indirectly, without the prior written consent of the
> Company, on behalf of any individual or entity other than the Company and its
> affiliates, perform services in any capacity (whether as an owner, employee,
> partner, independent contractor or otherwise, whether with or without
> compensation) in all or any portion of any business that the Company or any of its
> affiliates conducts or is developing as of the date of such termination (each such
> competitor a "Competitor of the Company") . . . . Employee and the Company
> acknowledge and agree that the business of the Company extends throughout the
> world, and that the terms of the non-competition agreement set forth herein will
> apply (i) on a nationwide basis throughout the United States and (ii) and [sic] each
> other country in which the Company has operations or does business.

37.     Section (c) of Exhibit A to the Employment Agreement provides:

> (c)     Non-Solicitation of Customers and Suppliers.  During the
> Applicable Period, Employee will not, directly or indirectly, influence or attempt
> to influence customers or suppliers of the Company or any of its affiliates to divert
> any of their business to any Competitor of the Company or otherwise away from
> the Company or its affiliates.

38.     Section (d) of Exhibit A to the Employment Agreement provides:

> (d)     Non-Solicitation of Employees.       Employee recognizes that
> Employee possesses and will possess Confidential Information about other
> employees of the Company and its affiliates, relating to their education, experience,
> skills, abilities, compensation and benefits, and inter-personal relationships with
> customers of the Company and its affiliates. Employee recognizes that the
> information Employee possesses and will possess about these other employees is
> not and will not be generally known, is of substantial value to the Company and/ or
> its affiliates in developing their business and in securing and retaining customers,
> and has been and will be acquired by Employee because of Employee's business
> position with the Company and its affiliates. Employee agrees that, during the
> Applicable Period, Employee will not directly or indirectly solicit, recruit, induce,
> or encourage or attempt to solicit, recruit, induce, or encourage any employee of
> the Company or its affiliates (i) for the purpose of being employed by him or by
> any Competitor of the Company on whose behalf Employee is acting as an agent,
> representative, employee or other capacity or (ii) to terminate Employee's or his or
> her employment or any other relationship with the Company or its affiliates.
> Employee also agrees that Employee will not convey any such Confidential
> Information or trade secrets about other employees of the Company or its affiliates
> to any other person or entity.

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

39.     Exhibit A to the Employment Agreement specifies that "[t]he obligations contained in these Confidential Information, Non-Competition and Non-Solicitation Terms will survive the termination or expiration of Employee's employment with the Company and will be fully enforceable thereafter."

40.     Exhibit A to the Employment Agreement further specifies that "Employee's obligations under these Confidential Information, Non-Competition and Non-Solicitation Terms will be tolled during any period of non-compliance."

41.     Exhibit A to the Employment Agreement contains the parties' express agreement that the Company would "suffer irreparable injury if Employee were to violate any of these Confidential Information, Non-Competition and Non-Solicitation Terms," that the Company would "by reason of such violation be entitled to injunctive relief," and "Employee further consents and stipulates to the entry of such injunctive relief" to prohibit "Employee from so violating the terms of this agreement."

## C. Elgin's Proprietary, Confidential, and Trade Secret Information

42.     An integral aspect of Elgin's business involves analyzing how industrial equipment is assembled and calibrated, and performs under real world conditions.

43.     Elgin designs and improves equipment so it can outperform equipment made by Elgin's peers.

44.     This analysis, redesigning, and improvement of industrial equipment is a painstaking process (the "Elgin Redesign Process").

45.     It takes months of careful research, design, measurements, fabrication, and trial and error to successfully complete the Elgin Redesign Process for any one type of equipment, requiring substantial investments of money and manpower.

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

46.     While redesigning and improving upon competitor products is common in the industry, the exact manner in which Elgin conducts the Elgin Redesign Process is confidential and proprietary.

47.     The Elgin Redesign Process includes how Elgin inspects, analyzes, and improves such equipment (an "Inspection Analysis") and results in the drafting of engineered drawings ("Drawings").

48.     As part of the documentation of an Inspection Analysis, Elgin's employees use company-issued devices to photograph each stage of the disassembly process in the exact order in which it occurs.

49.     These photographs, and the order in which they are taken, reveal Elgin's proprietary methods.

50.     The order of the photographs reveals a chronology showing each step of the disassembly process, as well as assembly (when reversed).

51.     Further, during the disassembly process, precise measurements are taken of customers' equipment in order to document areas in need of repair and maintenance. Such measurements are written on the equipment in a manner that makes them visible when the photographs are taken.

52.     Thus, photographs of the disassembly process also include highly useful information concerning the precise repairs needed to service customer equipment.

53.     The Drawings include two- and three-dimensional models of a part or piece of equipment, measurements, notes, part numbers, fabrication and machining tolerances, welding notes, and other information.

54.     As the Elgin Redesign Process proceeds, Elgin's engineers, draftsmen, and

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

mechanics develop improvements and alterations that are then incorporated into the design of the equipment, including through the use of Inspection Analyses.

55.     Examples of such modifications include moving the locations of gussets, increasing or decreasing the thickness of material in specific areas, and moving the locations of flanges.

56.     These modifications are intended to increase performance and longevity of the equipment being developed.

57.     Thus, the end result of the Elgin Redesign Process are Drawings of a piece of equipment that is different from and usually superior to the original equipment that served as the starting point for the project.

58.     Further, to facilitate its customers' use of Elgin-designed and manufactured equipment, Elgin creates manuals, containing text and Drawings, detailing the manner in which its customers should operate and maintain the specialized equipment.

59.     As a result of the Elgin Redesign Process, both the Drawings and documentation of the Inspection Analyses contain Elgin's intellectual property, which it maintains as confidential and trade secret, having been developed over decades of study and millions of dollars of investment, including through the acquisition of the assets of Dillon's former companies, Industrial Process Equipment, Inc. and Eagle One Corp.

60.     Elgin takes many steps to protect its proprietary, trade secret, and confidential information.

61.     Elgin's Employee Handbook, attached as **Exhibit 3**, is distributed to all employees in Poca and contains a confidentiality policy providing:

> Employees are prohibited from using or disclosing confidential information relating to the Company's business, or the business of any of [Elgin]'s customers, except where an employee does so for a proper purpose, on a strict need-to-know basis, in the conscientious performance of an employee's job responsibilities. An

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

employee may be required to sign a separate confidentiality agreement further confirming his or her adherence to this obligation.

Employees must maintain the confidentiality of confidential information entrusted to [Elgin] employees by [Elgin] or its customers, except when disclosure is authorized by the Company's counsel or required by laws or regulations. Confidential information includes all non-public information that might be of use to competitors, or harmful to [Elgin] or its customers, if disclosed. It also includes information that suppliers and customers have entrusted to [Elgin]. Employees may also not use or share any confidential information obtained from previous employers. The obligation to preserve confidential information continues even after employment ends.

\*\*\*

It is a violation of the Company's policy for any employee to disclose, use, release or discuss any confidential information belonging to the Company or its customers both during and after the employee's association with the Company. It is also a violation of the Company's policy for an employee to use any confidential information for the employee's own use or use such information in any way inconsistent with the Company's interests.

The files, manuals, reports, notes, lists and other records or data of the Company, in any form, are the exclusive property of the Company and must be returned at the end of employment with the Company. Also, all correspondence files, business files, customer and prospect lists, price lists, manuals, technical data, forecasts, budgets, customer materials, employee files, and other material that contain confidential information must be returned.

Employees are expected to advise management immediately of any observed or suspected breach of this policy.

62.     The policy defines confidential information to include:

- "Information that could help others commit fraud, misuse the Company's products and services, or damage the Company's business or the business of its customers";

- "The identity of customers and prospects, their specific requirements, and the names, addresses and telephone numbers of individual contacts, prices, renewal dates and other detailed terms of customer and supplier contracts and proposals";

- "Information not generally known to the public upon which the goodwill, welfare and competitive ability of the Company depends, including information regarding product plans and designs, marketing and sales plans and strategies, pricing policies, information about costs, profits and sales, and other confidential information relating to the business of the Company"; and

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

- "Information about the Company's business plans, including forecasts, budgets, acquisition models and other non-public financial information, management policies, information about possible acquisitions or dispositions and other business and acquisition strategies and policies."

63.    The handbook's "Work Product Ownership" section provides:

All [Elgin] employees must be aware that [Elgin] retains legal ownership of the product of their work. No work product created while employed by [Elgin] can be claimed, construed, or presented as property of the individual, even after employment by [Elgin] has been terminated or the relevant project completed. This includes written and electronic documents, audio and video recordings, system code, and also any concepts, ideas, or other intellectual property developed for [Elgin], regardless of whether the intellectual property is actually used by [Elgin]. Although it is acceptable for an employee to display or discuss a portion or the whole of certain work product, one must bear in mind that information classified as confidential must remain so even after the end of employment, and that supplying certain other entities with certain types of information may constitute a conflict of interest. In any event, it must always be made clear that work product is the sole and exclusive property of [Elgin].

64.    The handbook's section on "Electronic Communications" provides in relevant part:

**Non-Removal**
Unless officially assigned the use of a company laptop, no one may remove from [Elgin] premises, any hardware, software, files, data, or other information relating to the Company's electronic mall, voice mail or Internet systems without prior management authorization. Those employees assigned laptops should take all reasonable measures to ensure the security of the information contained on their device and report immediately to the [Elgin] Corporate IT department the compromise or loss of their laptop.

**Passwords**
Passwords are used to keep unauthorized individuals from accessing messages and files stored on the computer system. Passwords should be kept confidential except In those cases where they need to be shared with another [Elgin] employee or outside contractor for a legitimate business reason.

\*\*\*

Notwithstanding [Elgin]'s right to retrieve and read any electronic mall or Internet messages or material, such messages or material should be treated as confidential by the other employees and accessed only by the intended recipient. Employees are, however, responsible for maintaining the confidentiality of material on the systems. Without proper management authorization, employees are not permitted to retrieve or read e-mail messages that are not sent to them. The contents of electronic mail or Internet messages or materials may, however, be disclosed to others at [Elgin],

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

with prior management authorization.

\*\*\*

*[Elgin]'s Confidential Information*
It is critical that all employees use the utmost care when transmitting confidential information or proprietary information to other authorized individuals. Each employee should be certain that the receiving individual is authorized to have the information and would not redistribute the information to unauthorized individuals. If any employee violates any terms of this Policy, they are subject to disciplinary action up to and including termination of employment and, if appropriate, civil and criminal prosecution.

65.     Finally, the handbook's "Visitors" policy explains that visitors to Elgin's locations may only be allowed to enter through a specific entrance and remain in a specific area, and are not permitted to enter any other location of Elgin's facility without an employee escort.

66.     Elgin maintains a Code of Business Conduct and Ethics ("Code of Conduct"), attached as **Exhibit 4**, which details its commitment to conducting its business in compliance with all laws, rules, and regulations and in accordance with the highest ethical values. At the beginning of their employment, every Elgin employee receives a copy of the Code of Conduct and instructions to review it thoroughly.

67.     The Code of Conduct contains a Confidentiality policy instructing employees to "maintain the confidentiality of confidential information entrusted to you by us or our customers," defining what constitutes "confidential information," and explaining:

It is a violation of the Company's policy for any employee to disclose, use, release or discuss any confidential information belonging to the Company or its customers both during and after the employee's association with the Company. It is also a violation of the Company's policy for an employee to use any confidential information for the employee's own use or use such information in any way inconsistent with the Company's interests.

68.     The Code of Conduct's "Protection and Proper Use of Our Assets" provision explains employees' obligation to protect company assets, including Elgin's "proprietary

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

information," which "includes intellectual property as well as business, marketing and service plans, engineering and manufacturing ideas, designs, databases, records, salary information and any unpublished financial data or reports." This provision tells employees that "[w]hen your employment ends with the Company, you must return all Company property to the Company. Company equipment should not be used for non-Company business, though incidental personal use may be permitted."

69.     Additionally, the Code of Conduct's "Computer and Communication Resources" provision explains in relevant part:

> The Company's computer and communication resources, including computers, voicemail and email, provide substantial benefits, but they also present significant security and liability risks to you and the Company. It is extremely important that you take all necessary measures to secure your computer and any computer or voicemail passwords.
>
> All of the computing resources used to provide computing and network connections throughout the organization are the property of the Company and are intended for use by the Company employees to conduct the Company's business. . . . In addition, use of the Company's computer and communication resources must conform with all Company policies, including those relating to harassment, privacy, export, copyright, trademark, trade secret and other intellectual property considerations.

70.     All Elgin employees are required to abide by all of Elgin's policies, including the confidentiality policy contained in the Employee Handbook and the Code of Conduct.

71.     As a further step to protect its intellectual property, Elgin labels the Drawings as follows:

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8



72. This label is intended to inform any viewer of the Drawing, including Elgin employees, that the Drawing is Elgin's intellectual property and may not be copied, shared or used without Elgin's express permission.

73. Elgin provides company-owned computers, iPads, external drives, and other computer equipment to its employees and requires them to use this equipment when viewing, creating, sharing, or storing its confidential and trade secret information.

74. For these company-owned devices and Elgin's proprietary systems, including intranet and data storage systems, Elgin requires the use of usernames and passwords as a further means of protecting its confidential and trade secret information.

75. Elgin actively discourages employees from using their personal computers, smartphones, or other devices in the performance of their job duties.

76. Elgin also significantly limits and restricts access to its confidential and trade secret information on a need to know basis.

77. Further, upon separation of employment for any reason, Elgin prevents former employees' access to Elgin's confidential and trade secret information by cutting off the former

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

employee's access to its facilities, systems, and data storage shortly after receiving notice of the termination of employment.

78.     Elgin also demands that former employees immediately return any and all company equipment in their possession, including computer devices.

**D.  Dillon's and Ritchie's Employment with Elgin**

79.     As president of Elgin's Poca location, Dillon's duties included overseeing all operations of the facility, from the development and maintenance of customer relationships, the defining of roles and responsibilities within the workforce, recruitment for the hiring of same, maintaining the integrity of Elgin's proprietary processes, and ensuring the design and manufacture of equipment met or exceeded industry and customer standards.

80.     Further, Dillon was personally involved in developing the Elgin Redesign Process, both on behalf of the companies he sold to Elgin and also during the near decade that he was President of Elgin's Poca facility. As President, Dillon occupied a position of trust and was entrusted with Elgin's confidential, proprietary, and trade secret information relating to the Elgin Redesign Process, its customers and its suppliers.

81.     In this role, Dillon was also responsible for enforcing Elgin's policies and procedures, and supervising Elgin's employees at the Poca, West Virginia facility.

82.     Ritchie began his employment with Elgin on September 26, 2018. Ritchie's position with Elgin was draftsman and later became production administrator.

83.     Ritchie's job duties in this position included creating and modifying Drawings, incorporating the results of Inspection Analyses to improve the equipment depicted in the Drawings, assisting with the drafting of maintenance and operations manuals, procurement, and issuing work orders.

84.     In this position, Ritchie was an active participant in the Elgin Redesign Process. Thus, Ritchie was in a position of trust at Elgin and Elgin entrusted Ritchie with its proprietary, confidential, and trade secret information relating to the Elgin Redesign Process in order to perform his job duties.

85.     On November 30, 2021, Dillon purported to give two weeks' notice of his resignation from his employment with Elgin.

86.     However, Dillon and Elgin came to an agreement by which Dillon would remain employed by Elgin until Elgin found a suitable replacement for Dillon, and he would continue performing his job duties in a transitional role. In this transitional role, he would continue to retain a high level access to Elgin's trade secrets and confidential information and continued to occupy a position of trust at Elgin, subject to all of Elgin's policies and procedures, and his various agreements with Elgin.

87.     While still employed by Elgin, Dillon set up a competing company, Dillon Industries, and began competing against Elgin.

88.     In March 2022, Dillon directly competed against Elgin by soliciting, receiving, and filling at least two purchase orders from Jay Gee Manufacturing, a subsidiary of Darling Ingredients and long-time Elgin customer. *See* **Exhibit 5.** The purchase orders totaled over $40,000, for industrial parts, namely, shafts and internal collars for pipes.

89.     In April 2022, Dillon sent from his Elgin email account (Chad.Dillon@elginps.com) to his Dillon Industries email address (chad.dillon@dillondecantermachine.com) a copy of Elgin's 24x60-LH Centrifuge Operation and Maintenance Manual (the "24x60 Manual"), which Ritchie helped create on behalf of Elgin, in collaboration with other Elgin employees. *See* **Exhibit 6.**

18

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

90.    The 24x60 Manual contains Elgin's copyrights and proprietary information, including detailed Drawings of parts and thorough instructions for the operation and maintenance of a 24x60-LH centrifuge.

91.    The 24x60 Manual contains the following text on its second page:

© Copyright 2022 Elgin Separation Solutions

All other product, brand, or trade names used in this publication are the trademarks or registered trademarks of their respective owners.

All rights reserved. This publication is the property of Elgin Separation Solutions and contains information proprietary to Elgin Separation Solutions. No part of this publication may be reproduced or copied in any form, or by any means, including electronic, mechanical, photocopying, recording or otherwise, without the prior written permission of Elgin Separation Solutions.

92.    Between August and September 2022, Dillon used Elgin computer equipment to scan and send to his work email address credit applications seeking lines of credit for Dillon Industries, Inc. Two such applications identified Dillon as the president of Dillon Industries and listed Mountain State Manufacturing, Tri-State Coating, and Mouldagraph Corp. as suppliers or references.

93.    In one credit application, Dillon stated that Dillon Industries had been in existence since October 19, 2021. In the other, he stated that Dillon Industries had been in business for one year.

94.    By August 2022, Ritchie created a folder called "Dillon Industries" on an external hard drive, which Ritchie connected numerous times to his Elgin computer.

95.    Among the documents Ritchie accessed in a folder labeled "Dillon Industries" on this external media are documents that appear to concern packing slips and documents pertaining to specific jobs for Elgin customers.

96.    In October and December 2022 and January 2023, Ritchie likewise stored

19

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

electronic media relating to particular types of Elgin equipment on the same external hard drive in the "Dillon Industries" folder and a folder labeled "Chad" (Dillon's preferred name), including documents that include "Dillon" in the title.

### E.   Dillon Competes Against Elgin and Continues Raiding Elgin for Employees

97.     After his employment with Elgin ended, Dillon continued operating Dillon Industries in Nitro, West Virginia (five miles from Elgin's Poca location) and began openly competing against Elgin in the centrifuge and hammer mill manufacture and repair business.

98.     During this time, Dillon requisitioned equipment components for the manufacture of new decanter centrifuges from two of Elgin's suppliers, Tri-State Coating & Machine, Inc. and Mouldagraph Corp., including the solids head, liquid head, bowl, conveyor/flite, upper cover, lower cover, and base.

99.     Dillon also continued manufacturing and/or servicing equipment for Elgin's main customers, Darling Ingredients (and/or its subsidiary Jay Gee Manufacturing), Paragon ISG, and Halliburton.

100.    Dillon and Dillon Industries could not feasibly obtain components from Elgin's suppliers and/or manufacture equipment for Elgin's customers in mere months without possession and use of the Drawings and Inspection Analyses.

101.    Dillon also continued soliciting Elgin employees, offering them salaries that were 10% higher than they were receiving at Elgin.

102.    In December 2022, as a result of Dillon's unlawful solicitations, the following Elgin employees left Elgin to work for Dillon and/or Dillon Industries:

       a.   Brandon Bias (welder)

       b.   Franklin Counts (welder)

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

    c.   Jeffrey Fledderman (balancer)

    d.   Joseph Kelley (machinist III)

    e.   Larry Landers (mechanic)

    f.   Patrick Marion[1] (mechanic)

    g.   Gregory McClanahan[2] (mechanic)

    h.   James McClung (mechanic)

103.    In January 2023, as a result of Dillon's unlawful solicitations, the following Elgin employees left Elgin to work for Dillon and/or Dillon Industries:

    a.   Jonathan Carter (mechanic)

    b.   Donald Ritchie[3] (draftsman and production administrator)

    c.   Michael Six (welder)

104.    Dillon also solicited two Elgin employees who chose not to resign their employment with Elgin: George Harron (welder) and Keith Riffe (mechanic).

105.    As a result of Dillon's unlawful solicitations, Elgin lost nearly half of its workforce – 11 employees – in a two-month time period, who collectively had nearly 50 years of experience at Elgin. This extreme and immediate draining of its personnel resources caused and continues to cause Elgin significant harm, including lost business and increased costs of recruitment and training.

---

[1] Marion falsely told Elgin he was quitting to start a woodworking business, when in reality he accepted a position with Dillon.
[2] McClanahan falsely told Elgin he was retiring, when in reality he quit to take a part-time position with Dillon as a parts washer.
[3] Before resigning, Ritchie misappropriated Elgin's trade secrets and breached his fiduciary duty, as alleged herein.

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

**F.  Defendant Ritchie's Active Participation in Dillon's Scheme**

106.  Ritchie voluntarily resigned his employment with Elgin on January 27, 2023.

107.  Immediately after resigning his employment with Elgin, Ritchie became an employee of Dillon Industries.

108.  In the months prior to his resignation, Ritchie downloaded vast amounts of Elgin's confidential and trade secret information from Elgin's password-protected intranet onto at least 14 external media devices, only two of which have been returned to Elgin.

109.  The Drawings and Inspection Analyses are among the documents that Ritchie downloaded and accessed on external media devices.

110.  Ritchie only returned one external hard drive to Elgin when his employment ended.

111.  Four months later, through Dillon's counsel, he returned one additional hard drive containing massive amounts of Elgin data. At least 12 devices containing Elgin's proprietary, confidential, and trade secret information remain in Ritchie's possession.

112.  The confidential information and trade secrets that Ritchie downloaded from Elgin's computer systems included Drawings, Inspection Analyses, and other information concerning completed projects that did not relate to any active orders or services at the time. In other words, Ritchie had no legitimate business reason to access and download such information at the time it was accessed.

**G.  Dillon Ignores Elgin's Demand to Cease and Desist His Wrongful Conduct**

113.  On March 24, 2023, Elgin, through its attorneys, sent Dillon a cease-and-desist letter demanding that Dillon immediately cease using all trade secrets owned by Elgin and all "confidential information" within the scope of the APC Agreement and the Employment Agreement.

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

114.    In the letter, Elgin also provided notice to Dillon that it was exercising its rights under the APC Agreement and the Employment Agreement to demand that Dillon immediately return all of Elgin's confidential information and trade secrets in his possession.

115.    In the letter, Elgin also demanded that Dillon immediately cease his solicitations of Elgin employees.

116.    On March 31, Elgin's attorneys received a letter from Dillon's counsel denying that Dillon had taken or used any of Elgin's trade secrets or solicited any of its employees.

117.    On April 11, Elgin sent a second letter to Dillon, this time through his attorney, explaining the inaccuracies in the response letter, listing the employees Dillon had solicited, and renewing its demands that Dillon cease and desist his wrongful conduct and return Elgin's confidential information.

118.    On April 26, Elgin learned that Dillon had, within the week prior, solicited another Elgin employee – James Paul Toney – well after receiving both cease-and-desist letters.

119.    On April 24, Elgin received from Dillon (through his counsel) 84 pages of Drawings.

120.    Many pages of the Drawings bear Elgin's name and logo and state: "This information is the sole property of Elgin Separation Solutions and is not to be copied, disclosed or used for any purpose other than the purpose for which it has been submitted without prior written permission by Elgin Separation Solutions" (capitalization omitted).

121.    The Drawings that Dillon took include all dimensions and tolerances necessary to build a complete a 24x60 centrifuge of the exact type used by Darling Ingredients (and/or its subsidiary, Jay Gee Manufacturing), an important Elgin customer.

122.    The Elgin drawings that Dillon took also include nearly all dimensions and

tolerances necessary to build a complete 18x50 centrifuge also used by Darling Ingredients (and/or its subsidiary, Jay Gee Manufacturing).

123.    The Elgin drawings that Dillon took also include schematics of the LYNX 40 centrifuge used by Elgin customer Paragon ISG.

124.    Mere days after Dillon asserted to Elgin in December 2022 that his non-compete period with Elgin had expired, Paragon representatives arrived at Elgin's facility, retrieved all equipment owned by the company that was stored or being worked on there, and took it to Dillon Industries' facility to begin doing business with Dillon.

125.    The Elgin drawings that Dillon took also include schematics of DE-7200 VFD centrifuge used by Elgin customer Halliburton.

126.    Before December 2022, Elgin regularly received orders to repair and service centrifuges from Darling Ingredients (and/or its subsidiary, Jay Gee Manufacturing), Paragon ISG, and Halliburton. After December 2022, Elgin received few or no orders from these customers. All three of these former Elgin customers now do business with Dillon and Dillon Industries.

127.    In servicing these former Elgin customers, Defendants have used and continued to use Elgin's confidential, proprietary, and trade secret information.

128.    Defendants provide specific services to these former Elgin customers that require industry knowledge gained as a result of time intensive engineering and redesigning. That Defendants were immediately able to perform these services without delay further shows that they received this knowledge not through their own research efforts, but rather by misappropriating Elgin's confidential, proprietary, and trade secret information.

**H. Elgin's Investigation Into Defendants' Conduct**

129.    On April 25, 2023, in response to the cease-and-desist letter Elgin sent to Dillon,

24

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

Elgin received from Dillon a thumb drive containing over 8,000 disassembly photographs taken as part of Inspection Analyses. These photographs included details regarding the equipment from customers that Elgin services, measurements, areas needing repair, and part and job numbers.

130.     On May 5, 2023, Elgin received from Dillon a second external drive containing Ritchie's backups of his Elgin computer from August 14, 2022, December 6, 2022, and January 18, 2023. It also contained a backup of a "pst" containing all of Ritchie's emails as of January 18, 2023.

131.     Elgin promptly conducted a forensic examination of the drives it received from Dillon, which revealed significant activity by Ritchie. Among other things, Elgin's investigation revealed that Ritchie deleted information from the external hard drive on or about May 2, 2023, before returning it to Elgin, including all data in folders labeled "Backup 12-6-22" and "Chads Other." This investigation also showed that on or about April 20, 2023, Ritchie saved all individual emails in the "Backup 12-6-22" folder on another device before deleting them from the external hard drive returned to Elgin.

132.     Discovery of these facts led Elgin to expand its investigation and analyze the company-owned laptop computer used by Ritchie during his employment.

133.     This examination revealed that Ritchie had downloaded vast amounts of information from Elgin's servers immediately before resigning his employment with Elgin to work for Dillon Industries. This includes pst files containing all communications from his work email account, and large amounts of Elgin's confidential and trade secret information.

134.     The examination also revealed that Ritchie had connected at least 12 other devices to the work laptop, which have not been returned to Elgin.

135.     Next, Elgin discovered that in March 2022, while still working for Elgin, Dillon

sent from his Elgin email account (Chad.Dillon@elginps.com) to his Dillon Industries email address (chad.dillon@dillondecantermachine.com) Elgin's copyrighted 24x60 Manual.

136.    Upon making this discovery, Elgin submitted an expedited application with the U.S. Copyright Office for the registration of Elgin's copyright in the 24x60 Manual.

137.    On June 14, 2023, the U.S. Copyright Office granted Elgin's application. An unofficial preview of Elgin's copyright registration certificate is attached hereto as **Exhibit 7**.

138.    Defendants remain in possession of Elgin's proprietary, confidential, and trade secret information, and continue to use that information to service former Elgin customers and compete against Elgin in the marketplace.

139.    Without this Court's immediate intervention, Defendants will continue their wrongful competition, causing immediate and irreparable harm to Elgin.

**I.   As a Result of Defendants' Scheme, Elgin Has Lost Employees, Business, and Profits**

140.    As discussed above, Elgin has lost 11 employees as a direct result of Dillon's unlawful solicitations of its employees. This has cost Elgin productivity, in addition to the time and money spent training and recruiting new employees to replace them.

141.    Defendants' scheme has also significantly impacted Elgin's business relationships and its profitability in Poca. Elgin went from receiving a steady stream of orders (between four and six per month) from Darling Ingredients (and/or its subsidiary, Jay Gee Manufacturing), Paragon ISG, and Halliburton before Dillon's departure to zero or one per month since, causing a loss in business ranging from $150,000 to $300,000 per month. This loss of business is a direct result of Defendants' wrongful conduct.

142.    Finally, as a result of Defendants' conduct, Elgin has sustained and continues to sustain irreparable harm as a result of the loss of control over its intellectual property and the

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

secrecy of its confidential information, which is harmful not only to its business, but also to its

goodwill and reputation, built over the course of its 160-year history.

## COUNT I
### Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* (All Defendants)

143.    Elgin restates and incorporates by reference the allegations contained in the

preceding paragraphs of this complaint.

144.    The Defend Trade Secrets Act prohibits the misappropriation of trade secrets.

145.    Elgin has developed and owns valuable trade secrets related to its products and

services that are used in, or intended for use in, interstate or foreign commerce.

146.    Elgin's trade secrets have value because they are not generally known to the public

and are not readily ascertainable.

147.    Elgin has taken reasonable measures to safeguard its trade secrets, including the

issuance, enforcement, and training of confidentiality and data security policies, granting and

monitoring limited access to its trade secrets, using password protection to access its trade secrets

on proprietary databases, and cutting off former employee's access to Elgin facilities, systems, and

data storage.

148.    Defendants took electronic data and hard copy Drawings containing Elgin's trade

secret information without a legitimate purpose.

149.    Dillon and Ritchie used improper means to acquire and use Elgin's trade secrets by

virtue of accessing and downloading Elgin's information without a lawful purpose after they had

planned to leave Elgin and compete against Elgin through Dillon Industries.

150.    Defendants have obtained an economic benefit from the misappropriation of

Elgin's trade secrets.

151.    As a result of Defendants' unlawful actions, Elgin has suffered harm, including: (1)

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

the loss of its confidential and proprietary information, including the lost value derived from Elgin's investment in a large amount of time and resources to develop the confidential information that gives Elgin an advantage over its competitors, (2) lost business from customers that are now serviced by Defendants, and (3) damage to goodwill and reputation.

**COUNT II**
**Violation of the West Virginia Uniform Trade Secrets Act, W. Va. Code § 47-22-1 *et seq.***
**(All Defendants)**

152.    Elgin restates and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

153.    The West Virginia Uniform Trade Secrets Act prohibits the misappropriation of trade secrets.

154.    Elgin has developed and owns valuable trade secrets related to its products and services that are used in, or intended for use in, interstate or foreign commerce.

155.    Elgin's trade secrets have value because they are not generally known to the public and are not readily ascertainable.

156.    Elgin has taken reasonable measures to safeguard its trade secrets.

157.    Defendants have obtained an economic benefit from the misappropriation of Elgin's trade secrets.

158.    Defendants used improper means to acquire and use Elgin's trade secrets while knowing that the acquisition and use was improper.

159.    As a result of Defendants' unlawful actions, Elgin has suffered harm, including: (1) the loss of its confidential and proprietary information, including the lost value derived from Elgin's investment in a large amount of time and resources to develop the confidential information that gives Elgin an advantage over its competitors, (2) lost business from customers that are now

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

serviced by Defendants, and (3) damage to goodwill and reputation.

## COUNT III
**Copyright Infringement, 17 U.S.C. § 101 *et seq.* (Defendants Dillon and Dillon Industries)**

160.   Elgin restates and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

161.   Elgin has a registered copyright in the 24x60 Manual. Elgin's copyright in the 24x60 Manual is valid and enforceable.

162.   By virtue of his employment with Elgin, Dillon had access to Elgin's 24x60 Manual.

163.   Immediately upon the publication of the 24x60 Manual, Dillon made a copy of the 24x60 Manual by sending it to his email account for his competing business, Defendant Dillon Industries (chad.dillon@dillondecantermachine.com).

164.   Elgin never provided permission for Dillon or Dillon Industries to make copies of the 24x60 Manual, remove it from Elgin's offices or computer systems, or use it in their competing business.

165.   Dillon and Dillon Industries took the 24x60 Manual without permission.

166.   Upon information and belief, Dillon and Dillon Industries have used or prepared derivative works based on the 24x60 Manual without permission.

167.   Dillon and Dillon Industries have infringed upon Elgin's copyright under the copyright laws of the United States, in violation of 17 U.S.C. § 101 *et seq.*

168.   Upon information and belief, Dillon, Dillon Industries and/or their agents continue to infringe upon Elgin's copyright in the 24x60 Manual after being notified of the infringing actions.

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

169.    Dillon and Dillon Industries have knowingly and willfully infringed Elgin's rights in and to the 24x60 Manual.

170.    Elgin has been, and continues to be, irreparably harmed by Dillon's and Dillon Industries' infringing acts for which there is no adequate remedy at law.

171.    Elgin has suffered and will continue to suffer damages as a result of Dillon's infringement, in an amount to be determined at trial.

### COUNT IV
### Breach of Contract – APC Agreement (Defendant Dillon)

172.    Elgin restates and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

173.    Dillon and his companies, on the one hand, and Spinner Equipment Group Holdings, LLC and Centrifugal Services, LLC, on the other, entered into a valid, enforceable contract when they executed the APC Agreement.

174.    Elgin acquired Spinner Equipment Group Holdings, LLC, the 100% owner and parent of Centrifugal Services, LLC. Through this acquisition, Elgin acquired Centrifugal Services, LLC and its rights under the APC Agreement. It also acquired and now owns all intellectual property owned or created by Dillon prior to 2013.

175.    As successor to Spinner Equipment Group Holdings, LLC and Centrifugal Services, LLC, the APC Agreement is binding upon and inures to the benefit of Elgin.

176.    The APC Agreement imposed a duty on Dillon to "treat and hold as such" all confidential information and refrain from using any confidential information except in connection with the APC Agreement.

177.    At all times, Elgin has performed is obligations under the APC Agreement.

178.    Dillon breached his contractual obligation to Elgin by using confidential

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

information within the scope of the APC Agreement to compete against Elgin.

179.    As a direct and proximate result of Dillon's unlawful actions, Elgin has suffered harm, including: (1) the loss of its confidential and proprietary information, including the lost value derived from Elgin's investment in a large amount of time and resources to develop the confidential information that gives Elgin an advantage over its competitors, (2) lost business from customers that are now serviced by Defendants, and (3) damage to goodwill and reputation.

**COUNT V**
**Breach of Contract – Employment Agreement (Defendant Dillon)**

180.    Elgin restates and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

181.    Dillon and Centrifugal Services, LLC entered into a valid, enforceable contract when they executed the Employment Agreement at the beginning of Dillon's employment with Centrifugal Services, LLC.

182.    Elgin acquired Spinner Equipment Group Holdings, LLC, the 100% owner and parent of Centrifugal Services, LLC. Through this acquisition, Elgin acquired Centrifugal Services, LLC and its rights under the Employment Agreement.

183.    The Employment Agreement imposed a duty on Dillon to refrain from disclosing to unauthorized persons or using in unauthorized ways Elgin's confidential information.

184.    Dillon breached his contractual obligation to Elgin by using confidential information within the scope of the Employment Agreement to compete against Elgin.

185.    The Employment Agreement imposed a duty on Dillon, during his employment and for a period of 12 months thereafter, to refrain from soliciting, recruiting, or encouraging to leave Elgin any current employee of Elgin with whom he had contact during the previous two years.

186.    Dillon breached his contractual obligation to Elgin by contacting, soliciting,

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

recruiting, or encouraging current Elgin employees to resign their employments with Elgin and join Dillon Industries.

187.    The Employment Agreement imposed a duty on Dillon, during his employment and for a period of 12 months thereafter, to refrain from influencing customers or suppliers of Elgin to divert any of their business to any competitor of Elgin or otherwise away from Elgin.

188.    Dillon breached his contractual obligation to Elgin by contacting, soliciting, or encouraging current Elgin customers and suppliers to cease doing business with Elgin and begin doing business with him and Defendant Dillon Industries.

189.    The Employment Agreement imposed a duty on Dillon, during his employment and for a period of 12 months thereafter, to refrain from performing services in any capacity in all or any portion of any business that Elgin conducts or is developing as of the date of termination.

190.    Dillon breached his contractual obligation to Elgin by establishing and operating a company no later than April 2022, which sought to conduct business identical to that of Elgin, namely, the manufacture and repair of industrial centrifuges and hammer mills.

191.    Exhibit A to the Employment Agreement makes clear that the applicable period of each restrictive covenant is tolled during any period of Dillon's non-compliance with the covenants. Such tolling applies here, as Dillon began violating his contractual duties while still employed by Elgin and during the applicable period thereafter.

192.    As a direct and proximate result of Dillon's unlawful actions, Elgin has suffered harm, including: (1) the costs of recruitment, hiring, training, and integration of new employees to replace the ones Dillon successfully solicited to leave Elgin; (2) increased salary costs of employees whom Dillon unsuccessfully solicited to leave Elgin; (3) the loss of its confidential and proprietary information, including the lost value derived from Elgin's investment in a large amount

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

of time and resources to develop the confidential information that gives Elgin an advantage over its competitors; and (4) lost business from customers that are now serviced by Defendants.

## COUNT VI
### Breach of Fiduciary Duty (Defendant Dillon)

193.    Elgin restates and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

194.    Dillon was a senior employee and agent of Elgin, charged with important job duties regarding Elgin's business strategies, intellectual property, customer relationships, and procurement plans.

195.    As a senior employee and agent of Elgin, Dillon had a duty to not use Elgin's confidential information, trade secrets, and other property for his own purposes.

196.    As a senior employee and agent of Elgin, Dillon had a duty to not acquire a material benefit from Elgin's existing or prospective customers at the expense of Elgin.

197.    Dillon, while still being employed at Elgin, breached his fiduciary duties to Elgin by secretly usurping Elgin's business strategies and valuable property, and using these assets to compete against Elgin through Dillon Industries.

198.    As a senior employee and agent of Elgin, Dillon had a duty to not acquire a material benefit from existing employees at the expense of Elgin.

199.    Dillon, while still being employed at Elgin, breached his fiduciary duties to Elgin by secretly soliciting Elgin's employees to leave, join him and Dillon Industries, and compete against Elgin through Dillon Industries.

200.    Dillon's actions were not conducted in good faith.

201.    As a direct result of Dillon's actions, Elgin has suffered harm, including the loss of customers and personnel, and lost productivity due to Dillon diverting his attention to establishing

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

a competing business instead of performing his duties as Elgin's President, damaging Elgin in an amount to be determined at trial.

## COUNT VII
### Tortious Interference (Defendant Dillon)

202.    Elgin restates and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

203.    Elgin has contractual or business relationships with its existing employees and customers, as well as potential customers.

204.    By his conduct described above – including soliciting Elgin's existing employees to resign their employments and join Dillon Industries and enticing existing Elgin employees to breach their fiduciary duties to Elgin by disclosing Elgin's trade secrets and other confidential information – Defendant Dillon has intentionally interfered with Elgin's contractual or business relationships with its existing employees and customers, as well as potential customers.

205.    Such interference has caused harm to Elgin in the loss of business and diminished reputation in the community.

206.    As a result of Dillon's tortious interference, Elgin has sustained damages including but not limited to loss of business and goodwill in the community.

207.    Elgin is also entitled to recover punitive damages resulting from Dillon's tortious interference.

## COUNT VIII
### Breach of Fiduciary Duty (Defendant Ritchie)

208.    Elgin restates and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

209.    Ritchie was an employee and agent of Elgin, charged with important job duties

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

regarding Elgin's confidential engineering and redesign projects, including creating Drawings, and was entrusted with Elgin's confidential information and trade secrets in order to perform his important job duties.

210.    As an employee and agent of Elgin, Ritchie had a duty to not use Elgin's confidential information, trade secrets, and other property for his own purposes.

211.    As an employee and agent of Elgin, Ritchie had a duty to not acquire a material benefit from existing or prospective customers at the expense of Elgin.

212.    Ritchie, while still being employed at Elgin, breached his fiduciary duties to Elgin by secretly usurping Elgin's valuable intellectual property, and aiding in Dillon's use of these assets to compete against Elgin through Dillon Industries.

213.    Ritchie's actions were not conducted in good faith.

214.    As a direct result of Ritchie's actions, Elgin has suffered harm, including the loss of business and personnel, and lost productivity due to Ritchie diverting his attention to assisting Dillon in his efforts to establish a competing business instead of performing his duties as Elgin's employee, damaging Elgin in an amount to be determined at trial.

## PRAYER FOR RELIEF

Wherefore, Elgin respectfully requests that the Court:

a.    Issue a temporary restraining order directing Defendants to immediately return all confidential information and trade secrets belonging to Elgin in their possession, including all computer and digital devices on which such information is stored, and take all actions necessary for Elgin to secure any of its confidential or trade secret information in the possession of any third parties;

b.    Issue a preliminary and permanent injunction prohibiting Defendants from using or disclosing any of Elgin's trade secrets for their benefit or doing business with the former Elgin customers whose equipment is the subject of many of the trade secrets and confidential information Defendants stole from Elgin;

c.    Issue a preliminary and permanent injunction prohibiting Defendant Dillon from further breaching his contractual duties to Elgin;

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

d.   Issue an order of judgment in Elgin's favor on its copyright infringement claim, pursuant to 17 U.S.C. § 101 *et seq.*

e.   Issue an order of judgment in Elgin's favor holding Defendants liable for damages stemming from their misappropriations of Elgin's trade secrets;

f.   Issue an order of judgment in Elgin's favor holding Defendant Dillon liable for damages stemming from his breaches of his contractual obligations to Elgin and his fiduciary duty of loyalty to Elgin, and tortious interference;

g.   Issue an order of judgment in Elgin's favor holding Defendant Ritchie liable for damages stemming from his breach of his fiduciary duty of loyalty to Elgin;

h.   Order disgorgement of any and all compensation received by Dillon and Ritchie from Elgin while they were breaching their fiduciary duties and any and all monies received by Defendants as a result of their illegal or wrongful conduct;

i.   Award Elgin its reasonable attorney's fees and associated costs;

j.   Award Elgin punitive damages; and

k.   Grant such other and further relief as this Court deems just and appropriate.

DocuSign Envelope ID: C282A576-31F8-4D6B-A1A9-F654EF575EF8

## VERIFICATION

I, Michael Anderson, President of Elgin Separation Solutions, LLC, do hereby affirm,

under the penalties of perjury, that the facts alleged in the foregoing verified complaint are true to

the best of my knowledge, information, and belief.

Michael Anderson

June 16, 2023

Date

Filed: June 16, 2023

Respectfully Submitted,

ELGIN SEPARATION
SOLUTIONS, LLC


/s/ Jill C. Rice
Jill Cranston Rice (WV State Bar No.
7421)
**Dinsmore & Shohl LLP**
215 Don Knotts Boulevard, Suite 310
Morgantown, WV 26501
Telephone (304) 296-1100 / Facsimile
(304) 296-6116
Email: jill.rice@dinsmore.com

and

/s/ Rachel L. Schaller

Rachel L. Schaller
*pro hac vice pending*
(IL ARDC No. 6306921)
Benjamin S. Morrell
*pro hac vice pending*
(NC Bar No. 56676)
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2600
Chicago, IL 60601
Telephone: (312) 527-4000
Facsimile: (312) 527-4011
rschaller@taftlaw.com
bmorrell@taftlaw.com

*Counsel for Plaintiff*