# EXHIBIT 1

ASSET PURCHASE AND CONTRIBUTION AGREEMENT

BY AND AMONG

CENTRIFUGAL SERVICES, LLC,

SPINNER EQUIPMENT GROUP HOLDINGS, LLC,

INDUSTRIAL PROCESS EQUIPMENT, INC.,

EAGLE ONE CORPORATION

AND

DAVID CHADWICK DILLON

November 13, 2013

## ASSET PURCHASE AND CONTRIBUTION AGREEMENT

THIS ASSET PURCHASE AND CONTRIBUTION AGREEMENT (this "Agreement"), dated as of November 13, 2013, is by and among Spinner Equipment Group Holdings, LLC, a Delaware limited liability company ("Parent"), and its indirect wholly-owned subsidiary Centrifugal Services, LLC, an Illinois limited liability company (the "Purchaser"), Industrial Process Equipment, Inc., a West Virginia corporation (the "Company"), Eagle One Corporation, a West Virginia corporation ( "Eagle One") (Eagle One and the Company, each a "Seller," and collectively, "Sellers"), and David Chadwick Dillon, the sole shareholder of the Company and Eagle One (the "Shareholder"). Capitalized terms used herein and not otherwise defined have the meanings given to such terms in Article VII below.

WHEREAS, the Company manufactures, refurbishes and sells centrifuges, centrifuge parts, cuttings dryers and cuttings dryers parts to the coal and oil & gas industries, provides maintenance and support services to such equipment, and provides service and repair on centrifuges (collectively, the "Business");

WHEREAS, Eagle One owns certain real property upon which the Business is operated;

WHEREAS, Purchaser, Parent, Sellers, and the Shareholder desire to enter into this Agreement whereby (i) Sellers propose to sell to Purchaser, and Purchaser proposes to purchase from Sellers, substantially all of the assets of Sellers used in connection with the Business, and (ii) the Company proposes to contribute certain of its assets to Parent in exchange for certain Class A Units of the Parent ("Parent Units"); and

WHEREAS, Sellers and the Shareholder recognize that their agreement to the terms of this Agreement (including Section 6.3) is a material inducement for Purchaser and Parent to enter into this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, agreements and understandings herein contained, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
### Sale and Transfer of Assets; Contribution; Purchase Price; Closing

1.1. <u>Assets To Be Sold</u>. Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, but effective as of the Effective Time, Sellers will sell, convey, assign, transfer and deliver to Purchaser, and Purchaser will purchase and acquire from Sellers free and clear of any Liens, all of Sellers' right, title and interest in all of the properties and assets of Sellers, excluding only the Excluded Assets and the Contributed Assets, including, but not limited to, the following (collectively, with the Contributed Assets (as defined in Section 1.3 below), the "Assets"):

> (a) all fixed assets and items of machinery, equipment, furniture, and all other tangible personal property of the Company, including without limitation those items set forth on Schedule 1.1(a);

(b)　　all rights existing under all Company Contracts, excluding those identified as Excluded Assets, but including without limitation those set forth on <u>Schedule 1.1(b)</u> ("<u>Purchased Contracts</u>");

(c)　　all files, lists and records of customers (whether past or current), suppliers, distributors, and agents, with respect to the Assets and Business, including without limitation quotation and purchase records and all books, records, ledgers, files, documents, correspondence, lists, studies and reports and other printed or written materials with respect to the Assets and Business;

(d)　　all inventory, wherever located, including all raw materials, spare parts and all other materials and supplies to be used in the production, service, and repair of goods by the Company, including without limitation the inventory set forth on <u>Schedule 1.1(d)</u> (the "<u>Inventory</u>");

(e)　　all claims, deposits, warranties, guarantees, refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature with respect to the Assets;

(f)　　all of the Company's Intellectual Property, including without limitation the Intellectual Property identified on <u>Schedule 1.1(f)</u>, including, but not limited to, the corporate and trade name "Industrial Process Equipment, Inc.", the Company's telephone and fax numbers, social media accounts, domain name and website and any content (including any copyright therein), and all goodwill associated therewith;

(g)　　all Permits, to the extent assignable, listed on <u>Schedule 1.1(g)</u>;

(h)　　all billed and unbilled accounts receivable and all correspondence with respect thereto, including without limitation, all trade accounts receivable, notes receivable from customers, and all other obligations from customers, including without limitation the items listed on <u>Schedule 1.1(h)</u> (the "<u>Accounts Receivable</u>");

(i)　　all insurance and warranty proceeds received after the Closing Date with respect to damage, non-conformance of or loss to the Assets or with respect to the Assets or the Assumed Liabilities;

(j)　　all prepayments, vendor credits, prepaid expenses and similar assets;

(k)　　the land owned by each of the Company and Eagle One legally described on attached <u>Schedule 1.1(k)</u> (collectively, the "<u>Land</u>"), together with (1) all buildings and improvements located on the Land (collectively, the "<u>Buildings</u>"), (2) all plumbing, lighting, heating, air conditioning, ventilating, water conditioning and other fixtures located in the Buildings or on the Land (collectively, the "<u>Fixtures</u>"), and (3) all easements and rights benefitting or appurtenant to the Land or the Buildings (collectively, the "<u>Owned Real Property</u>");

(l)     the lease (the "Real Property Lease") relating to real property (the "Leased Real Property" and collectively with the Owned Real Property, the "Real Property") described on the attached Schedule 1.1(l); and

(m)     all goodwill and going concern value associated with the Company's operation of the Business.

1.2.    Excluded Assets.   Notwithstanding the foregoing Section 1.1, Purchaser acknowledges and agrees that Purchaser is not acquiring the following assets of Sellers (collectively, the "Excluded Assets"):

(a)     all Cash;

(b)     Sellers' rights under or pursuant to this Agreement and agreements entered into pursuant to this Agreement;

(c)     Sellers' minute books, statutory books and company seal;

(d)     all Permits that are not assignable;

(e)     all rights existing under each Contract set forth on Schedule 1.2(e) (the "Excluded Contracts");

(f)     all business insurance policies;

(g)     all Employee Benefit Plans and employee Contracts;

(h)     all Contracts related to Indebtedness (excluding those Contracts associated with the Assumed Indebtedness); and

(i)     the assets set forth on Schedule 1.2(i).

1.3.    Contribution of Contributed Assets In Exchange for Parent Units.   Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, but effective as of the Effective Time, the Company hereby contributes to Parent an undivided Two Hundred Fifty Thousand and no/100 Dollars ($250,000) of goodwill and going concern value with respect to the Business (the "Contributed Assets") in exchange for the Parent Units, which is based on a price per Class A Unit of $1,000 (the "Per Unit Price").

1.4.    Liabilities.

(a)     Assumed Liabilities.   The Company acknowledges and agrees that Purchaser is assuming all of the Company's accounts payable set forth on Schedule 1.4 and the Company's obligations under Purchased Contracts, the Real Property Lease, and the Assumed Indebtedness (as defined herein) (collectively, the "Assumed Liabilities"). Except for the Assumed Liabilities, Purchaser is not assuming any other Liabilities or obligations of Sellers (the "Excluded Liabilities").   Notwithstanding the above, the Assumed Liabilities do not include any failure to perform, improper performance, or

other breach, default or violation by the Company under Purchased Contracts, Real Property Lease, and Assumed Indebtedness on or prior to the Closing Date.

(b)     <u>Excluded Liabilities</u>.   The Excluded Liabilities will remain the sole responsibility of and will be retained, paid, performed and discharged solely by Sellers. For the avoidance of doubt, the Excluded Liabilities will expressly include (i) all Liabilities that are caused by the actions or inactions of the Company with respect to the Purchased Contracts on or prior to the Closing Date, (ii) all Liabilities related to Taxes, (iii) all product liability, all returns, and all warranty liability with respect to sales made by the Company, and (iv) any other Liabilities of Sellers not specifically included in the Assumed Liabilities.

1.5.   <u>Purchase Price</u>.

(a)     The consideration for the Assets (other than the Contributed Assets) will be the sum of (collectively, the "<u>Assets Purchase Price</u>") (i) Three Million Four Hundred Seventy Thousand and no/100 Dollars ($3,470,000) (the "<u>Cash Purchase Price</u>"), <u>adjusted</u> (plus or minus) by (ii) the Cash Adjustment as provided in <u>Section 1.8</u>, <u>plus</u> (iii) the amount of the Assumed Indebtedness (as defined herein), <u>plus</u> (iv) the amount of the Earn-Out Payments, if any, as set forth in <u>Section 1.9</u>.

(b)     The consideration for the Contributed Assets will be an amount equal to Two Hundred Fifty Thousand and no/100 Dollars ($250,000) (the "<u>Contributed Assets Purchase Price</u>").

(c)     The Assets Purchase Price and the Contributed Assets Purchase Price are collectively referred to as the "<u>Purchase Price</u>".

1.6.   <u>Payment of Purchase Price; Assumption of Liabilities</u>.   On the Closing Date, and subject to the conditions set forth in this Agreement:

(a)     The Assets Purchase Price will be payable by Purchaser at Closing as follows:

(i)     Purchaser will pay Outstanding Transaction Expenses;

(ii)     Purchaser will pay an amount equal to Four Hundred Fifty Four Thousand Three Hundred Fifty Six and 22/100 Dollars ($454,356.22) (the "<u>Indebtedness Amount</u>"), to pay off the Company's Indebtedness (excluding the Assumed Indebtedness) with such payment being made to the holders of such Indebtedness pursuant to payoff letters in form acceptable to Purchaser;

(iii)     Purchaser will pay off (pursuant to payoff letters in form acceptable to Purchaser) or, at Purchaser's option, assume the Indebtedness set forth on <u>Schedule 1.6(a)(iii)</u> (the "<u>Assumed Indebtedness</u>");

(iv)     Purchaser will pay an amount equal to Three Hundred Fifty Thousand and no/100 Dollars ($350,000) (the "<u>Escrow Amount</u>") to JPMorgan

- 4 -

Chase Bank, NA (the "Escrow Agent") with such funds to be held in an escrow account pursuant to the terms and conditions of an escrow agreement (the "Escrow Agreement"); and

(v)     Purchaser will pay to Sellers, by wire transfer of immediately available funds to such accounts as are designated by Sellers, an aggregate amount equal to the sum of:

1)   the Cash Purchase Price, adjusted (plus or minus) by;

2)   Estimated Cash Adjustment, less;

3)   the Indebtedness Amount, less;

4)   the Outstanding Transaction Expenses, and less;

5)   the Escrow Amount.

The amounts payable to Sellers pursuant to this Section 1.6(a)(v) will be allocated using the percentages set forth on Schedule 1.6(a)(v).

(b)     Purchaser will assume the Assumed Liabilities.

1.7.   The Closing.   The closing of the purchase and sale of the Assets and the transactions relating thereto (the "Closing"), will take place at the offices of Fredrikson & Byron, P.A., located at 200 South Sixth Street, Suite 4000, Minneapolis, Minnesota, commencing at 9:00 a.m. local time on the date hereof.  The date of the Closing is referred to as the "Closing Date."  The effective time of the Closing is 12:01 a.m. eastern time on the Closing Date (the "Effective Time").

1.8.   Purchase Price Adjustment.   The Assets Purchase Price will be subject to adjustment as provided in this Section 1.8 (the "Cash Adjustment").

(a)     Cash.  "Cash" means the Company's cash, cash equivalents and customer deposits (net of amounts for outstanding checks or similar uncleared amounts).

(b)     Estimated Cash Adjustment.  At least three (3) days prior to the Closing Date, the Company will deliver to Purchaser an estimated statement of the Cash as of the close of business on the day prior to the Closing Date, which will be acceptable to Purchaser in Purchaser's reasonable discretion (the "Estimated Cash").  If the Estimated Cash is greater than the Cash Target, then, on the Closing Date, the Purchase Price will be decreased on a dollar for dollar basis by an amount equal to the Estimated Cash less the Cash Target, and if the Cash Target is greater than the Estimated Cash, then, on the Closing Date, the Purchase Price will be increased on a dollar for dollar basis by an amount equal to the Cash Target less the Estimated Cash (such adjustment, the "Estimated Cash Adjustment").

(c)     Closing Cash Adjustment.

(i)      Within ninety (90) days after the Closing Date, Purchaser will prepare and deliver to the Company, a reasonably detailed statement (the "Closing Cash Statement") of the Cash as of the close of business on the day prior to the Closing Date (the "Closing Cash").  Following the Closing Date, the Company and the Shareholder agree that they will cooperate with Purchaser and its advisors in making available to Purchaser and its advisors such accounts, statements, books, records, financial information, work papers, and supporting data, as reasonably requested, in connection with Purchaser's review of the Closing Cash.

(ii)      The Company may deliver a written notice to Purchaser within twenty (20) days of the Company's receipt of the Closing Cash Statement stating whether the Company has any objections to the Closing Cash, describing in reasonable detail any objections thereto.  Failure to give a timely objection notice (or written notification from the Company that it has no objection to the Closing Cash Statement) will constitute acceptance and approval of the Closing Cash set forth therein, and such Closing Cash will be final and binding upon the parties.

(iii)      If the Company notifies Purchaser of any objection to the Closing Cash Statement within the time period set forth in Section 1.8(c)(ii), Purchaser and the Company will attempt in good faith to reach an agreement as to the matter in dispute.  If such parties have failed to resolve any such disputed item within ten days after receipt of timely notice of such objection, then any such disputed item will be submitted to and determined by an independent accounting firm selected by Purchaser and the Company (the "Independent Accounting Firm"); provided, however, the parties may mutually agree on an extended period to resolve any such dispute before submitting it to the Independent Accounting Firm.  The Independent Accounting Firm will be given reasonable access to all of the records of the Company and Purchaser to resolve any disputed item regarding the Closing Cash Statement, and will be instructed to submit its determination in writing with respect to any disputed matters to Purchaser and the Company within twenty (20) days.  The Independent Accounting Firm will address only those items properly disputed in accordance with Section 1.8(c)(ii) and the Independent Accounting Firm may not assign a value greater than the greatest value or lower than the lowest value for any such item claimed by Purchaser, on the one hand, or the Company, on the other hand.  The Company and Purchaser will be entitled to present any materials they deem appropriate to the Independent Accounting Firm, including a meeting, with all parties present (to the extent such parties desire to be present in such meeting), to discuss their position.  The fees and expenses of the Independent Accounting Firm incurred in resolving the disputed matter will be split equally between Purchaser and the Company.  The Closing Cash Statement properly disputed under this Section 1.8(c)(iii) will, after resolution of such dispute pursuant to this Section 1.8(c)(iii), be final, binding and conclusive on all parties.

(iv)      If the Closing Cash as finally determined is greater than the Estimated Cash, the Company and the Shareholder, jointly and severally, will pay such excess on a dollar for dollar basis to Purchaser in immediately available

- 6 -

funds, and if the Estimated Cash is greater than the Closing Cash, Purchaser will pay such excess on a dollar for dollar basis to the Company in immediately available funds (such final adjustment, the "Closing Cash Adjustment").  All payments pursuant to this Section 1.8(c)(iv) will be made within five (5) days after the determination of Closing Cash becomes final and binding.  In Purchaser's sole discretion, any payment due from the Company and Shareholder may be paid from the Escrow Amount.

1.9.   Earn-Out Payments.  Subject to Sections 1.9(b) and (c) below, within ten (10) days of Purchaser's determination of EBITDA (as defined below) for the applicable periods set forth below, Purchaser will make the payments below by wire transfer of immediately available funds (such payments, collectively, the "Earn-Out Payments").  "EBITDA" means Purchaser's earnings before interest, taxes, depreciation and amortization determined in accordance with GAAP with respect to the Business from the (x) sale of rebuilt cuttings dryers for oil and gas drilling industry, and (y) repair of decanting centrifuges at the Company's facilities in West Virginia.  Notwithstanding anything herein to the contrary, EBITDA will (i) be reduced by the operating expenses associated with respect to the Business at the Company's facilities and an allocation of Purchaser's and its Affiliates' expenses incurred with regard to the sale of such goods or services (such allocation determined in the sole discretion of Purchaser), (ii) exclude any revenues with respect to acquisitions, mergers, or other similar transactions following the Closing Date, (iii) exclude any revenues from the sale of rebuilt cuttings dryers for oil and gas drilling industry to current customers of the Purchaser and its Affiliates (excluding customers who were also current customers of the Seller as of the date of this Agreement), and (iv) exclude all revenue from extraordinary or non-recurring events.  In addition to achieving the required EBTIDA thresholds set forth below, the Earn-Out Payment will only be due for the applicable period set forth below if the Shareholder is employed by the Purchaser as of the end of the applicable period; provided, however, this employment requirement will not apply for the applicable period if the Shareholder's employment is terminated by Purchaser other than for Cause (as such term is defined in the Employment Agreement (as defined herein)), or is as a result of the Shareholder's death.  During the applicable period, Purchaser will not take any action or omit to take any action with the primary intent to cause the Company not to earn the Earn-Out Payments.

(a)     If EBITDA equals or exceeds the thresholds set forth below during the applicable period, Purchaser will pay the following amount(s) to the Company:

(i)     An additional Two Hundred Fifty Thousand and 00/100 Dollars ($250,000), if EBITDA for the 12 month period ended December 31, 2014 equals or exceeds One Million and 00/100 Dollars ($1,000,000); plus

(ii)     An additional Two Hundred Fifty Thousand and 00/100 Dollars ($250,000), if EBITDA for the 12 month period ended December 31, 2015 equals or exceeds One Million Four Hundred Thousand and 00/100 Dollars ($1,400,000).

(b)     Parent, Purchaser, Sellers, and the Shareholder each hereby covenants and agrees that the payment of the Earn-Out Payments (the "Junior Payments") will be subordinate in right of payment, to the extent and in the manner hereinafter set forth, to

the prior payment of Senior Indebtedness (as defined below) outstanding on the date hereof or hereafter incurred. For purposes of this Agreement, "Senior Indebtedness" means indebtedness of Parent, Purchaser, or any of their Affiliates: (i) for money borrowed by Parent, Purchaser, or any of their Affiliates pursuant to that certain Credit Agreement, dated as of June 24, 2011, entered into by and among Elgin Equipment Group, LLC, a Delaware limited liability company ("EEG"), the other parties named therein and designated as Credit Parties (as defined therein), General Electric Capital Corporation, a Delaware corporation, as agent for the several financial institutions from time to time party thereto, as lenders (collectively, the "Lenders"), and such Lenders (as amended from time to time, the "Senior Loan Agreement"), (ii) for money borrowed by Parent, Purchaser, or any of their Affiliates pursuant to that certain Note Purchase Agreement, dated as of June 24, 2011, by and among EEG, the other parties named therein and designated as Credit Parties (as defined therein), and certain investors from time to time party thereto (as amended from time to time, the "Subordinated Note Purchase Agreement" and together, with the Senior Loan Agreement, the "Credit Agreements"), (iii) for money borrowed by Parent, Purchaser, or any of their Affiliates from banks, finance companies, trust companies, pension trusts, insurance companies, or other financial institutions in the business of commercial finance, (iv) in connection with the issuance of tax exempt notes or debentures, and/or (v) in connection with the acquisition of capital equipment.

Sellers and the Shareholder each hereby covenants and agree (i) that the Junior Payments are and will remain unsecured, (ii) that holders of Senior Indebtedness are third party beneficiaries of the provisions in this Section and may enforce them against holders of the Junior Payments directly, (iii) that any amendments to this Section will not be effective to decrease the rights of any holder of Senior Indebtedness without such holder's prior written consent, and (iv) to do or cause to be done any and all further acts and things and to execute and deliver any and all further documents and instruments as Parent, Purchaser, or any of their Affiliates or holders of the Senior Indebtedness deem necessary or appropriate to carry out the full intent and purpose of this Section 1.9(b). The Junior Payments will not be made unless after giving effect thereto (i) Availability (as defined in the Senior Loan Agreement) is greater than or equal to $5,000,000 (as determined by the most recently then delivered Availability Certificate required under the Senior Loan Agreement), (ii) no Default (as defined in either of the Credit Agreements) or Event of Default (as defined in either of the Credit Agreements) will then exist or would exist after giving effect thereto, (iii) the Credit Parties (as defined in the Senior Loan Agreement) are then in compliance with the covenants set forth in Article VI of the Senior Loan Agreement, recomputed for the most recent Fiscal Quarter (as defined in the Senior Loan Agreement) for which financial statements have been delivered and, for the purposes of this condition, including the amount of such proposed cash payment as a Fixed Charge (as defined in the Senior Credit Agreement) in the pro forma calculation of the Fixed Charge Coverage Ratio (as defined in the Senior Credit Agreement), and (iv) the Credit Parties (as defined in the Subordinated Note Purchase Agreement) are then in compliance with the covenants set forth in Article VI of the Subordinated Note Purchase Agreement, recomputed for the most recent Fiscal Quarter (as defined in the Subordinated Note Purchase Agreement) for which financial statements have been delivered and, for the purposes of this condition, including the amount of such proposed

- 8 -

cash payment as a Fixed Charge (as defined in the Subordinated Note Purchase Agreement) in the pro forma calculation of the Fixed Charge Coverage Ratio (as defined in the Subordinated Note Purchase Agreement); provided, however, if the payment of the Junior Payments is delayed by this Section, Purchaser will promptly make any partial or full payment of the Junior Payments to the extent such payments do not violate any condition set forth in this Section. The failure to make the Junior Payments by reason of the operation of this Section will be construed as preventing the occurrence of any breach or default with respect to the Junior Payments. Until the Senior Indebtedness is paid in full, no enforcement action of any kind may be taken with respect to the Junior Payments unless it is expressly permitted to be paid hereunder.

1.10.  <u>Purchase Price Allocation</u>.  The Purchase Price will be allocated among the Assets (other than the Contributed Assets) as set forth on <u>Schedule 1.10</u>. The parties agree that any Tax Returns will be prepared and filed consistently with the agreed upon allocation.

## ARTICLE II
## Closing Conditions

2.1.  <u>Conditions to Purchaser's and Parent's Obligations</u>.  The obligation of Purchaser and Parent to consummate the transactions contemplated by this Agreement on the Closing Date is subject to the satisfaction, prior to or on the Closing Date, of each of the following conditions:

(a)  <u>Representations and Warranties</u>.  The representations and warranties made by Sellers and the Shareholder will be accurate and correct.

(b)  <u>Consents and Other Items</u>.  Sellers will have obtained and delivered to Purchaser (i) any and all written consents and authority necessary or appropriate to permit Purchaser and Parent to purchase the Assets and to consummate the other transactions contemplated hereby, (ii) evidence reasonably satisfactory to Purchaser and Parent that all necessary and appropriate notices have been given to third parties, and (iii) estoppel certificates, non-disturbance agreements and consents from third parties to leases, Contracts and agreements of Sellers necessary or appropriate to permit Purchaser to purchase the Assets, operate the leased Assets undisturbed and to consummate the other transactions contemplated hereby, in each case in form and substance reasonably satisfactory to Purchaser and Parent.

(c)  <u>Material Adverse Effect</u>.  Prior to the Closing Date, there will have been no Material Adverse Effect with respect to Sellers, the Assets or the Business.

(d)  <u>Release of Liens</u>.  Sellers will have obtained releases of all Liens on the Assets, including, but not limited to, those set forth on <u>Schedule 3.7</u> (other than with respect to Assumed Indebtedness). Sellers will deliver such pay off letters, discharges of Liens, releases of guarantees and other releases as are reasonably requested by Purchaser and Parent.

(e)  <u>Title to Owned Real Property</u>.  Title to the Owned Real Property will have been found acceptable by Purchaser.

(f)     Closing Documents.  At the Closing, Sellers will deliver, or cause to be delivered, to Purchaser and Parent all of the following documents:

(i)     a certificate from the Secretary of each of Sellers certifying as to correct and complete copies of (A) such Seller's Organizational Documents, (B) incumbency and signatures of officers of such Seller, and (C) resolutions of the sole shareholder and Board of Directors of such Seller authorizing the execution and delivery of this Agreement and the other documents to which such Seller will be a party and the taking of any and all actions reasonably necessary to consummate the transactions contemplated herein and therein;

(ii)     certificates issued by the West Virginia Secretary of State, as of a date reasonably acceptable to Purchaser and Parent, as to the good standing of each Seller, in such state and certificates issued by the Secretary of State for each Seller in each jurisdiction referred to on Schedule 3.1;

(iii)     the Escrow Agreement, executed by the Company;

(iv)     a bill of sale for the Assets (other than the Contributed Assets) (the "Bill of Sale"), executed by the Company;

(v)     a bill of sale for the Contributed Assets, executed by the Company (the "CA Bill of Sale");

(vi)     an assignment of all of the Purchased Contracts and the Real Property Lease (the "Assignment Agreement"), executed by the Company;

(vii)     an assignment of all of the Intellectual Property rights (the "IP Assignment"), executed by the Company;

(viii)     warranty deeds executed by each Seller conveying the Owned Real Property to Purchaser, free and clear of all Liens and encumbrances other than with respect to the Assumed Indebtedness;

(ix)     a termination of the existing lease relating to the Owned Real Property owned by Eagle One, executed by the Company and Eagle One;

(x)     an affidavit by Sellers and the Shareholder indicating that on the Closing Date there are no outstanding, unsatisfied judgments, tax liens or bankruptcies against or involving Sellers or the Owned Real Property; that there has been no skill, labor or material furnished to the Owned Real Property for which payment has not been made or for which mechanics' liens could be filed; and that there are no other unrecorded interests in the Owned Real Property, together with whatever standard owner's affidavit and/or indemnity that may be required by the Title Company to issue an owner's policy of title insurance with the standard exceptions waived;

(xi)    non-foreign affidavits, properly executed and in recordable form, containing such information as is required by IRC Section 1445(b)(2) and its regulations executed by each Seller;

(xii)    a survey of the Owned Real Property in form acceptable to Purchaser;

(xiii)    an employment agreement between the Shareholder and the Purchaser (the "Employment Agreement"), executed by the Shareholder; and

(xiv)    such other documents relating to the transactions contemplated by this Agreement as Purchaser or Parent may reasonably request.

(g)    Name Change.  The Company will adopt, as of the Closing Date, a new corporate name wholly dissimilar to its current name and any variations or derivations thereof, and will promptly following the Closing file the amendment to its Organizational Documents to reflect such name change.

(h)    Joinder Agreement and Subscription Agreement.   The Company will execute and deliver a joinder agreement to the Amended and Restated Limited Liability Company Agreement of Parent, dated as of September 22, 2011, as may be amended from time to time (the "Joinder Agreement") and a subscription agreement (the "Subscription Agreement"), both of which will be acceptable to Parent, pursuant to which the Company will acquire two hundred fifty Parent Units in exchange for $250,000 (which is based on a price per Class A Unit of $1,000 (the "Per Unit Price").

2.2.    Conditions to Sellers' Obligations.  The obligation of Sellers to consummate the transactions contemplated by this Agreement on the Closing Date is subject to the satisfaction, prior to or on the Closing Date, of each of the following conditions:

(a)    Representations and Warranties.  The representations and warranties made by Purchaser and Parent will be accurate and correct.

(b)    Closing Documents.  At the Closing, Purchaser and Parent will have delivered to Sellers all of the following documents:

(i)    good standing or similar certificates of Purchaser from the State of Illinois and Parent from the State of Delaware;

(ii)    certified copies of the resolutions duly adopted by Purchaser's board of directors and Parent's board of managers authorizing the execution, delivery and performance of this Agreement, all other agreements or instruments contemplated hereby and the consummation of the transactions contemplated hereby;

(iii)    the Escrow Agreement, executed by Purchaser;

(iv)    the Assignment Agreement, executed by Purchaser;

- 11 -

(v)     the IP Assignment, executed by Purchaser;

(vi)    the Employment Agreement, executed by Purchaser;

(vii)   the Subscription Agreement, executed by Parent; and

(viii)  such other documents relating to the transactions contemplated by this Agreement as Sellers may reasonably request.

### ARTICLE III
### Representations and Warranties of Sellers and Shareholder

As a material inducement to Purchaser and Parent to enter into this Agreement and consummate the transactions contemplated hereby, Sellers and the Shareholder, jointly and severally, hereby represent and warrant to Purchaser and Parent as follows:

3.1.   <u>Organization and Qualification; Capitalization</u>.

(a)     The Company is a duly organized, validly existing corporation in good standing under the laws of the State of West Virginia. The Company has all the requisite power, authority and capacity to own, lease and operate its assets and to carry on the Business as the same was and is now being conducted. The Company is qualified as a foreign corporation and is in good standing in all jurisdictions where the conduct of the Business or the ownership of its assets requires such qualification, and <u>Schedule 3.1</u> sets forth all such jurisdictions. The Company has delivered to Purchaser complete and correct copies of its Organizational Documents now in effect, and the Company is not in default under or in violation of any provision of its Organizational Documents. The minute books containing the records of meetings of the directors and shareholders and the stock ledger of the Company that have previously been furnished to Purchaser are correct and complete. The Company has no subsidiaries. The Company does not own directly or indirectly any equity ownership interest in any other Person. The Shareholder owns all of the outstanding equity interests of the Company.

(b)     Eagle One is a duly organized, validly existing corporation in good standing under the laws of the State of West Virginia. Eagle One has delivered to Purchaser complete and correct copies of its Organizational Documents now in effect, and Eagle One is not in default under or in violation of any provision of its Organizational Documents. The Shareholder owns all of the outstanding equity interests of Eagle One.

3.2.   <u>Power and Authority; Enforceability</u>. Each of Sellers and the Shareholder has all power and authority to enter into and consummate the transactions contemplated by this Agreement and any ancillary agreements (collectively, the "<u>Transaction Documents</u>") to which it is a party. The execution and delivery of the Transaction Documents by Sellers and the Shareholder and the consummation of the transactions contemplated by the Transaction Documents to which are a party have been duly authorized by all necessary corporate and owner action on the part of Sellers and the Shareholder. This Transaction Documents have been duly executed and delivered by Sellers and the Shareholder and such Transaction Documents

constitute the legal, valid and binding obligations of each of Sellers and the Shareholder, respectively, enforceable against each of Sellers and the Shareholder in accordance with their respective terms, except to the extent that (a) their enforceability may be limited by applicable bankruptcy, insolvency, reorganization or other laws affecting the enforcement of creditor's rights generally, and (b) the availability of equitable remedies is subject to the discretion of the court before which any such proceeding may be brought.

3.3.   No Conflict.   Neither the execution and delivery of the Transaction Documents nor the performance of the provisions hereof or the transactions contemplated hereby (a) violate or conflict with Sellers' Organizational Documents; (b) violate or conflict with any Law, rule, regulation, writ, judgment, injunction, decree, determination, award or other order of any court, government or governmental agency or instrumentality, domestic or foreign, that is applicable to Sellers; or (c) will result in a breach of any of the terms or conditions of, or constitute a default under, any mortgage, note, bond, indenture, agreement, license or other instrument or obligation to which Sellers or the Shareholder is a party or by which any of their respective properties or assets may be bound or affected.   With respect to Sellers and the Shareholder, no consent, approval, order or authorization of or from, or registration, notification, declaration or filing with any individual or entity, including without limitation, any Government Entity, is required in connection with the execution, delivery or performance of this Agreement by Sellers and the Shareholder or the consummation by Sellers and the Shareholder of the transactions contemplated herein.   Except as set forth in Schedule 3.3, neither the Shareholder nor a Seller is or will be required to give any notice to or obtain any consent from any Person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the transactions contemplated herein.

3.4.   Financial Statements.

(a)     Attached hereto as part of Schedule 3.4(a) are (a) the unaudited balance sheet for the years ended December 31, 2011 and December 31, 2012 and income statement and statement of cash flows for the years ended as of December 31, 2011 and December 31, 2012, and (b) the unaudited balance sheet of the Company as of September 30, 2013 (the "Most Recent Balance Sheet") and income statement and statement of cash flows for the nine-month period then ended.   All of the foregoing financial statements, which have been reviewed by the Company's accountant, are collectively referred to as the "Financial Statements."

(b)     The Financial Statements do not have the disclosures required by GAAP. The Financial Statements fairly present the financial condition of the Company and the accounting practices have been consistently applied for all periods represented by the Financial Statements.   The Company's books and records are complete and correct and accurately reflect all of the assets, liabilities, transactions and results of operations of the Company and the Company has provided the Purchaser with true, correct and complete information with respect to the Company's accounts receivables and trade payables.

(c)     The Company has no Liabilities, Indebtedness, or obligations except (i) those disclosed or reserved against on the Financial Statements, (ii) those incurred after the date of the Most Recent Balance Sheet in the Ordinary Course of Business, (iii) those which would constitute Permitted Liens, or (iv) those set forth on Schedule 3.4(c).

(d)     Except as set forth on <u>Schedule 3.4(d)</u>, since August 1, 2013, the Shareholder has not received any distributions from the Company.

3.5.     <u>Accounts Receivable; Inventories</u>.  All Accounts Receivable reflected on the Most Recent Balance Sheet are valid receivables, collectible, and represent arm's length transactions in the Ordinary Course of Business.  The reserve for doubtful accounts with respect to such Accounts Receivable has been determined in accordance with historical patterns and practice of the Business.  There is no contest, claim, defense or right of setoff with any account debtor of the Company relating to the amount or validity of such Accounts Receivable.  Each of the Accounts Receivable either has been or will be collected in full, without any setoff, within 90 days after the day on which it first becomes due and payable.  The Inventory of the Company is held for resale and is reflected on the Most Recent Balance Sheet and consists of items that are of a quality and quantity usable and saleable (without discount or price reduction) and are of the type, nature and quantity that the Company has sold or utilized within the one-year period prior to the date of this Agreement.  The method of valuing such Inventories on the Financial Statements, and the reserves with respect thereto, are consistent with past practice.  The values of Inventory known to the Company to be obsolete or be below standard quality have been written down on the Company's books.  Since January 1, 2013, the Company has maintained its Inventory levels in the Ordinary Course of Business.  All of the Inventory is located at the Company's principal place of business.

3.6.     <u>Absence of Certain Developments</u>.  Except as set forth on <u>Schedule 3.6</u>, (other than actions and conduct relating to the transactions contemplated by this Agreement) since January 1, 2013, the Company has conducted business only in the Ordinary Course of Business and has not:

(a)     discharged or satisfied any Liens or paid any material obligation or Liability, other than current Liabilities paid in the Ordinary Course of Business, or cancelled, compromised, waived or released any right or claim;

(b)     sold, assigned, licensed or transferred any of its assets, except for sales in the Ordinary Course of Business, or mortgaged, pledged or subjected its assets to any Lien;

(c)     sold, assigned, transferred, abandoned or permitted to lapse any licenses or permits;

(d)     suffered any extraordinary loss, damage, destruction or casualty loss or waived any rights of value, whether or not covered by insurance and whether or not in the Ordinary Course of Business;

(e)     borrowed any amount or incurred or become subject to any Liabilities, except current Liabilities incurred in the Ordinary Course of Business and Liabilities under Contracts entered into in the Ordinary Course of Business;

(f)     commenced any litigation or binding dispute resolution process or settled or compromised any pending or threatened suit, action or claim;

(g)    entered into any other material transaction, other than in the Ordinary Course of Business; or

(h)    changed its policies or practices with regard to cash management, collection of receivables, payment of payables, maintenance of inventory, pricing and credit.

3.7.    <u>Title to Assets; Sufficiency</u>.  The Company owns (subject only to the matters permitted by the following sentence) all of the assets located in the facilities owned or operated by the Company or reflected as owned in the books and records of the Company, including all of the assets reflected in the Most Recent Balance Sheet (except for assets held under capital leases disclosed in this <u>Section 3.7</u> and personal property sold since the date of the Most Recent Balance Sheet, as the case may be, in the Ordinary Course of Business), and all of the assets purchased or otherwise acquired by the Company since the date of the Most Recent Balance Sheet (except for personal property acquired and sold since the date of the Most Recent Balance Sheet in the Ordinary Course of Business and consistent with past practice), which subsequently purchased or acquired assets with a book value in excess of $25,000 (other than inventory and short-term investments) are listed on <u>Schedule 3.7</u>.  All assets reflected in the Most Recent Balance Sheet are free and clear of all Liens other than Permitted Liens listed on <u>Schedule 3.7</u>. Eagle One owns no assets other than the Land, Buildings and Fixtures identified as being owned by it on <u>Schedule 1.1(k)</u> and has never engaged in any business activities other than the lease of such Land, Buildings and Fixtures to the Company.  The Assets constitute all of those assets necessary to conduct the Business as presently conducted.  The Assets are sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted by the Company prior to the Closing Date.

3.8.    <u>Tax Matters</u>.  Except as set forth on <u>Schedule 3.8</u>:

(a)    The Company has timely filed all Tax Returns that it was required to file. All such Tax Returns were correct and complete in all material respects and were prepared in compliance with all applicable Laws.  All Taxes owed by the Company (whether or not shown or required to be shown on any Tax Return) have been paid.  The Company is not currently the beneficiary of any extension of time within which to file any Tax Return.  No claim has ever been made by an authority in a jurisdiction where the Company does not file Tax Returns that the Company is or may be subject to taxation by that jurisdiction.  There are no Liens on any of the assets of the Company that arose in connection with any failure (or alleged failure) to pay any Tax.  The Company has not waived any statute of limitations in respect of Taxes nor has agreed to nor is subject to any extension of time with respect to a Tax assessment or deficiency.

(b)    There is no dispute or claim concerning any Tax Liability of the Company either (i) claimed or raised by any Government Entity or (ii) as to which the Company has Knowledge.  The Company has delivered to Purchaser correct and complete copies of all income Tax Returns, examination reports, and statements of deficiencies assessed against or agreed to by the Company since December 31, 2010.

(c)     The Company is not a party to any Tax allocation or sharing agreement. The Company has no Liability for the Taxes of any Person, as a transferee or successor, by Contract, or otherwise.

3.9.     Purchased Contracts.

(a)     Schedule 3.9 contains a complete and accurate list of all Material Contracts.

(b)     The Company has performed, in all material respects, all obligations required to be performed by it to date under the Material Contracts, and there are no defaults, to the Knowledge of the Company, by any other party thereto, and no event has occurred (or failed to occur) that, with the passing of time or the giving of notice or both would constitute a default by the Company under any such Material Contract, including the consummation of the transactions contemplated by this Agreement.

(c)     Except as set forth in Schedule 3.9, no consent, permission, waiver or approval is required to be obtained from, and no penalty, assessment or special payment is required to be paid to, and no notice is required to be sent to, any third party or Government Entity in order to preserve for Purchaser the benefits of the Purchased Contracts after the consummation of the transactions contemplated by this Agreement. Except as set forth in Schedule 3.9 and with respect to the specific dollar amount set forth therein, the Company is not obligated to accept any returns from a customer and none of the Purchased Contracts are on a consignment or similar basis.

(d)     Each Material Contract is in full force and effect and constitutes a legal, valid, binding agreement, except that the enforceability thereof may be subject to or limited by bankruptcy, insolvency, reorganization, arrangement, moratorium, or other similar Laws relating to or affecting rights of creditors and general equitable principles.

(e)     Purchaser has been supplied with a true and correct copy of all written Contracts required to be disclosed on the attached Schedule 3.9 or copies of the applicable form Contracts also disclosed on the attached Schedule 3.9 to the extent customers have executed a form Contract, together with all amendments, waivers or other changes thereto and true and correct written summaries of all oral Contracts or agreements.

3.10.     Intellectual Property Rights.     Set forth on Schedule 3.10 is a list and brief description of patents, patent rights, patent applications, trademarks, trademark applications and registrations, proprietary rights, service marks, service mark applications, trade names, domain names, websites and copyrights owned by or registered in the name of the Company, or of which the Company is a licensor or licensee or in which the Company has any right, and in each case a brief description of the nature of such right.   The Company is not subject to any obligation, including any license or royalty obligation, relating to any product or service that the Company now markets or has marketed in the three past years.   Except as set forth on Schedule 3.10, the Company owns all rights in, or possesses adequate licenses or other rights to use, all patents, patent applications, trademarks, trademark applications and registrations, service marks, service mark applications and registrations, proprietary rights, trade names, social media accounts,

- 16 -

domain names, websites, copyrights, manufacturing processes, formulae, technology, trade secrets and know how necessary to conduct the Business as conducted prior to Closing (collectively, "Intellectual Property"). The Intellectual Property does not infringe or conflict upon the right of any third party. The Shareholder does not own or have any interest in the Intellectual Property used by the Company. All employees and independent contractors (including consultants) that have participated in the development or creation of Intellectual Property have executed appropriate assignment agreements, pursuant to which each such employee or independent contractor has assigned to the Company all of its rights, in and to all Intellectual Property, ideas, inventions, processes, works of authorship and other work products that relate to the Business, and that were conceived, created, authored or developed, in whole or in part, by such employee or independent contractor. No past or present employee or independent contractor of the Company has any ownership interest, license, permission or other right in or to any such Intellectual Property.

3.11.   Litigation.   Except as set forth on Schedule 3.11, there are no actions, suits, proceedings (including any arbitration proceedings), orders, investigations or claims pending or, to the Knowledge of the Company, threatened against Sellers at law or in equity, or before or by any Government Entity.   Schedule 3.11 lists all suits, proceedings (including any arbitration proceedings), orders, investigations or claims against Sellers at law or in equity that have occurred since January 1, 2010.

3.12.   Brokerage and Finder's Fees.   Sellers and the Shareholder have not incurred and will not incur any brokerage, finder's or similar fee in connection with the transactions contemplated by this Agreement.

3.13.   Insurance.   Each Seller is currently insured by insurers unaffiliated with the Seller with respect to its properties, assets and operation of the Business and Owned Real Property in such amounts and against such risks that are appropriate and customary for the type of business conducted by such Seller with customary deductibles and retained amounts and which insurance policies are set forth in Schedule 3.13.   In addition, each Seller has maintained comparable insurance for all prior periods with respect to the Business and Owned Real Property. With respect to each insurance policy held by the Company (a) the policy is legal, valid, binding and in full force and effect; and (b) the Company is not in default under the respective policy. Except as listed in Schedule 3.13, there are no claims by the Company pending under any such policies and the Company has not been informed that coverage has been questioned, denied or disputed by the underwriters of such policies with respect to any such claims.

3.14.   Compliance with Laws; Permits.   Except as set forth on Schedule 3.14:

(a)      Each Seller is in material compliance with all applicable Laws.

(b)      Each Seller holds all permits, approvals, registrations, franchises, licenses, certificates, accreditations and other authorizations of all Government Entities (the "Permits") required for the conduct of the Business and the Owned Real Property and all such Permits are set forth on Schedule 3.14.   Each Seller has complied with and is in compliance with the terms and conditions of such Permits. Each Seller has not received any notices that it is in violation of any of the terms or conditions of such Permits. Each Seller has taken all reasonable action to maintain such Permits. No loss or expiration of

any such Permit is pending to which a Seller has received notice or, to the Company's Knowledge, threatened other than expiration in accordance with the terms thereof. Except as set forth on Schedule 3.14, the Permits owned or used by such Seller immediately prior to the Closing will be available for use by Purchaser on the same terms and conditions immediately subsequent to the Closing.

3.15.   Related Party Transactions.  Except as set forth on Schedule 3.15, the Company is not currently a party to any Related Party Transaction and has not been a party to any Related Party Transaction since January 1, 2011.

3.16.   Customers and Suppliers.  Schedule 3.16 sets forth a list of the top 10 customers with respect to the Business and the top 10 suppliers of the Company with respect to the Business by dollar volume of sales and purchases with respect to the Business for the years ended December 31, 2011 and December 31, 2012 and for the ten-month period ended October 31, 2013.  Except as set forth on Schedule 3.16, since December 31, 2012, the Company has not received any notice from any customer or supplier listed on Schedule 3.16 to the effect that any such customer or supplier will stop, materially decrease the rate of, or materially change the terms (whether related to payment, price or otherwise) with respect to, purchasing or selling products or services from or to the Company (whether as a result of the consummation of the transactions contemplated hereby or otherwise).  The Company has not received notice and has no Knowledge that any customer or customers which, individually or in the aggregate, account for more than two percent (2%) of the Company's revenue has plans or has threatened to stop or materially decrease the rate of business done with the Company.  The Company has not received notice and the Company has no Knowledge that any supplier or suppliers which, individually or in the aggregate, account for more than two percent (2%) of the dollar amount of payments made by the Company has plans or has threatened to stop or materially decrease the rate of business done with the Company.

3.17.   Warranties; Products.  Schedule 3.17 sets forth a description of all product or service warranties and guarantees given by the Company to any customer in connection with the Business.  Each of the products in the Business developed, sold or distributed by the Company (the "Products") meets, and at all times has met, all standards for quality and workmanship prescribed by Law, industry standards, contractual agreements or the product literature of the Company and have been labeled in accordance with all Laws.  Except as described on Schedule 3.17, (a) no claims have been made under the product or service warranties or guarantees of the Company, and (b) there have not been any mandatory or voluntary product recalls or withdrawals with respect to any Products.  The Company has no Liability arising out of any injury to any Person or property as a result of the ownership, possession, or use of any products sold, leased, distributed or delivered by the Company.

3.18.   Compensation of and Contracts with Employees; Accrued Liabilities. Schedule 3.18 sets forth a correct and complete list of all employees, consultants or contractors of the Business as of the date hereof, and sets forth for each such individual the following: (a) name, (b) title or position (including whether full or part-time), (c) hire date, (d) current annual base compensation rate, (e) commission, bonus or other incentive-based compensation, and (f) the rate and amount of such compensation paid to each such employee through October 31, 2013.  Except as set forth on Schedule 3.18, there have been no changes in such compensation since December 31, 2012, in each case including bonuses and other compensation and fringe

benefits. Except as listed on <u>Schedule 3.18</u>, the Company has no employment agreement, written or oral, with any currently active employee, including any agreement to provide any bonus or benefit to any such employee. Except as set forth on <u>Schedule 3.18</u>, since December 31, 2012, the Company has not made any pension, bonus or other payment, other than base salary, or become obligated to make any such payment, to any employee other than in the Ordinary Course of Business. Except as set forth on <u>Schedule 3.18</u>, the Company has no outstanding loans or advances to employees. <u>Schedule 3.18</u> lists any employee handbook and/or personnel manuals that in any way affect such employees, correct and complete copies of which have been given to Purchaser. Any individual performing services for the Company who has been classified as an independent contractor, as an employee of some other entity whose services are leased to the Company, or as any other nonemployee category, has been correctly so classified and is in fact not a common law employee of the Company. Except as set forth on <u>Schedule 3.18</u>, no employees are out on a leave of absence (whether related to disability, under the Family and Medical Leave Act, or otherwise).

    3.19.  <u>Labor Relations; Benefit Plans</u>. Except as set forth on <u>Schedule 3.19</u>:

    (a)  The Company is not a party to any collective bargaining agreement covering any employee, and no union or association of employees has been certified or recognized as the collective bargaining representative of any employees or has attempted to engage in negotiations regarding terms and conditions of employment of such employees. No unfair labor practice charge, work stoppage, picketing, or other such activity relating to labor matters of the Company will be pending as of the Closing Date. To the Company's Knowledge, there are no current or threatened attempts to organize or establish any labor union or employee association to represent any employees.

    (b)  The Company is in material compliance with all requirements of all applicable Laws governing employment and employee relations, including laws relating to employment discrimination, civil rights, equal pay, wages, hours, collective bargaining and labor relations, occupational safety and health, workers' compensation, immigration, or the withholding and payment of income, social security (FICA) or similar taxes, and any similar laws of any foreign jurisdiction. No suits, charges or administrative proceedings relating to any such law or regulation will be pending as of the Closing Date. To the Company's Knowledge, no suit, charge or administrative investigation alleging a violation of any such applicable Law has been threatened. Purchaser and Parent will have no Liability to any employee (or to any Government Entity with respect to any such employee) under any such Law or regulation relating to claims arising out of or related to any event occurring on or before the Closing Date.

    (c)  As of the Closing Date, the Company has not engaged in any plant closing, mass layoff or other action related to any employee that has resulted or could result in Liability under the Worker Adjustment and Retraining Notification Act of 1988, or under any comparable Law or regulation of a state or a foreign jurisdiction, and has not issued any notice that any such action is to occur in the future.

    (d)  The Company is in material compliance with all applicable requirements of the Immigration Reform and Control Act, and has in its files properly completed copies of Form I-9 for all employees with respect to whom that form is required.

(e)     The Company has no workers' compensation Liabilities with respect to employees that are not covered by insurance or accrued for in the Most Recent Balance Sheet.

(f)     Set forth on Schedule 3.19 is a complete list of all pension, profit sharing, retirement, stock purchase, stock option, bonus, incentive compensation and deferred compensation plans, life, health, dental, accident or disability, workers' compensation or other employee welfare benefit plans (insured or self insured), educational assistance, pre tax premium or flexible spending account plans, supplemental or executive benefit plans, non-qualified retirement plans, severance or separation plans, and any other employee benefit plans, practices, policies or arrangements of any kind, whether written or oral, which are currently maintained by the Company for the benefit of any of its employees (including former employees), or under which the Company has any current or potential Liability with respect to any employee or former employee or the dependents of any such person, including any "employee benefit plan" which is subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA") (herein collectively referred to as "Employee Benefit Plans" and individually as an "Employee Benefit Plan").  All Employee Benefit Plans materially comply in form and in operation in all respects with their terms, the applicable requirements of ERISA, the Code and all applicable Laws.  Purchaser will not have any Liability (whether actual, potential or contingent) on or after the Closing Date with respect to any Employee Benefit Plan.

(g)     With respect to each Employee Benefit Plan, the Company has delivered to Purchaser accurate, current and complete copies of each of the following: (i) where the Employee Benefit Plan has been reduced to writing, the plan document together with all amendments; (ii) where the Employee Benefit Plan has not been reduced to writing, a written summary of all material plan terms; (iii) where applicable, copies of any trust agreements, custodial agreements, insurance policies, administration agreements and similar agreements, and investment management or investment advisory agreements; (iv) copies of any summary plan descriptions, employee handbooks or similar employee communications relating to any Employee Benefit Plan; (v) in the case of any Employee Benefit Plan that is intended to be qualified under Section 401(a) of the Code, a copy of the most recent determination letter from the Internal Revenue Service; (vi) in the case of any Employee Benefit Plan for which Forms 5500 are required to be filed, a copy of the most recently filed Forms 5500, with schedules attached; and (vii) copies of notices, letters or other correspondence from the Internal Revenue Service, Department of Labor or Pension Benefit Guaranty Corporation relating to the Benefit Plan.

3.20.   Real Property.

(a)     Except as set forth on Schedule 3.20(a), the Sellers own marketable fee simple title to the Owned Real Property free and clear of all Liens.

(b)     The Real Property Lease is in full force and effect.  There are currently no defaults under the Real Property Lease and no event has occurred and no condition exists, which, with the giving of notice or the passage of time, or both, will constitute a default under the Real Property Lease.

(c)     The Real Property constitutes all of the real property used by the Company in connection with the operation of the Business.

(d)     No Seller has received notice that there are any pending or, to the Knowledge of the Company, threatened, condemnation or other proceedings relating to the Real Property or other matters adversely affecting the use or occupancy of the Real Property.

(e)     The Company has received all requisite approvals of Government Entities (including Permits) required to be obtained by Company in connection with the Company's occupancy of the Real Property and operation of the Business, and no Seller has received notice that the Real Property has not been operated and maintained in accordance with applicable Laws.

(f)     Except as set forth on <u>Schedule 3.20(f)</u>, Sellers have not entered into any leases, subleases, licenses, concessions, or other agreements, written or oral, granting to any party the right of use or occupancy of any portion of the Real Property, with the exception of the lease of the Real Property from Eagle One to the Company.

(g)     Except as set forth on <u>Schedule 3.20(g)</u>, there are no Contracts affecting the Real Property that will survive Closing other than the Assumed Indebtedness.

(h)     No Seller has received notice of actual or threatened reduction or curtailment of any utility service now supplied to the Real Property.

(i)     The Real Property has legal and practical access to a public right of way.

(j)     The Buildings are in good operating condition, including but not limited to the roof, foundation and Buildings' systems.

(k)     No Seller is in default concerning any of its obligations or liabilities regarding the Real Property.

(l)     Neither Seller is a "foreign person", "foreign partnership", "foreign trust" or "foreign estate" as those terms are defined in Section 1445 of the Internal Revenue Code.

(m)     The Real Property is usable for its current uses without violating any federal, state, local or other governmental building, zoning, health, safety, platting, subdivision or other law, ordinance or regulation, or any applicable private restriction, and such use is a legal conforming use.

(n)     There are no wells or private sewage treatment systems in, on, or about the Real Property.

3.21.   <u>Indebtedness and Guarantees</u>.   <u>Schedule 3.21</u> lists all Indebtedness of Sellers (including the outstanding balance as of the Closing Date) and all obligations of others guaranteed by a Seller, which includes amounts for assets under capital leases (as determined in

accordance with GAAP whether or not properly reported on such Seller's financial statements). No Seller is in default of its obligations under its Indebtedness.

3.22.    Environmental Matters.  Except as disclosed on Schedule 3.22:  (a) Sellers are and have been in material compliance with all Environmental Laws; (b) Sellers have not received, in the past five (5) years, any notice from a Government Entity alleging that Sellers are not in compliance with applicable Environmental Laws; (c) Sellers have obtained and are in material compliance with all Permits that are required pursuant to Environmental Laws for the occupation of their Real Property and the operation of the Business, and Sellers are in material compliance with all such Permits, which Permits are listed on Schedule 3.22; (d) Sellers have not received any order, notice, or other communication regarding any actual or alleged violations of or any liabilities or potential liabilities (whether accrued, absolute, contingent, unliquidated or otherwise) or corrective, investigatory or remedial obligations arising under Environmental Laws; (e) there are no pending or, to the Knowledge of the Company, threatened, claims, Liens, or other restrictions of any nature, resulting from any violation or failure to comply with any applicable Environmental Law; (f) there has been no release of any Hazardous Substances on, under, to or from any real property owned, operated or leased by Sellers so as to give rise to any current or future liability (including any liability for response costs, corrective action costs, or attorneys' fees or any investigative, corrective, or remedial obligations) under any Environmental Law; (g) Sellers' operations have not caused to occur or exist any Hazardous Substances present on or in the Real Property, including any Hazardous Substances contained in barrels, above or underground storage tanks, landfills, land deposits, dumps, equipment (whether moveable or fixed) or other containers, either temporary or permanent, and deposited or located in land, water, sumps, or any other part of the Real Property in material violation of any applicable Environmental Laws; (h) the Company has not sent or disposed of Hazardous Substances to or at a site which, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.), or any similar state law, has been listed or proposed for listing on the "National Priorities List" or its state equivalent; (i) Sellers have delivered to Purchaser true and complete copies of all environmental studies, audits and investigations with respect to the Real Property and the operation of the Business; and (j) Sellers have not installed nor has there existed at the Real Property,  (i) any underground storage tanks, including without limitation those regulated pursuant to 40 C.F.R. Part 280 or delegated state programs, (ii) dikes or impoundments containing Hazardous Substances, (iii) any asbestos containing building materials or (iv) any polychlorinated biphenyls.

3.23.    Disclosure.   No representation or warranty by Sellers or the Shareholder contained in this Agreement, and no statement contained in the Schedules or any other document, certificate or other instrument delivered to or to be delivered by or on behalf of the Company pursuant to this Agreement, contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary, in light of the circumstances under which it was or will be made, in order to make the statements herein or therein not misleading.

## ARTICLE IV
## Representations and Warranties of Purchaser and Parent

As a material inducement to the Company to enter into this Agreement and consummate the transactions contemplated hereby, Purchaser and Parent, jointly and severally, hereby represent and warrant to Sellers as follows:

4.1.   <u>Organization</u>.  Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of Illinois.  Parent is a limited liability company duly organized, validly existing and in good standing under the Laws of Delaware.  Purchaser and Parent each possess all requisite power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted.

4.2.   <u>Power and Authority; Enforceability</u>.  Purchaser and Parent each have all requisite power and authority to enter into and consummate the transactions contemplated by the Transaction Documents to which they are a party.  The execution and delivery by each of Purchaser and Parent of the Transaction Documents to which they are a party and the consummation of the transactions contemplated thereby have been duly authorized by all necessary action on the part of Purchaser and Parent.  This Agreement and each of the other Transaction Documents to which they are a party has been duly executed and delivered by each of Purchaser and Parent and this Agreement and such Transaction Documents constitute the legal, valid and binding obligations of Purchaser and Parent, enforceable against Purchaser and Parent in accordance with their respective terms, except to the extent that (a) their enforceability may be limited by applicable bankruptcy, insolvency, reorganization or other laws affecting the enforcement of creditor's rights generally, and (b) the availability of equitable remedies is subject to the discretion of the court before which any such proceeding may be brought.

4.3.   <u>No Conflicts</u>.  Neither the execution and delivery of this Agreement by Purchaser or Parent or of any Transaction Documents to which either is a party nor the consummation by Purchaser or Parent of the transactions contemplated by such Transaction Documents will (a) conflict with or violate any provision of the Organizational Documents of Purchaser or Parent, or (b) require any authorization, consent, approval, exemption or other action by or notice to any court, other Government Entity or other Person or entity under, the provisions of any applicable Law, judgment, order or decree, except as obtained by Purchaser or Parent in advance of the Closing.

**ARTICLE V**
**Indemnification**

5.1.   <u>Indemnification by Sellers and the Shareholder</u>.  Sellers and the Shareholder will, jointly and severally, indemnify, defend, and hold harmless Purchaser and Parent and each of their respective officers, managers, directors, employees, members, shareholders, representatives and successors and assigns from, against and with respect to any claim, Liability, obligation, loss, damage, assessment, judgment, cost, and expense (including, without limitation, reasonable attorney's and accountant's fees and costs and expenses reasonably incurred in investigating, preparing, defending against, or prosecuting any litigation or claim, action, suit, proceeding, or demand) (collectively, "<u>Damages</u>"), of any kind or character, arising out of or in any manner incident, relating or attributable to (a) any inaccuracy in any representation or warranty of any Seller or the Shareholder contained in this Agreement, (b) any failure by a Seller or the Shareholder to perform or observe, or to have performed or observed, in full, any covenant, agreement, or condition to be performed or observed by it under this Agreement, (c) the Excluded Liabilities, (d) the operation of the Business or the ownership of the Assets on or prior to the Closing Date, (e) any Taxes with respect to operation of the Business by the Company, (f) any unpaid transaction expenses of Sellers or the Shareholder, (g) any unpaid Indebtedness of Sellers (excluding the Assumed Indebtedness), or (h) the potential encroachment by the

Company onto the real property of Trojan Steel Company, as identified in the survey performed by Terradon Corporation, dated November 11, 2013.

5.2.    Limitations.

(a)    Subject to Section 5.2(b), the liability of Sellers and the Shareholder for claims pursuant to Section 5.1(a) will only continue in effect for a period of twenty four (24) months after the Closing Date.

(b)    Claims related to or arising out of inaccuracies or breach in any representation or warranty in (i) Sections 3.1 (Organization and Qualification; Capitalization), 3.2 (Power and Authority; Enforceability), 3.4(d) (Financial Statements), 3.7 (Title to Assets; Sufficiency), 3.10 (Intellectual Property Rights), 3.12 (Brokerage and Finder's Fees), 3.20 (Real Property), 3.21 (Indebtedness and Guarantees), 4.1 (Organization and Qualification; Capitalization), 4.2 (Power and Authority; Enforceability) and 4.3 (No Conflicts) will survive indefinitely and (ii) Sections 3.8 (Tax Matters), 3.19 (Labor Relations, Benefit Plans) and 3.22 (Environmental Matters) will survive for the applicable statute of limitations plus 30 days (collectively the Sections referenced in (i) and (ii) above, the "Fundamental Reps").  In addition, if notice of a violation or breach of any specified representation or warranty is given to the party charged with such violation or breach during the period provided for in Sections 5.2(a) or 5.2(b), such representation or warranty will continue to survive until such matter has been resolved by settlement, litigation (including all appeals related thereto) or otherwise. All covenants and agreements that by their terms contemplate performance after the Closing Date will survive the Closing indefinitely, unless specified otherwise by their terms.

(c)    Notwithstanding the foregoing, Sellers and the Shareholder will not be obligated to indemnify and hold Purchaser or Parent harmless for a claim pursuant to Section 5.1(a) (other than with respect to Fundamental Reps) for such Damages unless and until the aggregate amount of such Damages exceeds Fifty Thousand and 00/100 Dollars ($50,000) (the "Deductible") and then Sellers and the Shareholder will be liable to Purchaser or Parent for all such Damages in excess of the Deductible, subject to the Cap (as hereinafter defined).  The maximum aggregate liability of Sellers and the Shareholder for all claims made by Purchaser or Parent pursuant to Section 5.1(a) will not exceed (i) fifty percent (50%) of the Cash Purchase Price (except for breaches of Fundamental Reps), or (ii) one hundred percent (100%) of the Purchase Price for breaches of Fundamental Reps ((i) and (ii), collectively, the "Cap").  The Deductible and the Cap will not apply to claims based on fraud or Sections 5.1(b)-(h).

(d)    Notwithstanding anything contained in this Agreement to the contrary, no limitations on liability set forth in this Article V will apply with respect to claims based on fraud or intentional misrepresentation.

(e)    Notwithstanding anything to the contrary herein, the right of any party hereto to indemnification, payment of Damages or other remedies will not be affected in any way by any investigation conducted or knowledge (whether actual, constructive or imputed) acquired at any time by such party with respect to the accuracy or inaccuracy of

or compliance with or performance of, any representation, warranty, covenant, agreement or obligation or by the waiver of any condition.

(f)     Notwithstanding anything to the contrary herein, for the purposes of determining the existence of any breach of a representation, warranty, covenant or agreement made by Sellers or the Shareholder or for the purposes of determining Damages, each representation, warranty, covenant and agreement made by Sellers and the Shareholder will be deemed made without any qualifications or limitations as to materiality and, without limiting the foregoing, the word "material" and words of similar import will be deemed deleted from any such representation, warranty, covenant or agreement.

(g)     Purchaser and Parent will have the right to offset any indemnifiable Damages against (i) the Escrow Amount, (ii) the Earn Out Payments, (iii) the Parent Units by the cancellation of such Parent Units based on the Per Unit Price, provided, further, that such cancellation will occur immediately upon the written notice of such offset provided by Purchaser or Parent to the Company and without any additional documentation required to be executed by the Company, or (iv) any other payment due to the Company and the Shareholder, in each case on a dollar-for-dollar basis.

5.3.    Indemnification by Purchaser.    Purchaser will indemnify, defend, and hold harmless Sellers and the Shareholder from, against and with respect to any Damages, of any kind or character, arising out of or in any manner incident, relating or attributable to (a) any inaccuracy in any representation or warranty of Purchaser or Parent contained in this Agreement, (b) any failure by Purchaser or Parent to perform or observe, or to have performed or observed, in full any covenant, agreement, or condition to be performed or observed by it under this Agreement, and (c) any Assumed Liability, in each case, other than to the extent the claim otherwise relates to a Sellers' or Shareholder's breach of a representation, warranty, or covenant. Any claim for indemnification pursuant to subsection (a) above will be made on or prior to the twenty four (24) month anniversary of the Closing Date.  Notwithstanding the above, any claim for indemnification under subsection (a) above made in accordance with this Article V prior to the expiration of the applicable indemnification period will survive until such matter is resolved. All covenants and agreements which by their terms contemplate performance after the Closing Date will survive Closing indefinitely, unless specified otherwise by their terms.

5.4.    Notice and Right to Defend.    Promptly after becoming aware of a third party claim as to which indemnity may be sought pursuant to this Article V, the party seeking indemnification (the "Indemnitee") will notify the other party (the "Indemnitor") of such claim. The Indemnitee's failure or delay in providing the notice will not relieve the Indemnitor of its obligations under this Article V except to the extent that the Indemnitor is materially prejudiced as a result thereof. Unless the Indemnitor notifies the Indemnitee that the Indemnitor elects to assume the defense or the settlement of such claim (such notice to be given as promptly as reasonably possible in view of the necessity to arrange such defense and in no event later than ten days following the notice to the Indemnitor), the Indemnitee will have the exclusive right to defend, settle, or pay such claim.  The Indemnitee will not be liable to the Indemnitor for any legal or other expense incurred by the Indemnitor in connection with any such defense or settlement undertaken by the Indemnitor.  If the Indemnitor assumes the defense, the Indemnitor will not agree to any settlement, compromise or discharge of a third-party claim without the

Indemnitee's prior written consent (not to be unreasonably withheld). If the Indemnitor has assumed the defense or settlement of such claim, the Indemnitee will have the right to employ its own counsel, at its own expense. If, in good faith, the Indemnitee concludes that there are specific defenses available to it that are different from or additional to those available to the Indemnitor, that such claim may have a material adverse effect upon the Indemnitee with respect to matters beyond the scope of the indemnities under this Article V, a court of competent jurisdiction rules that the Indemnitor has failed or is failing to prosecute or defend such claim, or the claim seeks damages other than monetary damages, the Indemnitee will have the right to direct the defense of any such claim at the expense of the Indemnitor (but subject to the limitations in this Article V). The defending party in any event will (a) settle or defend such claim with reasonable diligence, (b) cooperate with the other parties in the investigation and analysis of such claim or proceeding, (c) afford the other parties reasonable access to such relevant information as it may have in its possession, and (d) keep the other parties reasonably informed regarding such claim and any related proceedings.

**ARTICLE VI**
**Covenants**

6.1. <u>General</u>. In case at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the parties will take such further action (including the execution and delivery of such further instruments and documents) as any other party reasonably may request, all at the sole cost and expense of the requesting party (unless the requesting party is entitled to indemnification under Article V). Sellers acknowledge and agree that from and after the Closing, Purchaser and Parent will be entitled to access all documents, books, records (including tax records), agreements, and financial data of any sort relating to the Assets.

6.2. <u>Confidentiality</u>. Sellers and the Shareholder will treat and hold as such all of the Confidential Information, refrain from using any of the Confidential Information except in connection with this Agreement, and deliver promptly to Purchaser or destroy, at the request and option of Purchaser, all tangible embodiments (and all copies) of the Confidential Information that are in such party's possession. In the event that either a Seller or the Shareholder is requested or required (by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process) to disclose any Confidential Information, such Seller or the Shareholder will notify Purchaser promptly of the request or requirement so that Purchaser may seek an appropriate protective order or waive compliance with the provisions of this Section 6.2. Notwithstanding anything herein to the contrary, each party to this Agreement (and each employee, representative, and other agent of such party) may disclose to any and all Persons, without limitation of any kind, the Agreement and the transactions contemplated hereby for Tax reporting, legal advice and other similar purposes.

6.3. <u>Non-Competition by Sellers and the Shareholder</u>.

    (a) <u>Noncompetition</u>. For a period of five (5) years after the Closing Date, each Seller and the Shareholder will not, directly or indirectly, invest in, own, manage, operate, finance, control, advise, render services to or guarantee the obligations of any Person engaged in or planning to become engaged in the Business or business of the

- 26 -

Purchaser or its Affiliates (collectively, a "Competing Business"), provided, however, that Sellers and the Shareholder may collectively purchase or otherwise acquire up to (but not more than) three percent (3%) of any class of the securities of any Person (but may not otherwise participate in the activities of such Person) if such securities are listed on any national or regional securities exchange or have been registered under Section 12(g) of the Exchange Act.

(b)     Nonsolicitation and Nonhire.   For a period of five (5) years after the Closing Date, each Seller and the Shareholder will not, directly or indirectly:

(i)     solicit the business of any Person who is a customer of Purchaser or its Affiliates with respect to the Competing Business;

(ii)     cause, induce or attempt to cause or induce any customer, supplier, licensee, licensor, franchisee, employee, consultant or other business relation of Purchaser or its Affiliates to cease doing business with such parties, to deal with any competitor of Purchaser or its Affiliates, or in any way interfere with its relationship with such parties;

(iii)     cause, induce or attempt to cause or induce any customer, supplier, licensee, licensor, franchisee, employee, consultant or other business relation of the Company on the Closing Date or within the year preceding the Closing Date to cease doing business with Purchaser or its Affiliates, to deal with any competitor of Purchaser or its Affiliates, or in any way interfere with its relationship with such parties with respect to the Competing Business; or

(iv)     hire, retain or attempt to hire or retain any employee or independent contractor of Purchaser or its Affiliates (current, or former if such Person was an employee or independent contractor in the twelve-month period prior to the relevant time period) or in any way interfere with the relationship between Purchaser and its Affiliates, and any of its employees or independent contractors.

(c)     Modification of Covenant.   If a final judgment of a court or tribunal of competent jurisdiction determines that any term or provision contained in Section 6.3 is invalid or unenforceable, then the parties agree that the court or tribunal will have the power to reduce the scope, duration or geographic area of the term or provision, to delete specific words or phrases or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.  This Section 6.3 will be enforceable as so modified after the expiration of the time within which the judgment may be appealed.  Sellers and the Shareholder acknowledge this Section 6.3 is reasonable and necessary to protect and preserve Purchaser's and its Affiliates legitimate business interests.

(d)     Enforcement of Covenant.   The parties agree that the remedy of damages at law for the breach of any of the covenants contained in this Section 6.3 is an inadequate remedy and that Sellers and the Shareholder will not challenge the

- 27 -

enforceability or reasonableness of the covenants set forth in this Section 6.3.  In recognition of the irreparable harm that a violation by Sellers or the Shareholder of any of the covenants, agreements or obligations arising under this Section 6.3 would cause Purchaser or its Affiliates, Sellers and the Shareholder agrees that in addition to any other remedies or relief afforded by law, an injunction against an actual or threatened violation or violations may be issued against Sellers or the Shareholder without posting a bond or other security.  In the event of an action to enforce the covenants in this Section 6.3, Purchaser will be entitled to be reimbursed for actual attorney's fees incurred by such party with respect to such action.  Sellers and the Shareholder acknowledge and expressly consent to the governing law and exclusive jurisdiction provisions set forth in Section 8.8 with respect to this Section 6.3.  In the event a Seller or the Shareholder violates any provisions of Section 6.3 hereof, then, in such event the period of the violation will be added to the restricted period set forth in such section with regard to such Seller or the Shareholder.

6.4.   Transfer Taxes and Other Closing Costs.  Sellers will be responsible for all stamp, transfer, documentary, sales, use, value added, registration, property, excise and other such taxes and fees relating thereto (including any penalties, interest and additions to such taxes) incurred in connection with this Agreement, all other agreements or instruments contemplated herein and the transactions contemplated hereby, and Sellers will make all filings, returns, reports and forms as may be required to comply with the provisions of all applicable tax laws.  Sellers will pay, on or before the Closing Date, all special assessments levied, pending or constituting a lien against the Owned Real Property as of the Closing Date including without limitation any installments of special assessments (including interest payable thereon) which are certified for payment with the real estate taxes in the year of the Closing.  Real estate taxes due and payable in the year of the Closing will be prorated between Sellers and Purchaser as of the Closing Date based upon a calendar year.  Real estate taxes due and payable in all prior years will be paid by Sellers.  Sellers will pay all deferred real estate taxes or special assessments that may become payable as a result of the sale contemplated hereby.  Sellers and the Purchaser will each pay one half of any reasonable and customary closing fee or charge imposed by any closing agent designated by the Title Company.  Sellers will pay the cost of recording all documents necessary to place record title in the condition warranted and required of Sellers in this Agreement.  Purchaser will pay the cost of recording the warranty deeds and any mortgages and related documents which the Purchaser grants on the Real Property in connection with the transaction contemplated by this Agreement.

6.5.   Payment of Excluded Liabilities.  Sellers will pay, or make adequate provision for the payment, in full (or such reduced amount as is mutually agreed upon by the vendor and such Seller) all of the Excluded Liabilities of such Seller.  If any such Excluded Liabilities are not so paid or provided for, or if Purchaser reasonably determines that failure to make any payments will impair Purchaser's use or enjoyment of the Assets or conduct of the Business previously conducted by Sellers with the Assets, Purchaser may, at any time after the Closing Date, elect to make all such payments directly (but will have no obligation to do so) and will be promptly reimbursed by Sellers and the Shareholder, jointly and severally, for the amount paid by Purchaser (or at Purchaser's election, Purchaser may offset such amount against any payment due to Sellers or the Shareholder).

6.6.     Post-Closing Reconciliation of Accounts.  The Shareholder and the Company will cause any payments received by the Company after the Closing Date with respect to the Accounts Receivable or other Assets to be promptly delivered to Purchaser.

6.7.     Employees.  On the Closing Date, Purchaser intends to offer employment to the employees of the Company (other than the Shareholder whose employment terms will be set forth in the Employment Agreement), with substantially comparable compensation based on Purchaser's compensation policies, subject to Purchaser's standard employment screening policies.  For the avoidance of doubt, the employees are not third party beneficiaries with respect to this Section 6.7.

6.8.     Resolution of Potential Encroachment.  Sellers will assist Purchaser, at the cost and expense of Sellers, in resolving to the reasonable satisfaction of Purchaser the potential encroachment of a fence and certain other personal property onto the real property of Trojan Steel Company, as identified in the survey performed by Terradon Corporation, dated November 11, 2013; provided, however, that Purchaser will not require Sellers (i) to pursue, or reimburse Purchaser for pursuing, a quiet title or similar action, or (ii) to purchase the real property in question, or reimburse Purchaser for the purchase of such real property.

## ARTICLE VII
### Definitions

For the purposes hereof, the following terms have the meanings set forth below:

"Affiliate" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, Contract or otherwise.

"Cash Target" means an amount equal to $450,000.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidential Information" means any information with respect to the Business that the Company treats as proprietary and that it does not in the Ordinary Course of Business disclose to any Person outside the Company concerning the businesses and affairs of the Company excluding any information that (a) was in the public domain at the time of disclosure, (b) is published or otherwise comes into the public domain after its disclosure through no violation of this Agreement, (c) is disclosed to the recipient by a third party not under an obligation of confidence, or (d) is already known by the recipient at the time of its disclosure as evidenced by written documentation of the recipient existing prior to such disclosure.

"Contracts" means all oral or written contracts, agreements, instruments and other documents to which a Person is a party or by which it or its assets is or are bound.

"Environmental Laws" means all Laws concerning pollution or protection of the environment and natural resources, including without limitation all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, control or cleanup of

any hazardous materials, substances or wastes, pesticides, pollutants or byproducts, asbestos, polychlorinated biphenyls, or radiation, each as amended and as now or hereafter in effect and those assuring that products are designed, formulated, packaged, and used so that they do not present unreasonable risks to human health or the environment.

"Escrow Agent" means JPMorgan Chase Bank, NA.

"GAAP" means United States generally accepted accounting principles consistently applied, as in effect from time to time.

"Government Entity" means individually, and "Government Entities" means collectively, any federal, state or local or foreign government, any political subdivision thereof or any court, administrative or regulatory agency, department, instrumentality, body or commission or other governmental authority or agency, domestic or foreign.

"Hazardous Substances" means all hazardous substances, as that term is defined in the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.), solid waste, hazardous waste and any other individual or class of pollutants, contaminants, toxins, chemicals, substances, wastes or materials in their solid, liquid or gaseous phase, defined, regulated, classified or identified under any Environmental Law.

"Indebtedness" means, with respect to any Person at any date, without duplication: (a) all obligations of such Person for borrowed money or in respect of loans or advances; (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments (including, without limitation, any seller notes issued in connection with any acquisition undertaken by Sellers or any of their subsidiaries); (c) all obligations of such Person that are not characterized as current liabilities under GAAP; (d) all obligations in respect of letters of credit, whether or not drawn, and bankers' acceptances issued for the account of such Person; (e) all capital lease obligations of such Person determined in accordance with GAAP; (f) all obligations of such Person secured by a contractual lien; (g) all guarantees of such Person in connection with any of the foregoing; or (h) any accrued interest, prepayment premiums or penalties or other costs or expenses related to any of the foregoing.

"Insider" means (a) any officer, manager, governor, member or owner of Sellers; (b) any individual related by blood, marriage or adoption to any individual listed in clause (a) hereof; or (c) any Person in which any individual listed in clauses (a) or (b) hereof has a beneficial interest.

"Knowledge" means the knowledge of such Person after reasonable inquiry and "Knowledge" as it is applied to Sellers or the Company, means the knowledge of each of the Shareholder and Dennis McCoy after reasonable investigation.

"Laws" means all statutes, laws, codes, ordinances, regulations, rules, orders, judgments, writs, injunctions, acts or decrees of any Government Entity.

"Liability" or "Liabilities" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due).

"Lien" or "Liens" means any mortgage, pledge, security interest, right of first refusal, option, encumbrance, lien or charge of any kind (including any conditional sale or other title retention agreement or lease in the nature thereof), any sale of receivables with recourse against Sellers, any filing or agreement to file a financing statement as debtor under the Uniform Commercial Code or any similar statute, or any subordination arrangement in favor of another Person.

"Material Adverse Effect" means any event, change, circumstance, effect, or state of facts that, when considered individually or in the aggregate, is, or is likely to be, materially adverse to (a) the Business, financial condition, prospects, or results of operations of Sellers, taken as a whole, or (b) the ability of Sellers or the Shareholder to perform their obligations under this Agreement or to consummate the transactions contemplated by this Agreement

"Material Contract" means, with respect to the Business, (a) any Contract for the acquisition or sale of any securities or any substantial portion of the assets or business of or to any other Person whether completed or pending; (b) any continuing Contract which requires the Company to purchase materials, supplies, equipment, services or data involving in the case of any such Contract or agreement more than $10,000 over the remaining life of such Contract or $15,000 per annum; (c) any customer Contract with annual revenues in excess of $25,000; (d) any customer Contract with a Government Entity, (e) any indenture, mortgage, note, loan agreement, equipment financing agreement, installment obligation, or other Contract, agreement or instrument relating to Indebtedness; (f) any Contract for capital expenditures with remaining obligations in excess of $15,000; (g) any Contract which contains non-competition, non-solicitation, or other similar provisions; (h) any confidentiality, secrecy, or non-disclosure agreement entered into outside the Ordinary Course of Business, (i) any Contract involving payments during a 12-month period of $15,000 or more, pursuant to which Company is a lessor or lessee of any real property, machinery, equipment, motor vehicles, office furniture, fixtures or other personal property; (j) any Contract involving a Related Party Transaction; (k) any Contract to provide a guaranty, indemnification, reimbursement, contribution, assumption or endorsement of, or any substantially similar commitment with respect to, the obligations, Liabilities or Indebtedness of any other Person except Contracts containing standard indemnification provisions entered into in the Ordinary Course of Business; (l) any investment banking, placement, broker or substantially similar Contract; (m) any Contract with any Government Entity, other than a customer Contract or zoning or land use agreements entered into in the Ordinary Course of Business; (n) any consulting Contract involving payments during any 12-month period of $15,000 or more; (o) any distribution, reseller, dealer, agency, franchise, advertising, revenue sharing, alliance, joint venture, marketing or similar Contract of the Company; (p) any employment, independent contractor or similar agreement that provides for the payment of actions or receive benefits or payments or otherwise triggers material obligations, in any case solely as a result of the consummation of any of the transactions contemplated by this Agreement, (q) any Contract which individually, or collectively with related Contracts, represents a material portion of the Company's revenue or is otherwise material to the Business, or (r) any non-competition, non-solicitation, assignment of invention or confidentiality agreement entered into with any employee of the Company.

"Ordinary Course of Business" means the ordinary course of business of the Company, consistent with past practice, including with regard to nature, frequency and magnitude.

"<u>Organizational Documents</u>" means the articles or certificate of incorporation or organization, bylaws, limited liability company agreement, partnership agreement or other governing documents of an entity.

"<u>Outstanding Transaction Expenses</u>" means fees and expenses that the parties hereto have mutually agreed that Purchaser will pay on Sellers' behalf at Close relating to the negotiation, execution and delivery of this Agreement and the other Transaction Documents.

"<u>Permitted Lien</u>" means Liens (a) for Taxes and other governmental charges and assessments that are not yet due and payable, or (b) identified on <u>Schedule 3.7</u>.

"<u>Person</u>" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a Government Entity.

"<u>Related Party Transaction</u>" means any Contract, arrangement, or understanding under which a company or its Insiders (a) has borrowed any monies from or has outstanding any indebtedness or other similar obligations to Sellers or their Affiliates; (b) owns any direct or indirect interest of any kind in, or is a governor, manager, officer, member, employee, partner, equity owner, consultant or lender to, or borrower from, or has the right to participate in the management, operations or profits of, any Person that is (x) a competitor, supplier, customer, distributor, lessor, tenant, creditor or debtor of a Seller, or (y) participates in any transaction to which a Seller is a party; or (c) is or has been a party to any Contract, arrangement, understanding or transaction with a Seller.

"<u>Tax</u>" or "<u>Taxes</u>" means federal, state, county, local, foreign or other income, gross receipts, *ad valorem*, franchise, profits, sales or use, transfer, registration, excise, utility, environmental, communications, real or personal property, capital stock, license, payroll, wage or other withholding, employment, social security, severance, stamp, occupation, alternative or add-on minimum, estimated and other taxes of any kind whatsoever (including deficiencies, penalties, additions to tax, and interest attributable thereto) whether disputed or not.

"<u>Tax Return</u>" means any return, information report or filing with respect to Taxes, including any schedules attached thereto and including any amendment thereof.

"<u>Title Company</u>" means a title company selected by Purchaser.

## ARTICLE VIII
## Miscellaneous

8.1.   <u>Fees and Expenses</u>.   Purchaser will be responsible for all costs and expenses incurred by Purchaser, Parent and their Affiliates in connection with the negotiation, preparation and entry into this Agreement and the consummation of the transactions contemplated hereby (including, expressly the cost of any title insurance).   Sellers will be responsible for costs and expenses incurred by Sellers and the Shareholder in connection with the negotiation, preparation and execution of this Agreement and the consummation of the transactions contemplated hereby (including, expressly the cost of any survey or charges by the Title Company other than the cost of title insurance).

8.2.     Remedies.  Except as expressly provided in this Agreement, any Person having any rights under any provision of this Agreement will be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by Law. Except as expressly provided in this Agreement, all such rights and remedies will be cumulative and non-exclusive, and may be exercised singularly or concurrently.  The parties acknowledge that any breach of this Agreement may cause substantial irreparable harm to the other party. Therefore, this Agreement may be enforced in equity by specific performance, temporary restraining order and/or injunction.  The rights to such equitable remedies will be in addition to all other rights or remedies which a party may have under this Agreement or under applicable Law.

8.3.     Consent to Amendments; Waivers.  This Agreement may be amended, or any provision of this Agreement may be waived upon the approval, in writing, executed by Purchaser, Parent, Sellers and the Shareholder.  No course of dealing between or among the parties hereto will be deemed effective to modify, amend or discharge any part of this Agreement or any rights or obligations of any such party or such holder under or by reason of this Agreement.

8.4.     Successors and Assigns; Public Disclosure.  This Agreement and all of the provisions hereof will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, except that neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated by Sellers or the Shareholder without the prior written consent of Purchaser.  Notwithstanding the foregoing, (a) Purchaser and Parent may assign in whole or in part their respective rights and obligations pursuant to this Agreement to one or more of their Affiliates, (b) Purchaser and Parent may assign this Agreement and its rights and obligations under this Agreement in connection with a merger or consolidation involving Purchaser or Parent, or in connection with a sale of substantially all of the equity or assets of Purchaser or Parent or other disposition of substantially all of the Business, and (c) Purchaser and Parent may assign any or all of their respective rights pursuant to this Agreement or the ancillary documents hereto, including its rights to indemnification, to any of its lenders as collateral security.  Neither Sellers nor the Shareholder will release any public statement concerning this Agreement or the transactions contemplated hereby without the prior written consent of Purchaser except as may be required by applicable Law.

8.5.     Severability.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement or the application of any such provision to any Person or circumstance will be held to be prohibited by, illegal or unenforceable under applicable Law or rule in any respect by a court of competent jurisdiction, such provision will be ineffective only to the extent of such prohibition, illegality or unenforceability, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

8.6.     Counterparts.  This Agreement may be executed in counterparts (including by means of facsimile or pdf signature pages), any one of which need not contain the signatures of more than one party, but all such counterparts taken together will constitute one and the same agreement.

8.7.    Entire Agreement.  This Agreement and the agreements and documents referred to herein contain the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings, whether written or oral, relating to such subject matter in any way, including, without limitation, the Letter of Intent dated September 4, 2013.

8.8.    Governing Law; Forum; Waiver of Jury.  All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement and the Schedules and Exhibits hereto will be governed by, and construed in accordance with, the Laws of the State of Delaware without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.  In furtherance of the foregoing, the internal Laws of the State of Delaware will control the interpretation and construction of this Agreement (and all Schedules and Exhibits hereto), even though under that jurisdiction's choice of law or conflict of law analysis, the substantive Law of some other jurisdiction would ordinarily apply.  Any judicial proceeding brought with respect to this Agreement must be brought in any court of competent jurisdiction in the State of Delaware, and, by execution and delivery of this Agreement, each party (a) accepts, generally and unconditionally, the exclusive jurisdiction of such courts and any related appellate court, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement and (b) irrevocably waives any objection it may now or hereafter have as to the venue of any such suit, action or proceeding brought in such a court or that such court is an inconvenient forum.  Each party waives the right to a jury trial.

8.9.    Attorney-Client Privilege.  The parties intend that, at all times after the Closing, Purchaser will have the right in its discretion to assert or waive any attorney work product protections, attorney-client privileges and similar protections and privileges relating to the Assets and Assumed Liabilities.Notices.  All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given when delivered personally to the recipient or when sent by facsimile followed by delivery by reputable overnight courier service, or one day after being sent to the recipient by reputable overnight courier service (charges prepaid).  Such notices, demands and other communications will be sent to Purchaser, Parent, Sellers and the Shareholder at the addresses indicated below or to such other address or to the attention of such other Person as the recipient party has specified by prior written notice to the sending party.  All notices, demands and other communications hereunder may be given by any other means (including electronic mail), but will not be deemed to have been duly given unless and until it is actually received by the intended recipient.To Sellers and the Shareholder:

David Chadwick Dillon
5403 Karen Circle
Cross Lanes, WV 25313
E-Mail:  my4greatkids@frontier.com

with a copy to (which will not constitute notice to Sellers and the Shareholder):

Jackson Kelly PLLC
500 Lee St. E., Suite 1600
Charleston, WV 25301-3202
Attn:  Charles D. Dunbar
Fax:  (304) 340-1080

To Purchaser and Parent:

Spinner Equipment Group Holdings, LLC
Attn: David Hall
2001 Butterfield Road, Suite 1020
Downers Grove, IL 60515
Fax: (630) 434-7246

with a copy to (which will not constitute notice to Purchaser):

Fredrikson & Byron, P.A.
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
Attn:  Sean P. Kearney
Fax:  (612) 492-7077

and

Audax Management Company, LLC
101 Huntington Avenue
Boston, MA 02199
Attn:  General Counsel
Fax:  (617) 859-1600

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase and Contribution Agreement on the date first written above.

CENTRIFUGAL SERVICES, LLC

By: _David Hall_

Name:  David Hall
Title:  Senior Vice President


SPINNER EQUIPMENT GROUP HOLDINGS, LLC

By: _____
Name:  Oliver Ewald
Title:  President


INDUSTRIAL PROCESS EQUIPMENT, INC.

By: _____
Name:  David Chadwick Dillon
Title:  President


EAGLE ONE CORPORATION

By: _____
Name:  David Chadwick Dillon
Title:  President


SHAREHOLDER:


_____
David Chadwick Dillon


7339038

*Signature Page to Asset Purchase and Contribution Agreement*

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase and Contribution Agreement on the date first written above.

CENTRIFUGAL SERVICES, LLC

By:_____
Name:  David Hall
Title:  Senior Vice President


SPINNER  EQUIPMENT  GROUP  HOLDINGS, LLC

By:_____
Name:  Oliver Ewald
Title:  President


INDUSTRIAL PROCESS EQUIPMENT, INC.

By:_____
Name:  David Chadwick Dillon
Title:  President


EAGLE ONE CORPORATION

By:_____
Name:  David Chadwick Dillon
Title:  President


SHAREHOLDER:


_____
David Chadwick Dillon


7339038

*Signature Page to Asset Purchase and Contribution Agreement*

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase and Contribution Agreement on the date first written above.

CENTRIFUGAL SERVICES, LLC

By:_____
Name:  David Hall
Title:  Senior Vice President


SPINNER EQUIPMENT GROUP HOLDINGS, LLC

By:_____
Name:  Oliver Ewald
Title:  President


INDUSTRIAL PROCESS EQUIPMENT, INC.

By:_____
Name:  David Chadwick Dillon
Title:  President


EAGLE ONE CORPORATION

By:_____
Name:  David Chadwick Dillon
Title:  President


SHAREHOLDER:

_____
David Chadwick Dillon


7339038

*Signature Page to Asset Purchase and Contribution Agreement*