**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

| | |
|---|---|
| ELGIN SEPARATION SOLUTIONS, LLC and CMI/CSI LLC f/k/a CENTRIFUGAL SERVICES, LLC | |
| Plaintiffs, | |
| v. | Case No. 2:23-cv-00440 |
| DAVID CHADWICK DILLON, DILLON INDUSTRIES, INC., and DONALD RITCHIE, | District Judge Berger<br>Magistrate Judge Aboulhosn |
| Defendants. | |

**ELGIN SEPARATION SOLUTIONS, LLC and CMI/CSI LLC f/k/a CENTRIFUGAL SERVICES, LLC's MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

ELGIN SEPARATION SOLUTIONS, LLC and CMI/CSI LLC

By:  /s/ *Rachel L . Schaller*

Rachel L. Schaller (IL ARDC No. 6306921)*
Taft Stettinius & Hollister LLP
111 East Wacker Drive, Suite 2600
Chicago, IL 60601
Telephone: (312) 527-4000
Facsimile: (312) 527-4011
rschaller@taftlaw.com
*pro hac vice*

Jill Cranston Rice (WV State Bar No. 7421)
Dinsmore & Shohl LLP
215 Don Knotts Boulevard, Suite 310
Morgantown, WV 26501
Telephone (304) 296-1100 / Facsimile
(304) 296-6116
jill.rice@dinsmore.com

## TABLE OF CONTENTS

**Page**

FACTUAL BACKGROUND ................................................................................. 1

    I.    Elgin's business and policies ........................................................... 1

        A.    The business ................................................................. 1

        B.    Elgin's copyrights, trade secrets, and other confidential information ................................................................. 2

        C.    Elgin's efforts to protect its proprietary information ................ 3

    II.    Dillon's employment with Elgin and departure ................................ 6

    III.    Ritchie's employment with Elgin and departure ............................... 8

    IV.    Elgin learns of and investigates Dillon's and Ritchie's misconduct.............. 9

        A.    The parties' pre-suit letter correspondence ............................. 9

        B.    Elgin's forensic investigation and analysis of devices ............... 11

            1.    Storage devices not returned ................................... 11

            2.    Elgin data transferred from Ritchie External Hard Drive 2 ........ 12

            3.    Dillon's work email account .................................... 15

            4.    Defendants' admit taking and using electronic Elgin Drawings. .................................................... 17

        C.    Elgin has continuously attempted to resolve disputes before filing this motion ............................................................ 18

LEGAL STANDARD ..................................................................................... 18

ARGUMENT ................................................................................................ 19

    I.    Elgin will likely prevail on its claims ............................................. 19

        A.    Misappropriation of trade secrets ..................................... 19

            1.    Elgin's information qualifies as trade secrets ................... 20

            2.    Defendants misappropriated Elgin's trade secrets ............... 25

            3.    Elgin's trade secrets implicate interstate or foreign commerce .................................................... 28

        B.    False designation of origin ............................................. 29

        C.    Copyright infringement ................................................ 32

        D.    Breach of contract claims .............................................. 34

            1.    The APC Agreement and the Employment Agreement are valid contracts ............................................... 35

            2.    Dillon breached both agreements ............................... 35

**Table of Contents**
**(continued)**

                                                                                    **Page**

        3.    Elgin has suffered harm as a result of Dillon's breaches............ 36

II.    Elgin will suffer irreparable harm in the absence of an injunction...................... 37

III.    The balance of harms favors Elgin ................................................................. 40

IV.    The public's interest is served by protecting Elgin's trade secrets, copyrights, and confidential information, vindicating its contract rights, and preventing unfair competition. ................................................... 42

CONCLUSION.................................................................................................... 42

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acierno v. New Castle Co.*,
    40 F. 3d 645 (3d Cir. 1994).................................................................38

*Albert S. Smyth Co. v. Motes*,
    No. CCB-17-677, 2018 WL 3635024 (D. Md. July 31, 2018)...............................24

*All Pro Maids, Inc. v. Layton*,
    No. CIV.A. 058-N, 2004 WL 1878784 (Del. Ch. Aug. 9, 2004), *aff'd*, 880
    A.2d 1047 (Del. 2005) ..................................................................35

*Aspen Tech., Inc. v. M3 Tech., Inc.*,
    569 F. App'x 259 (5th Cir. 2014) .......................................................28

*Bennett v. Zydron*,
    No. 2:17CV92, 2018 WL 10550750 (E.D. Va. Apr. 25, 2018)...............................31

*Bridgetree, Inc. v. Red F Mktg. LLC*,
    No. 3:10-CV-00228-FDW, 2013 WL 443698 (W.D.N.C. Feb. 5, 2013).........................22, 28

*Capital Meats, Inc. v. Meat Shoppe, LLC*,
    CIV. JFM-15-212, 2015 WL 4249166 (D. Md. July 9, 2015)...............................24

*Compulife Software Inc. v. Newman*,
    959 F.3d 1288. (11th Cir. 2020) .......................................................19

*Concrete Machinery Co., Inc. v. Classic Lawn Ornaments, Inc.*,
    843 F.2d 600 (1st Cir. 1988)..........................................................32

*Cree, Inc. v. Bain*,
    1:15-CV-547, 2015 WL 12911774 (M.D.N.C. July 13, 2015)..............................26

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
    539 U.S. 23 ............................................................................29

*Decision Insights, Inc. v. Sentia Grp., Inc.*,
    416 F. App'x 324 (4th Cir. 2011) .....................................................20

*E. Coast Fire Prot., Inc. v. Muhammad*,
    3:08CV511-HEH, 2008 WL 11389214 (E.D. Va. Sept. 18, 2008) .........................39

*E.I. du Pont de Nemours & Co. v. Am. Potash & Chem. Corp.*,
   200 A.2d 428 (Del. Ch. 1964) ................................................................38

*Eagle Force Holdings, LLC v. Campbell*,
   187 A.3d 1209 (Del. 2018) ....................................................................35

*EMI April Music, Inc. v. Garland Enters., LLC*,
   No. CIV.A. DKC 11-3352, 2012 WL 1986529 (D. Md. June 1, 2012) ................................42

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*,
   499 U.S. 340 (1991) ............................................................................32

*Fuller v. Gemini Ventures, LLC*,
   No. CIV.A.05C-06-019RFS, 2006 WL 2811708 (Del. Super. Ct. Oct. 2, 2006) ................35

*GetWell Network, Inc. v. Grossman*,
   PWG-13-3624, 2014 WL 12908272 (D. Md. Apr. 29, 2014) ...............................39

*GlaxoSmithKline, LLC v. Brooks*,
   8:22-CV-00364-PWG, 2022 WL 463070 (D. Md. Feb. 15, 2022) ........................27

*Glynn v. EDO Corp.*,
   710 F.3d 209 (4th Cir. 2013) ..................................................................23

*Glynn v. Impact Sci. & Tech., Inc.*,
   807 F. Supp. 2d 391 (D. Md. 2011) ........................................................23

*Hatfield v. Autonation, Inc.*,
   939 So. 2d 155 (Fla. Dist. Ct. App. 2006) ..............................................42

*Haught v. Louis Berkman LLC*,
   417 F. Supp. 2d 777 (N.D. W. Va. 2006) ..........................................39, 42

*Herrmann Int'l, Inc. v. Herrmann Int'l Europe*,
   1:17-CV-00073-MR, 2021 WL 861712 (W.D.N.C. Mar. 8, 2021) ......................41

*Home Funding Grp., LLC v. Myers*,
   No. 1: 06cvl400, 2006 WL 6847953 (E.D. Va. Dec. 14, 2006) .........................38

*Integrated Global Servs., Inc. v. Mayo*,
   3:17-CV-563, 2017 WL 4052809 (E.D. Va. Sept. 13, 2017) ....................26, 39, 40

*John Bean Techs. Corp. v. B GSE Grp., LLC*,
   480 F. Supp. 3d 1274 (D. Utah 2020) ................................................30, 31

*Johnson v. Jones*,
   149 F.3d 494 (6th Cir. 1998) ................................................................30

*Keystone Transp. Sols., LLC v. Nw. Hardwoods, Inc.*,
  No. 5:18-CV-00039, 2019 WL 1756293 (W.D. Va. Apr. 19, 2019) ..................................... 25

*KnowledgePlex, Inc. v. Placebase, Inc.*,
  No. C 08-4267 JF (RS), 2008 WL 5245484 (N.D. Cal. Dec. 17, 2008) ................................ 28

*Landis v. Jarden Corp.*,
  2:11-CV-101, 2014 WL 790917 (N.D. W. Va. Feb. 26, 2014) ......................................... 34, 35

*Laura Laaman & Assocs., LLC v. Davis*,
  No. 3:16-CV-00594 (MPS), 2017 WL 5711393 (D. Conn. Nov. 27, 2017) ......................... 31

*Life Spine, Inc. v. Aegis Spine, Inc.*,
  8 F.4th 531 (7th Cir. 2021) ............................................................................................. 20

*Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*,
  43 F.3d 922, 938 (4th Cir.1995) ..................................................................................... 37

*Lorenzetti v. Hodges*,
  62 A.3d 1224, 2013 WL 592923 (Del. 2013) ................................................................. 35

*MAI Sys. Corp. v. Peak Computer, Inc.*,
  991 F.2d 511 (9th Cir. 1993) .......................................................................................... 33

*Martin Marietta Materials, Inc. v. Vulcan Materials Co.*,
  68 A.3d 1208 (Del. 2012) ......................................................................................... 38, 41

*MicroStrategy Inc. v. Bus. Objects, S.A.*,
  331 F. Supp. 2d 396 (E.D. Va. 2004) .............................................................................. 24

*Moement, Inc. v. Groomore, Inc.*,
  No. 222CV02871MWFJEMX, 2022 WL 18284405 (C.D. Cal. Nov. 29, 2022) ................. 22

*Monovis, Inc. v. Aquino*,
  905 F. Supp. 1205 (W.D.N.Y. 1994) ............................................................................... 28

*New v. GameStop, Inc.*,
  753 S.E.2d 62 (W. Va. 2013) .......................................................................................... 35

*Niemi v. NHK Spring Co., Ltd.*,
  543 F.3d 294 (6th Cir. 2008) .......................................................................................... 23

*Oakwood Labs. LLC v. Thanoo*,
  999 F.3d 892 (3d Cir. 2021) ..................................................................................... 20, 27

*Pioneer Hi-Bred Int'l v. Holden Found. Seeds*,
  35 F.3d 1226 (8th Cir. 1994) .......................................................................................... 23

*RC Trailers, Inc. v. Darkhorse Cargo, Inc.*,
    3:19-CV-973-JD-MGG, 2019 WL 13218401 (N.D. Ind. Dec. 6, 2019) ...............................39

*Robert L. Stark Enters., Inc. v. Neptune Design Grp., LLC*,
    No. 1:16 CV 264, 2017 WL 1345195 (N.D. Ohio Apr. 12, 2017) .........................................33

*Robinson v. New Line Cinema Corp.*,
    211 F.3d 1265 (4th Cir. 2000) ...........................................................................................32

*Roe v. Dep't of Defense*,
    947 F.3d 207 (4th Cir. 2020), *as amended* (Jan. 14, 2020) ..................................................19

*Serv. & Training, Inc. v. Data Gen. Corp.*,
    963 F.2d 680 (4th Cir. 1992) ...............................................................................32, 34, 37

*Sneberger v. Morrison*,
    776 S.E.2d 156 (W. Va. 2015)...........................................................................................35

*Sogefi USA, Inc. v. Interplex Sunbelt, Inc.*,
    535 F. Supp. 3d 548 (S.D. W. Va. 2021)............................................................................42

*Stand Energy Corp. v. Columbia Gas Transmission Corp.*,
    CIV.A. 2:04-0867, 2005 WL 1639320 (S.D. W. Va. July 5, 2005) .................................34, 35

*Stern v. Weinstein*,
    No. CV 09-1986-GHK, 2010 WL 11459791 (C.D. Cal. Jan. 6, 2010), *aff'd*,
    512 F. App'x 701 (9th Cir. 2013) ......................................................................................33

*Syngenta Seeds, Inc. v. Delta Cotton Coop., Inc.*,
    457 F.3d 1269 (Fed.Cir.2006).............................................................................................29

*T. Rowe Price Recovery Fund, L.P. v. Rubin*,
    770 A.2d 536 (Del. Ch. 2000).............................................................................................39

*Therapeutic Research Fac. v. NBTY, Inc.*,
    488 F. Supp. 2d 991 (E.D. Cal. 2007)..................................................................................33

*Thousand Oaks Barrel Co. v. Barrels*,
    No. 121CV848LMBTCB, 2022 WL 3337798, (E.D. Va. July 11, 2022),
    *report and recommendation adopted*, No. 1:21CV848 (LMB/WEF), 2022 WL
    4378689 (E.D. Va. Sept. 22, 2022)..............................................................................37, 42

*Trandes Corp. v. Guy F. Atkinson Co.*,
    996 F.2d 655 (4th Cir. 1993) .............................................................................................23

*Uhlig LLC v. Shirley*,
    6:08-CV-01208-JMC, 2012 WL 2923242 (D.S.C. July 17, 2012).........................................24

*Ultraflo Corp. v. Pelican Tank Parts, Inc.*,
    4:09-CV-782, 2012 WL 3929821 (S.D. Tex. Sept. 7, 2012)................................................22

*Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*,
    618 F.3d 417 (4th Cir. 2010), *as amended* (Aug. 24, 2010).......................................29, 31, 32

*Variable Annuity Life Ins. Co. v. Coreth*,
    535 F. Supp. 3d 488 (E.D. Va. 2021) ...................................................................................27

*Vault Corp. v. Quaid Software Ltd.*,
    847 F.2d 255 (5th Cir. 1988) ...............................................................................................33

*WeRide Corp. v. Kun Huang*,
    379 F. Supp. 3d 834 (N.D. Cal. 2019), *modified in part*, No. 5:18-CV-07233-
    EJD, 2019 WL 5722620 (N.D. Cal. Nov. 5, 2019)................................................................22

*Worlds of Wonder v. Veritel Learning Sys.*,
    658 F. Supp. 351 (N.D. Tex. 1986) ......................................................................................40

**Statutes**

Copyright Act, 17 U.S.C. § 502(a) .............................................................................................32

Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ......................................19, 20, 24, 25, 27, 28

Lanham Act, 15 U.S.C. § 1125 *et seq.*................................................................................29, 31

West Virginia Uniform Trade Secrets Act ("UTSA"), W. Va. Code § 47-22-1 *et
    seq.* ...............................................................................................................19, 20, 24, 42

## MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Elgin's action against its former division president (Dillon), his new company (Dillon Industries), and his lieutenant (Ritchie) stems from their coordinated scheme to steal Elgin's information, employees, customers and suppliers. While still employed by Elgin and bound by restrictive covenants, Dillon created Dillon Industries to compete against Elgin and began soliciting and filling orders for Elgin's customers, using Elgin's supplier's, employees and trade secret information. Dillon accomplished this both on his own and by enlisting Ritchie to download vast amounts of information from Elgin's secure computer systems. Through their unlawful conduct, Defendants have crippled Elgin's business in southern West Virginia. Elgin requests immediate action from this Court to stop the bleeding in the form of a preliminary injunction restraining Defendants from doing business with specific Elgin customers and suppliers, and require Defendants to cease using all Elgin information in their possession, including any works they have created using Elgin information.

## FACTUAL BACKGROUND

I.      **Elgin's business and policies**

        A.      **The business**

Plaintiffs Elgin Separations Solutions, LLC ("Elgin Separation Solutions") and CMS/CSI LLC, f/k/a Centrifugal Services, LLC ("Centrifugal," collectively with Elgin Separation Solutions, "Elgin") are in the business of designing, manufacturing, and servicing specialized processing equipment. (Am. Compl. ¶ 5.) Elgin's customers operate in industries relating to natural resources processing, water intake, industrial power and lighting, oil and gas, and pipeline construction. (*Id*.) Several arms of Elgin's business operate independently in different locations in West Virginia.

1

(*See id.* ¶ 20.) Elgin's location in Poca specializes in the manufacture and repair of industrial equipment, primarily high speed decanter centrifuges and hammer mills. (*Id.* ¶¶ 21–23.)

## B.  Elgin's copyrights, trade secrets, and other confidential information

Elgin's business involves analyzing how industrial equipment is assembled and calibrated, and performs under real world conditions. (*Id.* ¶ 46.) Using this analysis, Elgin designs and improves equipment so it can outperform products made by Elgin's peers (the "Elgin Redesign Process"). (*Id.* ¶ 47.) Through the Elgin Redesign Process, Elgin's engineers, draftsmen, and mechanics develop improvements and alterations that are then incorporated into the design of the equipment. (*Id.* ¶ 58.) Examples of such modifications include moving the locations of gussets, increasing or decreasing the thickness of material in specific areas, and moving the locations of flanges. (*Id.* ¶ 59.) These modifications are intended to increase performance and longevity of the equipment being developed. (*Id.* ¶ 60.) Thus, the end result of the Elgin Redesign Process is Drawings for a piece of equipment that is different from and usually superior to the original equipment that served as the starting point for the project. (*Id.* ¶ 61.)

The Elgin Redesign Process takes months of careful research, design, measurements, fabrication, and trial and error to complete for any one type of equipment, requiring substantial investments of money and manpower. (*Id.* ¶¶ 48-49.) While redesigning and improving upon competitor products is common in the industry, the exact manner in which Elgin conducts the Elgin Redesign Process is confidential and proprietary. (*Id.* ¶ 50.) Documentation facilitating the Elgin Redesign Process is proprietary, confidential, and trade secret, having been developed over decades of study and millions of dollars of investment, including through the acquisition of the assets of Dillon's former companies, Industrial Process Equipment, Inc. and Eagle One Corp. (*Id.* ¶ 63.) Such documentation includes:

- **Drawings.** Elgin draftsmen create engineered drawings of equipment (the "Drawings"), including centrifuge and hammer mill products and parts. (*Id.* ¶ 51.) Electronic Drawings are created using special software, including AutoCAD and SolidWorks, and are stored in various file extensions, including SLDDRW (two-dimensional SolidWorks model), SLDPRT (three-dimensional SolidWorks model), SLDASM (SolidWorks Assembly) and DXF (Drawing Exchange Format). (**Ex. 1**, Henley Aff. ¶18-19.). The Drawings include two and three-dimensional models of the part or entire piece of equipment, measurements, notes, part numbers, fabrication and machining tolerances, welding notes, and other information. (Am. Compl. ¶ 57.)

- **Manuals, parts lists and other written instructions.** Elgin designs and drafts operations and maintenance manuals for the specialized equipment it designs and manufactures. (*Id.* ¶ 21.) For example an early 2022, Ritchie created an operations manual regarding a high speed 24x60 centrifuge (the "24x60 Centrifuge Manual"). (Am. Compl. Ex. 6, DKT 21-6, 1-6, at 4.) Elgin registered its copyright in the 24x50 Centrifuge Maual and holds common law copyrights in other manuals. (Am. Compl ¶ 141.) Additionally, Elgin maintains parts lists and other written instructions needed for the fabrication of its specialized equipment. (*Id.* ¶ 9.)

- **Photographs.** As part of Elgin's analysis of equipment, Elgin's employees use company-issued devices to photograph each stage of the disassembly process in the exact order in which it occurs. (Am. Compl. ¶ 52.) These photographs, and the order in which they are taken, reveal Elgin's proprietary methods. (*Id.* ¶ 53.) The order of the photographs reveals a chronology showing each step of the disassembly process, as well as assembly. (*Id.* ¶ 54.) During the disassembly process, precise measurements are taken of customers' equipment in order to document areas in need of repair and maintenance. (*Id.* ¶ 55.) Such measurements are written on the equipment in a manner that makes them visible when the photographs are taken. (*Id.*) Thus, photographs of the disassembly process also include highly useful information concerning the precise repairs needed to service customer equipment. (*Id.* ¶ 56.)

## C.    Elgin's efforts to protect its proprietary information

Elgin maintains a number of policies and practices to ensure the protection and safeguarding of its confidential information and trade secrets. (Am. Compl. ¶ 64.) Certain, high-level employees, including division presidents (like Dillon's former position) are required to execute confidentiality agreements with Elgin to ensure the security of the secret, proprietary information Elgin shares with such employees to facilitate the performance of their job duties.

(Henley Aff. ¶ 11.) Elgin also labels Drawings to alert and explain they are confidential and proprietary:



(Am. Compl. ¶ 75.)

Further, Elgin displays a copyright notice in the manuals it authors, including in the 24x60 Centrifuge Manual, which provides on its second page:

© Copyright 2022 Elgin Separation Solutions

All other product, brand, or trade names used in this publication are the trademarks or registered trademarks of their respective owners.

All rights reserved. This publication is the property of Elgin Separation Solutions and contains information proprietary to Elgin Separation Solutions. No part of this publication may be reproduced or copied in any form, or by any means, including electronic, mechanical, photocopying, recording or otherwise, without the prior written permission of Elgin Separation Solutions.

(*Id.* ¶ 95.)

Elgin also maintains employment policies and procedures to safeguard its confidential information. Elgin employees are provided Elgin's Employee Handbook upon commencement of their employment with instructions to review it thoroughly. (Am. Compl. ¶ 65; Henley Aff. ¶12.) The Employee Handbook contains a confidentiality policy prohibiting Elgin employees from disclosing, releasing or discussing Elgin's confidential information outside of the company, or using it for any purpose that is inconsistent with the company's interests, both during their employment with Elgin and after. (Am. Compl. Ex. 3, DKT 21-3, 1-3 ("Emp. Handbook").)

Employees are specifically advised that "[t]he files, manuals, reports, notes, lists and other records or data of the Company, in any form, are the exclusive property of the Company and must be returned at the end of employment with the Company."[1] (*Id.* at 13.) Confidential information is defined to include any "[i]information not generally known to the public upon which the goodwill, welfare and competitive ability of the Company depends, including information regarding product plans and designs…" (*Id.*)

In addition to an Employee Handbook, Elgin maintains a Code of Business Conduct and Ethics ("Code of Conduct") detailing its commitment to conducting its business in compliance with all laws, rules, and regulations and in accordance with the highest ethical values. (Am. Compl. Ex. 4, DKT 21-4,. 1-4 ("Code of Conduct").) At the beginning of their employment, every Elgin employee receives a copy of the Code of Conduct with instructions to review it thoroughly. (Am. Compl. ¶ 70; Henley Aff. ¶ 14) In addition to reiterating employee's obligations of confidentiality, the Code of Conduct explains employees' obligation to protect company assets, including Elgin's "proprietary information," which "includes intellectual property as well as business, marketing and service plans, engineering and manufacturing ideas, designs, databases, records, salary information and any unpublished financial data or reports." (Code of Conduct at 7.) This provision tells employees that "[w]hen your employment ends with the Company, you must return all

---

[1] Similarly, the Employee Handbook's Work Product Ownership policy provides: "All [Elgin] employees must be aware that [Elgin] retains legal ownership of the product of their work. No work product created while employed by [Elgin] can be claimed, construed, or presented as property of the individual, even after employment by [Elgin] has been terminated or the relevant project completed. This includes written and electronic documents, audio and video recordings, system code, and also any concepts, ideas, or other intellectual property developed for [Elgin], regardless of whether the intellectual property is actually used by [Elgin]. Although It is acceptable for an employee to display or discuss a portion or the whole of certain work product, one must bear in mind that information classified as confidential must remain so even after the end of employment, and that supplying certain other entities with certain types of information may constitute a conflict of interest. In any event, it must always be made clear that work product is the sole and exclusive property of [Elgin]." (*Id.* at 7–8.)

Company property to the Company. Company equipment should not be used for non-Company business, though incidental personal use may be permitted." (*Id.*)

In terms of security procedures, employees may not "remove from [Elgin] premises, any hardware, software, files, data, or other information relating to the Company's electronic mail, voice mail or Internet systems without prior management authorization. Those employees assigned laptops should take all reasonable measures to ensure the security of the information contained on their device…" (*Id.* at 15; *see also* Code of Conduct at 8, explaining "[i]t is extremely important that you take all necessary measures to secure your computer and any computer or voicemail passwords.") Elgin limits confidential information on a need-to-know basis and password protects its computer systems and requires employees to maintain those passwords as confidential. (*Id.*) Finally, the handbook's "Visitors" policy explains that visitors to Elgin's locations may only be allowed to enter through a specific entrance and remain in a specific area, and are not permitted to enter any other location of Elgin's facility without an employee escort. (*Id.* at 17.)

## II.     Dillon's employment with Elgin and departure

On or about November 13, 2013, Dillon sold his prior businesses, Eagle One Corp. and Industrial Process Equipment, Inc., to Centrifugal Services for $3,470,000 and other benefits worth over $700,000. (Am. Compl. ¶ 31). In connection with this transaction, the parties entered into two contracts at issue here: (1) the Asset Purchase and Contribution Agreement (the "APC Agreement") that governed the sale of Dillon's centrifuge repair business to Centrifugal Services, and (2) the Employment Agreement with Centrifugal Services executed on the same day that governed Dillon's employment as president of Elgin's Poca division. (Am. Compl. ¶¶ 25, 32; Am. Compl. Ex. 1, DKT 21-1, 1-1 ("APC Agreement"); Am. Compl. Ex. 2, DKT 21-2, 1-2 ("Emp't Agreement").) The APC and Employment Agreements were structured so that Dillon would continue running the business after selling it, as president of Elgin's Poca division. Dillon's duties

6

in this position included overseeing all operations of the facility, from the development and maintenance of customer relationships, the defining of roles and responsibilities within the workforce, recruitment for the hiring of same, maintaining the integrity of Elgin's proprietary processes, and ensuring the design and manufacture of equipment met or exceeded industry and customer standards. (Am. Compl. ¶ 83.) Dillon was personally involved in developing the Elgin Redesign Process, both on behalf of the companies he sold to Elgin and also during the near decade that he was Elgin's division president. (*Id.* ¶ 84.) In that role, Dillon occupied a position of trust at Elgin, and Elgin entrusted Dillon with its confidential, proprietary, and trade secret information relating to the Elgin Redesign Process, its customers and its suppliers. (*Id.* ¶ 85.)

The APC Agreement's "Confidentiality" provision requires Dillon to refrain from using Elgin's confidential information (as that term is defined in the contract) "except in connection with this Agreement" and to deliver to Elgin all such confidential information in his possession upon Elgin's request. (APC Agreement at 26, 29; *see* Am. Compl. ¶¶ 27–28.) The Employment Agreement also contains key provisions regarding the protection of Elgin's business:

- the Confidential Information provision, which requires Dillon to refrain from using or disclosing Elgin's confidential information (as that term is defined in the contract) "except in the course of the good faith performance of [his] duties to the Company and its affiliates or as required by applicable law" (Emp't Agreement at 8; *see* Am. Compl. ¶ 36);

- the Non-Competition provision, which prohibits Dillon from "directly or indirectly, without the prior written consent of the Company, on behalf of any individual or entity other than the Company and its affiliates, perform services in any capacity (whether as an owner, employee, partner, independent contractor or otherwise, whether with or without compensation) in all or any portion of any business that the Company or any of its affiliates conducts or is developing as of the date of such termination." (Emp't Agreement at 39; *see* Am. Compl. ¶ 36);

- the Non-Solicitation of Customers and Suppliers provision, which requires Dillon to, during the applicable period, refrain from directly or indirectly "influenc[ing] or attempt[ing] to influence customers or suppliers of the Company or any of its affiliates to divert any of their business to any Competitor of the Company or

otherwise away from the Company or its affiliates" (Emp't Agreement at 9; *see* Am. Compl. ¶ 39); and

- the Non-Solicitation of Employees provision, which requires Dillon to, during the applicable period, refrain from directly or indirectly soliciting, recruiting, inducing, or encouraging any employee of the Company or its affiliates "(i) for the purpose of being employed by him or by any Competitor of the Company on whose behalf Employee is acting as an agent, representative, employee or other capacity or (ii) to terminate Employee's or his or her employment or any other relationship with the Company or its affiliates" (Emp't Agreement at 9; *see* Am. Compl. ¶ 41).

The "applicable period" at issue in the non-solicitation provisions covers "the period of Employee's employment by the Company and continuing until the first anniversary of the date that Employee ceases to be employed with the Company for any reason." (Emp't Agreement at 8; *see* Am. Compl. ¶ 38.) The obligations under these provisions are "tolled during any period of non-compliance" and "survive the termination or expiration of Employee's employment." (Emp't Agreement at 9; *see* Am. Compl. ¶¶ 43-44).

On November 30, 2021, Dillon purported to give two weeks' notice of his resignation from Elgin. (*Id.* ¶ 89.) However, Dillon and Elgin came to an agreement by which Dillon would remain employed by Elgin until Elgin found a suitable replacement president. (*Id.* ¶ 90.) In this transitional role, Dillon continued to retain a high level of access to Elgin's trade secrets and confidential information and continued to occupy a position of trust at Elgin, subject to all of Elgin's policies and procedures, and his various agreements with Elgin. (*Id.*) In or about December 2022, Elgin found a suitable replacement President of the Poca facility, and Dillon resigned. (Henley Aff. ¶ 27.)

### III.    Ritchie's employment with Elgin and departure

Defendant Ritchie began his employment with Elgin as a draftsman on September 26, 2018, and later became a production administrator. (Am. Compl. ¶ 86.) His job duties in these positions included creating and modifying Drawings, assisting with the drafting of maintenance and operations manuals, procurement, and issuing work orders. (*Id.* ¶ 87.) In these positions,

Ritchie was an active participant in the Elgin Redesign Process. (*Id.* ¶ 88.) Thus, Ritchie was in a position of trust at Elgin and Elgin entrusted Ritchie with its confidential and trade secret information relating to the Elgin Redesign Process in order to perform his job duties. (*Id.*) Ritchie voluntarily resigned his employment with Elgin on January 27, 2023. (*Id.* ¶ 110.) Upon his resignation, Ritchie returned one external hard drive to Elgin ("Ritchie External Hard Drive 1"), purportedly in accordance with his obligation to return all Elgin information in his possession. (*Id.* ¶ 114). Immediately afterward, Ritchie became an official employee of Dillon Industries. (*Id.* ¶ 111.)

## IV.   Elgin learns of and investigates Dillon's and Ritchie's misconduct

### A.   The parties' pre-suit letter correspondence

On March 24, 2023, shortly after learning that Dillon solicited many Elgin employees to work for Dillon Industries, Elgin, through its attorneys, sent Dillon a letter notifying him that Elgin was exercising its rights under the APC Agreement and the Employment Agreement to demand that Dillon cease and desist soliciting its employees, stop using all confidential information in his possession and immediately return all such information to Elgin. (Henley Aff. ¶32; *id.* Ex. 1; *see* Am. Compl. ¶¶ 105–109 (describing Dillon's solicitation of Elgin employees).) The letter contained a litigation hold notice requesting that Dillon "preserve all communications, information, and evidence related to your employment with Elgin or the conduct or events described herein" and noted that "Elgin's investigation into your activities is ongoing." (*Id.* at 3.)

Elgin received a response from Dillon's attorney denying that Dillon had ever solicited Elgin employees or customers, and purporting to report that Dillon recently discovered Elgin's information in his possession, including "headings on an excel spreadsheet that were developed by Elgin (but only amount to writing down the universal process) on an Excel spreadsheet to document necessary repairs and their completion," (2) drawings that had been brought over by a

former Elgin employee, based on 'reverse engineering' of various pieces of equipment or which were published by the original manufacturer," and (3) "copies of 'progress photographs' which were used to document repairs by Elgin." (Henley Aff., Ex. 2 at 2, 3.)

On April 11, 2023, Elgin sent a second letter to Dillon, through his attorney, noting inaccuracies in Dillon's response, chief among them the assertion that Dillon never solicited Elgin employees. (Henley Aff., Ex. 3 at 1–2.) Elgin directed Dillon to send its attorneys copies of the confidential information described in his response and requested "assurances that Mr. Dillon and Dillon Industries, Inc. will destroy all digital copies of this information within the next ten days." (*Id.* at 2–3.) Elgin received a short response letter from Dillon's attorney on April 18, 2023. (Henley Aff. ¶ 38; *id.* Ex. 4.) The letter "continue[d] to deny the solicitation of Elgin employees at any time" by Dillon and, regarding Elgin's confidential information, stated: "The drawings and a thumb drive with pictures described in my previous letter have been sent to you at the address provided, and all copies have been destroyed." (Henley Aff., Ex. 4 at 1–2.)

Though Dillon returned some information to Elgin at this time,[2] on May 2, 2023, Dillon's attorney sent an email to Elgin's counsel explaining that Dillon "discovered some additional

---

[2] On April 24, 2023, Elgin received (through its attorneys) from Dillon physical copies of engineered drawings of parts and equipment totaling 84 pages. (Henley Aff. ¶39; Am. Compl. ¶ 123.) The Drawings include two-dimensional models of pieces of equipment, including measurements, notes, part numbers, fabrication and machining tolerances, welding notes, and other information. (Am. Compl. ¶ 57.) 80 pages of the Drawings contained a notice stating that the Drawing contained Elgin's proprietary information and may not be used, copied, or disclosed without Elgin's prior written consent. (Henley Aff. ¶ 40; Am. Compl. ¶¶ 75, 124.) The Drawings included all of the schematics necessary to build a complete 24x60 decanter centrifuge used by Elgin customer Darling Ingredients (including its subsidiary, Jay Gee Manufacturing) and nearly all the schematics necessary to build a complete 18x50 centrifuge, also used by Darling/Jay Gee. (Henley Aff. ¶ 40; Am. Compl. ¶¶ 125–126.) The Drawings also included schematics of a LYNX 40 centrifuge used by Elgin customer Paragon ISG and schematics of a DE-7200 VFD centrifuge used by Elgin customer Halliburton. (Henley Aff. ¶ 41; Am. Compl. ¶¶ 127, 129.) Further, On April 25, 2023, Elgin's counsel received a USB flash drive (commonly referred to as a memory stick or "thumb drive") from Dillon. (Henley Aff. ¶41.) It contained 8,204 photographs taken as part of Elgin's inspection analyses. (*Id.* ¶41; Am. Compl. ¶ 133.) These photographs included details regarding the equipment from customers that Elgin services, measurements, areas needing repair, and part and job numbers. (Henley Aff. ¶ 42; Am.  Compl. ¶ 133.) These photographs, and the order in which they are taken, reveal Elgin's proprietary methods. (Am. Compl. ¶ 53.) The order of the photographs reveals a chronology showing each step of the disassembly process, as well as assembly (when reversed). (*Id.* ¶ 54.) Further, during the disassembly process, precise measurements are taken of customers' equipment in order to document areas in need of repair and maintenance. (*Id.* ¶ 55.) Such measurements are written on the equipment in a manner that makes

drawings on an employee's computer that were a combination of drawings brought to Elgin by that employee and developed during his employment at Elgin. A thumb drive is being sent to you by mail today, and copies of the drawings have been destroyed." (Henley Aff., Ex. 5.) Three days later, Elgin received from Dillon a second drive ("Ritchie External Hard Drive 2"). (Henley Aff. ¶ 39; *see* Am. Compl. ¶¶ 114–115.)

**B.    Elgin's forensic investigation and analysis of devices**

Upon receiving the Ritchie External Hard Drive 2, Elgin enlisted the help of a digital forensic examiner to analyze all drives received from Dillon, as well as the Elgin-owned laptop computers issued to Dillon and Ritchie during their employment. (**Ex. 2**, Swaminathan Aff. ¶6.) Through this analysis, Elgin was able to identify additional external storage devices connected to each laptop, which have not been returned to (*Id.* Ex. 4.). Further, it determined that the Ritchie External Hard Drive 2 was connected to a computer device and used on at least three days in February 2023, at least six days in March 2023, at least 18 days in April 2023, and on May 1 and May 2 of 2023. (*Id.* ¶ 68.) As described below, confidential, proprietary and trade secret information belonging to Elgin remains in Defendants' possession on the unreturned drives and the computers to which the Ritchie External Hard Drive 2 was connected. Further, as explained below, Dillon's email correspondence during the last months of his employment with Elgin unequivocally shows his current activities and future plans to compete against Elgin.

**1.    Storage devices not returned**

Analysis of Dillon's work laptop revealed that, in the last eight months of Dillon's employment with Elgin, he connected five different external drives to his work computer, including a 1 terabyte drive with the volume name SSD2 (the "SSD2 Drive"). (Swaminathan Aff.

---

them visible when the photographs are taken. (*Id.*) Thus, photographs of the disassembly process also include highly useful information concerning the precise repairs needed to service customer equipment. (*Id.* ¶ 56.)

¶11.) On May 4, 2022, Dillon copied at least 36 folders from the network location "\\POCAWVFPS01\HOME\Chad.Dillon\My Documents\" on Elgin's servers to the SSD2 Drive using his work laptop. (*Id.* ¶15.) On August 18, 2022, Dillon copied at least 282 folders from the network location "\\POCAWVFPS01\Machine Pictures" on Elgin's servers to the SSD2 Drive using his work laptop. (*Id.* ¶14.) Elgin's photographs depicting its confidential inspection analyses were stored in this location. (**Ex. 3**, Clark Aff. ¶ 9.)

Analysis of Ritchie's work laptop revealed that, in addition to the Ritchie External Drive 1 and Ritchie External Drive 2 returned to Elgin, between January 2022 and his resignation in January 2023, Ritchie connected 15 different external drives to his work computer, including the SSD2 Drive connected to Dillon's work computer and a Kingston DataTraveler 2.0 USB Flash Drive (the "Kingston Drive") that was connected to Dillon's work computer on March 14, 2022. (Swaminathan Aff. ¶38.) Richie accessed at least 157 files on the Kingston Drive using his work computer between August 2022 and his resignation on January 27, 2023, including files saved in a folder called "Dillon Industries" (in August and October 2022), and Excel files, SLDDRW files, DXF files, pdf files and other file types providing detailed instructions for the fabrication of Elgin's 24x60 Centrifuge saved in a folder called "Chad" – (Dillon's middle name and alias). (Swaminathan Aff. Ex. H.)

## 2.    Elgin data transferred from Ritchie External Hard Drive 2

Analysis of the Ritchie External Hard Drive 2 revealed that Ritchie backed up the entire contents of various Elgin network locations onto the drive on August 15, 2022, December 6, 2022, and January 18, 2023, and then accessed thousands of files in the back-ups of Elgin's network on unknown computer devices on at least 29 different days after resigning from Elgin. The confidential information and trade secrets that Ritchie downloaded from Elgin's servers included Drawings, photographs of inspection analyses, manuals, parts lists and other written instructions

for fabricating Elgin equipment, which did not relate to any active orders or services at the time. (Henley Aff. ¶53; Clark Aff. ¶16.)In other words, Ritchie had no legitimate business reason to access and download such information at the time it was accessed.

On August 15, 2022, while working for Elgin, Ritchie copied the entire contents of his "My Documents" folder from Elgin's secure network drive to Ritchie External Hard Drive 2 under folders he labeled "Backups 8-15-22." (Swaminathan Aff. ¶ 54.) Among the files downloaded are at least:

(1)     2,750 files and folders were identified under the folder named "18 x 50," containing 205 DXF files, 144 SLDASM files, 161 SLDDRW files,  and 1,385 SLDPRT files;

(2)     260 files and folders were identified under the folder named "18 x 42," including three DXF files, 20 SLDASM files, 17 SLDDRW files, and 140 SLDPRT files.

(3)     9,900 files and folders were identified under the folder named "24 x 60," including 848 DXF files, 591 SLDASM files, 640 SLDDRW files, and 4,851 SLDPRT files.

(4)     2,300 files and folders were identified under the folder named "24 x 38," including 348 DXF files, 112 SLDASM files, 122 SLDDRW files, and 868 SLDPRT files.

(5)     1,200 files and folders were identified under the folder named "Lynx 40," including 34 DXF files, 50 SLDASM files, 282 SLDDRW files, and 410 SLDPRT files.

(6)     1,800 files and folders were identified under the folder named "2612 Hammer Mill Machine," including 356 DXF files, 85 SLDASM files, 83 SLDDRW files, and 681 SLDPRT files. (Swaminathan Aff. ¶ 54.)

Ritchie performed a similar procedure on December 6, 2022, copying the "My Documents" folder from Elgin's secure network drive to Ritchie External Hard Drive 2 under a folder labeled "Backup 12-6-22." (Swaminathan Aff. ¶ 57.) Similar to his acts on August 15, 2022, thousands of

the files he downloaded pertained to the six equipment types, listed above, including those with DXF, SLDASM, SLDDRW and SLDPRT file extensions. (Swaminathan Aff. ¶ 57.)

Further, on December 6, 2022, Ritchie copied at least 692 folders from the network location "\\POCAWVFPS01\Machine Pictures" on Elgin's servers to Ritchie External Hard Drive 2. (*Id.* ¶40.) Elgin's photographs depicting its inspection analyses of equipment were stored in this location. (Clark Aff. ¶ 9) The majority of the folder matched the folder names identified under the "Inspection" folder on the SSD2 Drive, which was connected to Chad Dillon's computer in May and August 2022. (Swaminathan Aff. ¶ 40.)

The files Ritchie downloaded on August 15 and December 6, 2022 contain all or nearly all of the information necessary to build a 24 x 60 centrifuge, an 18x50 centrifuges an 18 x 42 centrifuge, a 24 x 38 centrifuge, a Lynx40, and a 2612 DIG Hammer Mill. (Clark Aff. ¶ 16.) The information contained in these files was developed as part of the confidential Elgin Redesign Process. (*Id.*) Other than the 24 x 60 centrifuge, Elgin did not have any open orders for new capital equipment for this equipment in August or December 2022. (*Id.* ¶ 53.) There is no reason related to Elgin's business why Ritchie would need to access and copy these files during that time. (*Id*).

Elgin considers Jay Gee/Darling and Paragon ISG to be important customers. (Henley Aff. ¶¶ 53-54.) Before January 2023, Elgin regularly received new capital orders from Jay Gee/Darling for 24 x 60, 18 x 50, 24 x 38 and 18 x 42 centrifuges, and 2612 Hammer Mills. (*Id.* ¶ 53.) After January 2023, Elgin has received no new capital orders from Jay Gee/Darling for these equipment models. (*Id.* ¶ 53.) Similarly, before January 2023, Elgin regularly received new capital orders from Paragon ISG for 24 x 60 centrifuges and Lynx 40 machines. (*Id.* ¶ 54.) After January 2023, Elgin has received no orders for new capital equipment from Paragon ISG. (*Id.* ¶ 54.)

14

3.      **Dillon's work email account**

Dillon's work laptop contained an ".ost" file with information from Dillon's work email account, Chad.Dillon@elginps.com. (Swaminathan Aff. ¶ 19.) Analysis of emails sent from Dillon's Elgin email account revealed a timeline of Dillon setting up and then running Dillon Industries while still employed by Elgin.

On September 22, 2021, Dillon sent an email from his Elgin email account ("Chad.Dillon@elginps.com") to a personal Gmail account ("clearwaterfarms13@gmail.com") attaching a plan for his new competing business. (Swaminathan Aff. ¶ 20; *id.* Ex. D-1.) The plan's executive summary stated that "Dillon Decanter and Machine, will solely focus on the repairing and manufacturing of horizontal decanter centrifuges" and "I will want 2/3 of the market by 2025." (Swaminathan Aff.,  Ex. D-1 at 2.) The plan also stated: "Within the first 3-4 years, we will develop a spare parts division, that will focus on reverse engineering common parts for most major makes and models of centrifuges." (*Id.*) Dillon projected $1 million in sales during the business's second year of operation and $2.5 million in the third. (*Id.* at 4.) Dillon also projected needing five to seven employees in year two and seven to ten employees in year three. (*Id.*)

Dillon then got to work setting up his new business. On October 19, 2021, Dillon filed paperwork with the West Virginia Secretary of State's Office incorporating Dillon Industries, Inc.[3] (*See* Am. Compl. ¶ 10.) The next day, he sent an email from his Elgin email account to "Samueldillon422@yahoo.com" with the subject line "Print" attaching an Application for Employer Identification Number for Dillon Industries, specifying in the form that he had "started a new business" involved in "Manufacturing Steel and Other Metals." (Swaminathan Aff. ¶21; Ex.

---

[3]    *See*   https://apps.sos.wv.gov/business/corporations/organization.aspx?org=522421.   "Dillon Decanter and Machine" is listed a trade name for the business with the "Effective Date" of January 6, 2023.

D-2.)  On December 3, 2021, Dillon forwarded from his Elgin email account to his personal Gmail account an email from Poca Valley Bank attaching documents related to setting up a Business Online Banking account for Dillon Industries. (Swaminathan Aff. ¶ 22; *id.* Ex. D-3.)

On February 17, 2022, Dillon sent an email from his Elgin email account to "chad.dillon@dillondecantermachine.com" a purchase order showing that the day before, Dillon Industries had ordered from American Hofman Corporation (1) a PCX-24.1 Horizontal Hard Bearing Dynamic Belt Drive Precision Balancing Machine for $91,040 and (2) remote angle hardware and software, presumably related to the balancing machine, for $2,702. (Swaminathan Aff. ¶24; *id.* Ex D-5.) Because Dillon Industries uses the trade name "Dillon Decanter and Machine," Elgin had reason to believe that Dillon used this email address while operating Dillon Industries. (*See* Am. Compl. ¶ 10.)

By March 2022, Dillon was already servicing Elgin's customers through Dillon Industries. On March 16, 2022, he sent an email from his Elgin email address to an employee of Darling Ingredients (which is a division of Jay Gee Manufacturing) containing bank account information for Dillon Industries. (Swaminathan Aff. ¶25; *id.* Ex. D-6.) Later  that month, Darling Ingredients sent two purchase orders to Dillon Industries ordering shafts and internal pipe collars for a total of $43,750. (Swaminathan Aff. ¶26; *id.* Ex D-7.) In April 2022, Dillon sent an email from his Elgin address to his Dillon Industries address attaching Elgin's copyrighted 24x60 manual.[4] (Swaminathan Aff. ¶27; *id.* Ex. D-8.)

---

[4] After discovering this email forwarding a copy of Elgin's 24x60 Manual to Dillon's email address for Dillon Industries, Elgin immediately initiated the process of registering its copyright. (*Id.* ¶ 140.) It submitted an expedited registration application with the U.S. Copyright Office, which was granted on June 14, 2023. (*Id.*; *see* Am. Compl. Ex. 7, DKT 121-7, 1-7.) Elgin filed this lawsuit two days later. (*See generally* Am. Compl.)

In the months that followed, Dillon sent more emails related to Dillon Industries' operations from his Elgin address, including the following:

- On May 16, 2022, an invoice for a Griffin Shaft with part number "JG0082" from Control Point Machining and Fabrication billed to Dillon Industries, (Swaminathan Aff. ¶ 29; *id.* Ex. D-10.);

- On June 2, 2022, a packing slip for Jay Gee Manufacturing prepared by Dillon Industries, (Swaminathan Aff. ¶ 31 *id.* Ex. D-12.);

- On June 8, 2022, a packing slip for Jay Gee Manufacturing prepared by Dillon Industries, (Swaminathan Aff. ¶32; *id.* Ex. D-13.); and

- On July 26, 2022, a packing slip for Jay Gee Manufacturing prepared by Dillon Industries, (Swaminathan Aff. ¶33; *id.* Ex. D-14.).

### 4. Defendants' admit taking and using electronic Elgin Drawings.

Prior to filing this motion, Elgin attempted to get Defendants to cease and desist all possession and use of its confidential, proprietary and trade secret information, including by demanding they stop doing business with Elgin suppliers and customers with whom Defendants have used or shared Elgin's information. While Elgin was able to secure the return of some of its information, most of it remains in Defendants' hands where they are using it to this day. Indeed, Defendants admitted that they took Elgin's electronic Drawing files from Elgin's secure servers, uploaded them onto Dillon Industries' servers, removed Elgin's label from the files, and placed Dillon Industries' label on them. (*See* **Ex. 4**, July 28, 2023 E-mail from S. Harvey to R. Schaller). Elgin independently reviewed one set of files provided by Defendants and confirmed the Drawings marked Dillon Decanter (the trade name of Dillon Industries) were exact replicas of electronic Drawings created by Elgin employees in the course of their employment using Elgin equipment and labeled by Elgin as confidential and proprietary. (Henley Aff. ¶ 49.)

The Elgin Drawings Defendants admit they are using are just the tip of the iceberg. Elgin's investigation revealed that on February 1 and March 31, 2023, Ritchie accessed thousands of

Drawing files (including SLDDRW, SLDPRT, SLDASM and DXF files) that he copied from Elgin's server on the Ritchie External Hard Drive 2, pertaining to a 24 x 60 centrifuge, an 18x50 centrifuge, an 18 x 42 centrifuge, a 24 x 38 centrifuge, a Lynx40 machine, and a 2612 DIG Hammer Mill. (Swaminathan Aff. ¶ 59-64). It would take a year and considerable money and effort for Defendants to recreate these Drawings from scratch. (Henley Aff. ¶ 56) This head start allowed Defendants to begin fulfilling orders for Elgin's customers, using Elgin designs, within weeks of Dillon and Ritchie leaving Elgin. (*Id.* ¶56.) By removing Elgin's mark and placing the Dillon Decanter mark on the electronic Drawings, Defendants created confusion among suppliers and customers as to the origin of the electronic Drawing. (*Id.*)

C.   **Elgin has continuously attempted to resolve disputes before filing this motion**

To summarize, Elgin first became aware of Defendant Dillon's active solicitation of its employees in March 2023. Since then, Elgin has engaged in an active investigation and exchanged detailed correspondence with Defendants and their counsel to attempt to (1) discovery the extent of Defendants' misconduct and (2) negotiate with Defendants to remediate the harm Elgin has suffered and continues to suffer as result of Defendants' misconduct. Defendants have slowly trickled information to Elgin after Elgin has made specific, repeated demands for information and action on Defendants' part. Now, these efforts have been exhausted without a satisfactory resolution that would protect Elgin's interest and cease the harm it continues to suffer. Elgin thus has no choice but to seek the Court's immediate intervention.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 65 authorizes district courts to issue preliminary injunctions. The purpose of a preliminary injunction is to protect the movant from irreparable harm and to preserve the Court's power to render a meaningful decision after a trial on the merits. *See dmarcian, Inc. v. dmarcian Europe BV*, 60 F.4th 119, 145 (4th Cir. 2023). In seeking a preliminary

injunction, the movant must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *dmarcian*, 60 F.4th at 145 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008)). As discussed below, however, "[i]n deciding motions for preliminary injunctions in the context of copyright law, a lower standard of proof is applied." *Palmetto Builders & Designers, Inc. v. UniReal, Inc.*, 342 F. Supp. 2d 468, 471 (D.S.C. 2004).

## ARGUMENT

### I.     Elgin will likely prevail on its claims

At this stage, Elgin "need not establish a certainty of success," but rather must "make a clear showing that [it is] likely to succeed at trial." *Roe v. Dep't of Defense*, 947 F.3d 207, 219 (4th Cir. 2020) (cleaned up), *as amended* (Jan. 14, 2020).

#### A.     Misappropriation of trade secrets

Elgin asserts claims for trade secret misappropriation under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, and the West Virginia Uniform Trade Secrets Act ("UTSA"), W. Va. Code § 47-22-1 *et seq.* Both statutes authorize issuing an injunction to prevent "actual" or "threatened" misappropriation of a "trade secret."[5] 18 U.S.C. § 1836(b)(3)(A); W. Va. Code § 47-22-2. This includes "requiring affirmative actions to be taken to protect the trade secret." 18 U.S.C. § 1836(b)(3)(A)(ii); *accord* W. Va. Code § 47-22-2(c). To show a

---

[5] The DTSA creates a federal cause of action that largely mirrors the UTSA. Indeed, the DTSA's definitions of "misappropriation" and "improper means" are largely identical to the UTSA's. *Compare* 18 U.S.C. § 1839(5), (6), *with* W. Va. Code § 47-22-1(a), (b). And the statutes' definitions of "trade secret," while not identical, are substantially equivalent. *Compare* 18 U.S.C. § 1839(3), *with* W. Va. Code § 47-22-1(d). Additionally, the substantive standard for misappropriation is identical under the UTSA and DTSA, at least as they apply here. Thus, Elgin does not undertake a separate analysis of each of its trade secrets claims in this brief. *Cf. Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1317 n.13. (11th Cir. 2020).

likelihood of success on the merits regarding its claims for trade secret misappropriation, Elgin must establish (1) the existence of a trade secret, (2) the trade secret's misappropriation, and—for its federal claim only—(3) that the trade secret implicates interstate or foreign commerce. *dmarcian*, 60 F.4th at 141. Elgin need not independently show it has suffered harm here because, "[b]y statutory definition, trade secret misappropriation *is* harm." *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 913 (3d Cir. 2021) (citing 18 U.S.C. § 1839(3), (5)).

### 1.      Elgin's information qualifies as trade secrets

A "trade secret"—broadly defined under both the DTSA and UTSA—means information that (1) derives economic value from not being readily ascertainable by others and (2) is the subject of reasonable efforts to maintain its secrecy. 18 U.S.C. § 1839(3); W. Va. Code § 47-22-1(d). "[T]he determination whether a trade secret exists ordinarily presents a question of fact to be determined by the fact finder from the greater weight of the evidence." *Decision Insights, Inc. v. Sentia Grp., Inc.*, 416 F. App'x 324, 329 (4th Cir. 2011) (citation omitted); *see Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 540 (7th Cir. 2021). The information that Defendants stole from Elgin meets both elements.

Economic value stemming from the information's secrecy. Defendants accessed, downloaded, and are using Elgin's proprietary, electronic Drawings and other information developed during the Elgin Redesign Process, i.e., the process by which Elgin analyzes, modifies, and improves upon the designs of decanter centrifuges and hammer mills. The end result of this process is superior equipment; Elgin improves upon the designs it starts with through painstaking research, measurements, and trial and error, and produces equipment that outperforms that marketed and sold by its peers.

Electronic Drawings play a critical role in the Elgin Redesign Process. They are different from, and far more valuable than, paper copies of Drawings. (Henley Aff. ¶ 19z) Electronic

Drawings are created using special software, including AutoCAD and SolidWorks, and are stored in various file extensions, including SLDDRW, SLDPRT, DXF and SLDASM. (*Id*. ¶ 18.) With an electronic Drawing, the design of a component can be isolated and modified (using SLDDRW or SLDPRT file formats) and then re-inserted back into a three-dimensional model of the equipment (using SLDASM file format). (*Id*. ¶19.) To modify a paper Drawing, the drafter would need to make a new drawing by hand and then engage in trial-and-error testing to achieve what computer software can accomplish in an instant using electronic Drawing files. (*Id*. ¶ 19.) Further, one particular file extension for Drawings – DXF files – are compatible with certain manufacturing equipment. (*Id*. ¶ 19.) The DXF file can be loaded directly to the manufacturing equipment to provide digital instructions for the manufacture of centrifuge and hammer mill components. (*Id*. ¶ 19.)

The files copied by Defendant Ritchie from Elgin's secure computer server to an external hard drive on August 12 and December 6, 2022, and January 18, 2023, concerning 24 x 60 centrifuge, an 18x50 centrifuges an 18 x 42 centrifuge, a 24 x 38 centrifuge, a Lynx40, and a 2612 DIG Hammer Mill contain Elgin's trade secrets.

As discussed above, Ritchie copied all or nearly all the information necessary to build each of these six equipment models. Defendants admit they have used Elgin's electronic Drawings and other Elgin information to manufacture equipment to compete against Elgin.

Defendants may argue that the Drawings and other materials can be readily ascertained by obtaining Elgin's equipment and reverse engineering these materials. The following illustrative example from Third Restatement of Unfair Competition, however, shows that this is not the case:

> A manufactures heavy-duty centrifugal blowers. Drawings containing dimensions and specifications for components of the blowers are taken without authorization by B, a former employee of A, and used to manufacture a competing product. Although the approximate dimensions and specifications of A's products can be

> determined by measuring blowers sold by A on the open market, the evidence establishes that the information resulting from such measurements would be less accurate than the drawings taken by B and less valuable in manufacturing competing products. The acquisition of information as accurate as that contained in the drawings taken by B would require a statistical analysis of measurements taken from a large number of A's blowers. The court may properly conclude that the information contained in the drawings is not readily ascertainable by proper means and is thus sufficiently secret to be protected as a trade secret. B is thus subject to liability to A for the appropriation of A's trade secrets under the rules stated in § 40.

*Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 4:09-CV-782, 2012 WL 3929821, at *3 (S.D. Tex. Sept. 7, 2012) (quoting Restatement (Third) of Unfair Competition § 39 cmt. (f), illus. (5)). Noting the similarity of this example with the case before it, the court in *Ultraflo* denied the defendant's motion to dismiss a claim of trade secret misappropriation where the plaintiff "alleged that Pelican Tank's competing valve matches Ultraflo's drawings better than Ultraflo's own valve matches the drawings, suggesting that even a statistical analysis of the publicly available valve would fail to give the Defendants the information they sought to obtain." *Id.* (cleaned up).

Similarly, courts have found likelihood of success on the merits of a trade secret claim where the plaintiff demonstrated that electronic files were not readily available to others, even if third parties have independently developed code that performs the same function as the plaintiff's trade secret. *See WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 847 (N.D. Cal. 2019), *modified in part*, No. 5:18-CV-07233-EJD, 2019 WL 5722620 (N.D. Cal. Nov. 5, 2019); *Moement, Inc. v. Groomore, Inc.*, No. 222CV02871MWFJEMX, 2022 WL 18284405, at *5 (C.D. Cal. Nov. 29, 2022) (explaining that "source code is undoubtedly a trade secret" and is protected even if some elements of it are in the public domain if the combination "is kept secret and has economic value.") (citing cases); *Bridgetree, Inc. v. Red F Mktg. LLC*, No. 3:10-CV-00228-FDW, 2013 WL 443698, at *7 (W.D.N.C. Feb. 5, 2013) ("The existence of similar products in the marketplace, some of which may include similarities in their formulas and methods, does not foreclose the fact that a unique combination of processes could be 'not generally known.'")

Here, Elgin has presented evidence that Defendants took the highly technical, electronic Drawings and other information necessary to build complex machinery and have used them to manufacture products that compete against Elgin. As a result, Defendants' access to Elgin's information has allowed them to mimic Elgin's designs much more closely than if they had simply attempted to create a competing product from purchasing and then analyzing a piece of Elgin-manufactured machinery. Additionally, it has allowed Defendants to begin competing against Elgin much more quickly than if they had started from scratch. Electronic Drawings have a higher degree of functionality and value than their paper counterparts. As discussed above, the Elgin Redesign Process takes months and substantial investments of time and money to produce electronic Drawings of improved, superior equipment. By taking Elgin's electronic Drawings that were the end result of that process, Defendants gained an unfair advantage without having to spend the time, effort, and money that Elgin did to create valuable electronic Drawings depicting a redesigned and superior product. Thus, Elgin's electronic Drawings and the other written instructions, manuals, and lists created during the Elgin Redesign Process have economic value, and that value is derived from the information's secrecy. Without it, competitors like Defendants can gain an unfair advantage piggybacking off of Elgin's hard work.

Elgin's reasonable efforts to safeguard its information. "Secrecy is a question of fact[.]" *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 664 (4th Cir. 1993); *see Niemi v. NHK Spring Co., Ltd.*, 543 F.3d 294, 303 (6th Cir. 2008). A plaintiff's efforts to maintain secrecy "need not be absolute. Reasonable precautions to protect the secrecy of a trade secret will suffice." *Glynn v. Impact Sci. & Tech., Inc.*, 807 F. Supp. 2d 391, 435 (D. Md. 2011) (quoting *Pioneer Hi-Bred Int'l v. Holden Found. Seeds*, 35 F.3d 1226, 1235 (8th Cir. 1994)), *aff'd sub nom. Glynn v. EDO Corp.*, 710 F.3d 209 (4th Cir. 2013). Moreover, "the owner of a trade secret may, without losing

protection, disclose it to a licensee, an employee, or a stranger, if the disclosure is made in confidence, express or implied." *MicroStrategy Inc. v. Bus. Objects, S.A.*, 331 F. Supp. 2d 396, 416 (E.D. Va. 2004) (citation omitted).

As discussed above, Elgin protects its information by, among other things, (1) requiring username and password credentials to access them, (2) maintaining and circulating confidentiality policies in the Employee Handbook and the Code of Conduct prohibiting employees from improperly using or disseminating the information, (3) requiring certain high-level employees—including Defendant Dillon—to sign confidentiality agreements, (4) requiring that the information be created and stored on company-owned computer servers and equipment, (5) only disclosing the information to certain employees who need access to it to perform their job duties, (6) in the case of the drawings, physically marking them confidential and proprietary to Elgin and sharing them only under an express or implied promise of confidentiality, and (7) upon receiving notice of the termination of their employment, cutting off former employees' access to its facilities, systems, and data storage and requiring that they return any information in their possession. (Am. Compl. ¶¶ 64–82; Emp. Handbook at 7–9, 15, 17; Code of Conduct at 6–8; Henley Aff. ¶8; Clark Aff. ¶ 8.) These all qualify as reasonable efforts to maintain secrecy under the DTSA and UTSA.[6]

---

[6] *See Capital Meats, Inc. v. Meat Shoppe, LLC*, CIV. JFM-15-212, 2015 WL 4249166, at *7 (D. Md. July 9, 2015) (limiting access to certain "authorized users," storing the information only on company-owned servers and computers, requiring "office log-ons and passwords," and "cancel[ing] and remov[ing] access to the Database and Call Center Website for the employees who had left" constitute reasonable efforts to maintain secrecy); *Uhlig LLC v. Shirley*, 6:08-CV-01208-JMC, 2012 WL 2923242, at *7 (D.S.C. July 17, 2012) (use of "confidentiality agreements," "network passwords" and "restricted access to certain information depending on the employee's job functions" provided evidence that the plaintiff "imposed reasonable efforts to protect the secrecy of the trade secrets"); *MicroStrategy*, 331 F. Supp. 2d at 416 ("Restricting access to information, implementing confidentiality agreements, and providing physical barriers to access are all reasonable efforts."); *see also Albert S. Smyth Co. v. Motes*, No. CCB-17-677, 2018 WL 3635024, at *3, 6 (D. Md. July 31, 2018) (finding limited employee access and handbook forbidding disclosure constituted reasonable steps to secure secrecy).

### 2.    Defendants misappropriated Elgin's trade secrets

One can misappropriate a trade secret by "acquisition," "disclosure," or "use." 18 U.S.C. § 1839(5). A person misappropriates a trade secret by acquisition when he acquires it and "knows or has reason to know that the trade secret was acquired by improper means." *Id.* § 1839(5)(A). A person misappropriates a secret by disclosure or use if he uses or discloses it "without express or implied consent" and either:

(i) used improper means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—

    (I) derived from or through a person who had used improper means to acquire the trade secret;

    (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

    (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(iii) before a material change of the position of the person, knew or had reason to know that—

    (I) the trade secret was a trade secret; and

    (II) knowledge of the trade secret had been acquired by accident or mistake;

*Id.* § 1839(5)(B). "Improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* § 1839(6). "[I]mportantly, determining whether a trade secret has been misappropriated is uniquely factual in nature because it ordinarily involves extensive circumstantial evidence that must be evaluated against the direct evidence often presented by defendants in a trade secrets case." *Keystone Transp. Sols., LLC v. Nw. Hardwoods, Inc.*, No. 5:18-CV-00039, 2019 WL 1756293, at *5 (W.D. Va. Apr. 19, 2019) (cleaned up). Here, Plaintiff has

provided ample facts proving Defendants acquired Elgin's trade secrets by improper means and used and disclosed them without Elgin's consent.

       <u>Acquisition by improper means</u>. As discussed above, Ritchie copied vast amounts of Elgin's trade secrets while Ritchie was still employed by Elgin and working with Dillon on the side to launch Dillon Industries. He continued to access Elgin's information after resigning from Elgin. Ritchie's continued activity accessing Elgin's information after his employment ended, which is sufficient to establish misappropriation. *See, e.g.*, *Integrated Global Servs., Inc. v. Mayo*, 3:17-CV-563, 2017 WL 4052809, at *8 (E.D. Va. Sept. 13, 2017) ("Mayo no longer was employed with IGS, and thus had no legitimate reason to access—let alone *copy*—IGS's trade secret information.").

       While Elgin authorized Dillon and Ritchie to access its trade secrets and other confidential information while they were employed by Elgin and in connection with their job duties for Elgin, Elgin made it abundantly clear through its policies that employees were prohibited from using Elgin's confidential information for any other purpose – and specifically prohibited its use for any purpose in conflict with Elgin's interests. (*See* Emp. Handbook at 8–9; Code of Conduct at 6–8.) Dillon's contracts with Elgin also made clear that he had a duty not to disclose Elgin's confidential information. (APC Agreement at 26; Emp't Agreement at 8.) Dillon's and Ritchie's violations of Elgin's policies and contractual rights provides additional evidence that Defendants acquired Elgin's trade secrets through improper means. *See, e.g.*, *Cree, Inc. v. Bain*, 1:15-CV-547, 2015 WL 12911774, at *1 (M.D.N.C. July 13, 2015) (granting TRO where employee emailed trade secrets from work email address to outside email address in "violation of Cree's confidentiality policies, . . . Code of Conduct and of the confidentiality provisions of the Handbook.").

Elgin has also submitted evidence that Ritchie did not have a legitimate reason to access Elgin's trade secret information that he copied in August and December 2022, and January 2023. That is, Ritchie copied information regarding a 24 x 60 centrifuge, an 18x50 centrifuges an18 x 42 centrifuge, a 24 x 38 centrifuge, a Lynx40, and a 2612 DIG Hammer Mill during a time when Elgin had no pending orders or jobs related to either piece of equipment. (Clark Aff. ¶ 14-16.) Thus, Ritchie had no reason related to the performance of his job duties to access this information, let alone copy it. That he did so shortly before resigning provides additional circumstantial evidence of misappropriation. *See, e.g.*, *Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488, 514 (E.D. Va. 2021); *GlaxoSmithKline, LLC v. Brooks*, 8:22-CV-00364-PWG, 2022 WL 463070, at *3 (D. Md. Feb. 15, 2022).

Threatened use and disclosure. After leaving Elgin, Dillon immediately began manufacturing centrifuges and hammer mills for Elgin's customers, using Elgin's suppliers and employees, without Elgin's consent, and in violation of Dillon's contracts, Elgin's policies and trade secret law. Defendants' efforts were so successful that Elgin's customers stopped doing business with Elgin and began ordering the exact same products and services from Dillon Industries. (*See* Henley Aff. ¶ 54-56) Recently, when Elgin confronted Defendants with evidence that they misappropriated Elgin's trade secrets, they *admitted* to taking Elgin's electronic Drawing files and using them for Dillon Industries. This conclusively establishes actual use and disclosure.

In addition to Defendants' admissions, the similarly of the product and the timing also provide circumstantial evidence of misappropriation. "[E]vidence of a similar product may give rise to an inference of actual use under certain circumstances, such as when the defendant's product was quickly developed by someone who had recently resigned from the plaintiff-company."[7]

---

[7] *See, e.g.*, *Oakwood Labs.*, 999 F.3d at 912–13 (reversing dismissal of DTSA claim where the

*Aspen Tech., Inc. v. M3 Tech., Inc.*, 569 F. App'x 259, 267 (5th Cir. 2014) (cleaned up). The similarities between this case and those cited herein compels the same conclusion: Defendants misappropriated Elgin's trade secrets and gained an unfair advantage in the process; they were able to skip months of time and expending substantial resources to research and redesign equipment and compete against Elgin by manufacturing nearly identical equipment. Moreover, the evidence here is not only circumstantial. Elgin has direct evidence that Ritchie copied its trade secrets before Dillon Industries began using those trade secret files to manufacture similar products.

### 3. Elgin's trade secrets implicate interstate or foreign commerce

Under the DTSA, Elgin must also show that the trade secrets at issue are "related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). Elgin's verified complaint and the affidavit of Christopher Henley both establish the interstate nature of Elgin's business related to the trade secrets at issue here. (Am. Compl. ¶¶ 150, 159; Henley Aff. ¶5-6.)

---

plaintiff proffered circumstantial evidence "to demonstrate that the Defendants could not have so quickly developed microsphere products without using Oakwood's trade secrets"); *Bridgetree, Inc. v. Red F Mktg. LLC*, 3:10-CV-00228-FDW, 2013 WL 443698, at *8 (W.D.N.C. Feb. 5, 2013) ("The jury could reasonably infer that the evidence showing Red F subsequently had working technologies to compete with Plaintiff [shortly after] the hiring of Mr. Li indicated Defendants misappropriated trade secrets . . . ."); *KnowledgePlex, Inc. v. Placebase, Inc.*, No. C 08-4267 JF (RS), 2008 WL 5245484, at *8 (N.D. Cal. Dec. 17, 2008) (plaintiff adequately alleged misappropriation where, among other things, the "Defendant developed its product in so much less time, at such an inferior cost, and with so many fewer resources that Defendant could only have copied, incorporated, and prepared derivative works of KnowledgePlex's confidential code"); *Monovis, Inc. v. Aquino*, 905 F. Supp. 1205, 1231 (W.D.N.Y. 1994) ("The circumstances of ATC's speedy coming of age in the single-screw compressor marketplace weigh decidedly in favor of the inference that they misappropriated the plaintiffs' trade secrets.").

## B.     False designation of origin

Elgin establishes a likelihood of success on the merits of its false designation of origin claim. The Lanham Act prohibits a "false designation of origin" that is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association ... or as to the origin" of "goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(A). False designation claims fall into two categories: "passing off" and "reverse passing off." This case concerns the latter,  which occurs when a "producer misrepresents someone else's goods or services as his own." *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 438 (4th Cir. 2010), *as amended* (Aug. 24, 2010), *quoting Dastar Corp. v. Twentieth Century Fox Film Corp.,* 539 U.S. 23, 28 n. 1 g(2003). To succeed on its reverse passing off claim, Elgin must show "(1) that the work at issue originated with the plaintiff; (2) that origin of the work was falsely designated by the defendant; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that the plaintiff was harmed by the defendant's false designation of origin." *Universal Furniture Int'l, Inc.* 618 F. 3d at 438, quoting *Syngenta Seeds, Inc. v. Delta Cotton Coop., Inc.,* 457 F.3d 1269, 1277 (Fed.Cir.2006).

As to the first element, Elgin is the origin of the equipment Dillon Industries is offering for sale, even if it does not manufacture all of the parts. In *Universal Furniture*, the Fourth Circuit found the plaintiff was the "origin" of furniture, even if it did not produce it, because "it is the company that markets and 'stands behind' its furniture collections." *Id*. Here, Elgin markets, obtains components for and stands behind its equipment through use of its mark on its Drawings, manuals, and other works created to facilitate Elgin's sale of its products to its customers. For example, the copyrighted 24x60 Centrifuge Operations Manual that Dillon sent from his Elgin email account to his Dillon Industries email account contains Elgin's mark and describes the maintenance and operational requirements for "Elgin Separation Solutions equipment" and the

"Elgin Separation Solutions centrifuge."  (Swaminathan Aff.,  Ex.D-8 at 2) The Drawings the Defendants used are copies of Elgin Drawings, stripped of any references to Elgin with Dillon Industries' name superimposed. The Drawings purport to provide engineering details for a Dillon Industries 24 x 60 centrifuge, even though no such equipment exists. *See John Bean Techs. Corp. v. B GSE Grp., LLC*, 480 F. Supp. 3d 1274, 1307 (D. Utah 2020) (finding plaintiff was the origin of equipment where the defendant removed the plaintiff's name from its drawings and manuals, and superimposed the defendant's name, thus claiming to offer its own product for sale when the produce was actually made by the plaintiff).

The second element that the origin of the work was falsely designated by the defendant is also satisfied. Defendants admit the only change they made to Elgin's Drawings was to remove Elgin's name and replace it with Dillon Industries' name. This case is like *Johnson v. Jones*, 149 F.3d 494, 503 (6th Cir. 1998), where an architect falsely designated drawings as his own by removing the real architect's name and inserting his own. There, the Sixth Circuit found it "difficult to imagine how a designation of origin of a product could be more false, or could be more likely to cause confusion or mistake as to the actual origin of the product." *Id*. There was no question the two architects provided the same kinds of services and used similar marketing channels, and that they competed against each other in the market for architectural services. Further, it was beyond dispute that by removing the plaintiff's name from the architectural plans and adding his own, the defendant intended people to believe the drawings were his. Again, the Court was "hard-pressed to imagine what effects these actions could possibly have other than to convince anyone who looked at the plans that they were [the defendant's] work. Few are the cases demonstrating a more obvious and imminent likelihood of confusion." *Id*. So too here.

The third element, consumer confusion, is broadly construed. "[W]here a court concludes a defendant has falsely designated the origin of its product, likelihood of confusion may be presumed." *John Bean Techs. Corp. v. B GSE Grp., LLC*, 480 F. Supp. 3d 1274, 1308 (D. Utah 2020); *Laura Laaman & Assocs., LLC v. Davis*, No. 3:16-CV-00594 (MPS), 2017 WL 5711393, at *6 (D. Conn. Nov. 27, 2017) ("As a general matter, however, courts have concluded that a party's attempt to pass off another party's product as its own satisfies the confusion requirement of the Lanham Act for an obvious reason—it represents a direct attempt to confuse a consumer about the origin of a product."). Thus, Elgin easily establishes the third element.

Finally, Elgin has been harmed and continues to suffer significant harm from Defendants' false designation of Elgin's Drawings as Dillon Industries. In a reverse passing off case, "the originator of the misidentified product is involuntarily deprived of the advertising value of its name and of the goodwill that otherwise would stem from public knowledge of the true source of the satisfactory product.' " *Bennett v. Zydron*, No. 2:17CV92, 2018 WL 10550750, at *2 (E.D. Va. Apr. 25, 2018), *quoting Universal Furniture*, 618 F.3d at 439 (internal citations omitted). Here, Dillon Industries used a false designation to begin immediately competing against Elgin, bypassing the months it would take to create the thousands of electronic Drawings that Ritchie took from Elgin. Defendants put Dillon Industries' name on Elgin's drawings in order to confuse parts manufactures into making components for Dillon Industries. Had Defendants not falsely designated Elgin's Drawings as belonging to Dillon Industries, the parts manufacturers would not have submitted proposals for or manufactured the components Defendants are using to manufacture equipment for Elgin's customers, including Darling Ingredients. Thus, Elgin is being harmed by Dillon Industries' false designation of Elgin's Drawings as its own.

### C.    Copyright infringement

The Copyright Act authorizes any court having jurisdiction over a copyright infringement claim to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a).  Elgin can succeed on its claim for copyright infringement by showing: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Robinson v. New Line Cinema Corp.*, 211 F.3d 1265 (4th Cir. 2000) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991)). Under Fourth Circuit precedent, once the plaintiff establishes a prima facie claim of copyright infringement, the court is "entitled to presume" that the plaintiff "could show both probable likelihood of success on the merits and irreparable harm." *Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 690 (4th Cir. 1992); *see also Concrete Machinery Co., Inc. v. Classic Lawn Ornaments, Inc.,* 843 F.2d 600, 612 (1st Cir. 1988) (explaining "[t]here is, therefore, no need actually to prove irreparable harm when seeking an injunction against copyright infringement"); *Palmetto Builders*, 342 F. Supp. 2d at 471.

Elgin's evidence establishes a prima facie claim of copyright infringement. First, Elgin owns a valid copyright in the 24x60 Manual. The registration of a copyright with the U.S. Copyright Office is prima facie evidence of ownership of a valid copyright and the facts stated in the registration, shifting the burden to the alleged infringer to dispute their validity. *Serv. & Training*, 963 F.2d at 688; *Universal Furniture Int'l, Inc.*, 618 F.3d at 428.

As part of their job duties for Elgin, Elgin employees contributed original drawings, schematics, and text to the 24x60 Manual. (Henley Aff. ¶25.) Prior to filing this lawsuit, and within five years of first publication, Elgin registered its copyright in the 24x60 Manual with the U.S. Copyright Office. On June 14, 2023, Elgin was issued a copyright registration certificate. (*See* Am.

Compl. Ex. 7, D.E. 1-7.) Thus, Elgin has shown a likelihood of success on the first element of its copyright infringement claim.

Elgin also satisfies the second element of a copyright infringement claim – the copying of the copyrighted work – by providing *direct evidence* of unauthorized copying. "The copying of copyrighted work into an email and forwarding it on may constitute copyright infringement." *Stern v. Weinstein*, No. CV 09-1986-GHK (PLAx), 2010 WL 11459791, at *5 (C.D. Cal. Jan. 6, 2010), *aff'd*, 512 F. App'x 701 (9th Cir. 2013); *see also Therapeutic Research Fac. v. NBTY, Inc.*, 488 F. Supp. 2d 991, 995 (E.D. Cal. 2007) (finding allegations of "pasting of text from the copyrighted work into an email, sending of emails to unauthorized users and improperly accessing the Publication for purposes of preparing FDA notifications, sufficiently alleges a violation of Plaintiff's exclusive rights to display, reproduce and distribute its work protected by the Copyright Act."); *Robert L. Stark Enters., Inc. v. Neptune Design Grp., LLC*, No. 1:16 CV 264, 2017 WL 1345195, at *5 (N.D. Ohio Apr. 12, 2017) (finding that emailing plans to someone else for purposes of preparing unauthorized derivative work was a reproduction of copyrighted material in violation of 17 U.S.C. § 106(1)). Copying also includes transferring copyrighted material from one computer to another, or one server to another. *Stern*, 2010 WL 11459791 at *5 (citing *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 519 (9th Cir. 1993)); *Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 260 (5th Cir. 1988) ("[T]he act of loading a program from a medium of storage into a computer's memory creates a copy of the program[.]").

Here, Elgin provides incontrovertible evidence that Dillon copied the 24x60 Manual on behalf of Dillon Industries by forwarding it from his Elgin e-mail address (Chad.Dillon@elginps.com) to his Dillon Industries email address (chad.dillon@dillondecantermachine.com). (Am. Compl. Ex. 6, D.E. 1-6.) He did this despite

notice that Elgin claimed copyright protection over the 24x60 Manual, including the prohibition against the 24x60 Manual being "reproduced or copied in any form, or by any means, including *electronic*" without the prior written permission of Elgin. (Am. Compl. ¶ 95 (emphasis added).)

Elgin never provided Dillon written permission to create a copy of the 24x60 Manual on the email servers of its competitor, Dillon Industries. To the contrary, in each of Dillon's written agreements with Elgin, he agreed that intellectual property such as the 24x60 Manual was the property of Elgin and that he was specifically restrained from competing or soliciting Elgin's customers or employees, specifically for the purpose of protecting Elgin's intellectual property and other legitimate business interests. (*See* APC Agreement at 26, 29; Emp't Agreement at 8–9.) Therefore, Elgin has established a prima facie case of copyright infringement, meaning the Court can presume "both probable likelihood of success on the merits and irreparable harm." *Serv. & Training*, 963 F.2d at 690.

### D. Breach of contract claims

Elgin also seeks equitable relief regarding its claims against Dillon for breach of contract. (*See* Am. Compl. at 38.) Both contracts' choice-of-law provisions select Delaware law for their interpretation, construction, validity, and enforcement (excepting Delaware's conflict-of-law rules). (APC Agreement at 34; Emp't Agreement at 5.) "West Virginia law provides that a choice-of-law provision will be upheld unless the chosen state has no substantial relationship to the parties to the transactions or unless the application of the law of the chosen state would be contrary to the fundamental public policy of this state." *Stand Energy Corp. v. Columbia Gas Transmission Corp.*, CIV.A. 2:04-0867, 2005 WL 1639320, at *3 (S.D. W. Va. July 5, 2005) (cleaned up). Delaware is the state of Elgin's formation as a limited liability company. (Am. Compl. ¶ 6.) Such a connection establishes a substantial relationship with the chosen state. *Landis v. Jarden Corp.*, 2:11-CV-101, 2014 WL 790917, at *3 (N.D. W. Va. Feb. 26, 2014). Additionally, multiple courts in West

Virginia have upheld contractual choice-of-law provisions selecting Delaware law and found that doing so would not offend this State's public policy. *See, e.g.*, *id.*; *Stand Energy*, 2005 WL 1639320, at *3. The same result is warranted here.

To establish a likelihood of success on the merits regarding its claim for breach of contract, Elgin must show "a) the existence of a contract; b) the breach of an obligation imposed by that contract; and c) resulting damages to the plaintiff." *Lorenzetti v. Hodges*, 62 A.3d 1224, 2013 WL 592923, at *3 (Del. 2013) (table); *accord Sneberger v. Morrison*, 776 S.E.2d 156, 171 (W. Va. 2015).

### 1. The APC Agreement and the Employment Agreement are valid contracts

"[T]he formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1212 (Del. 2018) (citation omitted); *accord New v. GameStop, Inc.*, 753 S.E.2d 62, 70 n.3 (W. Va. 2013). The APC Agreement governed Dillon's sale of his business to Centrifugal Services in exchange for substantial sums of money. The Employment Agreement governed Dillon's employment during which he provided services to Elgin and received a salary in return. The parties' mutual promises contained in the contracts establish that each is supported by consideration. *Fuller v. Gemini Ventures, LLC*, No. CIV.A.05C-06-019RFS, 2006 WL 2811708, at *4 (Del. Super. Ct. Oct. 2, 2006). The signatures of the parties to those agreements establish their mutual assent to the exchanges. *All Pro Maids, Inc. v. Layton*, No. CIV.A. 058-N, 2004 WL 1878784, at *3 (Del. Ch. Aug. 9, 2004), *aff'd*, 880 A.2d 1047 (Del. 2005).

### 2. Dillon breached both agreements

Elgin has shown that Dillon violated the APC Agreement's "Confidentiality" provision and the Employment Agreement's "Confidential Information," "Non-Solicitation of Customers

35

and Suppliers," and "Non-Solicitation of Employees" provisions. (APC Agreement at 26, 29; Emp't Agreement at 8–9.) Elgin has also shown that Dillon engaged in conduct that triggers the Employment Agreement's tolling provision, which states: "Employee's obligations under these Confidential Information, Non-Competition and Non-Solicitation Terms will be tolled during any period of non-compliance." (Emp't Agreement at 9.)

That is, Dillon began competing against Elgin, soliciting its employees, and directing Ritchie to copy Elgin's confidential information, in violation of the non-solicitation covenants and confidentiality provision, while still employed by Elgin and during the one-year "Applicable Period" following his employment (triggering the tolling provision). (*See id.* at 8–9; Am. Compl. ¶¶ 38-39, 196) He began directly competing against Elgin at least as early as March 2022, by soliciting, accepting, and fulfilling purchase orders from Jay Gee Manufacturing through Dillon Industries, and then by directing Ritchie to take Elgin information on his and Dillon Industries' behalf.[8] (Am. Compl. Ex. 5, DKT 21-5,.E. 1-5.) Dillon also violated both contracts' confidentiality provisions by emailing Elgin's confidential information from his Elgin email account to personal email accounts. (*See* Swaminathan Aff. ¶¶ 30.) Because Dillon still retains multiple external storage devices containing Elgin's confidential information, his breaches of these provisions is ongoing.

### 3.    Elgin has suffered harm as a result of Dillon's breaches

As a result of Dillon's flagrant breaches of his agreements with Elgin, Elgin has suffered and continues to suffer significant harm. In addition to the loss of its trade secrets and confidential information discussed above, and the diversion of its business with long-standing customers, Elgin

---

[8] Dillon's misconduct here also shows that Elgin is likely to succeed on the merits of its tortious interference claim against Dillon. *See Tiernan v. Charleston Area Med. Ctr., Inc.*, 506 S.E.2d 578, 591 n.20 (W. Va. 1998); *see also Seebach Am., Inc. v. Seetech, LLC*, CIV.A. 2:09-CV-00510, 2009 WL 3380342, at *3 (S.D. W. Va. Oct. 16, 2009).

has lost 11 employees, whom Dillon successfully solicited to resign their employments with Elgin and begin working for Dillon Industries. (Am. Compl. ¶ 145) Dillon's breaches of the two Agreements at issue will continue and cause further harm to Elgin unless this Court intervenes. Dillon continues to use Elgin's confidential information to directly compete against Elgin by servicing and soliciting Elgin's customers.

## II.     Elgin will suffer irreparable harm in the absence of an injunction

Because Elgin establishes a prima facie claim of copyright infringement, the Court may presume Elgin's irreparable harm and enter an injunction restraining the continued infringement of Elgin's copyright. *Serv. & Training*, 963 F.2d at 690. Similarly, Elgin's establishment of consumer confusion creates a presumption of irreparable injury. *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.,* 43 F.3d 922, 938 (4th Cir.1995) (noting that a finding of irreparable injury "ordinarily follows when a likelihood of confusion or possible risk to reputation appears"); *see also Thousand Oaks Barrel Co. v. Barrels*, No. 121CV848LMBTCB, 2022 WL 3337798, at *12 (E.D. Va. July 11, 2022), *report and recommendation adopted*, No. 1:21CV848 (LMB/WEF), 2022 WL 4378689 (E.D. Va. Sept. 22, 2022).

Further, Elgin will sustain irreparable harm as a result of Dillon's breach of contract and Defendants' trade secret infringement. Both contracts between Elgin and Defendant Dillon contain provisions stipulating that irreparable harm to the non-breaching party will occur upon a party's breach of certain provisions. The relevant provision of the APC Agreement provides:

> 8.2.    <u>Remedies</u>.       Except as expressly provided in this Agreement, any Person having any rights under any provision of this Agreement will be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by Law. Except as expressly provided in this Agreement, all such rights and remedies will be cumulative and non-exclusive, and may be exercised singularly or concurrently. The parties acknowledge that any breach of this Agreement may cause substantial irreparable harm to the other party. Therefore, this Agreement may be enforced in equity by specific performance,

temporary restraining order and/or injunction. The rights to such equitable remedies will be in addition to all other rights or remedies which a party may have under this Agreement or under applicable Law.

(APC Agreement at 33.) The relevant provision of the Employment Agreement similarly provides:

(e)     Remedies.     It is expressly agreed that the Company including its affiliates, will or would suffer irreparable injury if Employee were to violate any of these Confidential Information, Non-Competition and Non-Solicitation Terms and that the Company and/ or any of its affiliates will by reason of such violation be entitled to injunctive relief, without the requirement of posting of a bond, in a court of competent jurisdiction and Employee further consents and stipulates to the entry of such injunctive relief in such a court prohibiting Employee from so violating the terms of this agreement.

(Emp't Agreement at 9.)

Delaware courts "have long held that contractual stipulations as to irreparable harm alone suffice to establish that element for the purpose of issuing injunctive relief." *Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 68 A.3d 1208, 1226 (Del. 2012), *as corrected* (July 12, 2012). Because Elgin has established that it is likely to succeed on the merits of its breach of contract claim against Dillon, the Court should enforce these provisions in the Agreements at issue here.

Beyond that, Elgin has submitted ample evidence that it will suffer irreparable harm without this Court's immediate intervention. "The disclosure of trade secrets establishes immediate irreparable harm because 'a trade secret, once lost is, of course, lost forever.'" *Home Funding Grp., LLC v. Myers*, No. 1: 06cvl400, 2006 WL 6847953, at *2 (E.D. Va. Dec. 14, 2006) (quoting *Acierno v. New Castle Co.*, 40 F. 3d 645, 647 (3d Cir. 1994)). Thus, "the law is well settled that where an employee has agreed . . . that he will not divulge or disclose to his employer's detriment any trade secrets or other confidential information which he has acquired in the course of his employment, the employer is entitled to an injunction against a threatened use or disclosure of such confidential information." *E.I. du Pont de Nemours & Co. v. Am. Potash & Chem. Corp.*,

200 A.2d 428, 431 (Del. Ch. 1964); *see T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536, 557 n.66 (Del. Ch. 2000) (recognizing long line of cases finding that sharing of confidential information among competitors "is a species of harm that courts have recognized is irreparable").

Similarly, "[t]he irreparable harm requirement is satisfied where a former employee, working for a competitor, has access to and knowledge of confidential information." *GetWell Network, Inc. v. Grossman*, PWG-13-3624, 2014 WL 12908272, at *6 (D. Md. Apr. 29, 2014) (cleaned up); *see Integrated Glob. Services, Inc. v. Mayo*, No. 3:17CV563, 2017 WL 4052809, at *9 (E.D. Va. Sept. 13, 2017) ("The evidence of Mayo's employment with a direct competitor, combined with the evidence that Mayo accessed, copied, and deleted IGS's confidential, proprietary, and trade secret information while seeking employment with a competitor of IGS, satisfies the requisite clear showing of actual and imminent irreparable harm given the possibility of permanent loss of customers to a competitor." (cleaned up)); *Haught v. Louis Berkman LLC*, 417 F. Supp. 2d 777, 786 (N.D. W. Va. 2006). Evidence that a defendant "had attempted both to access [the former employer's] confidential information and to solicit a number of [its] employees to join [his new employer] after he left" further supports a finding of irreparable harm to the movant "in the loss of its clients, employees, good will, and confidential information." *E. Coast Fire Prot., Inc. v. Muhammad*, 3:08CV511-HEH, 2008 WL 11389214, at *3 (E.D. Va. Sept. 18, 2008) (cleaned up). Finally, the "risk of spoliation on its own increases the possibility of irreparable harm" to Elgin. *RC Trailers, Inc. v. Darkhorse Cargo, Inc.*, 3:19-CV-973-JD-MGG, 2019 WL 13218401, at *2 (N.D. Ind. Dec. 6, 2019).

Defendants have engaged in all of this conduct. They hatched and executed a coordinated plan to steal Elgin's Drawings and other trade secrets and confidential information, and then use that information to solicit and service Elgin's customers, all the while misleading Elgin's

customers and suppliers into believing that Dillon Industries designed and manufactured what is actually Elgin equipment. This process began while both Dillon and Ritchie were employed by Elgin and continues to today. Without the electronic Drawings taken by Ritchie, Defendants would not have been able to immediately obtain components to build decanter centrifuges and hammer mills for Elgin customers Darling Ingredients (including Jay Gee) and Paragon ISG. (Henly Aff. ¶55.) Given the volume of information taken, it would take a year for Defendants to recreate the thousands of Drawings from scratch. (*Id.*) This head start allowed Defendants to begin fulfilling orders for Elgin's customers, using Elgin designs, within weeks of Dillon and Ritchie leaving Elgin. (*Id.*) Further, Defendants' use of Elgin's electronic Drawings is causing significant confusion among Elgin's suppliers and customers, and is harming the goodwill that Elgin has spent decades building. (*Id.*) Elgin has suffered and will continue to suffer irreparable harm without this Court's immediate intervention.

## III.   The balance of harms favors Elgin

The requested equitable relief is narrow and would not harm Defendants. First, Elgin seeks a preliminary injunction enjoining Defendants from any continued possession, copying, use, or disclosure of Elgin's intellectual property (including all copyrights, trade secrets and confidential information). This would do little more than preserve the status quo as of the time immediately before Defendants' numerous legal violations and prevent Defendants from destroying, retaining, using, or disclosing Elgin's intellectual property, confidential information and trade secrets— obligations they are already bound to under state and federal law. Defendants have "no legitimate interest in possessing [Elgin's] trade secret information," and therefore "lose[ ] nothing if the injunction is granted." *Integrated Glob. Services, Inc. v. Mayo*, No. 3:17CV563, 2017 WL 4052809, at *9 (E.D. Va. Sept. 13, 2017); *see Worlds of Wonder v. Veritel Learning Sys.*, 658 F. Supp. 351, 357 (N.D. Tex. 1986) (copyright infringer has no legitimate interest in continuing to

break the law and cannot argue that its business would be harmed by enforcing a valid copyright). Likewise, the only harm Dillon Industries will suffer if not permitted to falsely designate Elgin's Drawings and designs as its own "would be the requirement to follow clearly established law and to cease its unfair business practices." *Thousand Oaks Barrel Co*., 2022 WL 3337798, at *12. By contrast, every day that Defendants are not immediately enjoined from using Elgin's intellectual property to compete against it and solicit and confuse its customers, suppliers and employees means further substantial, imminent, and irreparable harm in the form of lost confidential information, trade secrets and copyright protection, lost business and income, and lost goodwill. The harm to Elgin greatly outweighs any purported hardship to Defendants.

Second, Elgin seeks a preliminary injunction enjoining Defendants from doing business with specific Elgin customers and suppliers that are the subjects of or received the misappropriated or copyrighted Elgin information. "Defendants have no cognizable right to conduct their business with the unlawful use of" Elgin's trade secrets and confidential information. *Herrmann Int'l, Inc. v. Herrmann Int'l Europe*, 1:17-CV-00073-MR, 2021 WL 861712, at *22 (W.D.N.C. Mar. 8, 2021). "While the Defendants' business may be diminished by being unable to sell their products using" Elgin's information, "it would be unfair to force [Elgin] to compete against [its] own intellectual property and Trade Secrets." *Id.* The balance of harms weighs strongly in Elgin's favor even if Defendants were only misappropriating its trade secrets. Of course, by falsely designating Elgin's Drawings and designs as originating with Dillon Industries, and breaching their fiduciary and contractual duties to Elgin, Defendants have done much more. *See e.g., Martin Marietta Materials, Inc*., 68 A.3d at 1227 (finding balance of the equities favored vindicating the plaintiff's reasonable contract expectations over any harm defendant would suffer as a result of its own conduct).

IV.     **The public's interest is served by protecting Elgin's trade secrets, copyrights, and confidential information, vindicating its contract rights, and preventing unfair competition.**

West Virginia policy favors the protection of businesses and their trade secrets, as evidenced by the Legislature's passage of the UTSA. *See Haught*, 417 F. Supp. 2d at 787; *see also, e.g.*, *Hatfield v. Autonation, Inc.*, 939 So. 2d 155, 158 (Fla. Dist. Ct. App. 2006) ("[T]he existence of Florida's trade secret statute illustrates our state's interest in protecting businesses from theft of confidential information."). Similarly, "the public interest is clearly served by requiring companies to comply with copyright laws." *EMI April Music, Inc. v. Garland Enters., LLC*, No. CIV.A. DKC 11-3352, 2012 WL 1986529, at *5 (D. Md. June 1, 2012). The public interest is also served by an injunction preventing the public from being misled into believing a defendant's products are associated with the plaintiff and its goodwill and reputation. *Thousand Oaks Barrel Co.*, No. 2022 WL 3337798, at *12.

Further, "the public has an interest in seeing valid contracts enforced." *Sogefi USA, Inc. v. Interplex Sunbelt, Inc.*, 535 F. Supp. 3d 548, 555 (S.D. W. Va. 2021); *accord Haught*, 417 F. Supp. 2d at 787. Here, "there is no evidence the public will be harmed if a preliminary injunction is granted and [Dillon] is required to continue abiding by the same contractual obligations [he] has operated under for years." *Sogefi*, 535 F. Supp. 3d at 555. Where, as here, the movant "has shown the requisite level of likelihood of success on the merits and an interest in preserving the secrecy of the confidential information, the issuance of a limited injunction would appear to be in the public interest." *Haught*, 417 F. Supp. 2d at 787.

## CONCLUSION

WHEREFORE, for the reasons discussed above, Elgin respectfully requests that the Court grant the motion and:

A.      Enter a preliminary injunction: (i) enjoining Defendants from using, disclosing, or further accessing Elgin's copyrights, trade secrets and confidential information, including copying, modifying or using any documents in their possession, which were taken from Elgin; (ii) enjoining Defendants from destroying, deleting, or failing to retain copies of Elgin's copyrights or its trade secrets, documents, and information, (iii) enjoining Defendants from doing business with Darling Ingredients, Paragon ISG and any other Elgin customer that is the subject of the information misappropriated from Elgin; (iv) enjoining Defendants from doing business with Elgin's suppliers; and (v) enjoining Defendants from soliciting Elgin's employees; and

B.      Grant such further relief as the Court deems just.

Filed: September 1, 2023

Respectfully Submitted,

ELGIN SEPARATION SOLUTIONS, LLC and CMI/CSI LLC

By: /s/ *Rachel L . Schaller*

Rachel L. Schaller (IL ARDC No. 6306921)*
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2600
Chicago, IL 60601
Telephone: (312) 527-4000
Facsimile: (312) 527-4011
rschaller@taftlaw.com
*pro hac vice*

Jill Cranston Rice (WV State Bar No. 7421)
DINSMORE & SHOHL LLP
215 Don Knotts Boulevard, Suite 310
Morgantown, WV 26501
Telephone (304) 296-1100 / Facsimile
(304) 296-6116
jill.rice@dinsmore.com

*Counsel for Plaintiffs*

43

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

ELGIN SEPARATION SOLUTIONS, LLC
and CMI/CSI LLC f/k/a CENTRIFUGAL
SERVICES, LLC

                  Plaintiffs,

v.

DAVID CHADWICK DILLON, DILLON
INDUSTRIES, INC., and DONALD
RITCHIE,

                  Defendants.

Case No. 2:23-cv-00440

District Judge Berger
Magistrate Judge Aboulhosn

### <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on the date listed below, I filed the foregoing document with the Clerk

of the Court using the Court's CM/ECF filing system, which will send notice of such filing to all

counsel of record.

Date: September 1, 2023

                            By: /s/ _____

                            Jill Cranston Rice
                            *Counsel for Plaintiffs*

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

ELGIN SEPARATION SOLUTIONS, LLC,

        Plaintiff,

v.

DAVID CHADWICK DILLON, DILLON
INDUSTRIES, INC., and DONALD
RITCHIE,

        Defendants.

Case No. 2:23-cv-00440

District Judge Berger

Magistrate Judge Aboulhosn

## <u>AFFIDAVIT OF CHRISTOPHER HENLEY</u>

1.      I have personal knowledge of the facts set forth in this Affidavit and would testify under oath to their veracity if called upon to do so.

### Elgin's Business

2.      I am a General Manager at Elgin Separation Solutions, LLC in Poca, West Virginia. I began working for Elgin on May 30, 2022..

3.      My job duties as General Manager include aggressively developing and executing a strategy with four fundamental objectives, to improve productivity, to lower the cost of goods sold, to improve on-time delivery and to improve product quality. Provide functional leadership in the development of the company's manufacturing processes and integrated supply chain program and is an active participant in overall business planning. Provide functional leadership in the development of the Company's near term and longer-term operational plan and an integral member of the management team.

4.      Elgin's location in Poca focuses on manufacturing and repairing decanter

centrifuges and hammer mills.

5.      Elgin's trade secrets at issue in this case concern such equipment. Elgin's customers use such equipment as part of their businesses, which extend beyond West Virginia to other states and, in some instances, other countries.

6.      For example, Elgin has sold high speed decanter centrifuges to The Dupps Company, which is based in Ohio. It has also serviced such equipment and created a maintenance and operations manual for such equipment and provided it to Dupps.

7.      I am familiar with David Chadwick Dillon ("Dillon"), the former division president of Elgin's Poca location.

**Elgin's Confidential and Trade Secret Information**

8.      Elgin operates using confidential, proprietary, and trade secret information. Elgin has spent years and millions of dollars independently developing its confidential information and trade secrets, which give Elgin great advantage over its peers.

9.      Elgin's confidential, proprietary and trade secret information includes two- and three-dimensional engineered drawings ("Drawings"), parts lists and other written instructions needed for the fabrication of its specialized equipment.

10.     Elgin takes a number of steps to protect its confidential, proprietary and trade secret information.

11.     Certain high-level employees at Elgin, including division presidents (like Dillon's former position) are required to execute confidentiality agreements with Elgin to ensure the security of the secret, proprietary information Elgin shares with such employees in order to facilitate the performance of their job duties.

12.     Elgin issues to its employees a copy of its Employee Handbook, which communicates and explains company policies to employees. At the beginning of their employment, every Elgin employee receives a copy of the handbook and instructions to review it thoroughly.

13.     I have reviewed the document filed as Exhibit 3 to the complaint in this matter (Docket Entry 1-3). It is a true and accurate copy of Elgin's Employee Handbook in effect during Dillon's and Ritchie's employment.

14.     Elgin also issues to its employees a copy of its Code of Business Conduct and Ethics ("Code of Conduct"), which communicates and explains additional policies to employees. At the beginning of their employment, every Elgin employee receives a copy of the Code of Conduct and instructions to review it thoroughly.

15.     I have reviewed the document filed as Exhibit 4 to the complaint in this case (Docket Entry 1-4). It is a true and accurate copy of Elgin's Code of Conduct in effect during Dillon's and Ritchie's employment.

16.     Elgin also labels its Drawings as follows:



17.    Elgin places this label on Drawings completed by an Elgin employee to reverse engineer parts or on work reflecting Elgin's process of developing changes to Drawings over time to manufacture a better and longer lasting product. This information has been developed over many years and is constantly being adjusted by Elgin employees to meet both customer needs and an overall better product.

18.    Elgin employees create Drawings using electronic programs that generate two and three dimensional models of equipment components, including those stored as SLDDRW files (two-dimensional SolidWorks model), SLDPRT (three-dimensional SolidWorks model) files, SLDASM (SolidWorks Assembly) file and DXF (Drawing Exchange Format) files.

19.    These electronic Drawings are different from and far more valuable than paper Drawings. With an electronic Drawing, the design of a component can be isolated and modified (using SLDDRW or SLDPRT file formats) and then re-inserted back into a three-dimensional model of the equipment (using SLDASM file format). To modify a paper Drawing, the drafter would need to make a new drawing by hand and then engage in trial-and-error testing to achieve

5

what computer software can accomplish in an instant using electronic Drawing files. Further, one particular file extension for Drawings – DXF files – are compatible with certain manufacturing equipment. The DXF file can be loaded directly to the manufacturing equipment to provide digital instructions for the manufacture of centrifuge and hammer mill components. Elgin's creation and use of electronic Drawing files saves significant time and money in its fabrication of equipment.

20.     While pdf versions of electronic Drawings are sometimes distributed to customers or suppliers, Elgin does not distribute other electronic formats of the Drawings, including those contained in SLDDRW files, SLDPRT files and DXF files, absent an agreement or course of dealing with a supplier or customer assuring the confidentiality and use of the electronic file only for the intended purpose.

21.     The programs and files needed to access Elgin's electronic Drawings are installed exclusively on Elgin-issued equipment, which is password protected and requires user authentication, and are accessible only to Elgin employees who must access the files in the course of the performance of their duties for Elgin and who have agreed to abide by the Confidentiality Policy and Code of Conduct.

**The 24x60 Manual**

22.     The Dupps Company is a customer of Elgin. In Mid-2022, Dupps purchased a 24x60 decanter centrifuge from Elgin.

23.     I have reviewed Exhibit 6 to Elgin's complaint in this case (Docket Entry 1-6), which comprises emails between employees of The Dupps Company, and Don Ritchie and Chad Dillon while they were Elgin employees in April 2022. I am familiar with the Operation and Maintenance Manual for a 24x60-LH centrifuge referenced in these emails (the "24x60 Manual").

24.     Elgin created the 24x60 Manual in response to a request from Dupps to facilitate its use of the centrifuge it had purchased from Elgin.

25.     As part of their job duties, Elgin employees contributed original drawings, schematics, and text to the 24x60 Manual. This includes Don Ritchie. As a draftsman, authoring such manuals was within his job duties. Ritchie was the primary drafter of the 24x60 Manual.

26.     The 75-page 24x60 Manual contained the following information regarding the installation, operations, and maintenance of the centrifuge:

- General information on intended use, warnings, cautions, notes, safety requirements, training, and maintenance;

- Operation information on starting, operating, and shutting down the centrifuge;

- Maintenance information on maintaining, inspecting, lubricating, and locking out the centrifuge;

- Troubleshooting various problems with the machinery that may arise;

- Repairing, removing, reinstalling, and replacing various parts of the machinery; and

- Parts and drawings.

**Solicitation of Elgin Employees**

27.     In or about December 2022, Elgin found a suitable replacement to serve as President of the Poca facility, and Dillon resigned.

28.     Defendant Dillon Industries is a business owned by Dillon that competes against Elgin in the manufacture and repair of decanter centrifuges and hammer mills.

29.     Dillon contacted many Elgin employees, offering them 10% more than their current salary if they resigned their employment with Elgin and began working for Dillon Industries.

30.     During December 2022 and January 2023, 11 Elgin employees took Dillon's offer and resigned their employment with Elgin to join Dillon Industries. This was nearly half of the

workforce at Elgin's Poca location.

31.     Elgin's productivity and its ability to manufacture equipment and provide repair services suffered and continues to suffer as a result of the mass exodus of employees over this short period of time.

**Investigation and Continuing Harm**

32.     On March 24, 2023, Elgin's attorneys sent Dillon a cease-and-desist letter notifying Dillon that Elgin was exercising its rights under two contracts it had with him, requesting that he return all of Elgin's confidential information in his possession, and demanding that he immediately cease his solicitation of Elgin employees. A true and accurate copy of this letter is attached hereto as **Exhibit 1**.

33.     On March 31, 2023, Elgin received a response letter from Dillon's attorney. A true and accurate copy of this letter is attached hereto as **Exhibit 2**.

34.     The March 31 response letter denied that Dillon had solicited Elgin employees. It also stated that Dillon had discovered he was in possession of Elgin's confidential information and offered to return or destroy such information.

35.     On April 11, 2023, Elgin sent a letter to Dillon's attorney responding to the statements in his March 31 letter. A true and accurate copy of this letter is attached hereto as **Exhibit 3**.

36.     Elgin's April 11 letter specifically listed the Elgin employees Dillon had successfully solicited to leave Elgin and join Dillon Industries, and reiterated its demand that Dillon immediately and permanently cease and desist from soliciting Elgin employees. Elgin also opted to receive all physical copies of its confidential information in Dillon's possession, provided

an address to send them to, and requested that Dillon destroy all remaining digital copies.

37.     On April 18, 2023, Elgin received a response letter from Dillon's attorney. A true and accurate copy of this letter is attached hereto as **Exhibit 4**.

38.     The April 18 response letter continued to deny that Dillon had ever solicited Elgin employees and stated: "The drawings and a thumb drive with pictures described in my previous letter have been sent to you at the address provided, and all copies have been destroyed."

39.     On April 24, 2023, Elgin received (through its attorneys) from Dillon paper copies of Drawings totaling 84 pages. 80 pages of the drawings contained a notice stating that the Drawing contained Elgin's proprietary information and may not be used, copied, or disclosed without Elgin's prior written consent.

40.     The Drawings included all of the schematics necessary to build a complete 24x60 decanter centrifuge used by Elgin customer Darling Ingredients (including its subsidiary, Jay Gee Manufacturing) and nearly all the schematics necessary to build a complete 18x50 centrifuge, also used by Darling/Jay Gee. The drawings also included schematics of a Lynx 40 centrifuge used by Elgin customer Paragon ISG and schematics of a DE-7200 VFD centrifuge used by Elgin customer Halliburton.

41.     On April 25, 2023, Elgin received a USB thumb drive from Dillon containing 8,204 photographs. These disassembly photographs were taken as part of Elgin's process for inspecting, analyzing, designing, and modifying equipment.

42.     The photographs included details regarding the equipment from customers that Elgin services, measurements, areas needing repair, and part and job numbers. The order of the photographs reveals the discrete steps of the assembly and disassembly processes for equipment.

43.     On May 2, 2023, Dillon's attorney sent an email to Elgin's counsel, stating that a former Elgin employee now working for Dillon Industries had discovered additional drawings on his computer "that were a combination of drawings brought to Elgin by that employee and developed during his employment at Elgin." A copy of this email is attached hereto as **Exhibit 5**.

44.     The email also stated that "[a] thumb drive is being sent to you by mail today, and copies of the drawings have been destroyed."

45.     On May 5, 2023, Elgin received a second drive from Dillon, containing Elgin information.

46.     Upon determining the second drive contained a vast amount of Elgin data downloaded by Ritchie (including thousands of files with detailed instructions to build 24 x 60, 18 x 50, 18 x 42, 24 x 38 decanter centrifuges, a 2612 Hammer Mill and a Lynx 40 machine), Elgin expanded its investigation into the computer devices used by both Dillon and Ritchie in the course of their employment with Elgin.

47.     This investigation revealed that Ritchie continued to possess at least 12 devices connected to his Elgin computer prior to resigning and containing Elgin drawings, schematics, parts lists, and other directions for the design and manufacture of centrifuges and hammer mills.

48.     Elgin demanded that Ritchie return the devices to Elgin's forensic computer vendor. Because Ritchie has not returned all of the devices to Elgin, it is being deprived of the opportunity to determine the full extent of the Elgin information that Defendants continue to possess and the nature of the activities they have undertaken using this information.

49.     Further, through correspondence between counsel for Elgin and counsel for Dillon and Dillon Industries, Elgin received pdfs of Drawings that Dillon Industries has been using to

obtain components to build decanter centrifuges. Copies of these Dillon Decanter drawings are attached as Exhibit _6_. Based on my review of these Drawings, they are exact replicas of electronic Drawings created by Elgin employees in the course of their employment using Elgin equipment and labeled by Elgin as confidential and proprietary. Copies of the copied Elgin Drawings are attached as Exhibit _7_.

50.     In response to this discovery, Elgin demanded that Dillon and Dillon Industries cease and desist all use of Elgin's electronic Drawings.

51.     I reviewed the orders Elgin received for new capital equipment in 2022 and 2023. I also have personal knowledge of the orders on which Elgin was working in December 2022 and January 2023.

52.     Elgin did not have any new capital orders related to 18x50 centrifuges, 18 x 42 centrifuges, 24 x  38 centrifuges, 2612 Hammer Mills or Lynx 40 machine during August or December 2022, or January 2023. I know of no reason related to Elgin's business why Ritchie would need to access and copy these files during that time.

53.     Elgin considers Jay Gee/Darling to be an important customer. Before January 2023, Elgin regularly received new capital orders from Jay Gee/Darling for 24 x 60, 18 x 50, 24 x 38 and 18 x 42 centrifuges, and 2612 Hammer Mills. After January 2023, Elgin has received no new capital orders from Jay Gee/Darling for these equipment models.

54.     Elgin considers Paragon ISG to be an important customer. Before January 2023, Elgin regularly received new capital orders from Paragon ISG for 24 x 60 centrifuges and Lynx 40 machines. After January 2023, Elgin has received no orders for new capital equipment from Paragon ISG.

11

55.     Elgin has sustained and continues to sustain severe irreparable harm as a result of Defendants' use of Elgin's Drawings, and unlawful competition against Elgin. Immediately after Dillon resigned from Elgin and solicited Elgin's employees, Defendants began openly competing against Elgin using the Drawings Ritchie took from Elgin. Without the Drawings, Defendants would not have been able to immediately obtain components to build decanter centrifuges and hammer mills for Elgin customers Darling Ingredients (including Jay Gee) and Paragon ISG. Given the volume of information taken, it would take a year for Defendants to recreate the thousands of Drawings from scratch. This head start allowed Defendants to begin fulfilling orders for Elgin's customers, using Elgin designs, within weeks of Dillon and Ritchie leaving Elgin. Further, Defendants' use of Elgin's electronic Drawings is causing significant confusion among Elgin's suppliers and customers, and is harming the goodwill that Elgin has spent decades building.

56.     I hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the above statements are true and correct.

Further affiant sayeth naught.

By: _____
        Christopher Henley

12

# EXHIBIT 1



111 East Wacker Drive, Suite 2600
Chicago, IL 60601-4208
Tel: 312.527.4000 | Fax: 312.527.4011
taftlaw.com

**Rachel L. Schaller**
312.836.4128
rschaller@taftlaw.com

March 24, 2023

<u>**VIA FED EX**</u>

David Chadwick Dillon
Dillon Industries, Inc.
212 Brooke Lane
Nitro, WV 25143

> ***Re:*** ***Notice to Cease and Desist and Regarding Exercise of Contractual Rights***

Dear Mr. Dillon:

Taft Stettinius & Hollister LLP represents Elgin Industries, Inc. ("Elgin" or "the Company"), your former employer. I am writing this letter on behalf of Elgin to remind you of your obligations under your Employment Agreement and Asset Purchase and Contribution Agreement with Elgin, and demand that you immediately cease and desist from breaching the restrictive covenants and other terms in these agreements, and misappropriating Elgin's trade secrets. If you fail to comply with the terms of this letter, Elgin will be forced to seek legal relief against you in a court of law to prevent you from further causing it harm and to recover damages for the significant harm Elgin has already incurred.

As you are aware, on November 13, 2013, you sold your centrifuge business to Spinner Equipment Group Holdings, LLC and Centrifugal Services, LLC—Elgin's predecessors in interest. Paragraph 3.10 of the Asset Purchase and Contribution Agreement ("APCA") governing that transaction makes clear that you sold all intellectual property rights related to the business, including confidential information and trade secrets, which are now the property of Elgin. Please see the attached copy of the APCA.

Specifically, the intellectual property Elgin now owns includes the mechanical diagnosis of high-speed rotating equipment, including, but not limited to, decanter centrifuges, centrifugal separation devices and related equipment, whereby the diagnosis would outline the repair, remanufacture or refurbishment process steps required to bring the noted device back to Original Equipment Manufacture tolerances and/or qualified field

David Chadwick Dillon
March 24, 2023
Page 2

operational tolerances, based on collective experience, that would meet the operational field performance needs of the customer. This intellectual property constitutes a trade secret and is protected by state and federal law. Elgin's trade secrets also include customer lists and other non-public information concerning Elgin's customers.

The APCA also contains restrictive covenants that persist to this day. First, Paragraph 6.2 of the APCA prohibits you from using in any way "confidential information" (as defined in Article VII) related to the business. Elgin is aware that you now operate a business that is in direct competition with Elgin in the Nitro, West Virginia area. **Elgin hereby demands that you immediate cease and desist from using any confidential information within the scope of the APCA or trade secret owned by Elgin**. Please note that for restrictive covenants that accompany the sale of a business, courts interpret and enforce them more broadly than those accompanying an employment agreement.

Second, the APCA also requires that you "deliver promptly" to Elgin all copies of such confidential information in your possession upon request. Accordingly, **Elgin hereby formally requests under Paragraph 6.2 of the APCA that you deliver to Elgin all copies of any such "confidential information" in your possession within ten (10) days of the date of this letter.** If you do not do so, Elgin shall treat your inaction as a breach of the APCA. Moreover, your use of these confidential materials to directly compete against Elgin gives rise to claims of breach of contract and misappropriation of trade secrets, which Elgin will aggressively pursue if you continue in your misconduct.

As you are also aware, your employment with Elgin, following the execution of the APCA, was governed by the Employment Agreement executed on November 13, 2013, between you and Elgin's predecessor in interest, and several obligations contained therein persist to this day as well. Please see the attached copy of the Employment Agreement, including Exhibit A.

As the Employment Agreement's explicit terms recognize, as a key and trusted employee of Elgin, you were granted access to Elgin's confidential business information and trade secrets. Exhibit A to the Employment Agreement prohibits you from using or disclosing Elgin's confidential information or trade secrets and required that you "deliver or return to the Company" all such confidential information and trade secrets upon the termination of your employment.

Because (1) Elgin granted you access to its trade secrets and confidential information during your employment and (2) you are now directly competing against Elgin for business, a court may *presume* that you are wrongfully misappropriating Elgin's trade secrets and confidential information. Elgin will aggressively pursue claims of breach of contract and trade secret misappropriation against you if you continue in your misconduct.

David Chadwick Dillon
March 24, 2023
Page 3

Further, while you remained employed by Elgin, you were subject to restrictive covenants preventing you from competing against the Company and soliciting its employees and customers. Pursuant to the Employment Agreement, the time period for the restrictive covenants is tolled during the entire period of your noncompliance. Further, you owed the Company a fiduciary duty of loyalty prohibiting you from competing against Elgin. This includes forming a competing business, recruiting Elgin's employees, and encouraging them to resign their employment. Elgin's ongoing investigation of your conduct during your employment has revealed that you used Company resources on Company time to seek loans for your competing business, Dillon Industries, Inc. We have also discovered that, while still employed by Elgin, you began recruiting Elgin employees to leave Elgin and join your new business venture. These activities constitute breaches of both your fiduciary duty to Elgin and the restrictive covenants contained in the Employment Agreement. Further, the one-year period applicable to your restrictive covenants has been tolled the entire time you have been soliciting employees and customers, and conducting a competing business in breach of your restrictive covenants.

To the extent any further solicitation of or interference with Elgin's employees is made by you or anyone connected to Dillon Industries, Inc., then Elgin will prosecute its rights and seek damages against you and your company in a court of law. These damages include any costs or lost revenue incurred as a result of any employee who leaves Elgin based on your solicitation, or damages related to any employee for which Elgin expended additional monies to retain. Additionally, Elgin is entitled to disgorgement of any compensation paid to you while you were acting in breach of your duties to Elgin. Finally, Elgin will seek its expended attorney's fees and costs for being forced to prosecute its rights.

As discussed above, Elgin demands that you return all of Elgin's confidential information or trade secrets in your possession within ten (10) days of the date of this letter, and that you immediately cease and desist from recruiting Elgin's employees to work for you or your company or otherwise encouraging them to resign their employments with Elgin. If Elgin does not receive adequate assurances from you that you will comply with these demands and cease your unlawful conduct, Elgin will seek to vindicate its rights in a court of law.

Kindly preserve all communications, information, and evidence related to your employment with Elgin or the conduct or events described herein.[1] Elgin's investigation into your activities is ongoing. This letter is without prejudice to all rights, remedies, and claims of Elgin, all of which are expressly reserved.

---

[1] This communication is not intended as a full or complete statement of all relevant facts or recitation of all applicable law; its purpose is to provide you with notice of Elgin's claims—and advise of potential claims should your conduct continue. Elgin is continuing to investigate your conduct and reserves all rights to modify or amend its statement of claims against you.

David Chadwick Dillon
March 24, 2023
Page 4

       Thank you in advance for your attention to this very serious matter.

                    Sincerely,

                    Taft Stettinius & Hollister LLP

                    Rachel L. Schaller

RLS
Enclosures

# EXHIBIT 2

# JACKSONKELLY PLLC

500 LEE STREET EAST • SUITE 1600 • P.O. BOX 553 • CHARLESTON, WEST VIRGINIA 25322 • TELEPHONE: 304-340-1000 • TELECOPIER: 304-340-1130
*www.jacksonkelly.com*

E-mail Address:  cdunbar@jacksonkelly.com
Direct Dial No.:  304-340-1196
Writer's Fax No.:  304-340-1130

March 31, 2023

<u>By Email and US Mail</u>

Rachel L. Schaller, Esq.
Taft Stettinius & Hollister LLP
111 East Wacker Drive, Suite 2600
Chicago, IL 60601-4208
rschaller@taftlaw.com

> Re:   David Chadwick Dillon
>        Elgin Industries, Inc.

Dear Ms. Schaller:

> Our Firm represents Dillon Industries, Inc., and David Chadwick Dillon, who asked us to respond to your letter of March 24, 2023.

> Your letter describes the process for diagnosis and repair of high-speed rotating equipment and claims that this process is protectible intellectual property and confidential information.  This is not the case. This exact process is universal in the centrifugal repair industry and is used by every company engaged in that business—more than a dozen companies. In fact, this process has been universally used in the centrifugal repair business for decades.  A vast majority of the repairs are made to equipment that was designed and built in the 1970's, and drawings have been copied, passed along to, and generally available to third parties since that time. There is nothing in the process that you described that is secret, non-public, or protectible intellectual property. Article VII of the Asset Purchase and Contribution Agreement among Centrifugal Services, LLC, Spinner Equipment Group Holdings, LLC, Industrial Process Equipment, Inc., Eagle One Corporation and David Chadwick Dillon dated November 13, 2013 (the "APCA") specifically excludes information in the public domain from the definition of Confidential Information.

> The universality of the process you described was at least implicitly recognized by the parties in  the APCA.  Section 3.10 of the APCA provides that the intellectual property being sold was listed on Schedule 3.10.  That Schedule, in turn, referenced Schedule 1.1(f).  The intellectual property listed in that Schedule included (i) corporate name; (ii) telephone number; (iii) facsimile number; (iv) domain name; (v) websites; and (vi) common law rights to the Industrial Process Equipment logo.   This  identical  list  was  included  as  an  exhibit  to  the

Bridgeport,WV • Charleston,WV • Martinsburg,WV • Morgantown,WV • Denver, CO
Evansville, IN • Lexington, KY • Akron, OH • Pittsburgh, PA • Washington, DC

4895-1203-5930.v1

Rachel L. Schaller
March 31, 2023
Page 2

Intellectual Property Assignment Agreement delivered on November 13, 2013. Similarly, the definition of "Confidential Information" in Mr. Dillon's Employment Agreement excludes information in the public domain.

After receipt of your letter, Mr. Dillon searched for documentation that may have been brought over by any employees of Dillon Industries. He discovered headings on an excel spreadsheet that were developed by Elgin (but only amount to writing down the universal process) on an Excel spreadsheet to document necessary repairs and their completion. He will cease using that form of the spreadsheet immediately. He also discovered some drawings that had been brought over by a former Elgin employee, based on "reverse engineering" of various pieces of equipment or which were published by the original manufacturer. Over half of the drawings had been brought to Elgin by that employee from his former employer in 2017 or 2018. Despite the fact that drawings such as these exact ones are widely used and available in the industry, he will destroy them or return them to Elgin. Please let us know where the drawings should be delivered if that is what Elgin desires. Finally, he discovered that an employee had copies of "progress photographs" which were used to document repairs by Elgin. These photographs have never been used, nor will they be, by Dillon Industries. Those photographs will be destroyed or sent to Elgin, at Elgin's option.

Mr. Dillon did not bring over, or use, any customer lists. In fact, he has not advertised or solicited business from anyone. A few customers have contacted Dillon Industries on their own volition, but not as a result of any solicitation or other action by Mr. Dillon or employees of Dillon Industries. Mr. Dillon has not engaged in any marketing activities, and Dillon Industries does not even maintain a website.

Your letter contains a number of allegations of breaches of Mr. Dillon's Employment Agreement. Mr. Dillon denies any such breach. Mr. Dillon intended to continue to work for Elgin indefinitely, but because of its shift in emphasis from repair of centrifugal equipment to lower margin jobs for the coal industry, he decided to resign in November of 2021. These coal industry jobs took about four times the man hours as the other repairs and carried a significantly lower profit margin. These jobs often resulted in losses, and Mr. Dillon did not want to be held accountable for a direction of the operations that were inadvisable in his opinion. At that time, he informed Elgin that he was resigning and that after the restricted period in his employment agreement expired, he intended to compete with Elgin.

On the day of his resignation, Mr. Dillon made it clear to his direct supervisor that he intended to start a competing business after his restricted period had expired. He also asked two other Elgin employees if Elgin's CEO and CFO had been made aware of his plans. Both of them told him that the Elgin executives were fully aware of his plans. His direct supervisor told Mr. Dillon that management had concluded that the result would be the same at the end of the restricted period, regardless of whether Mr. Dillon stayed for six months or left after his two-week notice period. The management of Elgin concluded that it was in the best interests of Elgin that Mr. Dillon stay for some period of time.

4895-1203-5930.v1

Rachel L. Schaller
March 31, 2023
Page 3

With full knowledge of Mr. Dillon's plans to compete after the expiration of the restricted period in his Employment Agreement, Elgin asked Mr. Dillon to stay on until a replacement could be found and trained.  Elgin even agreed that the restricted period would run during this time.  Despite his reservations and with the mutual understanding that he would also be developing, but not operating, his new business, Mr. Dillon agreed to continue to work until a replacement could be found and trained, although he only planned to stay until January of 2022.  During this period, other Elgin employees were aware that Mr. Dillon was leaving, but he did not tell them that he intended to engage in a competing business, and at no time did he solicit them for employment or encourage them to leave their employment at Elgin.

This situation was extremely stressful for Mr. Dillon because he was fielding multiple inquiries about his plans from other Elgin employees.  While he did not want to lie, he felt that he had to mislead those other employees in order to honor his agreement not to solicit them for employment.  In February of 2022, it became clear to Mr. Dillon that Elgin was not attempting to fill the position as .aggressively as he felt Elgin should.  He began expressing that concern with a weekly visiting employee from Elgin.

In response to questions from customers, he confirmed that he was leaving Elgin but did not inform them that he intended to compete and did not solicit any business from them.  After about eight months and after his replacement had been hired and trained, he left employment with Elgin.  Both before and after that time, he meticulously avoided any action or statement that could be construed to be a solicitation of Elgin's employees or customers.

At no time, even after the expiration of the restricted period, did Mr. Dillon solicit employees of Elgin.  On December 15, 2022, an Elgin employee called Mr. Dillon to inquire about employment.  Mr. Dillon informed him that he had arranged for a general advertisement on Zip Recruiter, which would appear the next day.  Although he was concerned as to whether he could hire that person due to cost, Mr. Dillon told him that he was free to respond to that ad. Without any direction from Mr. Dillon, that employee told other Elgin employees about the ad, and many responded.  Some, but not all, of them were hired by Mr. Dillon.  All  of the employees were hired in January of 2022, except one, and that person was hired after the end of the restricted period.

While Mr. Dillon was gratified by the response to the ad, he was fully prepared to train a new crew and did not solicit anyone for employment.  The employees who joined Dillon Industries did so at about the same rate of pay as that paid or offered by Elgin (and sometimes less), but with significantly fewer benefits.

On January 9, 2023, David Hall, the CEO of Elgin, called Mr. Dillon.  Mr. Dillon returned the call, and Mr. Hall informed Mr. Dillon that, after their review, they had concluded there was nothing that Elgin could do about his leaving,  his competing with Elgin, and his hiring of former Elgin employees.  Mr. Hall asked, as a courtesy and based on the parties' mutual respect, that Dillon Industries cease hiring former Elgin employees.  At that time, there were two employees who had left Elgin and had accepted positions at Dillon

Rachel L. Schaller
March 31, 2023
Page 4


Industries but had not started work.  Mr. Dillon honored the employment offers to those employees but has not hired any Elgin employee since then.  He has no intention to do so, and he has no intention to solicit Elgin employees.  However, that decision was based on personal and general business concerns, and not on his Employment Agreement.

Thank you for your attention to this matter.  Please feel free to call or email me with any comments or questions.

Very truly yours,



Charles D. Dunbar


CDD

Cc:     David Chadwick Dillon

# EXHIBIT 3



111 East Wacker Drive, Suite 2600
Chicago, IL 60601-4208
Tel: 312.527.4000 | Fax: 312.527.4011
taftlaw.com

**Rachel L. Schaller**
312.836.4128
rschaller@taftlaw.com

April 11, 2023

<u>**VIA EMAIL**</u>

Charles D. Dunbar
Jackson Kelly PLLC
500 Lee Street East, Suite 1600
Charleston, WV 25301
cdunbar@jacksonkelly.com

   *Re: David Chadwick Dillon*

Dear Mr. Dunbar:

  We have received your March 31, 2023 letter responding to our cease-and-desist letter sent to Mr. David Chadwick Dillon. We have identified several inaccuracies in your letter, which are addressed below, and thus we must renew our demand that Mr. Dillon, Dillon Industries, Inc., and all other entities owned or controlled by Mr. Dillon immediately cease and desist his wrongful conduct in breach of his contractual agreements with Elgin. Namely, his solicitation of Elgin employees.

  Your contentions that Mr. Dillon did not solicit Elgin employees (or otherwise encourage them to leave Elgin and accept employment with him and/or Dillon Industries, Inc.), either before or after his employment with Elgin ended, are incorrect. We have evidence that Dillon has solicited no fewer than *thirteen* Elgin employees, eleven of which left Elgin and went to work for Mr. Dillon and/or Dillon Industries, Inc. on a full or part-time basis. Specifically:

- Mr. Dillon solicited Brandon Bias (welder), who left Elgin in December 2022 to work for Mr. Dillon and/or Dillon Industries, Inc.

- Mr. Dillon solicited Jonathan Carter (mechanic), who left Elgin in January 2023 to work for Mr. Dillon and/or Dillon Industries, Inc.

- Mr. Dillon solicited Franklin Counts (welder), who left Elgin in December 2022 to work for Mr. Dillon and/or Dillon Industries, Inc.

Charles D. Dunbar
April 11, 2023
Page 2

- Mr. Dillon solicited Jeffrey Fledderman (balancer), who left Elgin in December 2022 to work for Mr. Dillon and/or Dillon Industries, Inc.

- Mr. Dillon solicited Joseph Kelley (machinist III), who left Elgin in December 2022 to work for Mr. Dillon and/or Dillon Industries, Inc.

- Mr. Dillon solicited Larry Landers (mechanic), who left Elgin in December 2022 to work for Mr. Dillon and/or Dillon Industries, Inc.

- Mr. Dillon solicited Patrick Marion (mechanic), who left Elgin in December 2022 to work for Mr. Dillon and/or Dillon Industries, Inc. Mr. Marion falsely told Elgin he was quitting to start a woodworking business, when in reality he accepted a position with Dillon.

- Mr. Dillon solicited Gregory McClanahan (mechanic), who left Elgin in December 2022 to work for Mr. Dillon and/or Dillon Industries, Inc. Mr. McClanahan falsely told Elgin he was retiring, when in reality he quit to take a part-time position with Dillon as a parts washer.

- Mr. Dillon solicited James McClung (mechanic), who left Elgin in December 2022 to work for Mr. Dillon and/or Dillon Industries, Inc.

- Mr. Dillon solicited Donald Ritchie (centrifuge designer), who left Elgin in January 2023 to work for Mr. Dillon and/or Dillon Industries, Inc.

- Mr. Dillon solicited Michael Six (welder), who left Elgin in January 2023 to work for Mr. Dillon and/or Dillon Industries, Inc.

Mr. Dillon also solicited two employees who chose not to resign their employments with Elgin: George Harron (welder) and Keith Riffe (mechanic).

Given the large number of Elgin employees whom Mr. Dillon has solicited since December 2022, Elgin reiterates its demand that Mr. Dillon immediately and permanently cease and desist from soliciting Elgin employees. Your letter does not provide adequate assurances that he will do so, as it completely misstates the factual bases for Elgin's concerns regarding its workforce in West Virginia the ongoing threat Mr. Dillon poses to it. For the same reason, we are not persuaded by your contention that Mr. Dillon engaged in no solicitation activities of Elgin employees while he remained employed by Elgin.

As for the confidential information still in Mr. Dillon's possession that you identified in your letter, please send all physical copies of such information to my attention to:

Charles D. Dunbar
April 11, 2023
Page 3

Taft Stettinius & Hollister LLP
111 East Wacker Drive, Suite 2600
Chicago, IL 60601-4208

Please provide assurances that Mr. Dillon and Dillon Industries, Inc. will destroy all digital copies of this information within the next ten days.

Thank you for your attention to this matter. If you have any questions, please contact me.

Sincerely,

Taft Stettinius & Hollister LLP

Rachel L. Schaller

77089399v1

# EXHIBIT 4

# JACKSONKELLY PLLC

500 LEE STREET EAST • SUITE 1600 • P.O. BOX 553 • CHARLESTON, WEST VIRGINIA 25322 • TELEPHONE: 304-340-1000 • TELECOPIER: 304-340-1130
www.jacksonkelly.com

E-mail Address:  cdunbar@jacksonkelly.com
Direct Dial No.:  304-340-1196
Writer's Fax No.:  304-340-1130

April 18, 2023

By Email

Rachel L. Schaller, Esq.
Taft Stettinius & Hollister LLP
111 East Wacker Drive, Suite 2600
Chicago, IL 60601-4208
rschaller@taftlaw.com

  Re: David Chadwick Dillon
    Elgin Industries, Inc.

Dear Ms. Schaller:

    We are in receipt of your letter of April 11, 2023.  Mr. Dillon continues to deny the solicitation of Elgin employees at any time.  In fact, the employees of Elgin approached Mr. Dillon on their own accord and not as a result of any solicitation.

    Your letter implies that Mr. Dillon could not solicit employees after the period provided for in his employment agreement dated November 13, 2013, with Elgin.  Paragraph (d) of Exhibit A to the employment agreement prohibited solicitation of employees during the "Applicable Period."  That term was defined in Paragraph (b) as ending on the first anniversary of the date that Mr. Dillon ceased to be an employee of Elgin.  On November 30, 2021, he gave notice of termination of employment, effective on December 14, 2021.  Elgin agreed that, despite Mr. Dillon's staying on until his replacement could be hired and trained, the Applicable Period began at that time.  Furthermore, Mr. Dillon did not take any action during the Applicable Period that would even arguably cause it to be extended. As a result, even if he did solicit Elgin employees (which he did not), Mr. Dillon was free to do so beginning on December 15, 2022.

    As I mentioned in my previous letter, Mr. Dillon has no intention to solicit employees of Elgin.  In order to avoid further time and expense, and as a gesture to Elgin, he is even willing to agree to refrain from doing so for a finite period of time, such as two years, but your request for a permanent bar on soliciting employees is extreme.  In addition, your letter implies that the mere fact that Dillon Industries hires a former Elgin employee is evidence of solicitation.  Dillon Industries should be free to hire persons who apply without a solicitation on the part of Mr. Dillon or his company.

Bridgeport, WV • Charleston, WV • Martinsburg, WV • Morgantown, WV • Denver, CO
Evansville, IN • Lexington, KY • Akron, OH • Pittsburgh, PA • Washington, DC

4867-9685-7437.v1

Rachel L. Schaller
April 18, 2023
Page 2

       The drawings and a thumb drive with pictures described in my previous letter have been sent to you at the address provided, and all copies have been destroyed.

       Thank you for your attention to this matter.  Please feel free to call or email me with any comments or questions.

Very truly yours,

Charles D. Dunbar

CDD

Cc:    David Chadwick Dillon

# EXHIBIT 5

## Morrell, Benjamin S.

**From:** Dunbar, Charlie <CDUNBAR@jacksonkelly.com>
**Sent:** Tuesday, May 2, 2023 8:37 AM
**To:** Schaller, Rachel L.
**Subject:** Elgin/Dillon

Ms. Schaller, Chad Dillon discovered some additional drawings on an employee's computer that were a combination of drawings brought to Elgin by that employee and developed during his employment at Elgin.  A thumb drive is being sent to you by mail today, and copies of the drawings have been destroyed.  Thank you, Charlie

**Charles Dunbar** | Member | **Jackson Kelly PLLC**
500 Lee Street East, Suite 1600 | Charleston, WV 25301-3202 | www.JacksonKelly.com
Office: (304) 340-1196 | Mobile: (304) 539-8196 | Fax: (304) 340-1080 | cdunbar@JacksonKelly.com | V-card | **BIO**



CONFIDENTIALITY NOTE:  This email message from the law office of Jackson Kelly PLLC is for the sole use of the intended recipient or recipients and may contain confidential and privileged information. Any unauthorized review, use, disclosure, distribution, or other dissemination of this e-mail message and/or the information contained therein is strictly prohibited. If you are not the intended recipient of this e-mail message, please contact the sender by reply e-mail and destroy all copies of the original message.

Pursuant to the requirements related to practice before the Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended or written to be used and cannot be used by any taxpayer for the purpose of (i) avoiding Federal tax penalties that may be imposed on the taxpayer or (ii) promoting, marketing or recommending to another person any tax-related matter.

# Exhibit 6



36 x ⌀ .688 THRU
⌴ ⌀ 1.000 �移 .750

⌀26.000 BHP

36 x ⌀ .688 THRU
⌴ ⌀ 1.000 �移 .750

⌀27.000 BHP

A

56.688
14.156
42.531
29.875
2.500
11.656
.500 REF
⌖ .001 A TIR
1.625
⊥ .001 A
1.620
⊥ .001 A

A

.750 MIN
.219

⌀27.250
⌀19.889
.219
⌀19.650
6.0°
20.0°
⌀24.000
BEFORE STRIPPING
25.001
25.000
⌀28.500

25.001
25.000

25.001
25.000

R.375
R.250
R.250
R.250

SECTION A—A

◎ .001 A TIR
◎ .001 A TIR

WELDING NOTE (UNLESS OTHERWISE NOTED)

1) ALL WELDS SHALL BE CONTINUOUS.

2) ALL FILLET WELDS SHALL HAVE EQUAL LEGS.

3) FILLET WELD SIZE SHALL EQUAL BASE METAL WHEN BASE METAL IS LESS THAN OR EQUAL TO 3/16".

4) WHEN THE THINNEST METAL IS 1/4" OR GREATER THE FILLET WELD SIZE SHALL BE 1/16" LESS THAN THE THINNEST METAL.

UNLESS OTHERWISE SPECIFIED

| MACHINING TOLERANCES | | FABRICATION TOLERANCES | |
|---|---|---|---|
| FRACTIONS = ±1/64" | | PREP = ±1/16" | |
| .X = ±.030 | | AS FORMED = ±1/16" | |
| .XX = ±.015 | | LOCATIONAL FIT = ±1/8" | |
| .XXX = ±.005 | | CONSTRUCTION 0"–120" = ±1/8" | |
| ANGLES = ±1/2° | | CONSTRUCTION 120"–18' = ±1/4" | |
| | | CONSTRUCTION 18'+ = ±1/2" | |
| SURFACE FINISH 125 RMS | | ANGULAR = ±1° | |
| | | ANGULARARITY: BOLT HC = ±1/2° | |
| INSIDE CORNER RADII .010min./.030max. | | DIMENSIONING  INCHES = ±1/2° | |
| BREAK ALL EDGES .005min./.015max. | | FEET = ±144" | |
| —ALL DIMENSIONS IN INCHES— | | —REMOVE ALL BURRS AND SHARP EDGES— | |

BUSINESS PROPRIETARY

THIS INFORMATION IS THE SOLE PROPERTY OF DILLON INDUSTRIES AND IS NOT TO BE COPIED, DISCLOSED OR USED FOR ANY PURPOSE OTHER THAN THE PURPOSE FOR WHICH IT HAS BEEN SUBMITTED WITHOUT PRIOR WRITTEN PERMISSION BY DILLON INDUSTRIES.

©2022

IF IN DOUBT – ASK!

DO NOT SCALE DRAWING

DILLON INDUSTRIES, LLC

727 Eleanor Industrial Park
ELEANOR, WV 25070
304–549–5118

TITLE
24 X 60 BOWL UNIT

PART NUMBER    203–30–0

| | | |
|---|---|---|
| DWN. DGR | DATE: 9/9/2020 | SCALE: | DRAWING NO. 1 OF 1 | REVISION: |
| CHK'D. | DATE: | | | |
| APP'D. | DATE: | WEIGHT: 1073 | | 0 |

| ITEM NO. | PART NUMBER | DESCRIPTION | LENGTH | QTY. |
|---|---|---|---|---|
| 1 | 203701010 — Feed Pipe Base | 1 1/4" MS PLATE | 6 1/4" x 16 1/4" | 1 |
| 2 | 203702010 | TS 4" x 4" x 3/8" | 4 11/32" | 1 |
| 3 | 203703010 | 3" MS PLATE | 7" x 6 1/4" | 1 |
| 4 | 203704010 | 3" MS PLATE | 7" X 6 1/4" | 1 |





SECTION A—A



WELDING NOTE (UNLESS OTHERWISE NOTED)

1) ALL WELDS SHALL BE CONTINUOUS.

2) ALL FILLET WELDS SHALL HAVE EQUAL LEGS.

3) FILLET WELD SIZE SHALL EQUAL BASE METAL WHEN BASE METAL IS LESS THAN OR EQUAL TO 3/16".

4) WHEN THE THINNEST METAL IS 1/4" OR GREATER THE FILLET WELD SIZE SHALL BE 1/16" LESS THAN THE THINNEST METAL.

UNLESS OTHERWISE SPECIFIED

| MACHINING TOLERANCES | FABRICATION TOLERANCES |
|---|---|
| FRACTIONS = ±1/64" | PREP = ±1/16" |
| .X = ±.030 | AS FORMED = ±1/16" |
| .XX = ±.015 | LOCATIONAL FIT = ±1/8" |
| .XXX = ±.005 | CONSTRUCTION 0"–120" = ±1/8" |
| ANGLES = ±1/2° | CONSTRUCTION 120"–18' = ±1/4" |
| | CONSTRUCTION 18'+ = ±1/2" |
| | ANGULAR = ±1° |
| | ANGULARARITY BOLT HC = ±1/2° |

SURFACE FINISH 125 RMS

INSIDE CORNER RADII .010min./.030max.
BREAK ALL EDGES .005min./.015max.
–ALL DIMENSIONS IN INCHES–

DIMENSIONING INCHES ± 144"
FEET " × 144"
–REMOVE ALL BURRS AND SHARP EDGES–

BUSINESS PROPRIETARY

THIS INFORMATION IS THE SOLE PROPERTY OF DILLON INDUSTRIES AND IS NOT TO BE COPIED, DISCLOSED OR USED FOR ANY PURPOSE OTHER THAN THE PURPOSE FOR WHICH IT HAS BEEN SUBMITTED WITHOUT PRIOR WRITTEN PERMISSION BY DILLON INDUSTRIES.

©2022

IF IN DOUBT — ASK!

DO NOT SCALE DRAWING

DILLON INDUSTRIES, LLC
131 Eleanor Industrial Park
ELEANOR, WV 25070
304–549–5118

TITLE: 24 x 60 FEED PIPE SUPPORT ASSEMBLY WELDMENT DRAWING

PART NUMBER: 203–14–2

| DWN. | DGR | DATE: | 4/29/2019 | SCALE: | DRAWING NO. | 1 OF 2 | REVISION |
|---|---|---|---|---|---|---|---|
| CHK'D. | | DATE: | | WEIGHT: | | | 2 |
| APP'D. | | DATE: | | 73 | | | |



4 x ⌀ .656 ⌄ 1.550
3/4–10 UNC ⌄ 1.250

A

3.500

4.625

6.750

125

1.250

⊕ .002 A B

◎ .002 A

.031

7.500±.001
7.469
(1.250)

⌀2.875 +.003 −.000

125

6.000

◻ .002 C

∥ .002 A
// .002 B

⊥ .002 A
// .002 B

1.000

4.000

6.000

C

4 x .813 X 1.625 SLOT

// .002 A

B

1.875

3.750

6.000

6.500

13.000

16.000

6.750
1.375
2.250

⌀2.875 +.003 −.000

2 X .875 X 45.0°
1.375
⌀1.1875
1.250

2.875
2.000

⌀.7969

.031

125

3.500

6.000

4.625

1.250

6.750

PART NUMBER                                    203−14−2

DILLON INDUSTRIES, LLC
131 Eleanor Industrial Park
ELEANOR, WV 25070
304−549−5118

TITLE
24 x 60 FEED PIPE SUPPORT ASSEMBLY
FINISHED DRAWING

DWN.  DGR   DATE:  4/29/2019    SCALE:        DRAWING NO.  2 OF 2    REVISION
CHK'D.                DATE:          WEIGHT:                                          2
APP'D.               DATE:          80

BUSINESS PROPRIETARY
THIS INFORMATION IS THE SOLE
PROPERTY OF DILLON INDUSTRIES
AND IS NOT TO BE COPIED,
DISCLOSED OR USED FOR ANY
PURPOSE OTHER THAN THE
PURPOSE FOR WHICH IT HAS BEEN
SUBMITTED WITHOUT PRIOR WRITTEN
PERMISSION BY DILLON INDUSTRIES
©2022

WELDING NOTE (UNLESS OTHERWISE NOTED)

1) ALL WELDS SHALL BE CONTINUOUS.

2) ALL FILLET WELDS SHALL HAVE EQUAL LEGS.

3) FILLET WELD SIZE SHALL EQUAL BASE METAL WHEN BASE
METAL IS LESS THAN OR EQUAL TO 3/16".

4) WHEN THE THINNEST METAL IS 1/4" OR GREATER THE FILLET
WELD SIZE SHALL BE 1/16" LESS THAN THE THINNEST METAL.

UNLESS OTHERWISE SPECIFIED

MACHINING TOLERANCES
FRACTIONS  =  ±1/64"
.X      =  ±.030
.XX     =  ±.015
.XXX    =  ±.005
ANGLES  =  ±1/2°

SURFACE FINISH 125 RMS

INSIDE CORNER RADII .010min./.030max.
BREAK ALL EDGES .005min./.015max.
–ALL DIMENSIONS IN INCHES–

FABRICATION TOLERANCES
PREP                    ±1/16"
AS FORMED               ±1/16"
LOCATIONAL FIT          ±1/8"
CONSTRUCTION 0"–120"    ±1/8"
CONSTRUCTION 120"–18'   ±1/4"
CONSTRUCTION 18'+       ±1/2"
ANGULAR                 ±1°
ANGULARARITY BOLT HC    ±1/2°
ANGULARARITY            ±1/2°
DIMENSIONING  INCHES  × 144"
FEET"  > 144"
–REMOVE ALL BURRS AND SHARP EDGES–

IF IN DOUBT − ASK!

DO NOT SCALE DRAWING

NOTE: ETCH OR STAMP NUMBER FOR EACH DIVISION OF ROTATION MARK



11 × DRILL MARKS

A

⌀1.500 THRU
⌀2.800 BHC
⌀4.042 BHC

1.813

45.0°

2 × ⌀ .313 ▽ .719
3/8-16 UNC ▽ .719

1.625

41.0°
15.0°
16.0°
12.5°
12.0°
13.0°
11.0°
12.0°
13.0°
14.0°
27.0°

0  1/4  1/2  3/4  1 1/4  1 1/2  1 3/4  2  2 1/4  2 1/2

BUNA O-RING #246 (1/8" × 4.75" OD × 4.50" ID)

MATERIAL: 304SS



.810
.434
.334

⌀4.490
⌀4.219
.191
.563
1.250
⌀4.813
.563

SECTION A-A

.219 X 45.0°

WELDING NOTE (UNLESS OTHERWISE NOTED)
1) ALL WELDS SHALL BE CONTINUOUS.
2) ALL FILLET WELDS SHALL HAVE EQUAL LEGS.
3) FILLET WELD SIZE SHALL EQUAL BASE METAL WHEN BASE METAL IS LESS THAN OR EQUAL TO 3/16".
4) WHEN THE THINNEST METAL IS 1/4" OR GREATER THE FILLET WELD SIZE SHALL BE 1/16" LESS THAN THE THINNEST METAL.

UNLESS OTHERWISE SPECIFIED

| MACHINING TOLERANCES | | FABRICATION TOLERANCES | |
|---|---|---|---|
| FRACTIONS = | ±1/64" | PREP. | ±1/16" |
| .X | ±.030 | AS FORMED | ±1/16" |
| .XX | ±.015 | LOCATIONAL FIT | ±1/8" |
| .XXX | ±.005 | CONSTRUCTION 0"-120" | ±1/8" |
| ANGLES | ±1/2° | CONSTRUCTION 120"-18' | ±1/4" |
| | | CONSTRUCTION 18'> | ±1/2" |
| SURFACE FINISH 125 RMS | | ANGULAR | ±1° |
| | | ANGULARARITY BOLT HC | ±1/2° |

INSIDE CORNER RADII .010min./.030max.
BREAK ALL EDGES .005min./.015max.
-ALL DIMENSIONS IN INCHES-

DIMENSIONING  INCHES < 144"
FEET " > 144"
-REMOVE ALL BURRS AND SHARP EDGES-

BUSINESS PROPRIETARY
THIS INFORMATION IS THE SOLE PROPERTY OF DILLON INDUSTRIES AND IS NOT TO BE COPIED, DISCLOSED OR USED FOR ANY PURPOSE OTHER THAN THE PURPOSE FOR WHICH IT HAS BEEN SUBMITTED WITHOUT PRIOR WRITTEN PERMISSION BY DILLON INDUSTRIES
©2022
IF IN DOUBT — ASK!
DO NOT SCALE DRAWING

DILLON INDUSTRIES, LLC
131 Eleanor Industrial Park
ELEANOR, WV 25070
304-549-5118

PART NUMBER  203529010
TITLE  24 × 60 SS DAM PLATE

| DWN. | DGR | DATE: | 11/20/2018 | SCALE: NONE | DRAWING NO. | 1 OF 1 | REVISION |
| CHK'D. | | DATE: | | | | | 1 |
| APP'D. | | DATE: | | WEIGHT: 3.04 | | | |

| ITEM NO. | PART NUMBER | DESCRIPTION | LENGTH | QTY. |
|---|---|---|---|---|
| 1 | 204-181 | 1/8" MS Plate | 4.50" x 33.591" | 1 |
| 2 | 204-182 | 1/8" MS Plate | 11.75" x 9" | 1 |



4X ⌀.563 THRU



ITEM 1 — 1/8" MS Plate



ITEM 2 — 1/8" MS Plate



WELDING NOTE (UNLESS OTHERWISE NOTED)

1) ALL WELDS SHALL BE CONTINUOUS.

2) ALL FILLET WELDS SHALL HAVE EQUAL LEGS.

3) FILLET WELD SIZE SHALL EQUAL BASE METAL WHEN BASE METAL IS LESS THAN OR EQUAL TO 3/16".

4) WHEN THE THINNEST METAL IS 1/4" OR GREATER THE FILLET WELD SIZE SHALL BE 1/16" LESS THAN THE THINNEST METAL.

**UNLESS OTHERWISE SPECIFIED**

| MACHINING TOLERANCES | | FABRICATION TOLERANCES | |
|---|---|---|---|
| FRACTIONS | = ±1/64" | PREP | ±1/16" |
| .X | = ±.030 | AS FORMED | ±1/16" |
| .XX | = ±.015 | LOCATIONAL FIT | ±1/8" |
| .XXX | = ±.005 | CONSTRUCTION 0"-120" | ±1/8" |
| ANGLES | = ±1/2° | CONSTRUCTION 120"-18" | ±1/4" |
| | | CONSTRUCTION 18"> | ±1/2" |
| | | ANGULAR | ±1/2° |
| | | ANGULARARITY BOLT HC | ±1/2" |

SURFACE FINISH 125 RMS

INSIDE CORNER RADII .010min./.030max.
BREAK ALL EDGES .005min./.015max.
-ALL DIMENSIONS IN INCHES-

DIMENSIONING FEET ' x 144'
INCHES " < 144"
-REMOVE ALL BURRS AND SHARP EDGES-

BUSINESS PROPRIETARY

THIS INFORMATION IS THE SOLE PROPERTY OF DILLON INDUSTRIES AND IS NOT TO BE COPIED, DISCLOSED OR USED FOR ANY PURPOSE OTHER THAN THE PURPOSE FOR WHICH IT HAS BEEN SUBMITTED WITHOUT PRIOR WRITTEN PERMISSION BY DILLON INDUSTRIES

©2022

IF IN DOUBT — ASK!

DO NOT SCALE DRAWING

**DILLON INDUSTRIES, LLC**

131 Eleanor Industrial Park
ELEANOR, WV 25070
304-549-5118

TITLE
24 x 60 FEED PIPE GUARD SHELL

| PART NUMBER | 204-181 |
|---|---|

| DWN. | DGR | DATE: 2/21/2023 | SCALE: NONE | DRAWING NO. 1 OF 1 | REVISION |
|---|---|---|---|---|---|
| CHK'D. | | DATE: | WEIGHT: 5.43 | | 0 |
| APP'D. | | DATE: | | | |

NOTE: Spline should be surface hardened.



8 x ⌀ .703 THRU ALL
⌴ ⌀ .984 ⤓ .453

22.5°

⌀9.250 BHC

2 x ⌀ .531 THRU ALL
5/8−11 UNC THRU ALL

MATERIAL: Carbon Steel



21.813

2.813

18.313

12.750

6.438

.688

R.375

32

32

32

3.250

.094

3.094

2.875

C.150 X 30°

.219

30.0°

15.0°

.141

.028

⌀10.484

⌀7.505

⌀3.220

A

3 1/4" 25 TOOTH 30° SPLINE

4.001 / 3.998

3.750 / 3.749

3.734

3.5435 / 3.5430

⌀3.296 SNAP RING GROOVE

15.375

⌖ .001 A

⌖ .001 A

⌖ .001 A

⌖ .001 A

BUSINESS PROPRIETARY

THIS INFORMATION IS THE SOLE PROPERTY OF DILLON INDUSTRIES AND IS NOT TO BE COPIED, DISCLOSED OR USED FOR ANY PURPOSE OTHER THAN THE PURPOSE FOR WHICH IT HAS BEEN SUBMITTED WITHOUT PRIOR WRITTEN PERMISSION BY DILLON INDUSTRIES.

©2022

WELDING NOTE (UNLESS OTHERWISE NOTED)

1) ALL WELDS SHALL BE CONTINUOUS.

2) ALL FILLET WELDS SHALL HAVE EQUAL LEGS.

3) FILLET WELD SIZE SHALL EQUAL BASE METAL WHEN BASE METAL IS LESS THAN OR EQUAL TO 3/16".

4) WHEN THE THINNEST METAL IS 1/4" OR GREATER THE FILLET WELD SIZE SHALL BE 1/16" LESS THAN THE THINNEST METAL.

UNLESS OTHERWISE SPECIFIED

MACHINING TOLERANCES
FRACTIONS = ±1/64"
.X = ±.030
.XX = ±.015
.XXX = ±.005
ANGLES = ±1/2°

SURFACE FINISH 125 RMS

INSIDE CORNER RADII .010min./.030max.
BREAK ALL EDGES .005min./.015max.
−ALL DIMENSIONS IN INCHES−

FABRICATION TOLERANCES
PREP = ±1/16"
AS FORMED = ±1/16"
LOCATIONAL FIT = ±1/8"
CONSTRUCTION 0"−120" = ±1/8"
CONSTRUCTION 120"−18' = ±1/4"
CONSTRUCTION 18'+ = ±1/2"
ANGULAR = ±1°
ANGULARARITY, BOLT HC = ±1/2°
DIMENSIONING  INCHES = ±1/2°
FEET " × 144" = ±1/2°
−REMOVE ALL BURRS AND SHARP EDGES−

IF IN DOUBT − ASK!

DO NOT SCALE DRAWING

DILLON INDUSTRIES, LLC
131 Eleanor Industrial Park
ELEANOR, WV 25070
304−549−5118

TITLE 24 x 60 RH  SOLID GEAR SIDE TRUNNION

PART NUMBER 204−22

DWN. DGR  DATE: 2/8/2023

CHK'D.  DATE:

APP'D.  DATE:

SCALE:

WEIGHT: 80.95

DRAWING NO. 1 OF 1

REVISION: 0



⌀9.250

2 x ⌀ .531  THRU ALL
5/8-11 UNC  THRU ALL

8 x ⌀ .703 THRU ALL

A — A



13.500

.188

.750

B  63

6.250

R.375
63
15.0°

⌀3.157

⌀7.500 +.000 / -.002

⌀10.477

63

◎ .001 B

⌀4.499±.001

⌀4.250±.004

◎ .001 B

SECTION A—A

MATERIAL: Plain Carbon Steel

BUSINESS PROPRIETARY

THIS INFORMATION IS THE SOLE PROPERTY OF DILLON INDUSTRIES AND IS NOT TO BE COPIED, DISCLOSED OR USED FOR ANY PURPOSE OTHER THAN THE PURPOSE FOR WHICH IT HAS BEEN SUBMITTED WITHOUT PRIOR WRITTEN PERMISSION BY DILLON INDUSTRIES
©2022

WELDING NOTE (UNLESS OTHERWISE NOTED)

1) ALL WELDS SHALL BE CONTINUOUS.

2) ALL FILLET WELDS SHALL HAVE EQUAL LEGS.

3) FILLET WELD SIZE SHALL EQUAL BASE METAL WHEN BASE METAL IS LESS THAN OR EQUAL TO 3/16".

4) WHEN THE THINNEST METAL IS 1/4" OR GREATER THE FILLET WELD SIZE SHALL BE 1/16" LESS THAN THE THINNEST METAL.

UNLESS OTHERWISE SPECIFIED

| MACHINING TOLERANCES | | FABRICATION TOLERANCES | |
|---|---|---|---|
| FRACTIONS = | ±1/64" | PREP = | ±1/16" |
| .X = | ±.030 | AS FORMED = | ±1/16" |
| .XX = | ±.015 | LOCATIONAL FIT = | ±1/8" |
| .XXX = | ±.005 | CONSTRUCTION 0"-120" = | ±1/8" |
| ANGLES = | ±1/2° | CONSTRUCTION 120"-18" = | ±1/4" |
| | | CONSTRUCTION 18"+ = | ±1/2" |
| | | ANGULAR = | ±1° |
| SURFACE FINISH 125 RMS | | ANGULARARITY BOLT HC = | ±1/2° |

INSIDE CORNER RADII .010min./.030max.
BREAK ALL EDGES .005min./.015max.
—ALL DIMENSIONS IN INCHES—

DIMENSIONING   INCHES = ±.144"
FEET' " × .144"
—REMOVE ALL BURRS AND SHARP EDGES—

IF IN DOUBT — ASK!

DO NOT SCALE DRAWING

DILLON INDUSTRIES, LLC

131 Eleanor Industrial Park
ELEANOR, WV 25070
304-549-3118

TITLE  24 x 60 RH  LIQUID FEED SIDE TRUNNION Check

PART NUMBER  204-23

| DWN. DGR | DATE: 2/8/2023 | SCALE: | DRAWING NO.  1 OF 1 | REVISION |
|---|---|---|---|---|
| CHK'D. | DATE: | | | 0 |
| APP'D. | DATE: | WEIGHT: 43.79 | | |





27.094

2.831

Ø 22.250

Ø 17.250

8.84°

Ø 13.061

Ø 18.499

SECTION A-A

MATERIAL: AISI 304

WELDING NOTE (UNLESS OTHERWISE NOTED)

1) ALL WELDS SHALL BE CONTINUOUS.

2) ALL FILLET WELDS SHALL HAVE EQUAL LEGS.

3) FILLET WELD SIZE SHALL EQUAL BASE METAL WHEN BASE METAL IS LESS THAN OR EQUAL TO 3/16".

4) WHEN THE THINNEST METAL IS 1/4" OR GREATER THE FILLET WELD SIZE SHALL BE 1/16" LESS THAN THE THINNEST METAL.

UNLESS OTHERWISE SPECIFIED

MACHINING TOLERANCES
FRACTIONS = ±1/64"
.X = ±.030
.XX = ±.015
.XXX = ±.005
ANGLES = ±1/2°

SURFACE FINISH 125 RMS

INSIDE CORNER RADII .010min./.030max.
BREAK ALL EDGES .005min./.015max.
-ALL DIMENSIONS IN INCHES-

FABRICATION TOLERANCES
PREP ±1/16"
AS FORMED ±1/16"
LOCATIONAL FIT ±1/8"
CONSTRUCTION 0"-120" ±1/8"
CONSTRUCTION 120"-18' ±1/4"
CONSTRUCTION 18'+ ±1/2"
ANGULAR ±1°
ANGULARARITY BOLT HC ±1/2°
ANGULAR ±144"
DIMENSIONING INCHES < 144"
FEET" X 144"
-REMOVE ALL BURRS AND SHARP EDGES-

BUSINESS PROPRIETARY

THIS INFORMATION IS THE SOLE PROPERTY OF DILLON INDUSTRIES AND IS NOT TO BE COPIED, DISCLOSED OR USED FOR ANY PURPOSE OTHER THAN FOR WHICH IT HAS BEEN SUBMITTED WITHOUT PRIOR WRITTEN PERMISSION BY DILLON INDUSTRIES

©2022

IF IN DOUBT - ASK!

DO NOT SCALE DRAWING

DILLON INDUSTRIES, LLC

131 Eleanor Industrial Park
ELEANOR, WV 25070
304-549-5118

TITLE
18 x 50 BOWL UNIT STRAIGHT SECTION

PART NUMBER 205202010

| | | |
|---|---|---|
| DWN. DGR | DATE: 2/12/2019 | SCALE: NONE |
| CHK'D. | DATE: | WEIGHT: 1189.2 |
| APP'D. | DATE: | |

DRAWING NO. 1 OF 4

REVISION 2



⌀22.250  ⌀17.750



23.688

MATERIAL: AISI 304

WELDING NOTE (UNLESS OTHERWISE NOTED)

1) ALL WELDS SHALL BE CONTINUOUS.

2) ALL FILLET WELDS SHALL HAVE EQUAL LEGS.

3) FILLET WELD SIZE SHALL EQUAL BASE METAL WHEN BASE METAL IS LESS THAN OR EQUAL TO 3/16".

4) WHEN THE THINNEST METAL IS 1/4" OR GREATER THE FILLET WELD SIZE SHALL BE 1/16" LESS THAN THE THINNEST METAL.

UNLESS OTHERWISE SPECIFIED

MACHINING TOLERANCES
FRACTIONS = ±1/64"
.X = ±.030
.XX = ±.015
.XXX = ±.005
ANGLES = ±1/2°

SURFACE FINISH 125 RMS
INSIDE CORNER RADII .010min./.030max.
BREAK ALL EDGES .005min./.015max.
—ALL DIMENSIONS IN INCHES—

FABRICATION TOLERANCES
PREP ±1/16"
AS FORMED ±1/16"
LOCATIONAL FIT ±1/8"
CONSTRUCTION 0"–120" ±1/8"
CONSTRUCTION 120"–18' ±1/4"
CONSTRUCTION 18'+ ±1/4"
ANGULAR ±1°
ANGULAR/ARITY BOLT HC ±1/2°
DIMENSIONING INCHES < 144"
FEET " > 144"
—REMOVE ALL BURRS AND SHARP EDGES—

BUSINESS PROPRIETARY

THIS INFORMATION IS THE SOLE PROPERTY OF DILLON INDUSTRIES AND IS NOT TO BE COPIED, DISCLOSED, OR USED FOR ANY PURPOSE OTHER THAN THAT FOR WHICH IT HAS BEEN SUBMITTED WITHOUT PRIOR WRITTEN PERMISSION BY DILLON INDUSTRIES

©2022

IF IN DOUBT – ASK!

DO NOT SCALE DRAWING

DILLON INDUSTRIES, LLC

DILLON DECANTER & MACHINE, INC.

131 Eleanor Industrial Park
ELEANOR, WV 25070
304-549-3118

TITLE 18 x 50 BOWL UNIT STRAIGHT SECTION

PART NUMBER  205202010

| DWN. | DGR | DATE: 2/12/2019 | SCALE: NONE | DRAWING NO. 2 OF 4 | REVISION 2 |
| CHK'D. | | DATE: | WEIGHT: 1189.2 | | |
| APP'D. | | DATE: | | | |



SECTION B-B

SECTION C-C

24 x ⌀ .531 ⤓ 1.523
5/8-11 UNC ⤓ 1.250
ON BOTH ENDS
*NOTE* DIFFERENT BHC ON ENDS

36 STRIPS
1/4" X 1/4" EVENLY SPACED

5/8" - 10" FUSION WELDED
5/8" - 10" NO FILLER USED

MATERIAL: AISI 304

WELDING NOTE (UNLESS OTHERWISE NOTED)

1) ALL WELDS SHALL BE CONTINUOUS.

2) ALL FILLET WELDS SHALL HAVE EQUAL LEGS.

3) FILLET WELD SIZE SHALL EQUAL BASE METAL WHEN BASE
METAL IS LESS THAN OR EQUAL TO 3/16".

4) WHEN THE THINNEST METAL IS 1/4" OR GREATER THE FILLET
WELD SIZE SHALL BE 1/16" LESS THAN THE THINNEST METAL.

UNLESS OTHERWISE SPECIFIED

| MACHINING TOLERANCES | | FABRICATION TOLERANCES | |
|---|---|---|---|
| FRACTIONS | =±1/64" | PREP | ±1/16" |
| .X | =±.030 | AS FORMED | ±1/16" |
| .XX | =±.015 | LOCATIONAL FIT | ±1/8" |
| .XXX | =±.005 | CONSTRUCTION 0"–120" | ±1/8" |
| ANGLES | =±1/2° | CONSTRUCTION 120"–18' | ±1/4" |
| | | CONSTRUCTION 18'> | ±1/2" |
| | | ANGULAR | ±1° |
| | | ANGULARARITY, BOLT HC | ±1/2° |

SURFACE FINISH 125 RMS

INSIDE CORNER RADII .010min./.030max.
BREAK ALL EDGES .005min./.015max.
–ALL DIMENSIONS IN INCHES–

DIMENSIONING    INCHES < 144"
FEET" > 144'
–REMOVE ALL BURRS AND SHARP EDGES–

BUSINESS PROPRIETARY

THIS INFORMATION IS THE SOLE
PROPERTY OF DILLON INDUSTRIES
AND IS NOT TO BE COPIED,
DISCLOSED OR USED FOR ANY
PURPOSE OTHER THAN THE
PURPOSE FOR WHICH IT HAS BEEN
SUBMITTED WITHOUT PRIOR WRITTEN
PERMISSION BY DILLON INDUSTRIES

©2022

IF IN DOUBT – ASK!

DO NOT SCALE DRAWING

DILLON INDUSTRIES, LLC

131 Eleanor Industrial Park
ELEANOR, WV 25070
304–549–5118

TITLE
18 x 50 BOWL UNIT STRAIGHT SECTION

| PART NUMBER | 205202010 | |
|---|---|---|
| DWN. DGR DATE: 2/12/2019 | SCALE: NONE | DRAWING NO. 3 OF 4 | REVISION |
| CHK'D. DATE: | | |
| APP'D. DATE: | WEIGHT: 1189.2 | 2 |

12 × ⌀ .656 THRU ALL
⌴ ⌀ 1.000 ⍌ .625

⌀20.250 BHC

⌀16.500 BHC

12 × ⌀ .531 ⍌ 1.523
5/8–11 UNC ⍌ 1.250

D

D

E

E

36 STRIPS
1/4" X 1/4" EVENLY SPACED

SECTION E–E

5/8" – 10"  FUSION WELDED
5/8" – 10"  NO FILLER USED

1.000
1.500
4.000
5.250
13.500
14.750
16.000

.500

2.500

.188

⌀18.250
16.500
⌀15.500
14.876
14.875
⌀13.341

.218

(2.500)

6 CUTOUTS
6.0 x 2.25

6.000

4 x 1/4" RADII
EACH CUT OUT

⌀15.500
⌀18.250

⌀19.000

25.690
26.878

63

.750

10.00°

⌀17.994

⌀19.000
18.999

20.250
21.750

63

125

R.375

R.375

R.375

R.375

R.375

SECTION D–D

.001 B

.001 B

.001 B

.001 B

MATERIAL: AISI 304

BUSINESS PROPRIETARY

THIS INFORMATION IS THE SOLE
PROPERTY OF DILLON INDUSTRIES
AND IS NOT TO BE COPIED,
DISCLOSED OR USED FOR ANY
PURPOSE OTHER THAN THE
PURPOSE FOR WHICH IT HAS BEEN
SUBMITTED WITHOUT PRIOR WRITTEN
PERMISSION BY DILLON INDUSTRIES

©2022

WELDING NOTE (UNLESS OTHERWISE NOTED)

1) ALL WELDS SHALL BE CONTINUOUS.

2) ALL FILLET WELDS SHALL HAVE EQUAL LEGS.

3) FILLET WELD SIZE SHALL EQUAL BASE METAL WHEN BASE
METAL IS LESS THAN OR EQUAL TO 3/16".

4) WHEN THE THINNEST METAL IS 1/4" OR GREATER THAN THE FILLET
WELD SIZE SHALL BE 1/16" LESS THAN THE THINNEST METAL.

UNLESS OTHERWISE SPECIFIED

| MACHINING TOLERANCES | | FABRICATION TOLERANCES | |
|---|---|---|---|
| FRACTIONS | ±1/64" | PREP | ±1/16" |
| .X | ±.030 | AS FORMED | ±1/16" |
| .XX | ±.015 | LOCATIONAL FIT | ±1/8" |
| .XXX | ±.005 | CONSTRUCTION 0"–120" | ±1/8" |
| ANGLES | ±1/2° | CONSTRUCTION 120"–18' | ±1/4" |
| | | CONSTRUCTION 18'+ | ±1/2" |
| | | ANGULAR | ±1° |
| SURFACE FINISH 125 RMS | | ANGULARITY BOLT HC | ±1/2° |

INSIDE CORNER RADII .010min./.030max.
BREAK ALL EDGES .005min./.015max.
–ALL DIMENSIONS IN INCHES–

DIMENSIONING   INCHES ≤ 144"
FEET" ≥ 144"

–REMOVE ALL BURRS AND SHARP EDGES–

IF IN DOUBT – ASK!

DO NOT SCALE DRAWING

DILLON
DECANTER
& MACHINE, INC.

DILLON INDUSTRIES, LLC

121 Eleanor Industrial Park
ELEANOR, WV 25070
304–549–5118

TITLE
18 x 50 BOWL UNIT STRAIGHT SECTION

| PART NUMBER | | 205202010 | | |
|---|---|---|---|---|
| DWN. DGR | DATE: 2/12/2019 | SCALE: NONE | DRAWING NO. 4 OF 4 | REVISION |
| CHK'D | DATE: | | | |
| APP'D. | DATE: | WEIGHT: 1189.2 | | 2 |

# Exhibit 7



A

A



27.094

2.831

⌀22.250

⌀17.250

⌀13.063

⌀18.500

8.84°

SECTION A—A

MATERIAL: AISI 304



WELDING NOTE (UNLESS OTHERWISE NOTED)

1) ALL WELDS SHALL BE CONTINUOUS.

2) ALL FILLET WELDS SHALL HAVE EQUAL LEGS.

3) FILLET WELD SIZE SHALL EQUAL BASE METAL WHEN BASE
METAL IS LESS THAN OR EQUAL TO 3/16".

4) WHEN THE THINNEST METAL IS 1/4" OR GREATER THE FILLET
WELD SIZE SHALL BE 1/16" LESS THAN THE THINNEST METAL.

UNLESS OTHERWISE SPECIFIED

MACHINING TOLERANCES
FRACTIONS  =  ±1/64"
.X      =  ±.030
.XX     =  ±.015
.XXX    =  ±.005
ANGLES  =  ±1/2°

SURFACE FINISH 125 RMS

INSIDE CORNER RADII .010min./.030max.
BREAK ALL EDGES .005min./.015max.
–ALL DIMENSIONS IN INCHES–

FABRICATION TOLERANCES
PREP                        ±1/16"
45 FORMED                   ±1/16"
LOCATIONAL FIT              ±1/8"
CONSTRUCTION 0"–120"        ±1/8"
CONSTRUCTION 120"–18'       ±1/4"
CONSTRUCTION 18'>           ±1/2"
ANGULAR                     ±1°
ANGULARARITY BOLT HC        ±1/2°
DIMENSIONING  FEET' "  INCHES < 144"
–REMOVE ALL BURRS AND SHARP EDGES–

BUSINESS PROPRIETARY

THIS INFORMATION IS THE SOLE
PROPERTY OF ELGIN SEPARATION
SOLUTIONS AND IS NOT TO BE
COPIED, DISCLOSED OR USED FOR
ANY PURPOSE OTHER THAN THE
PURPOSE FOR WHICH IT HAS BEEN
SUBMITTED WITHOUT PRIOR WRITTEN
PERMISSION BY ELGIN SEPARATION
SOLUTIONS

©2015

IF IN DOUBT — ASK!

DO NOT SCALE DRAWING

PART NUMBER

ELGIN SEPARATION SOLUTIONS   10500 Cash Road
STAFFORD, TEXAS 77477
281—261—5778

TITLE  18 x 50 TAPERED BOWL SECTION
PREMACHINED CASTING SIZE

DWN.  DGR   DATE: 2/12/2019

CHK'D.   DATE:

APP'D.   DATE:

SCALE:
NONE

WEIGHT:
1189.2

DRAWING NO. 1 OF 2

REVISION
0



⌀ 22.250
⌀ 17.750



23.688

MATERIAL: AISI 304



WELDING NOTE (UNLESS OTHERWISE NOTED)

1) ALL WELDS SHALL BE CONTINUOUS.

2) ALL FILLET WELDS SHALL HAVE EQUAL LEGS.

3) FILLET WELD SIZE SHALL EQUAL BASE METAL WHEN BASE
   METAL IS LESS THAN OR EQUAL TO 3/16".

4) WHEN THE THINNEST METAL IS 1/4" OR GREATER THE FILLET
   WELD SIZE SHALL BE 1/16" LESS THAN THE THINNEST METAL.

UNLESS OTHERWISE SPECIFIED

MACHINING TOLERANCES

FRACTIONS  =  ±1/64"
.X      =  ±.030
.XX     =  ±.015
.XXX    =  ±.005
ANGLES  =  ±1/2°

SURFACE FINISH 125 RMS

INSIDE CORNER RADII .010min./.030max.
BREAK ALL EDGES .005min./.015max.
—ALL DIMENSIONS IN INCHES—

FABRICATION TOLERANCES

PREP               ±1/16"
AS FORMED          ±1/16"
LOCATIONAL FIT     ±1/8"
CONSTRUCTION 0"−120"  ±1/8"
CONSTRUCTION 120"−18'  ±1/4"
CONSTRUCTION 18'+   ±1/2"
ANGULAR            ±1°
ANGULARARITY, BOLT HC   ±1/2°

DIMENSIONING  INCHES < 144"
              FEET " X 144"
—REMOVE ALL BURRS AND SHARP EDGES—

BUSINESS PROPRIETARY

THIS INFORMATION IS THE SOLE
PROPERTY OF ELGIN SEPARATION
SOLUTIONS AND IS NOT TO BE
COPIED, DISCLOSED OR USED FOR
ANY PURPOSE OTHER THAN THE
PURPOSE FOR WHICH IT HAS BEEN
SUBMITTED WITHOUT PRIOR WRITTEN
PERMISSION BY ELGIN SEPARATION
SOLUTIONS.            ©2015

IF IN DOUBT − ASK!

DO NOT SCALE DRAWING

ELGIN  SEPARATION  SOLUTIONS   10500 Cash Road
                                STAFFORD, TEXAS 77477
                                281−261−5778

TITLE   18 x 50 STRAIGHT BOWL SECTION
        PREMACHINED CASTING SIZE

| | | |
|---|---|---|
| DWN. DGR | DATE: 2/12/2019 | SCALE: NONE |
| CHK'D. | DATE: | WEIGHT: 1189.2 |
| APP'D. | DATE: | 3 |

PART NUMBER

DRAWING NO.  2 OF 2

REVISION  0

MATERIAL: AISI 304



36 x ⌀ .688 THRU
⌴ ⌀ 1.000 ▽ .750

⌀26.000 BHP

A

A

36 x ⌀ .688 THRU
⌴ ⌀ 1.000 ▽ .750

⌀27.000 BHP

56.688

14.156

42.531

29.875

2.500

11.656

.500 REF

| ◎ | .001 | A TIR |

1.625

1.620

| ⟂ | .001 | A |

.750 MIN

A

| ⟂ | .001 | A |

.219

⌀27.250

⌀19.889

.219

⌀19.650

6.0°

20.0°

⌀24.000
BEFORE STRIPPING

25.001
25.000

25.001
25.000

⌀28.500

R.375

R.250 — R.250

R.250

SECTION A—A

| ◎ | .001 | A TIR |

| ◎ | .001 | A TIR |

| ◎ | .001 | A TIR |

WELDING NOTE (UNLESS OTHERWISE NOTED)

1) ALL WELDS SHALL BE CONTINUOUS.

2) ALL FILLET WELDS SHALL HAVE EQUAL LEGS.

3) FILLET WELD SIZE SHALL EQUAL BASE METAL WHEN BASE METAL IS LESS THAN OR EQUAL TO 3/16".

4) WHEN THE THINNEST METAL IS 1/4" OR GREATER THE FILLET WELD SIZE SHALL BE 1/16" LESS THAN THE THINNEST METAL.

UNLESS OTHERWISE SPECIFIED

MACHINING TOLERANCES
| FRACTIONS | ± 1/64" |
| .X | ± .030 |
| .XX | ± .015 |
| .XXX | ± .005 |
| ANGLES | ± 1/2° |

SURFACE FINISH 125 RMS

INSIDE CORNER RADII .010min./.030max.
BREAK ALL EDGES .005min./.015max.
—ALL DIMENSIONS IN INCHES—

FABRICATION TOLERANCES
| PREF | ± 1/16" |
| AS FORMED | ± 1/16" |
| LOCATIONAL FIT | ± 1/8" |
| CONSTRUCTION 0"–120" | ± 1/8" |
| CONSTRUCTION 120"–18' | ± 1/4" |
| CONSTRUCTION 18'+ | ± 1/2" |
| ANGULAR | ± 1° |
| ANGULARARITY: BOLT HC | ± 1/2° |
| DIMENSIONING: INCHES < 144" |
| FEET" > 144" |
—REMOVE ALL BURRS AND SHARP EDGES—

BUSINESS PROPRIETARY

THIS INFORMATION IS THE SOLE
PROPERTY OF ELGIN SEPARATION
SOLUTIONS AND IS NOT TO BE
COPIED, DISCLOSED OR USED FOR
ANY PURPOSE OTHER THAN THE
PURPOSE FOR WHICH IT HAS BEEN
SUBMITTED WITHOUT PRIOR WRITTEN
PERMISSION BY ELGIN SEPARATION
SOLUTIONS

©2015

IF IN DOUBT – ASK!

DO NOT SCALE DRAWING

| PART NUMBER | 203–30–0 |

ELGIN SEPARATION SOLUTIONS
10500 Cash Road
STAFFORD, TEXAS 77477
281–261–5778

TITLE 24 X 60 BOWL UNIT

| DWN. | DGR | DATE: 9/9/2020 |
| CHK'D. | | DATE: |
| APP'D. | | DATE: |

SCALE:

DRAWING NO. 1 OF 1

WEIGHT:
1073

REVISION
0

| ITEM NO. | PART NUMBER | DESCRIPTION | LENGTH | QTY. |
|---|---|---|---|---|
| 1 | 203701010 | 1 1/4" MS PLATE | 6 1/4" x 16 1/4" | 1 |
| 2 | 203702010 | TS 4" x 4" x 3/8" | 4 11/32" | 1 |
| 3 | 203703010 | 3" MS PLATE | 7" x 6 1/4" | 1 |
| 4 | 203704010 | 3" MS PLATE | 7" X 6 1/4" | 1 |







SECTION A–A

WELDING NOTE (UNLESS OTHERWISE NOTED)
1) ALL WELDS SHALL BE CONTINUOUS.
2) ALL FILLET WELDS SHALL HAVE EQUAL LEGS.
3) FILLET WELD SIZE SHALL EQUAL BASE METAL WHEN BASE METAL IS LESS THAN OR EQUAL TO 3/16".
4) WHEN THE THINNEST METAL IS 1/4" OR GREATER THE FILLET WELD SIZE SHALL BE 1/16" LESS THAN THE THINNEST METAL.

UNLESS OTHERWISE SPECIFIED

MACHINING TOLERANCES
FRACTIONS = ±1/64"
.X = ±.030
.XX = ±.015
.XXX = ±.005
ANGLES = ±1/2°

SURFACE FINISH 125 RMS

INSIDE CORNER RADII .010min./.030max.
BREAK ALL EDGES .005min./.015max.
—ALL DIMENSIONS IN INCHES—

FABRICATION TOLERANCES
PREP. ±1/16"
AS FORMED ±1/16"
LOCATIONAL FIT ±1/8"
CONSTRUCTION 0"–120" ±1/8"
CONSTRUCTION 120"–18' ±1/4"
CONSTRUCTION 18'> ±1/2"
ANGULAR ±1°
ANGULARARITY BOLT HC ±1/2°
DIMENSIONING INCHES < 144"
FEET' > 144"
—REMOVE ALL BURRS AND SHARP EDGES—

BUSINESS PROPRIETARY
THIS INFORMATION IS THE SOLE PROPERTY OF ELGIN SEPARATION SOLUTIONS AND IS NOT TO BE COPIED, DISCLOSED OR USED FOR ANY PURPOSE OTHER THAN THE PURPOSE FOR WHICH IT HAS BEEN SUBMITTED WITHOUT PRIOR WRITTEN PERMISSION BY ELGIN SEPARATION SOLUTIONS.
Ⓒ2015

IF IN DOUBT — ASK!
DO NOT SCALE DRAWING

ELGIN SEPARATION SOLUTIONS
10500 Cash Road STAFFORD, TEXAS 77477 281–261–5778

| PART NUMBER | 203700010 |
|---|---|

TITLE
24 x 60 FEED PIPE SUPPORT ASSEMBLY

DWN. DGR   DATE: 4/29/2019
CHK'D.   DATE:
APP'D.   DATE:

SCALE:
WEIGHT: 73

DRAWING NO.  1 OF 2

REVISION
1



4 x ⌀ .656 ▽ 1.550
3/4–10 UNC ▽ 1.250

| A |

3.500
1.250
4.625
6.750
| ⊕ | .002 | A | B |
125/

| ◎ | .002 | A |
.031
7.625±.001
7.594
(1.250)
⌀2.875 +.003 −.000
125/

6.000
| ⌀ | .002 | C |
| ⊥ | .002 | A |
| // | .002 | B |
| ∠ | .002 | A |
| // | .002 | B |
1.000
4.000
6.000
| C |

4 x .813 X 1.625 SLOT
| // | .002 | A |
| B |
1.875
3.750
6.000
6.500
13.000
16.000

6.750
1.375
2.250
2 X.875 X 45.0°
1.375
⌀1.1875
1.250
⌀2.875 +.003 −.000
2.875
2.000
.031
⌀.7969

3.500
6.000
4.625
1.250
6.750

WELDING NOTE (UNLESS OTHERWISE NOTED)
1) ALL WELDS SHALL BE CONTINUOUS.
2) ALL FILLET WELDS SHALL HAVE EQUAL LEGS.
3) FILLET WELD SIZE SHALL EQUAL BASE METAL WHEN BASE METAL IS LESS THAN OR EQUAL TO 3/16".
4) WHEN THE THINNEST METAL IS 1/4" OR GREATER THE FILLET WELD SIZE SHALL BE 1/16" LESS THAN THE THINNEST METAL.

UNLESS OTHERWISE SPECIFIED

MACHINING TOLERANCES
FRACTIONS = ±1/64"
.X = ±.030
.XX = ±.015
.XXX = ±.005
ANGLES = ±1/2°

FABRICATION TOLERANCES
PREP. = ±1/16"
45 FORMED = ±1/16"
LOCATIONAL FIT = ±1/8"
CONSTRUCTION 0"–120" = ±1/8"
CONSTRUCTION 120"–18" = ±1/4"
CONSTRUCTION 18"+ = ±1/2"
ANGULAR = ±1°
ANGULARARITY BOLT HC = ±1/2°
DIMENSIONING FEET " > 144" = ±1/2"
INCHES ≤ 144"
–REMOVE ALL BURRS AND SHARP EDGES–

SURFACE FINISH 125 RMS
INSIDE CORNER RADII .010min./.030max.
BREAK ALL EDGES .005min./.015max.
–ALL DIMENSIONS IN INCHES–

BUSINESS PROPRIETARY
THIS INFORMATION IS THE SOLE PROPERTY OF ELGIN SEPARATION SOLUTIONS AND IS NOT TO BE COPIED, DISCLOSED OR USED FOR ANY PURPOSE OTHER THAN THE PURPOSE FOR WHICH IT HAS BEEN SUBMITTED WITHOUT PRIOR WRITTEN PERMISSION BY ELGIN SEPARATION SOLUTIONS
©2015

IF IN DOUBT – ASK!
DO NOT SCALE DRAWING

PART NUMBER    203700010

ELGIN SEPARATION SOLUTIONS    10500 Cash Road STAFFORD, TEXAS 77477 281–261–5778

TITLE  24 x 60 FEED PIPE SUPPORT ASSEMBLY

DWN.  DGR    DATE:  4/29/2019
CHK'D.    DATE:
APP'D.    DATE:

SCALE:
WEIGHT:  80

DRAWING NO.  2 OF 2

REVISION  1

NOTE: ETCH OR STAMP NUMBER FOR EACH DIVISION OF ROTATION MARK



11 × DRILL MARKS

∅1.500 THRU
∅2.800 BHC
∅4.042 BHC

2 × ∅ .313 ▽ .719
3/8-16 UNC ▽ .719

MATERIAL: 304SS



SECTION A-A

.219 X 45.0°

WELDING NOTE (UNLESS OTHERWISE NOTED)
1) ALL WELDS SHALL BE CONTINUOUS.
2) ALL FILLET WELDS SHALL HAVE EQUAL LEGS.
3) FILLET WELD SIZE SHALL EQUAL BASE METAL WHEN BASE METAL IS LESS THAN OR EQUAL TO 3/16".
4) WHEN THE THINNEST METAL IS 1/4" OR GREATER THE FILLET WELD SIZE SHALL BE 1/16" LESS THAN THE THINNEST METAL.

UNLESS OTHERWISE SPECIFIED

MACHINING TOLERANCES
FRACTIONS  = ±1/64"
.X    = ±.030
.XX   = ±.015
.XXX  = ±.005
ANGLES = ±1/2°

SURFACE FINISH 125 RMS

INSIDE CORNER RADII .010min./.030max.
BREAK ALL EDGES .005min./.015max.
—ALL DIMENSIONS IN INCHES—

FABRICATION TOLERANCES
PREP        = ±1/16"
AS FORMED   = ±1/16"
LOCATIONAL FIT    = ±1/8"
CONSTRUCTION 0"-120"  = ±1/8"
CONSTRUCTION 120"-18' = ±1/4"
CONSTRUCTION 18'+     = ±1/2"
ANGULAR            = ±1°
ANGULARARITY BOLT HC  = ±1/2°
DIMENSIONING  INCHES < 144"
          FEET" < 144"
—REMOVE ALL BURRS AND SHARP EDGES—

BUSINESS PROPRIETARY
THIS INFORMATION IS THE SOLE PROPERTY OF ELGIN SEPARATION SOLUTIONS AND IS NOT TO BE COPIED, DISCLOSED OR USED FOR ANY PURPOSE OTHER THAN THE PURPOSE FOR WHICH IT HAS BEEN SUBMITTED WITHOUT PRIOR WRITTEN PERMISSION BY ELGIN SEPARATION SOLUTIONS.
©2015
IF IN DOUBT – ASK!
DO NOT SCALE DRAWING

PART NUMBER          203529010
ELGIN SEPARATION SOLUTIONS
10500 Cash Road
STAFFORD, TEXAS 77477
281-261-5778
TITLE  24 × 60 SS DAM PLATE

| DWN. | DGR | DATE: | 11/20/2018 | SCALE: NONE | DRAWING NO. 1 OF 1 | REVISION |
| CHK'D. | | DATE: | | | | 1 |
| APP'D. | | DATE: | | WEIGHT: 3.04 | | |

NOTE: Spline should be surface hardened.





8 x ⌀ .703 THRU ALL
⌴ ⌀ .984 �移 .453

22.5°

⌀9.250 BHC

2 x ⌀ .531 THRU ALL
5/8-11 UNC THRU ALL

21.813

2.813

18.313

12.750

6.438

.688

R.375

32    32

32

3.250

.094

3.094

2.875

C.150 X 30°

.219

30.0°

.141

15.0°

.028

⌀10.484

⌀7.505

A

⌀3.220

4.001
3.998

3.750
3.749

⌀3.734

3.5435
3.5430

⌀3.296
SNAP RING
GROOVE

3 1/4" 25 TOOTH 30° SPLINE

15.375

| ⌀ | .001 | A |
| ⌀ | .001 | A |
| ⌀ | .001 | A |
| ⌀ | .001 | A |

MATERIAL: Carbon Steel

WELDING NOTE (UNLESS OTHERWISE NOTED)
1) ALL WELDS SHALL BE CONTINUOUS.
2) ALL FILLET WELDS SHALL HAVE EQUAL LEGS.
3) FILLET WELD SIZE SHALL EQUAL BASE METAL WHEN BASE METAL IS LESS THAN OR EQUAL TO 3/16".
4) WHEN THE THINNEST METAL IS 1/4" OR GREATER THE FILLET WELD SIZE SHALL BE 1/16" LESS THAN THE THINNEST METAL.

| UNLESS OTHERWISE SPECIFIED | |
|---|---|
| MACHINING TOLERANCES | FABRICATION TOLERANCES |
| FRACTIONS = ±1/64" | PREP = ±1/16" |
| .X = ±.030 | AS FORMED = ±1/16" |
| .XX = ±.015 | LOCATIONAL FIT = ±1/8" |
| .XXX = ±.005 | CONSTRUCTION 0"-120" ±1/8" |
| ANGLES = ±1/2° | CONSTRUCTION 120"-18' ±1/4" |
| | CONSTRUCTION 18'+ ±1/2" |
| | ANGULAR ±1° |
| SURFACE FINISH 125 RMS | ANGULARARITY BOLT HC ±1/2° |
| INSIDE CORNER RADII .010min./.030max. | DIMENSIONING FEET ' 'x 144' |
| BREAK ALL EDGES .005min./.015max. | INCHES " ±.144" |
| —ALL DIMENSIONS IN INCHES— | —REMOVE ALL BURRS AND SHARP EDGES— |

BUSINESS PROPRIETARY
THIS INFORMATION IS THE SOLE PROPERTY OF ELGIN SEPARATION SOLUTIONS AND IS NOT TO BE COPIED, DISCLOSED OR USED FOR ANY PURPOSE OTHER THAN THE PURPOSE FOR WHICH IT WAS BEEN SUBMITTED WITHOUT PRIOR WRITTEN PERMISSION BY ELGIN SEPARATION SOLUTIONS.
©2015

IF IN DOUBT — ASK!
DO NOT SCALE DRAWING

PART NUMBER          204-22-1

ELGIN SEPARATION SOLUTIONS    10500 Cash Road STAFFORD, TEXAS 77477 281-261-5778

TITLE   24 x 60 RH   SOLID SIDE TRUNNION

| DWN. DGR | DATE: 11/16/2018 | SCALE: | DRAWING NO. 1 OF 1 | REVISION |
| CHK'D. | DATE: | | WEIGHT: | 0 |
| APP'D. | DATE: | | 80.95 | |



Ø9.250

2 x Ø .531  THRU ALL
5/8-11 UNC  THRU ALL

A

A

8 x Ø .703 THRU ALL



13.500

.188          .750

B          63

6.250

R.375
63
15.0°          63

Ø10.477
Ø7.500 +.000/-.002

Ø3.157

◎ .001 B

Ø4.499±.001

Ø4.250±.004

◎ .001 B

SECTION A-A

MATERIAL: Plain Carbon Steel

WELDING NOTE (UNLESS OTHERWISE NOTED)

1) ALL WELDS SHALL BE CONTINUOUS.

2) ALL FILLET WELDS SHALL HAVE EQUAL LEGS.

3) FILLET WELD SIZE SHALL EQUAL BASE METAL WHEN BASE
METAL IS LESS THAN OR EQUAL TO 3/16".

4) WHEN THE THINNEST METAL IS 1/4" OR GREATER THE FILLET
WELD SIZE SHALL BE 1/16" LESS THAN THE THINNEST METAL.



UNLESS OTHERWISE SPECIFIED

MACHINING TOLERANCES
FRACTIONS  =  ±1/64"
.X    =  ±.030
.XX   =  ±.015
.XXX  =  ±.005
ANGLES  =  ±1/2°

SURFACE FINISH 125 RMS

INSIDE CORNER RADII .010min./.030max.
BREAK ALL EDGES .005min./.015max.
-ALL DIMENSIONS IN INCHES-

FABRICATION TOLERANCES
PREP           ±1/16"
AS FORMED      ±1/16"
LOCATIONAL FIT ±1/8"
CONSTRUCTION 0"-120" ±1/8"
CONSTRUCTION 120"-18" ±1/4"
CONSTRUCTION 18"+   ±1/2"
ANGULAR        ±1°
ANGULARARITY BOLT HC ±1/2°
DIMENSIONING INCHES = ±1/2°
FEET " X 144"
-REMOVE ALL BURRS AND SHARP EDGES-

BUSINESS PROPRIETARY

THIS INFORMATION IS THE SOLE
PROPERTY OF ELGIN SEPARATION
SOLUTIONS AND IS NOT TO BE
COPIED, DISCLOSED OR USED FOR
ANY PURPOSE OTHER THAN THE
PURPOSE FOR WHICH IT HAS BEEN
SUBMITTED WITHOUT PRIOR WRITTEN
PERMISSION BY ELGIN SEPARATION
SOLUTIONS.

©2015

IF IN DOUBT - ASK!

DO NOT SCALE DRAWING

PART NUMBER          204-23-1

ELGIN SEPARATION SOLUTIONS
10500 Cash Road
STAFFORD, TEXAS 77477
281-261-5778

TITLE  24 x 60 RH  EFFLUENT SIDE TRUNNION

| DWN. | DGR | DATE: | 11/16/2018 | SCALE: | DRAWING NO. 1 OF 1 | REVISION |
| CHK'D. | | DATE: | | | | 1 |
| APP'D. | | DATE: | | WEIGHT: 43.79 | | |

| ITEM NO. | PART NUMBER | DESCRIPTION | LENGTH | QTY. |
|---|---|---|---|---|
| 1 | 204671000 | 1/8" MS Plate | 4 1/2" x 2'- 9 19/32" | 1 |
| 2 | 204672000 | 1/8" MS Plate | 11 3/4" x 9" | 1 |



4X ⌀.563 THRU



ITEM 1 - 1/8" MS Plate



ITEM 2 - 1/8" MS Plate



1/8

PART NUMBER 204670000

WELDING NOTE (UNLESS OTHERWISE NOTED)
1) ALL WELDS SHALL BE CONTINUOUS.
2) ALL FILLET WELDS SHALL HAVE EQUAL LEGS.
3) FILLET WELD SIZE SHALL EQUAL BASE METAL WHEN BASE METAL IS LESS THAN OR EQUAL TO 3/16".
4) WHEN THE THINNEST METAL IS 1/4" OR GREATER THE FILLET WELD SIZE SHALL BE 1/16" LESS THAN THE THINNEST METAL.

UNLESS OTHERWISE SPECIFIED

MACHINING TOLERANCES
FRACTIONS = ±1/64"
.X = ±.030
.XX = ±.015
.XXX = ±.005
ANGLES = ±1/2°

FABRICATION TOLERANCES
PREP = ±1/16"
AS FORMED = ±1/16"
LOCATIONAL FIT = ±1/8"
CONSTRUCTION 0"-120" = ±1/8"
CONSTRUCTION 120"-18' = ±1/4"
CONSTRUCTION 18'> = ±1/2"
ANGULAR = ±1/2°
ANGULARARITY BOLT HC = ±1/2°
DIMENSIONING INCHES < 144"
FEET " X 144"

SURFACE FINISH 125 RMS
INSIDE CORNER RADII .010min./.030max.
BREAK ALL EDGES .005min./.015max.
—ALL DIMENSIONS IN INCHES—
—REMOVE ALL BURRS AND SHARP EDGES—

BUSINESS PROPRIETARY
THIS INFORMATION IS THE SOLE PROPERTY OF ELGIN SEPARATION SOLUTIONS AND IS NOT TO BE COPIED, DISCLOSED OR USED FOR ANY PURPOSE OTHER THAN THE PURPOSE FOR WHICH IT HAS BEEN SUBMITTED WITHOUT PRIOR WRITTEN PERMISSION BY ELGIN SEPARATION SOLUTIONS
©2015

ELGIN SEPARATION SOLUTIONS
10500 Cash Road STAFFORD, TEXAS 77477
281-261-5778

TITLE: 24 x 60 RH FEED PIPE GUARD

| DWN. DGR | DATE: 7/29/2019 | SCALE: NONE | DRAWING NO. 1 OF 1 | REVISION |
|---|---|---|---|---|
| CHK'D. | DATE: | WEIGHT: | | 0 |
| APP'D. | DATE: | 5.43 | | |

IF IN DOUBT - ASK!
DO NOT SCALE DRAWING

# EXHIBIT 2 –

# PROVIDED TO THE COURT

# VIA HAND DELIVERY

# Exhibit 3

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

ELGIN SEPARATION SOLUTIONS, LLC,

               Plaintiff,

v.

DAVID CHADWICK DILLON, DILLON
INDUSTRIES, INC., and DONALD
RITCHIE,

               Defendants.

Case No. 2:23-cv-00440

District Judge Berger

Magistrate Judge Aboulhosn

## <u>AFFIDAVIT OF MITCHELL CLARK</u>

1.      I have personal knowledge of the facts set forth in this Affidavit and would testify under oath to their veracity if called upon to do so.

2.      I am a Machinist/Gearbox Shop Lead at Elgin Separation Solutions, LLC in Poca, West Virginia. This is a management position. I joined Elgin on December 1, 2022.

3.      My job duties as Machinist/Gearbox Shop Lead include  managing machine shop, machine shop schedule, measure incoming parts from venders, reverse engineering assemblies, drafting, revising current assemblies, operations administrator and machining parts.

### Elgin's Business and Confidential Information

4.      When I began my employment with Elgin, Elgin issued a laptop computer to me with instructions to use it in connection with my job duties. I also received a copy of Elgin's Employee Handbook and Code of Business Conduct and Ethics, and was told to review both documents thoroughly.

5.      Exhibit 3 to the complaint filed in this case contains a true and accurate copy of

1

Elgin's Employee Handbook, and Exhibit 4 to the complaint contains a true and accurate copy of Elgin's Code of Business Conduct and Ethics.

6.      Elgin devotes considerable time and resources to analyzing how industrial equipment is manufactured, assembled, and calibrated, and how it performs under real-world conditions. When manufacturing new equipment or repairing existing equipment, Elgin constantly redesigns and improves the equipment to increase its performance and longevity. These constant efforts to improve machinery give Elgin a critical edge over its competitors.

7.      Elgin has spent years and millions of dollars on independently redesigning equipment and creating detailed, confidential records and information related to this process. Elgin considers such information confidential and trade secret, and takes steps to protect it as such.

8.      Elgin stores information about its business in Poca, including confidential and trade secret information, on a secure computer server. The server is accessible to certain Elgin employees in Poca who have been issued the login credentials necessary to access it.

9.      I am familiar with a location on the server named "\\POCAWVFPS01\Machine Pictures." Photographs taken by Elgin employees using Elgin-issued devices are stored in this folder. These photos depict the step-by-step disassembly of equipment that is part of Elgin's Inspection Analysis, the process by which Elgin inspects and analyzes equipment with the goal of redesigning and improving it for future manufacturing and repair operations.

10.     During this process, precise measurements are taken of customers' equipment to note areas in need of repair and maintenance, and those measurements are written on the equipment so that they are legible in the photographs.

11.     These photographs are highly useful to Elgin, and Elgin considers them confidential

and proprietary.

12.     Some of the files stored on Elgin's servers are SLDDRW files (two-dimensional SolidWorks model), SLDPRT (three-dimensional SolidWorks model) files, SLDASM (SolidWorks Assembly) file or DXF (Drawing Exchange Format) files.

**Files Copied by Don Ritchie**

13.     I am familiar with Donald Ritchie ("Ritchie"), a former draftsman and production administrator at Elgin who now works for Dillon Industries. Ritchie's last day of employment with Elgin was January 27, 2023.

14.     I understand that on August 15 and December 6, 2022, and January 18, 2023, Ritchie copied from Elgin's secure computer server onto an external hard drive, and thereafter accessed this information on the hard drive.

15.     I have reviewed the filenames, file extensions and folder paths of the files downloaded from Elgin and then accessed by Ritchie, as set forth in Exhibits J through O of Vaidyanathan Swaminathan's affidavit, and then reviewed a sample set of the files, themselves.

16.     The files set forth in Exhibits J through O contain SLDDRW, SLDPRT, SLDASM and DXF files and pdf files providing all or nearly all the information necessary to build the following models of decanter centrifuges and hammer mills: (1) 24 x 60 centrifuge; (2) 18 x 50 centrifuge; (3) 18 x 42 centrifuge; (4) 24 x 38 centrifuge; (5) 2612 Hammer Mill; and (6) Lynx 40. The information contained in these files was developed by Elgin as part of the confidential Elgin redesign process. The two-dimensional SLDDRW and SLDPRT files contain Elgin's label and notice of confidential and proprietary information.

17.     Despite this demand, on or about August 5, 2023, I visited with Mouldagraph Corp.,

an Elgin supplier. During this visit, one of the supplier's machinists told me that in preparing a component for Elgin, he had been referencing Drawings marked Dillon Decanter (the d/b/a of Dillon Industries) because its Drawings were the same as Elgin's. Further, he expressed confusion because though Dillon Industries was continuing to use the Drawings, it was making minor changes to them so they were slightly different than Elgin's drawings.

18.     I hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the above statements are true and correct.

Further affiant sayeth naught.

By:
Mitchell Clark

# Exhibit 4

**Mandarino, Gina**

| | |
|---|---|
| **From:** | Harvey, M. Shane <sharvey@jacksonkelly.com> |
| **Sent:** | Friday, July 28, 2023 4:08 PM |
| **To:** | Schaller, Rachel L.; Scott H. Kaminski |
| **Cc:** | Rice, Jill Cranston; Prisco, Monica; Dunbar, Charlie; Loy, Stacie; Hurney, Grace |
| **Subject:** | RE: Elgin Separation Solutions, LLC v. David Chadwick Dillon, Dillon Industries, Inc. and Donald Ritchie, 2:23-cv-00440 |
| **Attachments:** | 24x60 RH.zip |

Rachel,

You are welcome.

I am providing information about the 24x60 RH decanter.  We will continue to roll out information about other equipment.

By way of background, Don Ritchie worked first at a company called Control Point.  He developed many drawings there and subsequently brought those drawings with him to Elgin.  When he left Elgin for Dillon, he brought some of these same (originally Control Point) drawings with him again.

When at Dillon, Don sought quotes for 24x60 RH parts from manufacturers.  He did so using drawings that that he used at Elgin (and in many cases before that at Control Point).  The only change he made to the drawings was showing Dillon's name on the drawings rather than Elgin's.  Don did this to avoid any suggestion that Elgin had any liability or responsibility for Dillon's work.

After obtaining quotes, Elgin (through you) began raising concerns about the use of its drawings.  While Dillon does not agree that the drawings are confidential or proprietary, it has taken steps to supply new drawings.  Also, it has made certain design changes to the equipment.

I have attached files provided by Dillon documenting much of this.  We continue to gather information in this regard.  I have also supplied notes below regarding Dillon's processes with respect to the various 18x60 RH POs.  We can discuss questions you have next week and further discuss whether a similar process works for the remaining POs.

Shane


Notes:

24 x 60 RH
PO 131; 143-1; 175-3; 176-3; 177-2 / Allied for cases (We have received the case; however, we have implemented design changes)
PO 132-01 / Mouldagraph for stainless steel heads (We received the liquid heads; however, the solid heads are under manufacturing under a newly supplied drawing to them.)
PO 137-5; 143-06; 175-2; 176-2; 177-2 / Charleston Steel for belt guards (We received the materials; however, we have implemented design changes and have modified the guards)
PO 180-7 / Kuhn for bowl unit (We used the drawing that I created from Elgin for these. It is the same as the OEM drawing which we also supplied to show that there was no difference in drawings)
PO 180-24 / Harbor Steel for base material (We received the materials; however, we have implemented design changes and have modified the bases)
PO 180-44 / Mouldagraph for RA parts (We have received none of these parts yet and have proactively replaced the drawings that we sent for quoting with our own updated drawings)

1

PO 180-47/ Control Point for effluent ports (Elgin drawing was copied from a Control Point drawing)
PO 180-48/ Control Point for feed pipe supports (Elgin drawing was copied from a Control Point drawing)
PO 180-49 / Charleston Steel for feed pipe guards (This is from the Elgin drawing that we created)

---

**From:** Schaller, Rachel L. <rschaller@taftlaw.com>
**Sent:** Friday, July 28, 2023 2:18 PM
**To:** Harvey, M. Shane <sharvey@jacksonkelly.com>; Scott H. Kaminski <ScottKaminski@rwk-law.com>
**Cc:** Rice, Jill Cranston <jill.rice@dinsmore.com>; Prisco, Monica <mprisco@taftlaw.com>; Dunbar, Charlie <CDUNBAR@jacksonkelly.com>; Loy, Stacie <stacie.loy@dinsmore.com>; Hurney, Grace <grace.hurney@jacksonkelly.com>
**Subject:** RE: Elgin Separation Solutions, LLC v. David Chadwick Dillon, Dillon Industries, Inc. and Donald Ritchie, 2:23-cv-00440

Shane,

Thank you for providing this, we are reviewing. Please provide the documentation on the drawings ASAP so we may evaluate.

Thank you,

Rachel

---

**From:** Harvey, M. Shane <sharvey@jacksonkelly.com>
**Sent:** Thursday, July 27, 2023 12:42 PM
**To:** Schaller, Rachel L. <rschaller@taftlaw.com>; Scott H. Kaminski <ScottKaminski@rwk-law.com>
**Cc:** Rice, Jill Cranston <jill.rice@dinsmore.com>; Prisco, Monica <mprisco@taftlaw.com>; Dunbar, Charlie <CDUNBAR@jacksonkelly.com>; Loy, Stacie <stacie.loy@dinsmore.com>; Hurney, Grace <grace.hurney@jacksonkelly.com>
**Subject:** RE: Elgin Separation Solutions, LLC v. David Chadwick Dillon, Dillon Industries, Inc. and Donald Ritchie, 2:23-cv-00440

Rachel:

AS requested, I've attached POs for parts for new equipment that you have previously identified.

However, while these are technically responsive to your request, I'm not sure they help answer the actual questions you have.  So, as a measure of good faith, let me provide some further information.

As I understand it, Elgin drawings were never provided with purchase orders; instead, Elgin drawings were used to obtain quotes from parts manufacturers.  Based on those quotes, parts were then ordered through POs, but those POs did not include the drawings.  Subsequently, after concerns were raised (through you) by Elgin, Dillon provided its own drawings to the manufacturers, to be used in place of Elgin drawings during the manufacturing process.  I understand this was done for all products except for hammer mills (which I believe may have already been completed before substitutions could be made).

We are working on assembling documentation of this, including documentation showing how Dillon independently created its own drawings.  I will continue to roll out this information to you, but wanted to both give you a status update and also tell you that the final product will look a little different than what you've asked for.

Please let me know if you have any questions.

Shane

**From:** Schaller, Rachel L. <rschaller@taftlaw.com>
**Sent:** Tuesday, July 18, 2023 12:56 PM
**To:** Scott H. Kaminski <ScottKaminski@rwk-law.com>; Harvey, M. Shane <sharvey@jacksonkelly.com>
**Cc:** Rice, Jill Cranston <jill.rice@dinsmore.com>; Prisco, Monica <mprisco@taftlaw.com>; Dunbar, Charlie <CDUNBAR@jacksonkelly.com>; Loy, Stacie <stacie.loy@dinsmore.com>; Hurney, Grace <grace.hurney@jacksonkelly.com>
**Subject:** RE: Elgin Separation Solutions, LLC v. David Chadwick Dillon, Dillon Industries, Inc. and Donald Ritchie, 2:23-cv-00440

Shane,

On our call last week you inquired whether Elgin is seeking purchase orders and drawings exchanged with suppliers for all orders (including repair work) or just new capital equipment. Elgin is seeking this information just with respect to new equipment.

Thank you,

Rachel

---

**From:** Schaller, Rachel L. <rschaller@taftlaw.com>
**Sent:** Monday, July 17, 2023 9:04 AM
**To:** Scott H. Kaminski <ScottKaminski@rwk-law.com>; Harvey, M. Shane <sharvey@jacksonkelly.com>
**Cc:** Rice, Jill Cranston <jill.rice@dinsmore.com>; Prisco, Monica <mprisco@taftlaw.com>; Dunbar, Charlie <CDUNBAR@jacksonkelly.com>; Loy, Stacie <stacie.loy@dinsmore.com>; Hurney, Grace <grace.hurney@jacksonkelly.com>
**Subject:** RE: Elgin Separation Solutions, LLC v. David Chadwick Dillon, Dillon Industries, Inc. and Donald Ritchie, 2:23-cv-00440

Scott,

Here are the shipping instructions for the devices.

- Pack in a container twice the size of the device
- Provide adequate packing material (e.g., bubble wrap, packing peanuts, etc.) so the device is secure during shipping

Please ship the device via a method that provides tracking information (e.g., FedEx, UPS, etc.) to **arrive at or after 8:00 a.m.** and **requires a signature for delivery**. Please provide me with the tracking number.

Shipping Address**:**
Digital Intelligence
Attention: Claudia Beyer
1841 North Prospect Avenue
Milwaukee, WI 53202
414.420.2126

---

**From:** Scott H. Kaminski <ScottKaminski@rwk-law.com>
**Sent:** Wednesday, July 12, 2023 3:57 PM
**To:** Schaller, Rachel L. <rschaller@taftlaw.com>; Harvey, M. Shane <sharvey@jacksonkelly.com>
**Cc:** Rice, Jill Cranston <jill.rice@dinsmore.com>; Prisco, Monica <mprisco@taftlaw.com>; Dunbar, Charlie <CDUNBAR@jacksonkelly.com>; Loy, Stacie <stacie.loy@dinsmore.com>; Hurney, Grace <grace.hurney@jacksonkelly.com>

**Subject:** RE: Elgin Separation Solutions, LLC v. David Chadwick Dillon, Dillon Industries, Inc. and Donald Ritchie, 2:23-cv-00440

Nice to meet you as well.  3:30 works for me as well.

---

**From:** Schaller, Rachel L. <rschaller@taftlaw.com>
**Sent:** Wednesday, July 12, 2023 3:49 PM
**To:** Harvey, M. Shane <sharvey@jacksonkelly.com>
**Cc:** Rice, Jill Cranston <jill.rice@dinsmore.com>; Prisco, Monica <mprisco@taftlaw.com>; Dunbar, Charlie <CDUNBAR@jacksonkelly.com>; Loy, Stacie <stacie.loy@dinsmore.com>; Hurney, Grace <grace.hurney@jacksonkelly.com>; Scott H. Kaminski <ScottKaminski@rwk-law.com>
**Subject:** Re: Elgin Separation Solutions, LLC v. David Chadwick Dillon, Dillon Industries, Inc. and Donald Ritchie, 2:23-cv-00440

That works for me. Nice to meet you virtually, Scott.


On Jul 12, 2023, at 10:55 AM, Harvey, M. Shane <sharvey@jacksonkelly.com> wrote:


How about 3:30 ET tomorrow?  Copying Scott.

Shane

---

**From:** Schaller, Rachel L. <rschaller@taftlaw.com>
**Sent:** Tuesday, July 11, 2023 6:27 PM
**To:** Harvey, M. Shane <sharvey@jacksonkelly.com>; Rice, Jill Cranston <jill.rice@dinsmore.com>; Prisco, Monica <mprisco@taftlaw.com>; Dunbar, Charlie <CDUNBAR@jacksonkelly.com>
**Cc:** Loy, Stacie <stacie.loy@dinsmore.com>; Hurney, Grace <grace.hurney@jacksonkelly.com>
**Subject:** RE: Elgin Separation Solutions, LLC v. David Chadwick Dillon, Dillon Industries, Inc. and Donald Ritchie, 2:23-cv-00440

I suggest we schedule a call. I'm in a deposition tomorrow but have time Thursday. I suggest Scott Kaminski attend as well. Let me know what time works on your end.

---

**From:** Harvey, M. Shane <sharvey@jacksonkelly.com>
**Sent:** Tuesday, July 11, 2023 5:13 PM
**To:** Schaller, Rachel L. <rschaller@taftlaw.com>; Rice, Jill Cranston <jill.rice@dinsmore.com>; Prisco, Monica <mprisco@taftlaw.com>; Dunbar, Charlie <CDUNBAR@jacksonkelly.com>
**Cc:** Loy, Stacie <stacie.loy@dinsmore.com>; Hurney, Grace <grace.hurney@jacksonkelly.com>
**Subject:** RE: Elgin Separation Solutions, LLC v. David Chadwick Dillon, Dillon Industries, Inc. and Donald Ritchie, 2:23-cv-00440

Mr. Ritchie now has counsel. He is Scott Kaminski, who Jill will know.  Scott likely spoke to Mr. Ritchie today.

When/how would you like to share Elgin's proposal on "derivative works?"

I'm around tomorrow and Thursday but out Friday.

Shane

---

**From:** Schaller, Rachel L. <rschaller@taftlaw.com>
**Sent:** Tuesday, July 11, 2023 5:15 PM

**To:** Harvey, M. Shane <sharvey@jacksonkelly.com>; Rice, Jill Cranston <jill.rice@dinsmore.com>; Prisco, Monica <mprisco@taftlaw.com>; Dunbar, Charlie <CDUNBAR@jacksonkelly.com>
**Cc:** Loy, Stacie <stacie.loy@dinsmore.com>; Hurney, Grace <grace.hurney@jacksonkelly.com>
**Subject:** RE: Elgin Separation Solutions, LLC v. David Chadwick Dillon, Dillon Industries, Inc. and Donald Ritchie, 2:23-cv-00440

Charlie and Shane,

Has Mr. Ritchie retained counsel yet? Also, I'm following up to see if there are any reactions to my email, below.

Thank you,

Rachel



**Rachel L. Schaller**
Partner
rschaller@taftlaw.com
Dir: 312.836.4128
Tel: 312.527.4000  |  Fax: 312.966.8535
111 E. Wacker Drive, Suite 2600
Chicago, Illinois 60601-4208

**taftlaw.com**

---

**From:** Schaller, Rachel L. <rschaller@taftlaw.com>
**Sent:** Monday, July 10, 2023 3:22 PM
**To:** Harvey, M. Shane <sharvey@jacksonkelly.com>; Rice, Jill Cranston <jill.rice@dinsmore.com>; Prisco, Monica <mprisco@taftlaw.com>; Dunbar, Charlie <CDUNBAR@jacksonkelly.com>
**Cc:** Loy, Stacie <stacie.loy@dinsmore.com>; Hurney, Grace <grace.hurney@jacksonkelly.com>
**Subject:** RE: Elgin Separation Solutions, LLC v. David Chadwick Dillon, Dillon Industries, Inc. and Donald Ritchie, 2:23-cv-00440

Charlie and Shane,

Nice speaking with you last Friday. As promised, below is an explanation from our vendor about the steps needed to remediate the Elgin information in Dillon's Gmail and Dillon Decanter email boxes.

Additionally, I spoke to Elgin about the second bullet point in our letter (regarding Dillon providing documentation about provenance) and they are okay with Dillon providing this documentation once, for each decanter centrifuge and hammer mill sold, rather than prior to each and every shipment. Finally, Elgin has a proposal regarding how the parties may identify derivative works. Once Ritchie retains counsel, I suggest we schedule a call to discuss.

Thank you,

Rachel

**For Gmail account remediation:**

1. The vendor would log into the Gmail account via web browser, and identify the emails to be remediated (this can be easily done by searching for specific email addresses in question).
2. Once identified, the vendor would add the emails to the "Trash" folder and empty the "Trash" folder to permanently delete them.
3. If Dillon accesses the Gmail account on his mobile phone, the phone will need to be inspected as well to verify those emails no longer show on the mobile phone.
4. If Dillon or Ritchie uses any third-party applications such as Outlook or Thunderbird to access emails on the computer, the vendor would need to remediate emails from them as well (This step can be excluded if emails are only accessed via a web browser).

**For Dillondecanter Email remediation:**

1. Before the vendor can describe the full process, we need to understand the type of email environment associated with the "dillondecanter" email address (For example, Microsoft, Google, etc.), and whether it is a business account or a personal account.
2. If it is a business account and a specific IT team manages that environment, then the vendor will need to have a conversation with the IT team to develop a plan for the permanent deletion of emails (since deleted emails can be restored relatively easier by an Admin).
3. If it is a personal account, the plan for remediation would be the same as that of the Gmail account.

**Taft/**

**Rachel L. Schaller,** Partner
Employment and Labor Relations
Direct: 312.836.4128 | Office Ext: 34128
Taft Office: Chicago

---

**From:** Harvey, M. Shane <sharvey@jacksonkelly.com>
**Sent:** Friday, July 7, 2023 9:20 AM
**To:** Rice, Jill Cranston <jill.rice@dinsmore.com>; Prisco, Monica <mprisco@taftlaw.com>; Dunbar, Charlie <CDUNBAR@jacksonkelly.com>
**Cc:** Schaller, Rachel L. <rschaller@taftlaw.com>; Loy, Stacie <stacie.loy@dinsmore.com>; Hurney, Grace <grace.hurney@jacksonkelly.com>
**Subject:** RE: Elgin Separation Solutions, LLC v. David Chadwick Dillon, Dillon Industries, Inc. and Donald Ritchie, 2:23-cv-00440

Jill,

Please also distribute it to Grace Hurney (copied).

Also, I only occasionally use Webex. Can someone on your side be prepared to share Rachel's request on the screen so that we can walk through it? I might fumble with that if I try to do it.

Shane

---

**From:** Rice, Jill Cranston <jill.rice@dinsmore.com>
**Sent:** Friday, July 7, 2023 9:08 AM
**To:** Harvey, M. Shane <sharvey@jacksonkelly.com>; Prisco, Monica <mprisco@taftlaw.com>; Dunbar, Charlie <CDUNBAR@jacksonkelly.com>
**Cc:** Schaller, Rachel L. <rschaller@taftlaw.com>; Loy, Stacie <stacie.loy@dinsmore.com>

6

**Subject:** Re: Elgin Separation Solutions, LLC v. David Chadwick Dillon, Dillon Industries, Inc. and Donald Ritchie, 2:23-cv-00440

We will distribute a WebEx invitation shortly.

Thanks.


Jill Cranston Rice
Partner
Dinsmore & Shohl LLP  •  Legal Counsel
T (304) 225-1430  •  C (304) 550-0501
E jill.rice@dinsmore.com

Sent from my iPhone

On July 6, 2023 at 7:04:44 PM EDT, Harvey, M. Shane <sharvey@jacksonkelly.com> wrote:

Let's do 1 pm ET.  Thanks.

Shane

Get Outlook for iOS

---

**From:** Rice, Jill Cranston <jill.rice@dinsmore.com>
**Sent:** Thursday, July 6, 2023 4:34:57 PM
**To:** Harvey, M. Shane <sharvey@jacksonkelly.com>; Prisco, Monica <mprisco@taftlaw.com>; Dunbar, Charlie <CDUNBAR@jacksonkelly.com>
**Cc:** Schaller, Rachel L. <rschaller@taftlaw.com>
**Subject:** RE: Elgin Separation Solutions, LLC v. David Chadwick Dillon, Dillon Industries, Inc. and Donald Ritchie, 2:23-cv-00440


Shane:


We are available tomorrow from 1:00-4:00 p.m. ET or after 5:00 p.m. ET.


Let us know if any of these times work, and we will set it up.


Thanks.


Jill

**Jill Cranston Rice**
Partner

Dinsmore & Shohl LLP  •  Legal Counsel
215 Don Knotts Blvd.
Suite 310
Morgantown, WV 26501
**T** (304) 225-1430  •  **F** (304) 296-6116 •  **C** (304) 550-0501
**E** jill.rice@dinsmore.com  •  dinsmore.com

---

**From:** Harvey, M. Shane <sharvey@jacksonkelly.com>
**Sent:** Thursday, July 6, 2023 10:29 AM
**To:** Rice, Jill Cranston <jill.rice@dinsmore.com>; Prisco, Monica <mprisco@taftlaw.com>; Dunbar, Charlie <CDUNBAR@jacksonkelly.com>
**Cc:** Schaller, Rachel L. <rschaller@taftlaw.com>
**Subject:** RE: Elgin Separation Solutions, LLC v. David Chadwick Dillon, Dillon Industries, Inc. and Donald Ritchie, 2:23-cv-00440

Jill,

No apologies necessary.  I can make the afternoon work also, if that fits.

Shane

---

**From:** Rice, Jill Cranston <jill.rice@dinsmore.com>
**Sent:** Thursday, July 6, 2023 10:28 AM
**To:** Harvey, M. Shane <sharvey@jacksonkelly.com>; Prisco, Monica <mprisco@taftlaw.com>; Dunbar, Charlie <CDUNBAR@jacksonkelly.com>
**Cc:** Schaller, Rachel L. <rschaller@taftlaw.com>
**Subject:** RE: Elgin Separation Solutions, LLC v. David Chadwick Dillon, Dillon Industries, Inc. and Donald Ritchie, 2:23-cv-00440

Shane:

With my apology, the only window on my calendar tomorrow when I am not available is from 10:30-12:30 ET.  I'll confer with Rachel and get back to you with alternative times.


Thanks,


Jill




**Jill Cranston Rice**
Partner

Dinsmore & Shohl LLP  •  Legal Counsel
215 Don Knotts Blvd.
Suite 310
Morgantown, WV 26501
**T** (304) 225-1430  •  **F** (304) 296-6116  •  **C** (304) 550-0501
**E** jill.rice@dinsmore.com  •  dinsmore.com

---

**From:** Harvey, M. Shane <sharvey@jacksonkelly.com>
**Sent:** Thursday, July 6, 2023 10:22 AM
**To:** Prisco, Monica <mprisco@taftlaw.com>; Dunbar, Charlie <CDUNBAR@jacksonkelly.com>
**Cc:** Rice, Jill Cranston <jill.rice@dinsmore.com>; Schaller, Rachel L. <rschaller@taftlaw.com>
**Subject:** RE: Elgin Separation Solutions, LLC v. David Chadwick Dillon, Dillon Industries, Inc. and Donald Ritchie, 2:23-cv-00440


I'm available at 11 am ET tomorrow, if that works.  If not, please let me know a time that does work for both Jill and Rachel.


Shane

9

**From:** Prisco, Monica <mprisco@taftlaw.com>
**Sent:** Thursday, July 6, 2023 10:17 AM
**To:** Dunbar, Charlie <CDUNBAR@jacksonkelly.com>; Harvey, M. Shane <sharvey@jacksonkelly.com>
**Cc:** jill.rice@dinsmore.com; Schaller, Rachel L. <rschaller@taftlaw.com>
**Subject:** Elgin Separation Solutions, LLC v. David Chadwick Dillon, Dillon Industries, Inc. and Donald Ritchie, 2:23-cv-00440

| |
|---|
| **EXTERNAL MESSAGE** |

Mr. Dunbar and Mr. Harvey,

Please see attached letter from Rachel Schaller regarding the above subject case.

Thank you

-Monica



**Monica Prisco**
Legal Assistant
mprisco@taftlaw.com
**Dir:** 312.836.4018
**Tel:** 312.527.4000  |  **Fax:** 312.527.4011
111 E. Wacker Drive, Suite 2600
Chicago, Illinois 60601-4208

**taftlaw.com**

This message may contain information that is attorney-client privileged, attorney work product or otherwise confidential. If you are not an intended recipient, use and disclosure of this message are prohibited. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

NOTICE: This electronic mail transmission from the law firm of Dinsmore & Shohl may constitute an attorney-client communication that is privileged at law. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this electronic mail transmission in error, please delete it from your system without copying it, and notify the sender by reply e-mail, so that our address record can be corrected.