## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

ELGIN SEPARATION
SOLUTIONS, LLC, and CMI/CSI LLC
f/k/a CENTRIFUGAL SERVICES, LLC,

       Plaintiffs,

v.

DAVID CHADWICK DILLON, DILLON
INDUSTRIES, INC., and DONALD RITCHIE,

       Defendants.

Case No. 2:23-cv-00440

Judge Irene C. Berger

### DEFENDANT DAVID CHADWICK DILLON AND
### DILLON INDUSTRIES, INC.'S RESPONSE TO ELGIN SEPARATION
### SOLUTIONS, LLC'S MOTION FOR PRELIMINARY INJUNCTION

### INTRODUCTION

Elgin Separation Solutions, LLC ("Elgin") seeks a preliminary injunction from this Court, arguing that it needs extraordinary relief to protect drawings that Elgin claims are confidential and trade secrets. The request is both misleading and entirely unnecessary.  As reflected in documents attached to Elgin's own filings, Dillon Industries, Inc. ("Dillon") has fully cooperated in the identification and return of Elgin's drawings even though they are not trade secrets.  Specifically, Dillon has:

    a.    Confirmed that current Dillon employees did leave with drawings upon departing Elgin;

    b.    Explained that the drawings were taken with the understanding that they were neither confidential nor trade secrets, but rather just common tools used and shared throughout the industry;

    c.    Nevertheless, ceased using the Elgin drawings in favor of drawings compiled or created by Dillon;

    d.    Voluntarily alerted Elgin to drawings in Dillon's possession; and

    e.    Returned to Elgin all drawings as well as any computer devices on which drawings may be held.

In short, Dillon *has already agreed* to provide the relief sought by Elgin with respect to the identification and return of Elgin's drawings.

All of this is buried in Elgin's lengthy filings with this Court.  There is a reason for this.  As this Court will ultimately learn, Elgin does not really care about the drawings.  Indeed, Elgin's publicly available filings in this case ***attach multiple copies*** of these supposed trade secrets for the world to see.[1]  What Elgin really wants is for Dillon to cease doing business.  As shown below, Dillon is outcompeting Elgin because Dillon takes better care of its customers and its employees, not because of drawings that have been available in the industry since the 1960s.  Knowing this, Elgin seeks to manufacture controversy around the drawings and hopes to parlay this controversy into an order from this Court that compels Dillon to stop doing business.

As described below, there is no basis for such relief.  While courts may indeed enjoin the use or disclosure of trade secrets, there is nothing here to enjoin.  Dillon has *already ceased* using Elgin's drawings and returned all copies of those drawings in its possession.  If something more remains to be done, Dillon remains willing to cooperate.  However, there is no authority for Elgin's request that the Court order Dillon to cease doing business prior to trial.  As this Court knows, a preliminary injunction must only be issued where there is a threat of irreparable injury and, even then, it must be narrowly tailored to do no more than preserve the status quo until trial.  Here, Elgin's request fails on both counts.  Its alleged harm is not irreparable: if Elgin truly lost business due to Dillon's improper use of trade secrets (and it did not) this harm can be remedied with monetary damages following trial.  And, certainly, an order requiring Dillon to cease doing business now would do far more than preserve the status quo.  It would effectively be final and dispositive (as Elgin well knows).

---

[1] *See* ECF No. 37 at 84–105.

In summary, the balance of harms weighs decidedly against a preliminary injunction. There is no risk of irreparable harm to Elgin.  The drawings have been returned and any previous harm to Elgin can be remedied with monetary damages.  By contrast, the harm to Dillon from an order requiring it to cease doing business would be devastating—not only to Dillon, but to the employees and customers that Elgin purports to care so much about.  All of these points are more fully explained below.

**BACKGROUND**

**A.  The Decanter Repair and Remanufacturing Industry**

Elgin and Dillon are both in the business of repairing and remanufacturing decanter centrifuges.  A decanter centrifuge is a mechanical device used for the separation of solids from slurries in many industrial processes, including coal mining and rendering.  The technology is not new.  The decanters that Dillon and Elgin repair often date back to the 1960s.  Ex. 1, Chad Dillon Aff. at ¶4.

Elgin and Dillon repair and build new decanter centrifuges based on designs created by other companies who often referred to as "Original Equipment Manufacturers" or "OEM."  On its website, for example, Elgin advertises "BYRD Style Centrifuges."  These are centrifuges based on equipment originally designed and manufactured by Bird Machine Company decades ago:

**Low-Speed Decanter Centrifuge**
BYRD™ Style Centrifuges

**Apex 1842BD**      **Apex 1850BD**      **Apex 2438BD**

*See Decanter Centrifuge*, ELGIN SEPARATION SOLS.

https://elginseparationsolutions.com/decanter-centrifuge/ (last accessed Sept. 14, 2023).

Bird Machine Company ("Bird") was an OEM based in Scott Depot, West Virginia. It began building decanter centrifuges in the 1960s for sale nationwide. Ex. 1, Dillon Aff. at ¶4. Bird's success spawned the creation of a number of companies in the Kanawha Valley that repaired, manufactured or supplied parts for Bird centrifuges, including Kanawha Manufacturing Company and Mouldagraph Corporation. *Id.* As a result of all this activity, drawings of Bird centrifuges are found throughout the Kanawha Valley. *Id.* This includes both original drawings by Bird and drawings created by other companies. *Id.*

Drawings are not needed to repair decanter centrifuges. *Id.* at ¶5. Broken or worn parts are simply identified and new parts are ordered from parts manufacturers *Id.* Building a new decanter centrifuge, however, typically requires drawings describing the location and size of the parts making up the decanter centrifuge. *Id.* at ¶6. Often, drawings for Bird equipment are readily available due to its historical presence in the Kanawha Valley. *Id.* For example, pictured below is a 1979 OEM drawing from Bird:



If OEM or similar drawings are not available, drawings can be created by "reverse engineering" the equipment. *Id.* at ¶17. This is a common industry practice used by both Dillon and Elgin. Contrary to Elgin's assertions, the reverse engineering process is *not* overly complex or time consuming. It simply involves taking the centrifuge apart, measuring its parts, and creating a drawing like the Bird drawing above. *Id.* Indeed, on its website, Elgin boasts of its "expedited reverse engineering" prowess:



*See Centrifuge Repair and Remanufacturing*, ELGIN SEPARATION SOLS., *available at* https://elginseparationsolutions.com/wp-content/uploads/2022/08/Elgin-Centrifuge-Brochure-2019-IPE.pdf (last accessed Sept. 14, 2023).

### B. The "Elgin Redesign Process"

In its amended complaint and motion for preliminary injunction, Elgin places great weight on the "Elgin Redesign Process." Elgin claims the "Elgin Redesign Process" is a top secret and extremely valuable process for manufacturing and improving equipment. According to Elgin, the "end result of the Elgin Redesign Process is Drawings for a piece of equipment that is different from and usually superior to the original equipment that served as the starting point for the project." Plfs' Mem. in Support of Mot. for Prelim. Inj. at 2 [ECF No. 37].

The "Elgin Redesign Process" is apparently so secret that no one has ever heard of it. Chad Dillon was Operations Manager of the Elgin facility in Poca for nearly ten years and does not recall ever hearing of such a process. Ex. 1, Dillon Aff. at ¶22. The same is true of Don Ritchie, who was employed by Elgin for four years. Ex. 2, Ritchie Aff. at ¶5. While Elgin claims that all employees were issued handbooks requiring them to keep the process secret, neither Mr. Dillon nor Mr. Ritchie recall this and Elgin has produced no evidence to the contrary in response to discovery requests. *See* Ex. 3 (Elgin Discovery Responses).

Certainly, Elgin does not tout the process. Unlike Coca-Cola's secret formula or KFC's secret recipe, Elgin says nothing about the benefits of its secret process in its promotional materials. Notably, Elgin publishes an online brochure ("Brochure") describing its repair and remanufacturing services. *See Centrifuge Repair and Remanufacturing*, ELGIN SEPARATION SOLS., *available at* https://elginseparationsolutions.com/wp-content/uploads/2022/08/Elgin-Centrifuge-Brochure-2019-IPE.pdf (last accessed Sept. 14, 2023). Nowhere in the Brochure is the "Elgin Redesign Process" or anything like it ever mentioned. Indeed, the Brochure largely focuses

on Elgin's ability to build equipment matching the OEM's standards rather than improving upon

those standards.  For example, the sixth page of the Brochure focuses on Elgin's ability to meet

OEM specifications:



*See* link to Brochure at 6 (arrows added).  Likewise, Elgin's website describes the decanter

centrifuges it manufactures, but does not discuss improvements from the "Elgin Redesign Process"

or anything of that sort.  *See Decanter Centrifuge*, ELGIN SEPARATION SOLS.

https://elginseparationsolutions.com/decanter-centrifuge/ (last accessed Sept. 14, 2023).

Given this, it is not surprising that neither Elgin's customers nor suppliers have heard of or

place value on Elgin's supposed process.  As demonstrated in the attached affidavit from Rudy

Moulder, Mouldagraph Corporation has supplied parts to Elgin for years and was not aware that

the drawings were the product of some secret process. Ex. 4, Moulder Aff. at ¶3.  As Mr. Moulder

explains, Elgin has historically provided its drawings to Mouldagraph in order to obtain parts, but

has never asked for nondisclosure agreements to be signed or for drawings to be returned or

destroyed after parts are manufactured.  *Id.* at ¶4.

Darling Ingredients is a customer of both Elgin and Dillon.  It ordered equipment for

delivery from Dillon in 2023.  Ex. 1, Dillon Aff. at ¶23.  Like Mouldagraph, Darling Ingredients

is unfamiliar with Elgin's alleged redesign process or the supposed improvements that flow from it. *Id.* Indeed, Darling Ingredients historically wants its equipment to resemble the OEM equipment manufactured by Bird. *Id.* As described more fully below, Darling Ingredients chose Dillon to manufacture equipment because of its confidence in Mr. Dillon, not because of the "Elgin Redesign Process" or drawings related to it. *Id.*

### C. Chad Dillon

Mr. Dillon's father formed a business, Industrial Process Equipment, to repair decanter centrifuges in St. Albans, West Virginia. *Id.* at ¶3. Mr. Dillon started working with his father at the age of 13 and ultimately decided to join the family business rather than go to college. *Id.* Mr. Dillon eventually took over the business and expanded it significantly. *Id.* In 2013, he sold Industrial Process Equipment to Plaintiff Centrifugal Services, a subsidiary of Elgin. Mr. Dillon remained with Centrifugal Services after the sale and served as its Operations Manager until shortly before resigning in 2022 to form his own business, Dillon Industries. *Id.* at ¶8.

Significantly, when Mr. Dillon sold the family business to Centrifugal Services in 2013, he did not sell or seek compensation for drawings or other intellectual property. The only "intellectual property" listed in the sale agreement was: (i) corporate name; (ii) telephone number; (iii) facsimile number; (iv) domain name; (v) websites; and (vi) common law right to the company logo. *See* Ex. 2, Plfs' Mem. in Support of Mot. for Prelim. Inj. at 71 [ECF No. 37].

There was a reason for this. Mr. Dillon's business was not valuable because of drawings or secret design processes. Instead, Mr. Dillon has been successful in the industry because of his management skills and his relationships with customers and employees. *Id.* at ¶10. Chad Dillon strives to communicate often and honestly. *Id.* He spends his days in the shop with employees. *Id.* Customers have his cell phone number and, if they call, he makes sure he talks to them that

same day.  *Id.*  As explained more fully below, Elgin did not continue to follow these basic rules after Chad Dillon left the company. *Id.* at ¶11.  That—and not the "Elgin Redesign Process"—is why Elgin has struggled to maintain customers and employees.

### D.  Don Ritchie

Don Ritchie is a machinist by trade and is proficient in the use of computer-aided drawing programs, like Auto-Cad. Ex. 2, Ritchie Aff. at ¶2.  For many years, he worked for a company called "Control Point" where he both acquired and created drawings of decanter centrifuges.  He subsequently came to work for Elgin in 2018 and brought with him many of the drawings he created at Control Point.  *Id*. at ¶3.  He worked for Elgin for four years.

After Chad Dillon's departure from Elgin, Don Ritchie found Elgin to be a difficult place to work.  It was stressful.  *Id.* at ¶4.  The business was disorganized, and customers were unhappy. *Id.*  Ultimately, Don Ritchie contacted Chad Dillon and asked if he could come to work for Chad. Chad initially told Don that he should not leave Elgin, as Chad could not afford to pay Don what Elgin was paying him in salary and benefits.  *Id.*  Eventually, Chad agreed and Don resigned his position at Elgin in January 2023 and joined Chad at Dillon Industries.  *Id.*

Prior to leaving Elgin, Don Ritchie did download material from his computer.  Some of this was personal material.  Mr. Ritchie is a minister and has organized several foreign missionary trips.  *Id.*  As a result, he had passport information belonging to others that he did not want to leave on his Elgin computer. *Id.*  But also, Mr. Ritchie downloaded drawings that Elgin now claims are trade secrets. *Id.*  Mr. Ritchie had personally acquired or created these drawings while at Elgin and at previous employers and he had never been told his work was secret or part of the alleged "Elgin Redesign Process."  *Id.*  Mr. Ritchie simply felt that the drawings, which he created, would be convenient to have in his new job at Dillon Industries.  *Id.*

During his tenure at Elgin, Mr. Ritchie was frequently asked for drawings and other material. *Id.* at ¶9. In response to this, Mr. Ritchie would occasionally connect thumb drives or other devices to his computer and download material. *Id.* Some of these devices were given to customers and some to fellow employees. *Id.* This happened during the course of Mr. Ritchie's day-to-day job duties and he does not remember every instance in which he downloaded material or what he did with the device that was used to store the information. *Id.* Elgin represents that its investigation has revealed thirteen occasions on which Don downloaded material onto external devices. Don Ritchie does not necessarily dispute this number, but he has diligently searched and found only six thumb drives in his possession. *Id.* He has voluntarily returned all of these thumb drives (through counsel) to Elgin for examination. He presumes the other devices were given to customers or fellow employees. *Id.*

### E.  Chad Dillon's Departure from Elgin and Elgin's Subsequent Struggles

In November 2021, Mr. Dillon decided to leave Elgin. Elgin had shifted its focus to the coal industry, which Mr. Dillon felt was unwise. Ex. 1, Dillon Aff. at ¶12.

Elgin asked Mr. Dillon to stay on until a replacement could be found and trained. Mr. Dillon agreed upon one condition. He had signed an employment agreement when he was hired in 2013 and Elgin took the position that the agreement prohibited Mr. Dillon from competing or soliciting employees for one year.[2] *Id.* at ¶13. Mr. Dillon agreed to stay on provided that the one-year period would begin to run from the effective date of his resignation, December 14, 2021. *Id.* Elgin agreed to this and fully understood that Mr. Dillon would compete with Elgin after the one-year period expired. *Id.*

---

[2] The validity of these covenants, as well as the employment agreement itself, is in dispute. *See infra* at 22–30.

During the one-year period, Mr. Dillon neither competed with Elgin nor solicited Elgin employees. *Id.* at ¶14.  Pursuant to the parties' understanding, Mr. Dillon *prepared* to compete, by arranging shop space and equipment, as well as financing for his new business, but he was careful to do no more. *Id.*  While Elgin now seeks to toll the one-year period by claiming Mr. Dillon competed during that time, Elgin stretches the word "compete" beyond all recognition, desperately claiming that Mr. Dillon's efforts to arrange shop space and financing are "competing."  It similarly points to the fact that Mr. Dillon executed purchase orders for an Elgin customer in March 2022, never revealing that the purchase orders were for a product (shafts) not even sold by Elgin. *Id.* at ¶15.

Elgin eventually hired Mr. Dillon's successor and the parties agreed that Mr. Dillon would leave Elgin in October 2022.  Afterwards, things at Elgin went downhill.  Business was chaotic and both employees and customers were upset. *Id.* at ¶16; Ex. 2, Ritchie Aff. at ¶4.  Customers later reported to Mr. Dillon that they could not even get Elgin managers to return phone calls. Ex. 1, Dillon Aff. at ¶16.

Mr. Dillon's one-year noncompete period expired on December 14, 2022.  *Id.* at ¶17.  His new business, Dillon Industries, placed an ad for employment on Zip Recruiter soon thereafter. *Id.*  Elgin employees learned about the ad without any direction from Mr. Dillon and began responding. *Id.*  Some, but not all, of the Elgin applicants were hired by Mr. Dillon.

The departures greatly upset Elgin.  *Id.* at ¶18.  On January 9, 2023, David Hall, the CEO of Elgin, called Mr. Dillon.  Mr. Hall informed Mr. Dillon that Elgin had concluded there was nothing that Elgin could do about his leaving, his competing with Elgin, and his hiring of former Elgin employees.  *Id.*  However, Mr. Hall asked as a courtesy that Dillon Industries cease hiring

former Elgin employees.  *Id.*  Mr. Dillon completed the hiring of two individuals who had already

been extended offers prior to Mr. Hall's call, but has not hired any other Elgin employee since.  *Id.*

### F.  Elgin's Demands and Dillon's Good Faith Response

The courtesy Mr. Dillon extended to Mr. Hall apparently did not engender much goodwill

with Elgin.  On March 24, 2023, Elgin's national counsel sent a letter to Mr. Dillon demanding

that he "cease and desist" from competing with Elgin, soliciting its employees and using its

confidential information.  Ex. 3, Plfs' Mem. in Support of Mot. for Prelim. Inj. at 66 [ECF No.

37].

In response, Mr. Dillon explained (through counsel) that he did not compete with Elgin or

solicit its employees.  Likewise, he explained that the drawings and similar material were not

confidential, but he nevertheless cooperated in the identification and return of such material.  In a

March 31, 2023 letter, Mr. Dillon's counsel advised Elgin' national counsel as follows:

> After receipt of your letter, Mr. Dillon searched for documentation that may have been brought over by any employees of Dillon Industries.  He discovered headings on an excel spreadsheet that were developed by Elgin (but only amount to writing down the universal process) on an Excel spreadsheet to document necessary repairs and their completion.  He will cease using that form of the spreadsheet immediately.  He also discovered some drawings that had been brought over by a former Elgin employee, based on "reverse engineering" of various pieces of equipment or which were published by the original manufacturer.  Over half of the drawings had been brought to Elgin by that employee from his former employer in 2017 or 2018.  Despite the fact that drawings such as these exact ones are widely used and available in the industry, he will destroy them or return them to Elgin.  Please let us know where the drawings should be delivered if that is what Elgin desires.  Finally, he discovered that an employee had copies of "progress photographs" which were used to document repairs by Elgin.  These photographs have never been used, nor will they be, by Dillon Industries. Those photographs will be destroyed or sent to Elgin, at Elgin's option.

Ex. 2, Plfs' Mem. in Support of Mot. for Prelim. Inj. at 72 [ECF No. 37].

Subsequently, in an email dated May 2, 2023, counsel for Mr. Dillon voluntarily alerted Elgin's counsel that additional materials had been found and would be returned:

> Ms. Schaller, Chad Dillon discovered some additional drawings on an employee's computer that were a combination of drawings brought to Elgin by that employee and developed during his employment at Elgin.  A thumb drive is being sent to you by mail today, and copies of the drawings have been destroyed.  Thank you, Charlie

Ex. 5, Plfs' Mem. in Support of Mot. for Prelim. Inj. at 83 [ECF No. 37].

Mr. Dillon's cooperation, through counsel, continued throughout the summer.  He advised Elgin's counsel that Elgin's drawings were no longer being used and explained the very limited manner in which the drawings had previously been used (to obtain quotes for parts). Ex. 5 (July 27, 2023 Email from S. Harvey at 1:42 P.M.).  He also advised of his willingness to participate in a process through which his email could be searched for Elgin documents, which would then be erased.  Ex. 1, Dillon Aff. at ¶ 21.  And he agreed to the return of six thumb drives in Mr. Ritchie's possession so that Elgin could forensically analyze the drives to determine whether the drawings had been forwarded to other parties. Ex. 4, Plfs' Mem. in Support of Mot. for Prelim. Inj. at 113-115 [ECF No. 37].

None of this made a difference with Elgin's national counsel.  Elgin simply responded with additional letters demanding the return of its trade secrets and relabeling Dillon's transparency as admissions of wrongdoing.

### G.  The Inevitable Litigation

Elgin tells the Court that it has "exhausted" all efforts to protect its alleged trade secrets and that its request for an injunction is a measure of last resort.  Plfs' Mem. in Support of Mot. for Prelim. Inj. at 18 [ECF No. 37].  This is simply untrue.  It is clear that Elgin has always intended

to seek an injunction to prohibit Dillon from doing business – no matter what efforts Dillon undertook with respect to Elgin's materials.

On the eve of the July 4th holiday weekend, for instance, Elgin sent a list of "demands" to Dillon and threatened a TRO hearing if those demands were not met by July 6th. *See* Ex. 6 (June 29, 2023 Letter from R. Schaller). Tellingly, the letter concluded by stating that even complete compliance with Elgin's demands might only "limit Elgin's need to seek a temporary restraining order." *Id.* at 5. And more recently, on the eve of the Rule 26(f) conference, Elgin threatened a preliminary injunction and advised that the only path to avoid this was to meet Elgin's "demands that Dillon . . . stop competing against Elgin in the design, manufacture and repair of hammer mills and decanter centrifuges." *See* Ex. 6 at 3 (August 7, 2023 Letter from R. Schaller). The same message was conveyed by Elgin's national counsel in telephone conferences.

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24. Rather, four factors (the "*Winter* factors") must be established by a movant before a court may issue a preliminary injunction: (1) that the movant is likely to succeed on the merits; (2) that the movant will suffer irreparable injury if the injunction is denied; (3) that the balance of harms favors granting the injunction; and (4) that the injunction is in the public interest. *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)). "**Each of these four requirements must be satisfied**." *Id.* (emphasis added). "[A] district court is entitled to deny preliminary injunctive relief on the failure of any single *Winter* factor, without fully evaluating the remaining factors." *Vitkus v. Blinken*, No. 22-6901, 2023 WL 5438170, at *7

(4th Cir. Aug. 24, 2023); *see also Henderson for Nat'l Lab. Rels. Bd. v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018).

As further explained below, Elgin has failed to establish any of these four factors and therefore is not entitled to a preliminary injunction. Additionally, the injunction Elgin proposes should be denied because it is not narrowly tailored and would not preserve the status quo.

### A.  There is No Irreparable Harm to Elgin

A request for injunctive relief may be denied at the outset if the plaintiff can show no irreparable harm.  "While irreparable harm is only one of the four factors courts must consider in determining whether to grant injunctions, the Supreme Court has made clear that, regardless of the other factors, '[t]he equitable remedy [of an injunction] is unavailable absent a showing of irreparable injury.'"  *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 386 (4th Cir. 2017) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).

Here, there is no irreparable harm to Elgin.  As described above, Dillon has cooperated fully in the identification and return of Elgin's drawings and other alleged trade secrets and has agreed not to use them further. Numerous courts have found that such cooperation and assurances by a defendant undercut a finding of irreparable harm and/or likelihood of success on the merits.  *See, e.g.*, *Integrated Process Sols., Inc. v. Lanix LLC*, No. 19-CV-567 (NEB/LIB), 2019 WL 1238835, at *6 (D. Minn. Mar. 18, 2019) ("While there are certainly circumstances where awarding injunctive relief is appropriate with a party has threatened misappropriation, this is not one of those cases because . . . . [defendant] has returned the server and all [plaintiff's] devices, which [defendant] lawfully had in the first place, and has made explicit promises not to use any of [plaintiff's] information."); *Midwest Sign & Screen Printing Supply Co. v. Dalpe*, 386 F. Supp. 3d 1037, 1056 (D. Minn. 2019) (finding no irreparable harm in misappropriation case because, among

other things, the defendants "provided sworn assurances that mitigate[d] the risk of irreparable harm."); *Delphi Auto. PLC v. Absmeier*, 167 F. Supp. 3d 868, 884 (E.D. Mich. 2016) (denying motion for preliminary injunction in misappropriation case because "[t]he quarantine of hard drives and the Dropbox account prevented files from being transmitted to [Defendant's new employer], and Plaintiff's counsel stated at the hearing that they are now in possession of the data that was quarantined."); *Am. Airlines, Inc. v. Imhof*, 620 F. Supp. 2d 574, 580 (S.D.N.Y. 2009) (holding that plaintiff failed to establish irreparable harm because Defendant "offered to return or destroy all copies of [the] materials" at issue and because Defendant's new employer "made clear that it would not receive these materials."); *Dresser-Rand Co. v. Schutte & Koerting Acquisition Co.*, No. CIV.A. H-12-184, 2012 WL 460275, at *11 (S.D. Tex. Feb. 13, 2012) (denying injunction where defendant had "instructed [plaintiff's former employees] not to make use of [plaintiff's] trade secrets or confidential materials.").

Moreover, while Elgin claims that it has lost business to Dillon due to its use of Elgin's trade secrets, that harm, if any, is not irreparable.  "Where the harm suffered by the moving party may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable." *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994); *see Henderson v. Bluefield Hosp. Co., LLC*, 208 F. Supp. 3d 763, 770 (S.D.W. Va. 2016) ("[E]conomic loss does not, in and of itself, constitute irreparable harm."); *Southtech Orthopedics, Inc. v. Dingus*, 428 F. Supp. 2d 410, 418 (E.D.N.C. 2006) ("it is axiomatic that purely economic injury, such as that resulting from lost sales, profits or market share, does not constitute irreparable harm sufficient to warrant injunctive relief[.]"); *Mylan Pharms., Inc. v. Thompson*, 207 F. Supp. 2d 476, 485 (N.D.W. Va. 2001) ("As any injury must be such that it

cannot be fully remedied by an award of monetary damages, courts have been hesitant to award injunctive relief based on assertions of lost opportunities and market share.").

Here, Elgin's alleged harm is undoubtedly reparable and calculable. In Paragraph 146 of its First Amended Verified Complaint, Elgin expressly alleges that it has experienced a "loss in business of $150,000 to $300,000 per month." Plfs' First Am. Verified Compl. at ¶146 [ECF No. 21]. Likewise, while Elgin makes conclusory statements about harm to business reputation and goodwill, these are insufficient to show irreparable harm. "[L]oss of control over business reputation and damage to goodwill . . . cannot be grounded in platitudes rather than evidence." *Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1208 (E.D. Cal. 2020).

### B.  Elgin is Unlikely to Succeed on the Merits

Because Elgin has no irreparable harm, the Court should end its inquiry. But further examination reveals that Elgin is also unlikely to succeed on the merits.

### 1.  Elgin Has Failed to Establish the Existence of Trade Secrets

A trade secret is information that: (1) derives economic value from not being readily ascertainable by others; and (2) is the subject of reasonable efforts to maintain its secrecy. 18 U.S.C. § 1839(3); W.Va. Code §47-22-1(d). Elgin's drawings and related material fail on both counts.

First, Elgin's claims fail because it has failed to show its drawings and processes have economic value not readily ascertainable by others. As explained above, drawings like Elgin's are widely available and have been passed around the industry since the 1960s. And to the extent a drawing is not readily available, it is "readily ascertainable" because it can be quickly reverse engineered, as explained above. Elgin's supposedly secret process for redesigning equipment similarly lacks value. As explained above, Elgin does not even tout this process in its promotional

material.  And plainly, Elgin's customers and suppliers do not recognize Elgin's claims.  Ex. 4, Moulder Aff. at ¶4; Ex. 1, Dillon Aff. at ¶23.

Importantly, Elgin never even bothers to explain to the Court just *how* its improvements add value.  It simply throws around the words "secrets" and "improvements" without providing any detail.  Courts have held that such general descriptions do not establish the economic value necessary for trade secret protection.  *Kairam v. W. Side GI, LLC*, 793 F. App'x 23, 28 (2d Cir. 2019) (holding plaintiff's misappropriation claims were properly dismissed because plaintiff did "not allege, for example, how the [misappropriated material] derives independent economic value from not being generally known to others[.]"); *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 465 (S.D.N.Y.), *aff'd*, 838 F. App'x 582 (2d Cir. 2020) (explaining that the plaintiffs' allegations concerning misappropriation fail because, *inter alia*, "the plaintiffs have failed to allege how these negative trade secrets derive independent economic value from not being generally known[.]"); *Rodney v. United Masters*, No. 21 CV 5872 (DG)(LB), 2023 WL 2184865, at *6 (E.D.N.Y. Feb. 10, 2023) (recommending dismissal of plaintiff's' trade secret claims because "[e]ven if plaintiff had taken reasonable measures to protect his alleged trade secrets, he fails to allege any facts demonstrating that his alleged trade secrets derive independent economic value[.]" ).  If called to testify, Mr. Dillon and Mr. Ritchie will both explain that most of the supposed "improvements" cited by Elgin are not really improvements at all, but rather just time-saving measures.  Centrifuge bowls are left thicker, for example, not to make the product better, but rather so that Elgin can save time thinning down material during production.  Ex. 1, Dillon Aff. at ¶22.

Elgin's trade secret claims must also fail because Elgin has not made "reasonable efforts" to maintain secrecy.  Bizarrely, Elgin spends forty-three pages telling the Court that its drawings are trade secrets warranting protection and **then attaches the drawings to its public filings in an**

**effort to prove that Dillon copied them**.  Exs. 6 & 7, Plfs' Mem. in Support of Mot. for Prelim. Inj. at 84–105 [ECF No. 37].  This alone belies Elgin's claims of secrecy.  Elgin's suppliers also cast doubt on Elgin's claims.  The attached affidavit from the President of Mouldagraph makes it clear that Elgin takes no steps to maintain the secrecy of drawings.  *See* Ex. 3, Moulder Aff. at ¶4.  Indeed, in responses to Dillon's discovery requests, Elgin could not even establish that its employee handbook (which allegedly requires secrecy) had ever been distributed to employees.  *See* Ex. 3 (Elgin's Discovery Responses).

### 2.   There is no Violation of the Lanham Act

After Dillon voluntarily explained that it had used Elgin's drawings to obtain quotes from parts suppliers, Elgin amended its Complaint to bring a claim under the Lanham Act.  This claim is completely without merit.

As Elgin concedes, the key to a Lanham Act claim is "consumer confusion."  ECF 23-1 at 38.  Plfs' Mem. in Support of Mot. for Prelim. Inj. at 29 [ECF No. 37].  But Elgin never explains just how the consumer in this case (Darling Ingredients) was supposedly confused by Elgin's communications with parts suppliers.  Nor can it.  As explained above, Darling Ingredients purchases equipment from Dillon due to its longstanding relationship with Mr. Dillon, not because it was duped by Dillon's use of an Elgin drawing to obtain quotes from parts suppliers.  Ex. 1, Dillon Aff. at ¶23.  Put differently, Darling Equipment is not buying equipment from Dillon because it believes it is getting an Elgin product. The Lanham Act claim is meritless.

### 3.   There is No Copyright Infringement

On April 22, 2022, Mr. Dillon forwarded an email from his Elgin email address to the new email address he had established for Dillon Industries.  *Id.* at ¶21.  While not the focus of Mr.

Dillon's attention, the email happened to attach a 24x60 manual that had been created by Don Ritchie at Elgin. *Id.*

Elgin subsequently examined Mr. Dillon's Elgin laptop and discovered the email. In response, Elgin did not immediately alert Mr. Dillon or ask him to return the manual as he had done with Elgin drawings and other material. Instead, Elgin quickly rushed to get the 24x60 manual copyrighted on an "expedited" basis. Plfs' Mem. in Support of Mot. for Prelim. Inj. at 16 n.1 [ECF No. 37]. Elgin subsequently received a copyright registration on June 14, 2023, and filed its suit for copyright infringement almost immediately thereafter, on June 16, 2023.

Elgin now claims that it will likely succeed on the merits of its claim because the forwarding of the email (with the subsequently registered 24x60 manual) establishes a prima facie case of copyright infringement. While Dillon has serious doubts about the strength of Elgin's claims of copyright infringement, the simple fact is that Elgin has no prior damages or threat of future harm, and therefore no likely prospect of obtaining relief on its claim.

Certainly, Elgin is not entitled to statutory damages or attorney's fees under the Copyright Act. Plaintiff Elgin's copyright in the Manual was registered on June 14, 2023, and the registration certificate attached to Plaintiffs' First Amended Verified Complaint indicates a first publication date of April 9, 2022. *See* Ex. 7 to Plfs' First Am. Verified Compl. [ECF No. 21]. Plaintiffs allege that the infringing action occurred on April 22, 2022. Under the Copyright Act, no statutory damages or attorney's fees are available for "any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work." 17 U.S.C. § 412; *see Johnson v. Univ. of Va.*, 606 F. Supp. 321, 324–25 (W.D. Va. 1985). Here, registration was not made within three months after the first publication of the work (April 9, 2022), and as a result, no statutory

damages or attorney's fees are available related to the Manual.  *See Cvent, Inc. v. Eventbrite, Inc.*, 739 F. Supp. 2d 927, 939 (E.D. Va. 2010) ("17 U.S.C. § 412 bars any award of statutory damages or attorneys' fees if the work at issue was not registered at the time the infringement commenced").  As a result, Plaintiffs are limited to actual damages.  *See id.*  Regardless, Plaintiff's request for injunctive relief based on the allegations related to Elgin's Copyright Act claim is completely unwarranted and unnecessary.

There is likewise no evidence of actual damage or threat of future harm. While Elgin claims in its Complaint that Dillon is using the manual and "continues to infringe" upon Elgin's copyright, Elgin is speculating: its accusation is based on "information and belief."  *See* Plfs' First Am. Verified Compl. at ¶¶171, 173 [ECF No. 21].  Importantly, Mr. Dillon expressly denies this through a sworn affidavit.  Ex. 1, Dillon Aff. at ¶21.

Moreover, while not highlighted by Elgin in its filings with this Court, Dillon (through counsel) has been in earnest discussions with Elgin since July 2023 about a process for not only returning the 24x60 manual but also cleansing it from Dillon's computer systems.  After Elgin filed suit, it finally approached Dillon about the 24x60 manual.  Specifically, Elgin asked Dillon to allow Elgin's contractor (Digital Intelligence) to examine Dillon's email accounts and to remove or "remediate" the email containing the 24x60 manual.  *See* Ex. 6 (June 29, 2023 Letter from R. Schaller).  Dillon expressed its willingness to cooperate with this process, provided appropriate protocols are established.  See Ex. 8 (July 26, 2023 Email from S. Harvey at 3:01 P.M.).  The ball remains in Elgin's court and Dillon remains ready to proceed.  Dillon is willing to follow this process because it has not used and has no plans to use the 24x60 manual as stated in his affidavit.

In short, Elgin's copyright infringement claim is a tempest in a teapot.  Rather than ask Dillon to return or destroy the 24x60 manual, Elgin rushed to copyright it so that it could file a suit

for copyright infringement.  But there is no damage or threatened harm to Elgin.  Dillon remains prepared to have the 24x60 manual erased from its systems and is willing to enter into an Agreed Order reflecting this, if necessary.

### 4.   There Was No Breach of Contract by Chad Dillon

In a final effort to shut down Dillon, Plaintiffs claim that Dillon should be enjoined because Mr. Dillon violated broad noncompete and non-solicitation provisions in an employment agreement ("Employment Agreement") signed by Mr. Dillon a decade ago.  There are many reasons this argument takes a backseat in Plaintiffs' memorandum.  Chief among them is the fact that West Virginia law—which applies here—greatly disfavors such noncompete agreements. Moreover, as explained below, this particular Employment Agreement suffers from several infirmities that make Elgin's likelihood of success on the merits particularly weak.

### a.   West Virginia Law Applies to the Employment Agreement

To be clear, despite Plaintiff's citations to Delaware law, West Virginia law should govern the interpretation of the Employment Agreement.  For contract cases, the West Virginia rule provides that "[t]he law of the state in which a contract is made and to be performed governs the construction of a contract when it is involved in litigation in the courts of this state."  *Melton v. Precision Laser & Instrument, Inc.*, No. 2:12-CV-1697, 2013 WL 210900, at *4 (S.D.W. Va. Jan. 18, 2013) (quoting *Howe v. Howe*, 625 S.E.2d 716, 721 (2005)); *see Gen. Elec. Co. v. Keyser*, 275 S.E.2d 289, 293 (W. Va. 1981) (refusing to enforce choice of law provision where the only connection with the chosen state was that one of the parties was incorporated in that state).  While the choice of law provision elects Delaware, the Agreement does not it indicate where it was executed.  It is clear, however, that the Agreement was to be performed in West Virginia.  Whether a state has a substantial relationship to the contract in dispute is determined by considering where

the parties reside, where the contract was formed, where the contract was performed, and where the contract was allegedly breached. *See Corky Wells Elec., Inc. v. Pratt*, No. 1:19-CV-158, 2019 WL 10056967, at *10 (N.D.W. Va. Dec. 5, 2019) (applying West Virginia over the specified choice of law **in employment agreement**); *CSS, Inc. v. Herrington*, 306 F. Supp. 3d 857, 879 (S.D.W. Va. 2018) (applying West Virginia law over contract choice of law provision because no parties resided in the chosen state and the contract was signed and allegedly breached in West Virginia); *see also McGough v. Nalco Co.*, 496 F. Supp. 2d 729, 743 (N.D.W. Va. 2007) (applying West Virginia law to **enforcement of non-competition agreement** where West Virginia had substantial relationship to enforcement of agreement and chosen state did not).

### b.  West Virginia Law Disfavors Noncompete Agreements

West Virginia "generally disfavors employee noncompete covenants," and public policy frowns upon restraining a person's freedom to work. *JAK Prods., Inc. v. Bayer*, 94 F. Supp. 3d 777, 786 (S.D.W. Va. 2015), *aff'd*, 616 F. App'x 94 (4th Cir. 2015); *see Weaver v. Ritchie*, 478 S.E.2d 363, 367 (W. Va. 1996) ("A restriction imposed upon a person following the termination of a period of employment imposes a restraint upon a person's freedom to work for himself. Public policy ... frowns upon [this]."); *Weaver*, 478 S.E.2d at 371 ("[C]ontracts which are calculated to rob one of his right to earn his daily bread, or to impoverish him, and cause him or his family to become a charge upon the public charities, or to deprive the public of valuable benefits to accrue from his skill, business or employment, will not be enforced.") (quoting *Boggs v. Friend*, 87 S.E. 873, 875 (W. Va. 1916); *see also Torbett v. Wheeling Dollar Sav. & Trust Co.*, 314 S.E.2d 166, 173 n.19 (W. Va. 1983) (stating "restrictive covenants that do not protect any legitimate business interests are against public policy"). The West Virginia Supreme Court of Appeals instructs that "courts should ... approach restrictive covenants with grave reservations, and take a strict view of

them on first impression." *Reddy v. Cmty. Health Found. of Man*, 298 S.E.2d 906, 915 (W. Va. 1982).  It advises to "approach the available authority with respect to time and area limitations with caution." *Id.* at n.7.

### c. West Virginia Does Not Enforce Invalid or Unreasonable Employment Agreements

West Virginia law requires that "[a]ny covenant not to compete must first, of course, pass inspection as a provision in a binding contract." *Reddy*, 298 S.E.2d at 915.  *Reddy* warns that "[i]f the entire contract fails, for lack of consideration, fraud, duress, adhesion or other contractual excuse, the covenant is also without effect."  *Id.*  Thus, in order to find a likelihood of success on the merits, the Employment Agreement must be valid.  *See JAK Prods., Inc.*, 94 F. Supp. 3d at 783–84 (citing *Reddy,* 298 S.E.2d at 915) ("Any covenant not to compete must first, of course, pass inspection as a provision in a binding contract.").

If the employer shows the contract is valid, the court will then determine if the covenant not to compete is enforceable.  *Id.*  A covenant not to compete is only enforceable if it is reasonable. *Audiology Distribution, LLC v. Hawkins,* No. 5:13CV154, 2013 WL 6583849, *4 (N.D.W. Va. Dec. 16, 2013).  "Specifically, a covenant is reasonable only if it: (1) is no greater than is required for the protection of the employer; (2) does not impose undue hardship on the employee; and (3) is not injurious to the public."  *Id.*

If the covenant is "utterly void and unenforceable" then no further analysis of the covenant is necessary when it is unreasonable on its face.  *Reddy*, 298 S.E.2d at 915; *see McGough*, 496 F.Supp.2d at 755 (holding that covenant is "unreasonable on its face [and the court] will not 'blue pencil' the covenant to conform it with the rule of reason").  A covenant is unreasonable on its face where:

> the restriction is excessively broad with respect to time or area, or if
> in the circumstances the true purpose of the covenant appears to be
> merely to repress the employee, and prevent him from leaving,
> rather than to protect the employer's business.

*Id.*  If a covenant not to compete is reasonable on its face, the employer must then show legitimate

interests which require protection.  *Id.* at 916.

### d.  The Employment Agreement is Invalid Because it Expired.

The Employment Agreement fails the first test applied by courts—that there be a valid

contract—for the simple reason that the contract has expired.

The Employment Agreement—by its own terms and Plaintiffs' own admissions—expired

eight years ago in 2015 after the first two years of Mr. Dillon's employment with Elgin and Mr.

Dillon became an at-will employee of Elgin.  *See* Plfs' First Am. Verified Compl. at ¶41 [ECF No.

21] ("Pursuant to the Employment Agreement, after the first two years of Dillon's employment,

his employment became at will.").  While the Employment Agreement contains a survival clause,

no West Virginia court has ever upheld a non-competition provision after the expiration of an

employment agreement because of a survival clause.

Courts examining this issue have reasoned that where an employee enters into a restrictive

covenant and then experiences a material change in that employment relationship, the original

relationship, including the original restrictive covenant, has been abandoned in favor of a new

agreement between the parties.  *F.A. Bartlett Tree Expert Co.*, 353 Mass. at 587–88 ("[F]ar

reaching changes [in an employment relationship] strongly suggest that the parties had abandoned

their old arrangement and had entered into a new relationship."); *CXENSE Inc. v. Maroniene*, No.

1630118MGM, 2017 WL 3131987, *8 (D. Mass. Jan. 4, 2017).  Thus, after a material change in

the employment relationship, a restrictive covenant signed before that change is no longer

enforceable and the restriction is only in place if a new restrictive covenant is signed. *Sodexo Operations, LLC*. v. *Abbe*, 382 F. Supp. 3d 162, 166 (D. Mass. 2019) (denying preliminary injunction); *Patriot Energy Group, Inc.*, 2014 WL 880880 at *8 (material change to position for a period of time with return to former position rendered restrictive covenant unenforceable); *KNF & T Staffing, Inc. v. Muller*, No. SUCV201303676BLS1, 2013 WL 7018645, *3 n.4 (Mass. Super. Oct. 24, 2013) (collecting cases).  Even further, there has been no evidence shown to indicate that Centrifugal Services LLC ever assigned the Employment Agreement to Elgin (and Elgin's standing to bring this claim is tenuous).

### e.  The Employment Agreement is Unreasonable on its Face.

Even if the Employment Agreement was found to be valid, Elgin still fails to allege facts sufficient to show that the non-competition obligations are reasonable. A non-compete agreement is facially unreasonable where its restrictions are greater than necessary to protect the employer's interests. *See McGough*, 496 F.Supp.2d at 729.  In *McGough*, the court found a non-compete that prevented the employee from working "in the same or any similar line of business" as her former employer to be facially unreasonable and unenforceable because the covenant was not limited to the line of business in which the employee worked. *Id.* at 755.  A non-compete agreement is also facially unreasonable where its geographic restriction has no relationship to the employer's legitimate interests. *See, e.g.*, *JAK Prod., Inc.*, 94 F. Supp. 3d at 777.

Here, the noncompete covenant's scope is essentially limitless.  It provides as follows:

> (b) Non-Competition. During the period of Employee's employment by the Company and continuing until the first anniversary of the date that Employee ceases to be employed with the Company for any reason (the "Applicable Period"). **Employee will not, directly or indirectly, without the prior written consent of the Company, on behalf of any individual or entity other than the Company and its affiliates, perform services in any capacity (whether as an**

**owner, employee, partner, independent contractor or otherwise, whether with or without compensation) in all or any portion of any business that the Company or any of its affiliates conducts or is developing as of the date of such termination** (each such competitor a <u>"Competitor of the Company");</u> provided, however, that the "beneficial ownership" by Employee, either individually or as a member of a "group" as such terms are used in Rule 13d of the General Rules and Regulations under the Exchange Act, of not more than five percent (5%) of the voting stock of any publicly held corporation will not alone constitute a violation of this paragraph. Employee and the Company acknowledge and agree that the business of the Company extends throughout the world, and that **the terms of the non-competition agreement set forth herein will apply (i) on a nationwide basis throughout the United States and (ii) and each other country in which the Company has operations or does business.**

Ex. 2, First Am. Verified Compl. at 10 [ECF 21].

Under the provision, Mr. Dillon cannot "perform services in any capacity (whether as an owner, employee, partner, independent contractor or otherwise, whether with or without compensation) in all or any portion of any business that the Company or any of its affiliates conducts or is developing as of the date of such termination[.]" *Id.* The covenant does not seek to limit the prohibition to the kind of work that Mr. Dillon actually performed for Elgin (repair of centrifuges and the manufacturing of certain pieces of heavy machinery). This alone is fatal to Elgin's claims. *See Nortec Commc'ns, Inc. v. Lee-Llacer*, 548 F. Supp. 2d 226, 230 (E.D. Va. 2008) (finding a noncompete covenant unenforceable "because the functions that are proscribed by the non-compete agreement are not limited to the functions that were performed by [the employee]").

The Elgin covenant is similar to the covenant examined in *Specialty Marketing, Inc. v. Lawrence*, which was found unenforceable. No. CL09000928-00, 2010 WL 7375616, at *2–3 (Cir. Ct. Va. Mar. 11, 2010). There, the noncompete provision prohibited the plaintiff from being

"employed by ... any business competitive with [the defendant]." *Id.* at *2. The court found that the language "far exceed[ed] whatever limitation would be necessary to protect [the employer's] business interests." *Id.* at *3. The covenant here is also similar to the restrictive covenant examined and rejected in *Simmons v. Miller*, 544 S.E.2d 666 (Va. 2001). The covenant in *Simmons* restricted the employee from engaging in "any business similar to the type of business conducted by [the employer]." *Id.* at 678.

The Employment Agreement also states that "the terms of the non-competition agreement set forth herein will apply (i) on a nationwide basis throughout the United States and (ii) and each other country in which the Company has operations or does business." Employment Agreement at section (b). As a result, the non-compete not only covers the United States, but expressly has global reach. The unlimited geographic scope of this non-compete also renders it unreasonable. *See Alston Studios, Inc. v. Lloyd V. Gress & Assocs.*, 492 F.2d 279, 281 (4th Cir. 1974) ("Because the covenant not to compete lacks geographic limitations, and is excessively broad as to the activities prohibited to Gress after his termination, we agree with the district court that it is excessively broad and unenforceable."); *see also McGough*, 496 F. Supp. 2d at 754-55 (finding nationwide scope of covenant not to compete to be unreasonable).

### f.   The Tolling Period is Unreasonable.

Similarly, the tolling provision contained in the Employment Agreement renders the Employment Agreement unreasonable. The tolling provision states that Mr. Dillon's "obligations under these Confidential Information, Non-Competition and Non-Solicitation Terms will be tolled during any period of non-compliance." Employment Agreement at section (f). The Agreement, however, provides no specification regarding how the time period is calculated. In the absence of clear contractual language, Elgin argues in its Motion that it is entitled to a one-year extension of

the non-competition, non-solicitation, and confidentiality provisions in the Employment Agreement.[3]  It is worth noting, however, that this is another unresolved issue of law that the West Virginia Supreme Court of Appeals has not addressed.

As the District Court for the District of Minnesota held in *Mobile Mini, Inc. v. Vevea*, "restarting the clock" on the restrictive covenant even where a tolling provision may permit such an extension would **"amount to a windfall for [former employer] that is not in the interests of justice[.]"**  No. 17-cv-1684 (JRT/KMM), 2017 WL 3172712, at *8 (D. Minn. July 25, 2017); *see also U.S. Water Servs., Inc. v. Watertech of Am., Inc.*, No. 13-cv-1258 (PJS/JSM), 2013 WL 5503725, at *1 n.2 (D. Minn. Oct. 3, 2013) ("Given that '[i]n Minnesota, employment noncompete agreements are looked upon with disfavor, cautiously considered, and carefully scrutinized', the Court doubts very much that any Minnesota court would give an employer a 'fresh set of downs' every time a former employee violates a covenant not to compete.") (citation omitted).  Like West Virginia, non-competes are heavily scrutinized and largely disfavored in Minnesota.

Courts reviewing similar tolling provisions found them unenforceable precisely because it is not "self-evident" how to measure the extension of the restrictions.  *See, e.g.*, *Hanson v. Loparex, Inc.*, 809 F. Supp. 2d 972, 980–81 & n.5 (D. Minn. Aug. 5, 2011) (applying Wisconsin law and finding unenforceable a restriction purporting to extend the restrictive period "by a length of time equal to 'the duration of any violation'"); *H&R Block E. Enters., Inc. v. Swenson*, 745 N.W.2d 421, 427–28 (Wisc. App. Ct. 2007) (tolling provision void because "a former employee cannot tell from the terms of his or her contract how long the extension will be for the particular conduct in violation of the clauses"); see also *Arizant Holdings Inc. v. Gust*, 668 F. Supp. 2d 1194, 1201 (D.

---

[3] Mr. Dillon expressly denies that he engaged in any activity that would have tolled the Employment Agreement. *See supra* at 2–13.

Minn. 2009) ("It is not clear whether the tolling provision on which [plaintiff] relies is enforceable. Although the Minnesota Supreme Court does not seem to have addressed the issue, several states have held that such tolling provisions are not enforceable.") (citing *H&R Block E. Enters.*, 745 N.W.2d at 427–28).

For example, in *H&R Block*, the Wisconsin Court of Appeals faced a similar tolling provision for a non-compete period.  The court held that the provision was unenforceable because "a former employee cannot tell from the terms of his or her contract how long the extension will be for particular conduct in violation of the clauses" and therefore it was likely that unpredictable but legitimate disputes would arise, requiring judicial resolution. 745 N.W.2d at 427. The same ambiguity as in H&R Block exists here: "What constitutes a 'one-day' violation? Is it any day in which there is any contact with a company client for whom one of the listed services is being provided? Does the violation then extend until the service is completed for that client?" *Id.*

### C.  Dillon Would be Irreparably Harmed by a Preliminary Injunction

The exact parameters of Elgin's sought-after injunction are unclear.  In its memorandum, Elgin asks the Court to enter five forms of injunctive relief:

> Enter a preliminary injunction: (i) enjoining Defendants from using, disclosing, or further accessing Elgin's copyrights, trade secrets and confidential information, including copying, modifying or using any documents in their possession, which were taken from Elgin: (ii) enjoining Defendants from destroying, deleting, or failing to retain copies of Elgin's copyrights or its trade secrets, documents, and information,  **(iii) enjoining Defendants from doing business with Darling Ingredients, Paragon ISG and any other Elgin customer that is the subject of the information misappropriated from Elgin; (iv) enjoining Defendants from doing business with Elgin's suppliers**; and (v) enjoying Defendants from soliciting Elgin's employees . . .

Plfs' Mem. in Support of Mot. for Prelim. Inj. at 43 [ECF No. 37] (**emphasis added**).  As described above, Dillon has already voluntarily complied with the first, second and fifth forms of relief

relating to the use of trade secrets and the solicitation of employees.  As such, a preliminary injunction on these points is unnecessary.  To the extent that any issues remain unresolved, Dillon is willing to work out an Agreed Order that can be monitored by the Court.

The third and fourth forms of relief (in bold) are less clear and more problematic.  It is unclear whether Elgin is seeking to halt work on *existing* orders to Darling Ingredients (which orders Elgin alleges are tied to its trade secrets) or something broader than that.  The language in the third form of relief limiting it to any "customer that is the subject of the information misappropriated from Elgin" is unclear, but may be intended as a limit on orders tied in some way to Elgin drawings.  The language in the fourth form of relief does not appear to have any limits whatsoever and, as written, would broadly bar Dillon from doing business with "Elgin's suppliers" whether or not Elgin's drawings are used.  Moreover, it is unclear whether the relief sought applies to mere repair work, which does not involve drawings or alleged trade secrets all.

In any event, even a more limited reading of Elgin's request would be crushing to Dillon. Dillon has expended approximately $1,000,000 in parts and labor to manufacture equipment for Darling Ingredients. Ex. 1, Dillon Aff. at ¶24.  Notably, approximately $120,000 in parts were ordered from Elgin itself.[4]  If Dillon cannot complete these orders and recoup its nearly $1,000,000 in expenses, its future existence is in serious peril.  And, if Elgin intends something broader that this, such as a flat prohibition on any future business with Elgin customers or suppliers between now and the trial date of August 12, 2024, then Dillon will be forced to go out of business.  *Id.* at ¶25.

---

[4] Dillon has separately filed a counterclaim for Elgin's acts of selling parts to Dillon on the one hand and then seeking to prohibit Dillon from using those parts on the other hand.  *See* ECF No. 39.

### D.  The Public Interest Does Not Favor a Preliminary Injunction

In trade secret cases, courts have found that, while trade secrets should be protected, there is also a public interest in robust and vigorous competition.  *Ill. Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 684 (Fed. Cir. 1990) ("Recognizing a public interest in the protection of patent rights, the district court [nonetheless permissively] deemed that interest counterbalanced in this case by [defendants'] continuing right to compete[.]"); *E.I. Du Pont de Nemours & Co. v. MacDermid, Inc.*, No. CIV.A. 06-3383(MLC), 2008 WL 4952450, at *33 (D.N.J. Nov. 19, 2008) ("The public interest in free competition outweighs the public interest in enforcing a patent where there is a substantial question as to the patent's validity."); *Otsuka Pharm. Co. v. Torrent Pharms. Ltd., Inc.*, 99 F. Supp. 3d 461, 507 (D.N.J. 2015) (denying plaintiffs request for a preliminary injunction in part because "the public interest would benefit from increased competition[.]"); *Sanho Corp. v. KaiJet Tech. Int'l Ltd., Inc.*, No. 1:18-CV-05385-SDG, 2020 WL 1800372, at *5 (N.D. Ga. Jan. 22, 2020) ("The public interest is further served by the promotion of robust competition in the marketplace.").  Here, Elgin seeks to snuff out its competitor Dillon over trade secret and other claims that are weak at best.

Additionally, the harm to customers and employees from an injunction would be severe. Dillon Industries currently employs 21 full time employees at its facility in Eleanor, West Virginia. Ex. 1, Dillon Aff. at ¶2.  As described above, these jobs would be jeopardized or lost if Dillon Industries is forced to cease business until trial on August 12, 2024.  Moreover, Darling Ingredients, the customer that Elgin claims to care so much about, would be severely impacted if Dillon cannot complete Darling's order.  Darling needs the equipment to be finished and delivered as soon as possible.  *Id.* at ¶24.

### E.  The Relief Elgin Seeks is not Narrowly Tailored to Preserve the Status Quo

"The principal function of a preliminary injunction is to maintain the status quo." *Di Biase v. SPX Corp.*, 872 F.3d 224, 231 (4th Cir. 2017).  The Fourt Circuit has held that "[t]he authority of the district court judge to issue a preliminary injunction, especially a mandatory one should be sparingly exercised" and "[m]andatory preliminary injunctions [which] do not preserve the status quo . . . should be granted only in those circumstances when the exigencies of the situation demand such relief."  *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980); *see also E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 828 (4th Cir. 2004).[5]

"Whenever the extraordinary writ of injunction is granted, it should be tailored to restrain no more than what is reasonably required to accomplish its ends."  *Consolidation Coal Co. v. Disabled Miners of S. W. Va.*, 442 F.2d 1261, 1267 (4th Cir. 1971); *see also Hayes v. N. State L. Enf't Officers Ass'n*, 10 F.3d 207, 217 (4th Cir. 1993) (same). This is particularly true when "preliminary relief, on something less than a full record and full resolution of the facts, is granted." *Id*.

Here, Elgin seeks a mandatory injunction to cease Mr. Dillon's business.  This is extreme and unnecessary to protect Elgin's alleged trade secrets.  As described above, Dillon has fully cooperated in the return and identification of Elgin's drawings and related material.  If something more remains to be done, Dillon is willing to cooperate further.  But shutting down all or part of

---

[5]  "'[A] preliminary injunction's tendency to preserve the status quo determines whether it is prohibitory or mandatory.'" *Billups v. City of Charleston*, 194 F. Supp. 3d 452, 460 (D.S.C. 2016) (quoting *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013)). Injunctions that do not preserve the status quo are termed "mandatory", while those that do are merely "prohibitory." *See id*.

Dillon's business prior to trial does not preserve the status quo and such an extreme remedy is not supported by the law.

While Elgin relies on *Herrmann International, Inc. v. Herrmann International Europe*, No. 1:17-CV-00073-MR, 2021 WL 861712, at *22 (W.D.N.C. Mar. 8, 2021) for such relief, Elgin's reliance is badly misplaced. *Hermann* involved a request for a *permanent* injunction, not a preliminary one. *Id.* There were no remaining hearings to be held or issues of fact to be resolved. Indeed, Elgin fails to point out that the defendants in Hermann had actually *defaulted*. *Id.* ("[b]y virtue of the Defendants' default, the Defendants [had] not identified any harms they might suffer as a result of the issuance of a permanent injunction."). *Herrmann* does not stand for the proposition that an injunction halting Dillon's business is appropriate at this early stage of the litigation.

Likewise, Elgin mistakenly relies upon *Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 68 A.3d 1208, 1213–14 (Del. 2012). Critically, Martin also involved a request for *permanent* injunctive relief following trial, not preliminary relief. Moreover, the facts in *Martin* are substantially different than those at issue here. There, the court found that the defendant used private information it obtained from plaintiff during merger discussion to institute a hostile takeover of plaintiff's business, violating various nondisclosure agreements in the process. "The [court's] injunction prohibited [defendant], for a four month period, from going forward with its Exchange Offer and Proxy Contest, from otherwise taking steps to acquire control of [plaintiff's] shares or assets, and from further violating the [nondisclosure agreements]." *Id.* at 1226. The unique facts in *Martin* in no way support Elgin's contention that Dillon should be enjoined from doing further business.

In summary, Elgin cites no cases supporting its request for the Court to alter the status quo and prohibit Dillon from conducting business.

### F.  The Balance of Harms Does Not Favor an Injunction

The balance of harms does not favor a preliminary injunction, especially the drastic one sought by Elgin.  There is no threat of irreparable harm to Elgin: its drawings have been returned and are no longer being used by Dillon.  Even if Elgin could establish some harm from the prior limited use of the drawings (it cannot) that harm could be easily remedied by a monetary award after trial.  By contrast, the harm to Dillon and others is great.  An order causing Dillon to shut down would be devastating to Dillon's business.  It would also greatly impact Dillon's employees and the customers Elgin purports to claim so much about.  Such an extreme remedy should not be granted prior to trial, particularly where Elgin's underlying claims are so contrived and questionable.

Respectively submitted,

**DAVID CHADWICK DILLON AND
DILLON INDUSTRIES, INC.**

By Counsel

_/s M. Shane Harvey_
M. Shane Harvey (WVSB # 6604)
Grace E. Hurney (WVSB # 12751)
JACKSON KELLY PLLC
Post Office Box 553
Charleston, West Virginia 25322
Office: (304) 340-1000
Fax: (304) 340-1080

35

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

ELGIN SEPARATION
SOLUTIONS, LLC,

       Plaintiff,

v.                                           Case No. 2:23-cv-00440
DAVID CHADWICK DILLON, DILLON           Judge Irene C. Berger
INDUSTRIES, INC., and DONALD RITCHIE,

### CERTIFICATE OF SERVICE

       I hereby certify that on September 15, 2023, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the CM/ECF participants registered to receive service in this action, including the following attorneys of record:

| | |
|---|---|
| Jill Cranston Rice | Rachel L. Schaller (*pro hac vice*) |
| DINSMORE & SHOHL LLP | TAFT STETTINIUS & HOLLISTER LLP |
| 215 Don Knotts Boulevard, Suite 310 | 111 East Wacker Drive, Suite 2600 |
| Morgantown, West Virginia | Chicago, Illinois 60601 |
| Office: (304) 296-1100 | Office: (312) 527-4000 |
| Fax: (304) 296-6116 | Fax: (312) 527-4011 |
| Jill.rice@dinsmore.com | rschaller@taftlaw.com |
| *Counsel for Plaintiff* | *Counsel for Plaintiff* |
| | |
| Jordan "Jo" McMinn | Scott H. Kaminski |
| DINSMORE & SHOHL LLP | Ray, Winton, and Kelley, PLLC |
| 707 Virginia Street, East, Suite 1300 | 109 Capitol Street, Suite 700 |
| Charleston, West Virginia | Charleston, West Virginia 25301 |
| Office: (304) 357-0900 | Office: (304) 342-1141 |
| Fax: (304) 357-0919 | Fax: (304) 342-0691 |
| Jordan.mcminn@dinsmore.com | ScottKaminski@rwk-law.com |

                                              */s M. Shane Harvey*
                                              M. Shane Harvey (WVSB 6604)