**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**ELGIN SEPARATION SOLUTIONS, LLC**
**and CMI/CSI LLC f/k/a CENTRIFUGAL**
**SERVICES, LLC,**

          **Plaintiffs,**

**v.**                                   **CASE NO. 2:23-cv-00440**
                                               **Judge Berger**

**DAVID CHADWICK DILLON**
**DILLON INDUSTRIES, INC. and**
**DONALD RITCHIE,**

          **Defendant.**

**<u>PLAINTIFF ELGIN SEPARATION SOLUTIONS, LLC'S AND CMI/CSI LLC f/k/a</u>**
**<u>CENTRIFUGAL SERVICES, LLC'S REPLY IN SUPPORT OF THEIR MOTION FOR</u>**
**<u>PRELIMINARY INJUNCTION</u>**

Rachel L. Schaller (*pro hac vice*)
IL ARDC No. 6306921
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2800
Chicago, Illinois 60601
Telephone: (312) 527-4000
Facsimile: (312) 527-4011
rschaller@taftlaw.com

Jill Cranston Rice
WV State Bar No. 7421
DINSMORE & SHOHL LLP
215 Don KNotts Boulevard, Suite 310
Morgantown, WV 26501
Telephone: (304) 296-1100
Facsimile: (304) 296-6116
jill.rice@dinsmore.com

*Counsel for Plaintiffs*

I.        **INTRODUCTION**

The facts supporting Plaintiffs' Motion for Preliminary Injunction (Dkt. 24) are not seriously in dispute. What remains for this Court to decide is whether, given Plaintiffs' likelihood of success on the merits of their claims, there is a form of relief which would mitigate the irreparable harm being suffered by Plaintiffs while limiting any harm to Defendants. As explained below, an order dispossessing Defendants of Elgin's trade secrets and limiting the ways in which Dillon can compete or solicit Elgin's customers and suppliers appropriately balances the parties' competing harms while upholding public interest in the integrity of contractual agreements and the protection of investments in trade secrets. *See Haught v. Louis Berkman LLC*, 417 F. Supp. 2d 777, 787 (N.D.W. Va. 2006).

II.       **ELGIN IS SUFFERING IRREPARABLE HARM, WHICH OUTWEIGHS ANY HARM TO DEFENDANTS.**

Elgin is suffering significant, ongoing irreparable harm in three ways. First, though Defendants claim they returned all Elgin information in their possession, Defendants continue to possess: (i) original and modified copies of Elgin's drawing files; (ii) other files Ritchie accessed over dozens of times since leaving Elgin; and (iii) two key devices connected to Ritchie's and Dillon's Elgin computers several times in the months leading up to their resignations. Defendants' purported compliance attempts earlier this year obfuscated their bad acts for months and fall woefully short of remediation. Second, Elgin is sustaining irreparable harm to its brand and goodwill. Third, Elgin is sustaining irreparable harm by Dillon's continuing violations of his non-competition and customer and supplier non-solicitation agreements.

A.        **Defendants continue to possess and use Elgin's electronic drawing files.**

Defendants claim they returned all computer devices containing Elgin's files to Elgin; however, Defendants' admissions and Elgin's computer forensic evidence tell a different story.

1

Defendants' actual misappropriation and continued access to Elgin's trade secret information distinguishes this case from the authority discussed in the Response.[1] "If, as Defendants claim, they do not currently possess Plaintiff's trade secrets or are not using them, then imposition of this injunction will not harm Defendants." *Indep. Techs., LLC v. Otodata Wireless Network, Inc.*, No. 320CV00072RJCCLB, 2020 WL 1433525, at *6 (D. Nev. Mar. 23, 2020).

i. Elgin drawings

Defendants remain in possession of electronic copies of the Elgin drawings they downloaded and modified. Defendants admit that in January 2023, just days after Ritchie officially joined Dillon Industries, he used drawings that he took from Elgin to obtain quotes for parts to manufacture a 24x60 centrifuge, among other equipment types that Defendants have not yet identified. Defendants admit the only change Ritchie "made to the drawings was showing Dillon's name on the drawings rather than Elgin's." Memorandum Ex. 4, Dkt. 37; Ritchie Aff., Dkt. 41-2, ¶ 6. The only way Ritchie could have modified Elgin's drawings was to access or download them on his Dillon Industries or personal computer. Moreover, as Ritchie e-mailed the modified Elgin drawings to Elgin suppliers using his Dillon Industries e-mail address, there are copies of the drawings on Dillon Industries' e-mail servers. While Defendants returned the remote storage media Ritchie originally used to misappropriate Elgin's files, they have not identified the devices or accounts onto which Ritchie copied and modified Elgin's files. Nor have they submitted these

---

[1] Response, pp. 15-16, citing *Integrated Process Sols., Inc. v. Lanix LLC*, No. 19-CV-567 (NEB/LIB), 2019 WL 1238835, at *6 (D. Minn. Mar. 18, 2019) (threatened misappropriation); *Midwest Sign & Screen Printing Supply Co. v. Dalpe*, 386 F. Supp. 3d 1037, 1054 (D. Minn. 2019) (no evidence of disclosure or use); *Am. Airlines, Inc. v. Imhof*, 620 F. Supp. 2d 574, 580 (S.D.N.Y. 2009) (threatened misappropriation). Further, Defendants have not taken any of the steps those courts found to moot injunctive relief. *Integrated Process*, 2019 WL 1238835, at *6 (defendants returned a server and all of plaintiff's devices and promised not to use plaintiff's information); *Delphi Auto. PLC v. Absmeier*, 167 F. Supp. 3d 868, 884 (E.D. Mich. 2016) (defendants identified and quarantined all copies of files). Finally, *Dresser-Rand Co. v. Schutte & Koerting Acquisition Co.* No. CIV.A. H-12-184, 2012 WL 460275, at *11 (S.D. Tex. Feb. 13, 2012) is inapposite since here, Dillon actively encouraged Ritchie to take Elgin's files (i.e., by Ritchie's copying of Elgin files to a folder labeled "Dillon Industries") instead of instructing him not to.

devices or accounts for inspection, or provided any sworn statements detailing the steps they took to identify and delete Elgin information in their possession.

ii.   Ritchie's unexplained access to thousands of other Elgin drawings and files.

In addition to Defendants' actual use and possession of Elgin's drawings, Ritchie accessed thousands of other Elgin's files on 29 different days between January and March 2023. These files contain complete electronic instructions to design and manufacture six distinct equipment models (the 24x60, 18x50, 18x42 and 24x38 decanter centrifuges, a Lynx 40 machine and a 2612 Hammer Mill Machine). *See* Memorandum, Dkt. 37, pp. 12-13. Defendants admit Ritchie accessed these files in January 2023 to obtain quotes for parts but do not provide any explanation for Ritchie's repeated access to the files through March 2023 – let alone an innocent explanation.

iii.   Defendants' failure to account for two key devices containing Elgin's files.

Defendants claim to be unable to locate half of the drives on which Ritchie stored Elgin's trade secret files – including the critical Kingston DataTraveler 2.0 drive, which was connected to Ritchie's Elgin laptop over 45 times in the months preceding his resignation and contain folders he created called "Dillon Industries" and "Chad." First Am. Compl. Ex. 6, Dkt. 21-6; *see also* Memorandum, Dkt. 37, p. 12. Ritchie claims he may have given the device to a coworker or a customer, but cannot explain why he gave away a device he so routinely used to perform his job for Elgin. Nor can Defendants account for the SSD2 drive, which was connected both to Dillon's and Ritchie's laptop numerous times in the months prior to their resignations. *Id.*

iv.   Proposed agreed order on remediation

Elgin has repeatedly demanded that Defendants return physical copies and certify their destruction of all other Elgin files in their possession or control. *See* Henley Aff. Ex. 1-4, Dkt. 37. Defendants did not do so, forcing Elgin to file this lawsuit. Only after Elgin filed suit and attempted to mediate a resolution did Defendants disclose their actual misappropriation to Elgin. While

Defendants now concede they will work out the terms of an agreed order for full remediation, any such order must account for several concerns.

First, Defendants claim to have created a third set of drawings, which they are now using instead of Elgin's files. Response, Dkt. 41-2, ¶8. Not only must Defendants be dispossessed of all original and modified Elgin files, they also must cease using and delete any new drawings they created while in possession of Elgin's files. Permitting Defendants to use files they created while in possession of Elgin's information violates "a cardinal equity rule that one should not benefit from his or her own wrongdoing." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Coffindaffer*, 183 F. Supp. 2d 842, 852 (N.D.W. Va. 2000).

Second, Defendants must identify all devices, drives, and email and remote storage accounts that contain information from Elgin's files and submit them for inspection under a mutually agreeable process the costs of which Plaintiffs will share equally with Defendants.

Third, Defendants must identify all suppliers and customers with whom they shared original or modified versions of Elgin's files, and, after such identification, instruct all such third parties to permanently delete and destroy the files.

Fourth, Defendants should be barred from doing business with any existing Elgin customer or supplier about whom Defendants misappropriated Elgin's trade secret files or with whom Defendants shared Elgin's trade secret files. *See Indep. Techs., LLC*, 2020 WL 1433525, at *6 (barring defendants from soliciting any of plaintiff's existing clients about whom defendants obtained plaintiff's trade secrets); *Sunbelt Rentals, Inc. v. Love*, No. CV2017611RMBAMD, 2021 WL 2349855, at *5 (D.N.J. June 9, 2021) (finding defendant unlikely to succeed on any appeal regarding the court's narrow preliminary injunction ordering defendant to stop working for his new employer pending further discovery confirming deletion of misappropriated trade secrets).

**B.      Elgin is suffering irreparable harm in the form of loss of goodwill.**

The harm to Elgin's goodwill is not "grounded in platitudes" as Defendants suggest. Defendants' own brief demonstrates that Elgin brands its equipment and advertises its special processes that "limit[] downtime" and involve "expedited reverse engineering." Response, pp. 3, 5. Defendants are confusing the market place by grafting off of Elgin's files and labeling its drawings "Dillon Industries." Moreover, Elgin is suffering irreparable harm to the goodwill it created by its sales representatives, which is "particularly true where, as here, the evidence demonstrates the importance of personal contacts to the success of a company." *All Pro Maids, Inc. v. Layton*, No. CIV.A. 058-N, 2004 WL 1878784, at *5 (Del. Ch. Aug. 9, 2004), *aff'd*, 880 A.2d 1047 (Del. 2005). Here, Dillon admits that when Elgin bought his family's company, it was paying for Dillon's relationships with customers and employees. Dillon Aff., Dkt. 41-1, ¶ 10. This more than suffices to establish actual, articulable harm to Elgin's brand and good will.

**C.      Elgin is suffering irreparable harm through Dillon's solicitation of customers and suppliers, and his direct competition, outweighing any harm to Dillon.**

Dillon does not address the irreparable harm Elgin is suffering as a result of his ongoing, direct competition and solicitations. While he claims Elgin is unlikely to succeed on the merits of its breach of contract claim, there appears to be no dispute that Dillon continues to solicit Elgin's suppliers and customers, and engage in direct competition with Elgin.

Merely ordering Defendants to stop using Elgin's files would not suffice to remedy the harm Elgin is suffering by Dillon's continued work with Elgin's suppliers. It is undisputed that Dillon Industries solicited Elgin's suppliers when Ritchie sent them Elgin drawings that he re-branded Dillon Industries and requested they provide quotes for the fabrication of the parts. Dillon solicited work from these suppliers by misleading them into believing that Dillon Industries created the drawings when, in fact, they were created by Elgin. In other words, had Ritchie

attempted to solicit Elgin's suppliers using Elgin's original drawings, showing Elgin's mark, the supplier would not have made the component for Dillon Industries.

Dillon does not address what harm he would suffer, if any, if he were ordered to stop working with Elgin's suppliers. That is because there is none. Dillon avers there are a number of companies in the Kanawha Valley that supply parts for decanter centrifuges. Dillon Aff., Dkt. 41-1, ¶ 4. Thus, little burden would be imposed on Dillon if he were restricted from soliciting or working with Elgin's suppliers during the pendency of this lawsuit. Elgin, on the other hand, is suffering significant harm, including its loss of its investment in its supply chain by teaching suppliers how to make specific components for Elgin. To the extent Dillon Industries claims it would shut down if it can no longer sell new manufactured equipment to the rendering industry, then it should be required to purchase Elgin-designed parts from Elgin, rather than use Elgin's drawings to manufacture the parts, itself. Other manufactures in the industry do this through legitimate channels, rather than through the theft and use of Elgin's drawings.

### D.   Dillon's solicitation of Elgin's customers must also be enjoined.

Dillon admits he is doing a significant amount of business with one of Elgin's largest and most important customers, Darling Ingredients, having expended $1,000,000 on parts and labor with respect to open orders for Darling Ingredients. Dillon Aff., Dkt. 41-1, ¶ 24. Dillon makes no such claim as to other Elgin customers. Thus, the Court could enforce the customer non-solicitation without halting Dillon Industries' active orders for Darling Ingredients by prohibiting Dillon from soliciting other Elgin customers, including Paragon ISG, NOV, MI Swaco, Halliburton, Baker Hughes, and Clean Harbors.

### E.   An award of monetary relief is inadequate.

Defendants claim an injunction is inappropriate because any harm to Elgin can be remedied by an award of money damages. True, Elgin has already suffered significant harm in the form of

specific orders from Darling Ingredients that should have been filled by Elgin but instead were filled by Dillon Industries using Elgin's trade secret files. But because Defendants continue to possess Elgin's trade secret information, they remain at liberty to use it to unlawfully compete against Elgin. Further, solicitation of customers is irreparable harm that cannot be satisfied by monetary damages, both because of the impossibility of ascertaining with any accuracy the extent of the loss, but also because the loss of goodwill is intangible and also supports irreparable harm. *Merrill Lynch*, 183 F. Supp. 2d at 850. Until recently, Elgin was able to keep the lights on working through its backlog of orders. With these orders fulfilled and its challenges obtaining new orders from long-standing customers, the future of Elgin's Poca Division is in doubt.

## III.   DEFENDANTS' ADMISSIONS ESTABLISH ELGIN HAS A LIKELIHOOD OF SUCCESS ON THE MERITS OF ELGIN'S TRADE SECRETS CLAIMS.

### A.   Elgin's electronic files are not "readily ascertainable."

Defendants claim Elgin's electronic drawing files are "readily ascertainable" from Original Equipment Manufacturers ("OEM") paper drawings or through reverse engineering. Yet, the undisputed evidence demonstrates that Elgin invested significant time and resources to transform paper OEM drawings or reverse engineering into electronic models, which it then improved through testing and analysis. Memorandum, Dkt. 37, pp. 2-3. For example, Defendants do not dispute Elgin employed Ritchie for years to create computer-assisted drawings and models, which it uses to manufacture equipment. Ritchie Aff., Dkt. 41-2, ¶ 2-3. Further, Ritchie claims he spent 250 hours to begin reverse engineering the drawings Dillon Industries is now using. *Id*. ¶ 8. The investment of time and resources needed to replace a mere fraction of the files Defendants took establish Elgin's electronic drawing files are not "readily ascertainable."

Defendants do not address, let alone distinguish, the authority discussed in Elgin's Memorandum. Under this guidance, drawings that have been reverse engineered and contain

dimensions and specifications for components of equipment are not readily ascertainable where the information in the drawings is made more accurate based on the analysis of a large number of machines. *Ultraflo Corp. v. Pelican Tank Parts, Inc*., 4:09-CV-782, 2012 WL 3929821, at *3 (S.D. Tex. Sept. 7, 2012) (quoting Restatement (Third) of Unfair Competition § 39 cmt. (f), illus. (5)). Defendants instead cite *Kairam v. West Side GI, LLC*, which is easily distinguishable from this case. 793 F. App'x 23, 28 (2d Cir. 2019). In *Kairam*, the plaintiff employee alleged her employer misappropriated a single, blank billing template, but failed to establish it provided any specific value to her employer. Here, Defendants admit to taking thousands of Elgin's files and then spending hundreds of hours to allegedly replace them.

Defendants also cite *Zirvi v. Flatley*, where the court found that the plaintiffs' code was not trade secret because similar sets of code were publicly available in published patents. 433 F. Supp. 3d 448, 465 (S.D.N.Y.), *aff'd*, 838 F. App'x 582 (2d Cir. 2020). Unlike in *Zirvi*, here, Elgin's electronic files – specifically, its SLDDRW, SLDPRT and DXF files – are not publicly available. While OEM paper drawings can be obtained from other sources, flat images of the designs (paper or electronic) have different functionality than SLDDRW, SLDPRT and DXF files, which are far more valuable. Henley Aff., Dkt. 37, ¶ 19. For example, Ritchie downloaded over 1,800 DXF files from Elgin's server and then accessed those files on various dates while working for Dillon Industries. *See* Memorandum, Dkt. 37, p. 13. DXF files can be directly uploaded onto the manufacturing machine used to create components for decanter centrifuges, providing electronic code instructing the machine how to manufacture the component. Henley Aff., Dkt. 37, ¶ 19. Use of a DXF file completely eliminates the need for a human worker to operate the machine. *Id*. A paper drawing or even an electronic image (like a PDF) cannot perform this function.

Further, after disclaiming the existence of the Elgin Redesign Process,[2] Defendants concede Elgin makes changes to OEM designs and brands its equipment and drawings. Response, Dkt. 41, pp. 3, 18. Given Defendants agree Elgin engineers make design changes, they cannot dispute that electronic files are more valuable since the engineer can change a design element in an electronic drawing just by editing the file, whereas a paper drawing would need to be redone. Henley Aff., Dkt. 37, ¶ 19. The iterative Elgin Redesign Process relies upon the ability to incorporate design innovations into its electronic drawing files.

Finally, Defendants claim many of the drawings that Ritchie took from Elgin were first created when he worked for Control Point, prior to coming to Elgin in 2018. Yet, these drawings were drafted on dates when Ritchie was working for Elgin. *See* Henley Aff. Ex. 6, Dkt. 37 (showing original design dates ranging from November 20, 2018 to September 9, 2020). Thus, Defendants have not provided any evidence that Elgin's competitor Control Point also has these drawings.

### B.    Elgin takes reasonable steps to safeguard its electronic files

Defendants claim Elgin fails to take reasonable steps to protect the secrecy of its trade secrets, alleging Ritchie never received Elgin's employee handbook and Elgin does not have confidentiality agreements with suppliers. Defendants' arguments fail for several reasons.

Defendants do not contest that Dillon's Employment Agreement and the APC Agreement each contain detailed confidentiality agreements, which themselves demonstrate Elgin's reasonable steps to safeguard the secrecy of information. *Uhlig LLC v. Shirley*, 6:08-CV01208-

---

[2] While Dillon and Ritchie claim to be unfamiliar with the Elgin Redesign Process, they acknowledge Elgin's website makes claims about its "expedited reverse engineering" process, which includes "complete 2D & 3D design and detailing, general assembly drawings, and process flow descriptions, to name a few." *See Turn-Key Solutions Provider*, ELGIN SEPARATION SOLUTIONS, https://elginseparationsolutions.com/turn-key-solutions/ (last visited Sept. 22, 2023). Further, Defendants claim Darling Ingredients is unfamiliar with the Elgin Redesign Process, but do not supply an affidavit from Darling Ingredients or any other Elgin customer.

JMC, 2012 WL 2923242, at *7 (D.S.C. July 17, 2012); *MicroStrategy*, 331 F. Supp. 2d at 416. To the extent Dillon or Ritchie disclaim having read and received Elgin's handbook, they make this argument with unclean hands. As President, Dillon was responsible for enforcing Elgin's policies in Poca, West Virginia, but has long planned in secret to build a competing empire. *See* Ex. D-1 to Swaminathan Aff., Dkt. 37. Further, Defendants admit that Ritchie created the drawings within the scope of his employment with Elgin. Ritchie Aff., Dkt. 41-2, ¶¶ 2-3, 5. While Ritchie claims he was never told the computer files he was creating for Elgin were confidential, he does not dispute that the files were stored on password-protected servers, which could only be accessed by Elgin employees with certain credentials and levels of access, or that Elgin required him to return all Elgin devices to Elgin upon his separation from employment. This too demonstrates reasonable steps to safeguard the secrecy of information. *See Capital Meats, Inc. v. Meat Shoppe, LLC*, CIV. JFM-15-212, 2015 WL 4249166, at *7 (D. Md. July 9, 2015); *Albert S. Smyth Co. v. Motes*, No. CCB-17-677, 2018 WL 3635024, at *3, *6 (D. Md. July 31, 2018).

As to Defendants' contention that Elgin failed to maintain the secrecy of its drawings by not requiring suppliers like Mouldagraph to sign non-disclosure agreements, neither Defendants nor the Mouldagraph affiant identify the format of the drawings that Elgin shares outside the company. As explained above, a paper drawing or flat electronic image (like a PDF) provides far different and less valuable functionality as compared to Elgin's trade secret SLDDRW, SLDPRT and DXF files. Henley Aff., Dkt. 37, ¶ 19. Defendants provide no evidence that Elgin shares SLDDRW, SLDRPRT or DXF files with suppliers. Moreover, when PDFs of drawings are shared with suppliers, the drawings contain a warning that the information provided is the "sole property" of Elgin and "is not to be copied, disclosed or used for any purpose other than the purpose for which it has been submitted" without Elgin's prior written permission. Indeed, Defendants used

this very same warning on the Elgin drawings they rebranded Dillon Industries and sent to suppliers. Memorandum Ex. 6, Dkt. 37. Defendants' own use of this warning demonstrates the common understanding and course of dealing to maintain the drawings confidential.

**C.      Defendants concede they improperly acquired and used Elgin's files.**

Defendants claim only that Elgin failed to establish the existence of its trade secrets and mount no defense to the facts establishing that they misappropriated and used Elgin's electronic files to compete. Defendants admit that, while Ritchie was working for Elgin, he downloaded and took Elgin's drawings with the understanding and belief that he would use them at Dillon Industries to directly compete against Elgin, shared the files with Dillon Industries, and then used them to obtain components from Elgin's supplier to make equipment for Elgin's customer. Response, Dkt. 41, pp. 9, 13. No more is required to establish acquisition by improper means and actual use of Elgin's trade secrets. Thus, Elgin has established a likelihood of success on its trade secrets claims.

**IV.     THERE IS NO MERIT TO DILLON'S CLAIM THAT HIS EMPLOYMENT AGREEMENT EXPIRED OR IS UNENFORCEABLE.**

**A.      Delaware Law Governs the Employment Agreement.**

Dillon's Employment Agreement contains a Delaware choice of law clause. Defendants contend that West Virginia law governs instead because the agreement's sole connection to Delaware is that Plaintiff Centrifugal Services was formed there. None of Defendants' authority supports this position. Defendants cite *Melton v.Precision Laser & Instrument, Inc.*, however, in that case, the court did not apply West Virginia law and instead upheld the parties' choice of Pennsylvania law since the defendant was headquartered there. No. 2:12-CV-1697, 2013 WL 210900, at *4 (S.D.W. Va. Jan. 18, 2013). Similarly, *Corky Wells Elec., Inc. v. Pratt*, does not apply since in that case, no party was incorporated in the state of the chosen law; the only

connection to that state was that the attorney who drafted the agreement as located there. No. 1:19-CV-158, 2019 WL 10056967, at *10 (N.D.W. Va. Dec. 5, 2019). Likewise, *CSS, Inc. v. Herrington*, is inapposite since all corporate parties in that case were incorporated in West Virginia and, despite a Texas choice of law provision, the litigants agreed to apply West Virginia law. 306 F. Supp. 3d 857, 879 (S.D.W. Va. 2018); *see also* 2016 WL 11575014 (S.D.W. Va.), First Am. Compl., ¶¶ 1, 4. Further, *McGough v. Nalco Co.*, does not apply since there, the court was tasked with performing a common law choice of law analysis rather than enforce a contractual choice of law provision. 496 F. Supp. 2d 729, 743 (N.D.W. Va. 2007).

In *General Electric Co. v. Keyser*, the West Virginia Supreme Court of Appeals noted it was required to "carefully scrutinize" a New York choice of law provision because of the "strong public policy attending cases involving usury." 275 S.E.2d 289, 293 (W. Va. 1981). Consistent with this principle, in *Landis v. Jarden Corp.*, the court held "where application of a foreign state's law does not offend West Virginia public policy, one party's incorporation in that state is a contact sufficient to allow the parties to choose its law to govern their contract." No. 2:11-CV-101, 2014 WL 790917, at *3 (N.D.W. Va. Feb. 26, 2014). Thus, Plaintiff Centrifugal Services' incorporation in the state of Delaware is sufficient to allow the parties to choose Delaware law where the application of Delaware law does not offend West Virginia public policy.

"Public policy concerns will not invalidate a choice-of-law provision based on '[t]he mere fact that the substantive law of another jurisdiction . . . is less favorable than the law of the forum state.'" *Melton*, 2013 WL 210900, at *4 (quoting Syl. Pt. 3, *Nadler v. Liberty Mut. Fre Ins. Co.*, 188 W.Va. 424 S.E.2d 256 (W. Va. 1992)). "Delaware and West Virginia interpret contracts in the same manner." *Landis*, 2014 WL 790917, at *4 (internal quotations omitted); *see also Stand Energy Corp. v. Columbia Gas Transmission Corp.*, CIV.A. 2:04-0867, 2005 WL 1639320, at *3

(S.D.W. Va. July 5, 2005) (cleaned up) (finding no evidence "that application of Delaware law would be contrary to the public policy of West Virginia").

Moreover, there is no West Virginia public policy voiding all restrictive covenants. Facially reasonable covenants are presumptively enforceable. *Huntington Eye Assocs., v. LoCascio*, 553 S.E.2d 773, 781-82 (W. Va. 2001) (reversing trial court's determination that the non-competition agreement was facially overbroad and unenforceable). "[G]reater latitude is allowed" when evaluating restrictive covenants that relate to the sale of a business. *Alston Studios, Inc. v. Lloyd V. Gress & Assocs.*, 492 F.2d 279, 284 (4th Cir. 1974); *see also Huntington Eye Assocs.*, 553 S.E.2d at 782. Here, it is undisputed that Dillon executed the Employment Agreement related to the sale of his family business to Centrifugal Services under the APC Agreement. *See* APC Agreement, Dkt. 21-1, p. 13-14 (listing executed Employment Agreement as a required document for the closing of the APC Agreement). Thus, Delaware law applies to the formation and enforcement of the contracts that are at-issue in this case.

**B.**     **Under either Delaware or West Virginia Law, the Employment Agreement is Valid and Enforceable.**

       i. The Employment Agreement did not expire in 2015.

After going through pains to argue that West Virginia law applies to his Employment Agreement instead of Delaware law, Dillon proceeds to rely exclusively on Massachusetts law to argue the Employment Agreement and its restrictive covenants expired in 2015 upon the conclusion of the initial term of the agreement. *See* Response, Dkt. 41, pp. 25-26. This is not the law in West Virginia where "it will be presumed prima facie" that an employee who continues to render the same services under an employment contract after expiration of a definite term "is serving under a new contract having the same terms and conditions as the original one." *Rhodes v. Nat'l Homes Corp.*, 263 S.E.2d 84, 89-90 (W. Va. 1979), (citing 53 Am. Jur. 2d Master and Servant

§ 23 at 99 (1970)). Thus, where the Employment Agreement states that Dillon's employment is "at will" after the initial two-year term, the presumption is that Dillon's Employment Agreement renewed on the same terms except that instead of employment for a definite term, Dillon's employment could be terminated "at will" by either party.

This presumption "may be rebutted by evidence showing a change of the terms of the contract, or by proof of facts and circumstances showing that the parties understood that the terms of the old contract were not to apply to the continued service." *Id*. Here, Dillon's own testimony demonstrates his belief that the terms of the Employment Agreement had not changed following the initial two-year term. In November 2021, Dillon requested that Elgin start the one-year restrictive covenant period in his Employment Agreement early and claims the one-year noncompete period expired in December 2022. Dillon Aff., Dkt. 41-1, ¶ 13. Thus, he admits he believed the Employment Agreement remained in effect and was not expired.

      ii.  <u>Elgin has established that it has legitimate interests in its confidential information and its customer and supplier relationships.</u>

"The most commonly asserted protectable employer interests are: (1) skills the employee acquired in the course of employment; (2) confidential or unique information, such as trade secrets or customer lists, and (3) the goodwill of the employer." *Merrill Lynch*, 183 F. Supp. 2d at 851-52. Courts also find employers have legitimate interests in protecting their customer relationships and established contracts. *See All Pro Maids, Inc.*, 2004 WL 1878784, at *5. Here, Elgin establishes that it has protectable interests in its long-standing customer and supplier relationships. First Am. Compl., Dkt. 21, ¶¶ 83-84, 92, 103; *see also* Henley Aff., Dkt. 37, p. 63. Dillon does not contest this. Indeed, he avers that when Elgin bought his family's company, what it was paying for was Dillon's relationships with customers and employees. Dillon Aff. Dkt. 41-1, ¶ 10. Further, Elgin has shown its legitimate interests in protecting its trade secrets and goodwill.

      iii. <u>The customer and supplier non-solicitation agreements are facially
reasonable and enforceable.</u>

Dillon does not address the enforceability of the customer or supplier non-solicit agreement

and forfeits any claim that they are overbroad, unreasonable or not justified by Elgin's legitimate

business interests. Sometimes called "non-piracy provisions" in West Virginia, the customer and

supplier non-solicits "ordinarily do not include territorial limits, are less restrictive on the

employee and the economic forces of the marketplace." *Wood v. Acordia of W. Va., Inc.*, 618

S.E.2d 415, 422 (W. Va. 2005) (affirming trial court's conclusion "that the restrictive covenant in

this action was a non-piracy provision and upheld its validity as reasonable and necessary to protect

[the employer's] legitimate business interest in its customer and contacted prospective customer

accounts for the two year period"). Delaware law also affords more lenient treatment to customer

and supplier non-solicitation agreements, finding "[a]n employer has an interest in the goodwill

created by its sales representatives and other employees, which is vulnerable to misappropriation

if the employer's former employees are allowed to solicit its customers shortly after changing

jobs." *All Pro Maids*, 2004 WL 1878784, at *5.

A customer or supplier non-solicitation agreement that is reasonable on its face will be

enforced depending on: "(1) whether the employer has a protectable business interest to be

safeguarded in relation to the employee, (2) the extent to which the non-piracy provision

reasonably and fairly protects that interest and (3) whether the non-piracy provision unjustly

restricts the employee from engaging in the business activity he or she seeks to pursue." *Wood*,

217 W. Va. at 413. As discussed above, Elgin has established protectable interests in its customer

and supplier relationships, and in the confidential and trade secret information it develops from

these relationships. The customer and supplier non-solicitation provision, which restricts Dillon

from influencing Elgin's customers or suppliers to divert their business to a competitor, is no

15

broader than necessary to protect Elgin's legitimate interests. *See* Ex. 2 to First Am. Compl., Dkt. 21-2, p. 11. This restriction does not prevent Dillon from engaging in the business activity he seeks to pursue. Dillon admits that Dillon Industries has business in areas that do not compete with Elgin – specifically, in the manufacture of shafts. Response, Dkt. 41-1, ¶ 15. Moreover, to the extent Dillon Industries can perform maintenance services without Elgin's files, customers or suppliers, it can continue performing such services without running afoul of this covenant.

iv. <u>The non-competition agreement is tailored to the scope of Plaintiffs' business.</u>

Dillon does not dispute the one-year period of the covenants is reasonable. Instead, he claims the activity restraints and geographic reach of the non-competition agreement are overbroad. Dillon's protestations fall short. As President of Elgin's Poca Division, Dillon performed duties touching on all aspects of the business, justifying a restriction on his performance of services in the same business as Elgin. Because Dillon held a key management position, this case is unlike those cited in the Response, Dkt. 41, pp. 27-28, where employers sought to restrain lower-level employees from competing in all areas of the employer's business.

The geographic reach of the non-competition agreement, covering the United States and foreign countries where Elgin conducts business, is also reasonable in scope. Elgin's business is both nationwide and global. Indeed, it maintains technical support offices in Brisbane, Australia; Edmonton, Canada; Houston, Texas; Raleigh, Illinois; Moscow, Russia; Dubai, United Arab Emirates; and Baroda, India.[3] Thus, this case is unlike *JAK Prod., Inc. v. Bayer*, where the geographic restriction had no relationship to the employer's legitimate interest. 94 F. Supp. 3d 777, 786 (S.D.W. Va. 2015), *aff'd*, 616 F. App'x 94 (4th Cir. 2015). This case is also unlike *Alston*

---

[3] *See Turn-key Industrial Solutions*, ELGIN, *https://elginseparationsolutions.com/wp-content/uploads/2022/09/Elgin-Industrial-Solutions-Cut-Sheet-2022-Rev-B.pdf* (last visited Sept. 22, 2023).

*Studios* and *McGough*, where the global or national reach of a restrictive covenant was not limited to areas where the company actually conducted business. Here, Dillon does not dispute that Elgin's business is global, but merely claims any non-competition agreement with global reach is facially invalid. Because Elgin's business is global, the scope of the non-compete is no broader than necessary.

Further, recognizing the nationwide and international reach of the covenant, the covenant is imposed for a short duration of one year – far shorter than the two-year restrictive covenants enforced by other courts applying West Virginia law. *See, e.g.*, *Panhandle Cleaning & Restoration, Inc. v. Vannest*, No. 5:11CV178, 2012 WL 4757906, at *4 (N.D.W. Va. Oct. 5, 2012); *Huntington Eye Assocs.*, 553 S.E.2d 773. And, while the court may consider the "theoretical breadth of the contractually proscribed area," it also should consider if the defendant actually opened a competing business in close proximity with his prior employer's business. *Id.* (reversing trial court's determination that the non-competition agreement was facially overbroad in part because the defendant established a competing office less than two miles away from former employer's business). Dillon Industries does business in Eleanor, West Virginia – 10 miles from Poca, West Virginia where Dillon worked for Plaintiffs for nearly a decade, and whose assets he sold to Plaintiffs. Thus, the reach of the non-compete agreement is narrowly tailored to protect Plaintiffs' legitimate business interests.

> v. The restrictive covenant period under the Employment Agreement should be tolled pursuant to the contract's valid and enforceable tolling provision.

Dillon admits no West Virginia law addresses the enforceability of tolling provisions in employment agreements and relies entirely to Minnesota and Wisconsin law. Response, Dkt. 41, pp. 28-30. On the other hand, the law the parties chose to apply to the Employment Agreement – Delaware law – respects and enforces tolling provisions in restrictive covenants. *See Sorrento*

*Therapeutics, Inc. v. Mack*, No. 2021-0210-PAF, 2023 WL 5670689, at \*19 (Del. Ch. Sept. 1, 2023) (tolling covenants until any breach is resolved); *Concord Steel, Inc. v. Wilmington Steel Processing Co.*, No. CIVA3369-VCP, 2009 WL 3161643, at \*15 (Del. Ch. Sept. 30, 2009), *aff'd*, 7 A.3d 486 (Del. 2010) (tolling non-competition agreement and issuing an injunction through the time remaining under the covenant). Moreover, enforcement of the tolling provision is consistent with West Virginia public policy where it assures the parties receive the benefit of their bargain and provides for the protection of trade secrets. *Sogefi USA, Inc. v. Interplex Sunbelt, Inc.*, 535 F. Supp. 3d 548, 555 (S.D.W. Va. 2021). Because there is no West Virginia public policy prohibiting tolling provisions in restrictive covenants, Delaware law should be applied.

Dillon has continuously solicited Elgin's customers and employees and misused Elgin's information since March 2022 in violation of his restrictive covenants. These facts are not seriously in dispute. Dillon admits he did business with Darling Ingredients in March 2022 on behalf of Dillon Industries. Dillon Aff., Dkt. 41-1, ¶ 15. While Dillon claims at that time, his work for Darling Ingredients was not competitive with Elgin, the very next month, he forwarded himself Elgin's copyrighted 24x60 manual. *See* Memorandum, Dkt. 37, p. 16. Dillon continued to do business with Darling Ingredients on behalf of Dillon Industries in May through July 2022. *Id.*, p. 17. In August 2022, Dillon solicited Ritchie to work for Dillon Industries. *Id.*, p. 12. Ritchie admits he took Elgin's files because he thought they would be helpful to use at Dillon Industries and he downloaded information from Elgin's servers to a folder he labeled "Dillon Industries" and saved on an external drive. *Id.*; Ritchie Aff., Dkt. 41-2, ¶ 5. Dillon and Ritchie continued to misuse Elgin's information throughout the remainder of their employment with Plaintiffs and continuing through to today. These facts were "self-evident" to Dillon, so he cannot claim ignorance as to how long his covenant would be extended based on this conduct. Even accepting Dillon's claim

that his one-year restrictive covenant began in November 2021, he observed it, if at all, for four months (through March 2022). Accordingly, at least eight months remain on Dillon's covenants.

## V.     **DILLON FAILS TO ADDRESS HIS BREACH OF THE APC AGREEMENT.**

Dillon does not address his breach of the APC Agreement since he claims he did not sell Plaintiffs any intellectual property thereunder. Contrary to Dillon's assertions, Section 3.10 of the APC Agreement provides for the conveyance of all of Dillon's company's "Intellectual Property," defined to include "manufacturing processes, formulae, technology, trade secrets and know how necessary to conduct the Business as conducted prior to Closing." APC Agreement, Dkt. 21-1, p. 16. Moreover, Dillon's prior company (Industrial Processing Equipment) averred that all of its employees and independent contractors had executed all documents necessary to assign all of their Intellectual Property, ideas, inventions, processes, works of authority and other work products. *Id*., p. 17. Thus, there is no merit to Dillon's claim that he did not sell Plaintiffs any intellectual property when he sold his family business to Centrifugal in 2013. Dillon's use of this intellectual property to compete against Plaintiffs is a clear violation of both Plaintiffs' exclusive right to possess and use such intellectual property, as well as Dillon's obligation in the APC Agreement to maintain its confidentiality and use it only for purposes of Elgin's business. *Id*., p. 26. The confidentiality provision of the APC Agreement is afforded wider latitude than similar restrictions in employment agreements and should be enforced. *Alston Studios*, 492 F.2d at 284.

## VI.    **ELGIN'S LANHAM ACT AND COPYRIGHT ACT CLAIMS ARE MERITORIOUS.**

Also supporting Elgin's request for preliminary injunctive relief are its meritorious Lanham Act and Copyright Act claims. Defendants claim they did not cause consumer confusion by relabeling Elgin's drawings since Darling Ingredients chose to do business with Dillon Industries solely based on its relationship with Dillon. As an initial matter, Defendants cite only Dillon's self-

serving affidavit and do not produce a single written communication with Darling Ingredients or an affidavit from a Darling Ingredients's representative. Further, Defendants misconstrue the "consumer confusion" element of a Lanham Act claim. Without citing a single case or provision of the Lanham Act, Defendants claim the sole way to demonstrate consumer confusion is if the end-user purchased a product on the belief that it was made by a company other than the seller. However, Elgin's reverse passing off claim actually alleges the opposite – that Dillon Industries mislead customers and suppliers into believing it made drawings that were in fact made by Elgin. Courts presume consumer confusion when a party attempts to pass of another party's product as its own for the "obvious reason" that "it represents a direct attempt to confuse a consumer about the origin of a product." *Laura Laaman & Assocs. v. Davis*, No. 3:16-CV-00594 (MPS), 2017 WL 5711393, at *6 (D. Conn. Nov. 27, 2017). Customers like Darling Ingredients believe they are getting a Dillon Industries product, but are actually getting Elgin equipment, built by Dillon Industries, using Elgin's proprietary files.

Finally, though Dillon claims he did not intend to forward Elgin's copyrighted 24x60 manual to his Dillon Industries e-mail address, he does not dispute there is still a copy of it on the servers of Dillon Industries. Discovery will reveal the full extent of Dillon's copyright infringement, but in the meantime, he should be enjoined from infringing on Elgin's copyright.

## VII.  <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs respectfully request the Court enter a preliminary injunction order providing the relief requested herein.

Dated: September 22, 2023

Respectfully Submitted,

**ELGIN SEPARATION
SOLUTIONS, LLC and
CMI/CSI LLC**

By: /s/ *Jill Cranston Rice*

Rachel L. Schaller
*pro hac vice*
(IL ARDC No. 6306921)
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2600
Chicago, IL 60601
Telephone: (312) 527-4000
Facsimile: (312) 527-4011
rschaller@taftlaw.com
bmorrell@taftlaw.com

Jill Cranston Rice
(WV State Bar No. 7421)
DINSMORE & SHOHL, LLP 215
Don Knotts Blvd., Suite 310
Morgantown, WV 26501
Telephone: (304) 296-1100
Facsimile: (304) 296-6116
Email: jill.rice@dinsmore.com

Jordan "Jo" McMinn
(WV State Bar No. 14084)
DINSMORE & SHOHL LLP
707 Virginia Street, East, Suite 1300
Charleston, WV 25301
Telephone: (304) 357-0900
Facsimile: (304) 357-0919
jordan.mcminn@dinsmore.com

*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**ELGIN SEPARATION SOLUTIONS, LLC
and CMI/CSI LLC f/k/a CENTRIFUGAL
SERVICES, LLC**

    **Plaintiffs,**

**v.**               **CASE NO. 2:23-cv-00440**
                    **Judge Berger**

**DAVID CHADWICK DILLON.,
DILLON INDUSTRIES, INC. and
DONALD RITCHIE**

    **Defendant.**

<u>**CERTIFICATE OF SERVICE**</u>

   I, Jill Cranston Rice, hereby certify that on the 22nd day of September, 2023, a true and correct copy of the foregoing **PLAINTIFF ELGIN SEPARATION SOLUTIONS, LLC'S AND CMI/CSI LLC f/k/a CENTRIFUGAL SERVICES, LLC'S REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION** was filed with the Court via the CM/ECF system on the parties below:

M. Shane Harvey / Grace E. Hurney
JACKSON KELLY PLLC
P.O. Box 553
Charleston, WV 25322
*Counsel for David Chadwick Dillon and
Dillon Industries, Inc.*

Scott H. Kaminski
RAY, WINTON & KELLY, PLLC
109 Capitol Street, Suite 700
Charleston, WV 25301
*Counsel for Donald Ritchie*

        /s/ Jill Cranston Rice
        Jill Cranston Rice (WV State Bar No. 7421)

22