**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

ELGIN SEPARATION SOLUTIONS, LLC, et al.,

Plaintiffs,

v. CIVIL ACTION NO. 2:23-cv-00440

DAVID CHADWICK DILLON, et al.,

Defendants.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed the Plaintiffs' *Motion for Preliminary Injunction* (Document 24), the *Memorandum in Support of Motion for Preliminary Injunction* (Document 37), *Defendant David Chadwick Dillon and Dillon Industries, Inc.'s Response to Elgin Separation Solutions, LLC's Motion for Preliminary Injunction* (Document 41), *Defendant Donald Ritchie's Joinder in David Chadwick Dillon and Dillon Industries, Inc.'s Response to Elgin Separatin* (sic) *Solutions, LLC's Motion for Preliminary Injunction* (Document 42), the Plaintiffs' *Reply in Support of Their Motion for Preliminary Injunction* (Document 43), as well as all attached exhibits. For the reasons stated herein, the Court finds that the motion for a preliminary injunction should be denied.

**FACTS[1]**

The Plaintiffs are Elgin Separation Solutions, LLC, and CMS/CSI LLC, formerly known as Centrifugal Services, LLC (collectively, "Plaintiffs" or "Elgin"). The Defendants are Dillon

1 For purposes of the motion for a preliminary injunction, the facts are drawn from the evidentiary exhibits. No facts material to the consideration of the motion for a preliminary injunction are disputed, and the Court finds that a hearing would not be helpful to resolve the motion.

Industries, Inc., its owner Chad Dillon, and employee Don Ritchie. Mr. Dillon and Mr. Ritchie are former Elgin employees. Mr. Dillon left Elgin to form his company, Dillon Industries ("Dillon"); Mr. Ritchie left Elgin to work at Dillon. Although not the sole focus of their work, Elgin and Dillon are both in the business of repairing and manufacturing specialized processing equipment; specifically, decanter centrifuges.

Decanter centrifuges are mechanical devices used to separate solids from slurries in industrial processes, including coal mining and rendering. The decanter centrifuges that Dillon and Elgin repair are often decades old. Accordingly, Elgin and Dillon repair and build new decanter centrifuges based on designs, or drawings, created by other companies often referred to as Original Equipment Manufacturers ("OEM"). For example, Elgin produces "BYRD Style Centrifuges," which are based on equipment originally designed and manufactured by Bird Machine Company ("Bird"), an OEM, in the 1960s. Elgin is not alone. Several companies in the Kanawha Valley, where Elgin and Dillon are based, have also repaired, manufactured, or supplied parts for Bird centrifuges. As a result, Dillon contends OEM drawings and other companies' drawings of Bird centrifuges are readily available throughout the area. (Document 41-1 at 1–2.) Drawings are not required to perform repairs but are typically required to build new decanter centrifuges because they describe the location and size of the parts making up the decanter centrifuge. If OEM or similar drawings are not available, a drawing can be created by reverse engineering the equipment. This involves taking apart the existing decanter centrifuge, measuring the parts, and creating a new drawing. Dillon asserts that this is a common industry practice used by both Elgin and Dillon. (*Id.* at 2). Elgin claims that, as part of this practice, it improves upon equipment in order to outperform its peers. (Document 37 at 2). Although Elgin acknowledges

that redesigning and improving upon competitor products is common in the industry, Elgin maintains the exact manner in which it conducts its redesign process is confidential and proprietary. (*Id.*).

Mr. Dillon became involved in the business of repairing decanter centrifuges at an early age when he began working at his father's business, Industrial Process Equipment, in St. Albans, West Virginia. He eventually joined the family business full time and later took it over and expanded it significantly. Due to his management skills and relationships with customers and employees, Mr. Dillon found success in the industry. (Document 41-1 at 3.)

In 2013, Mr. Dillon sold the family business to Centrifugal Services, an Elgin subsidiary. At that time, the parties entered into two contracts: (1) an Asset Purchase and Contribution Agreement (the "APC Agreement") governing the sale of the business, and (2) an Employment Agreement governing Mr. Dillon's employment with Elgin. Mr. Dillon did not seek compensation in the sale for drawings or intellectual property beyond that listed in the APC Agreement, namely: "(i) corporate name; (ii) telephone number; (iii) facsimile number; (iv) domain numbers; (v) websites; and (vi) common law right to the company logo." (Documents 41-1 at 2; 21-1.) Following the sale, Mr. Dillon continued running the business as president of Elgin's Poca, West Virginia, division. In this position, he oversaw all facility operations, including the development and maintenance of customer relationships, defining the roles and responsibilities of the workforce, recruitment and hiring, and ensuring compliance with industry and customer standards. As a result, Elgin asserts that it came to entrust Mr. Dillon with its confidential information, customers, and suppliers. (*See* Document 37 at 7.)

In November 2021, Mr. Dillon decided to leave Elgin with the intention of starting his own competing business. Elgin requested he stay on until Elgin found a suitable replacement, to which Mr. Dillon agreed on the condition that the one-year non-competition and non-solicitation provisions in his Employment Agreement would begin to run from the effective date of his resignation, December 14, 2021. Elgin does not dispute that the one-year period began to run from this time. During this period, Mr. Dillon attests that he prepared to compete with Elgin by arranging office space, equipment, and financing for his new business, but was careful not to compete with Elgin or solicit Elgin employees. (Document 41-1 at 3.)[2] Mr. Dillon admits that he executed purchase orders for some Elgin customers, but maintains the orders were for shafts, a product Elgin does not sell. (*Id.*) In April 2022, Mr. Dillon forwarded an email from his Elgin email account to his Dillon Industries email account which contained a copy of a 24x60 Manual which Elgin had previously prepared in response to a customer request. Dillon asserts that it has never used the Manual. (Document 41-1 at 5.) Upon later discovering this email, Elgin initiated the process of registering its copyright in the 24x60 Manual. Two days after the United States Copyright Office granted Elgin's application, Elgin initiated the present suit.

Around October or December 2022, Elgin found a suitable replacement for Mr. Dillon, and Mr. Dillon left his employment with Elgin. On December 14, 2022, the one-year restrictive covenant period expired. Dillon Industries placed an ad for employment online the next day, at which time Dillon maintains several Elgin employees learned about the ad and applied to work for Dillon. Dillon hired some of these employees. In January 2023, Mr. Dillon claims he received

2 Elgin submitted the affidavit of Christopher Henley, a General Manager at Elgin's Poca division, in support of its contention that Dillon solicited Elgin employees. (*See* Document 37 at 59). Henley's affidavit states without further support that Dillon contacted "many Elgin employees, offering them 10% more than their current salary" to resign. (*Id.*)

a call from Elgin's CEO with a request to cease hiring former Elgin employees. (Document 41-1 at 4.) Mr. Dillon completed the hiring of two Elgin employees to whom he had previously extended offers but maintains that since then he has ceased hiring Elgin employees.

Mr. Ritchie is a machinist by trade and is proficient in the use of computer-aided drawing programs, such as AutoCAD. (Document 41-2 at 1.) He previously worked for a company called Control Point where he acquired and created drawings of decanter centrifuges. (*Id.*) In 2018, Ritchie began working at Elgin's Poca Division and claims he brought with him many of the drawings he created at Control Point. (*Id.*) Ritchie's job duties at Elgin involved creating and modifying drawings, assisting in the drafting of maintenance and operations manuals, procurement, and issuing work orders. Following Mr. Dillon's departure, Ritchie attests that he found the Poca Division to be a difficult place to work. According to Ritchie, business was disorganized, and customers were unhappy. (*Id.*) Consequently, he claims he reached out to Mr. Dillon and asked to work for Dillon Industries. Mr. Dillon initially advised against leaving Elgin, citing his inability to pay Ritchie the same salary and benefits. (*Id.* at 2). However, Mr. Dillon eventually agreed, and Ritchie left Elgin in January 2023 to work for Dillon. Upon his resignation, Ritchie returned one external hard drive to Elgin. Prior to leaving, however, he downloaded drawings he claims he acquired or created while at Control Point and Elgin. (*Id.*). Elgin represents that a forensic investigation revealed Ritchie connected fifteen different external drives to his work computer. (Document 37 at 20.) Ritchie does not dispute this number but maintains that he has diligently searched for these devices and found only six thumb drives in his possession, which he returned to Elgin for further examination. (Document 41-2 at 2–3).

In March 2023, Elgin, through counsel, sent a cease-and-desist letter to Dillon demanding he cease competing with Elgin, soliciting Elgin employees, and using Elgin's confidential information. Mr. Dillon disputed these allegations but contends he cooperated in the identification and return of such material. (Document 41 at 12). In a letter to Elgin's counsel, Mr. Dillon identified, through counsel, headings on an Excel spreadsheet developed by Elgin, Elgin drawings, and copies of "progress photographs" used to document repairs by Elgin. He maintains Dillon never used the progress photographs, and he assured Elgin that Dillon would cease using the spreadsheet in its current form and return or destroy the drawings and photographs. (*See* Document 37 at 72.) In May 2023, Mr. Dillon voluntarily alerted Elgin's counsel that he had discovered additional drawings on an employee's computer, and that the drawings would be returned to Elgin and all other copies destroyed. (*See id.* at 83.) Mr. Dillon advised Elgin that Dillon had initially used relabeled Elgin drawings to obtain quotes for parts, but further assured Elgin that Dillon had since ceased using any Elgin drawings in its business dealings. (*See id.* at 113–14.) He has expressed his willingness to participate in a remediation process by which Elgin could locate any of its information remaining on Dillon's email account and erase it. (Document 41-1 at 5.) Mr. Dillon also agreed to return the six thumb drives discovered in Ritchie's possession. (Document 37 at 113–15.) Despite the Defendants' assurances to the contrary, Elgin maintains that Dillon is still in possession of Elgin's confidential information. Accordingly, on June 16, 2023, Elgin initiated the instant matter.

The Amended Verified Complaint asserts the following causes of action: Count I: Violation of the Defend Trade Secrets Act; Count II: Violation of the West Virginia Uniform Trade Secrets Act; Count III: Copyright Infringement (as to Mr. Dillon and Dillon Industries); Count IV:

Breach of Contract – APC Agreement (as to Mr. Dillon); Count V: Breach of Contract – Employment Agreement (as to Mr. Dillon); Count VI: Breach of Fiduciary Duty (as to Mr. Dillon); Count VII: Tortious Interference (as to Mr. Dillon); Count VIII: Breach of Fiduciary Duty (as to Mr. Ritchie); and Count IX: False Designation of Origin – Lanham Act.

Elgin urges the Court to enter a preliminary injunction:

> (i) enjoining Defendants from using, disclosing, or further accessing Elgin's copyrights, trade secrets and confidential information, including copying, modifying or using any documents in their possession, which were taken from Elgin; (ii) enjoining Defendants from destroying, deleting, or failing to retain copies of Elgin's copyrights or its trade secrets, documents, and information, (iii) enjoining Defendants from doing business with Darling Ingredients, Paragon ISG and any other Elgin customer that is the subject of the information misappropriated from Elgin; (iv) enjoining Defendants from doing business with Elgin's suppliers; and (v) enjoying Defendants from soliciting Elgin's employees.

(Document 37 at 43.) Dillon contends injunctive relief is unnecessary to the extent that it has already voluntarily complied with Elgin's first, second, and fifth requests, but notes that it remains "willing to work out an Agreed Order that can be monitored by the Court" as to any remaining issues. (Document 41 at 30–31.)

**APPLICABLE LAW**

Rule 65(a)(1) of the Federal Rules of Civil Procedure provides that a preliminary injunction may be issued "only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). The Defendants have appeared and responded in this matter.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs must satisfy all four requirements. *JAK*

*Prods., Inc. v. Bayer*, 616 F. App'x 94, 95 (4th Cir. 2015) (unpublished, per curiam opinion); *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *cert. granted, judgment vacated*, 559 U.S. 1089, 130 S. Ct. 2371, 176 L. Ed. 2d 764 (2010), and *adhered to in part sub nom. The Real Truth About Obama, Inc. v. F.E.C.*, 607 F.3d 355 (4th Cir. 2010). Thus, injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

**DISCUSSION**

Elgin urges the Court to enter a preliminary injunction to prevent the Defendants from doing business with Elgin's customers and suppliers and to require the Defendants to cease using any of Elgin's information still in their possession, including any works the Defendants have created using Elgin information or created while in possession of Elgin's information. Elgin contends it has established prima facie cases as to each of its claims and is thus likely to succeed on the merits of each claim at trial. Elgin further asserts that it has clearly demonstrated a likelihood of irreparable harm in the absence of an injunction, the balance of harms weighs in its favor, and injunctive relief will serve the public interest by protecting Elgin's trade secrets, copyright and confidential information, and enforcing its contractual rights. In response, Dillon argues that any harm to Elgin is not irreparable because Dillon has cooperated in the identification and return of Elgin's drawings and other confidential material and agreed not to use them further. Dillon further claims that any business Elgin lost to Dillon is calculable and reparable. Dillon disputes that Elgin has demonstrated a likelihood of success on the merits of any of its claims and argues that the public interest favors robust competition, whereas Elgin's requested relief would force Dillon to go out of business. Elgin maintains that an award of monetary relief is inadequate

and that each of its claims have merit. To the extent Dillon claims the requested injunctive relief would cause it to shut down, Elgin responds that Dillon should be required to purchase Elgin-designed products from Elgin rather than use Elgin's drawings.

An initial bar to relief arises from Elgin's failure to demonstrate that Dillon's conduct irreparably harmed Elgin. "While irreparable harm is only one of the four factors courts must consider in determining whether to grant injunctions, the Supreme Court has made clear that, regardless of the other factors, '[t]he equitable remedy [of an injunction] is unavailable absent a showing of irreparable injury.'" *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 386 (4th Cir. 2017) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). Relevant here, "[w]here the harm suffered by the moving party may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable." *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994); *see Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." (internal quotation omitted)); *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) ("A plaintiff must overcome the presumption that a preliminary injunction will not issue when the harm suffered can be remedied by money damages at the time of judgment."); *Henderson v. Bluefield Hosp. Co., LLC*, 208 F. Supp. 3d 763, 770 (S.D.W. Va. 2016), *aff'd sub nom. Henderson for Nat'l Lab. Rels. Bd. v. Bluefield Hosp. Co., LLC*, 902 F.3d 432 (4th Cir. 2018) ("It is also well settled that economic loss does not, in and of itself, constitute irreparable harm." (internal citation omitted)).

The Court finds that Elgin's damages are generally calculable and reparable. Elgin claims it has lost employees, business, and profits as a result of Dillon's actions. (*See* Document 21 ¶¶145–47.) Specifically, Elgin contends it lost eleven employees to Dillon and has had to spend time and money recruiting and training replacements. (*Id.* ¶145.) Elgin also claims it has experienced "a loss in business ranging from $150,000 to $300,000 per month." (*Id.* ¶146.) Such harms are the kind of economic losses that "may be compensated by an award of money damages at judgment," *see Hughes*, 17 F.3d at 694, and thus do not rise to the level of irreparable harm.

Elgin further argues that, absent a preliminary injunction, it will be irreparably harmed by the devaluation of its copyright and trade secrets inherent in Dillon's allegedly ongoing infringement. "As such, the 'likelihood of irreparable harm to Plaintiff' question is intertwined with questions about the merits of the infringement action." *Wonder Works v. Cranium, Inc.*, 455 F. Supp. 2d 453, 457 (D.S.C. 2006); *see also Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272 (4th Cir. 2002) (finding the earlier *Blackwelder* balance-of-the-hardship question as to irreparable harm "intertwined with questions about the merits" where "[b]y virtue of certain intricacies in the law governing Lanham Act claims, some courts apply a presumption of irreparable harm if the plaintiff has made a threshold showing as to the merits of his Lanham Act claim."). Accordingly, the Court's further analysis of the irreparable harm question will require a brief detour into the substance of Elgin's claims where necessary.

As to its copyright claim, Elgin further argues it "has been, and continues to be, irreparably harmed by Dillon's and Dillon Industries' infringing acts [as to Elgin's 24x60 Manual] for which

there is no adequate remedy at law." (Document 21 ¶175.) The Copyright Act, 17 U.S.C. §§ 101 *et seq.*, provides that

> no award of statutory damages or of attorney's fees, as provided by [the Act], shall be made for . . . any infringement of copyright commenced after first publication of the work and before the effective date of its registration, *unless such registration is made within three months after the first publication of the work.*

17 U.S.C. § 412 (emphasis added). The registration certificate for Elgin's 24x60 Manual indicates a first publication date of April 9, 2022. (Document 21-7.) Elgin alleges that Dillon sent the 24x60 Manual from his Elgin email account to his Dillon Industries email account in April 2022. (Document 37 at 16.) Elgin's copyright in the 24x60 Manual was registered on June 14, 2023. (Documents 21-7; 37 at 32.) Inasmuch as Elgin's copyright was not registered within three months after the first publication of the 24x60 Manual, no statutory damages or attorney's fees are available. Thus, even if Elgin could show a likelihood of success on the merits of its claim, any remedy would be limited to actual damages. The evidence presented does not indicate that Dillon has used, or intends to use, the 24x60 Manual in his business competing against Elgin. (*See* Document 41-1 ¶21.) Indeed, Dillon appears willing to cure any infringement without the Court's intervention. (*Id.* at 21.) Accordingly, although the Court is "entitled to presume" that Elgin "could show both probable likelihood of success on the merits and irreparable harm" upon establishing "a prima facie claim of copyright infringement," *Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 690 (4th Cir. 1992), the Court finds Elgin has not clearly demonstrated a likelihood of irreparable harm. *See Reg'l Serv. Ctr., Inc. v. HGD Enterprises, LLC*, No. 5:06-CV-498-BR, 2007 WL 9718505, at *3 (E.D.N.C. July 9, 2007) ("[T]he Supreme 'Court has consistently rejected invitations to replace traditional equitable considerations with a rule that an

injunction automatically follows a determination that a copyright has been infringed.'" (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393 (2006))).

Elgin further asserts that it has suffered irreparable harm in the form of damage to its goodwill and reputation as to its false designation of origin, breach of contract, and misappropriation of trade secrets claims. Regarding its claims under the Lanham Act, 15 U.S.C. § 1125, Elgin argues that Dillon "used a false designation to begin immediately competing against Elgin, bypassing the months it would take to create the thousands of electronic Drawings that Ritchie took from Elgin." (Document 37 at 31.) Specifically, the Defendants put Dillon Industries' name and logo on drawings taken from Elgin. Elgin claims the Defendants did so "in order to confuse parts manufactures [sic] into making components for Dillon Industries, and that "[h]ad Defendants not falsely designated Elgin's Drawings as belonging to Dillon Industries, the parts manufacturers would not have submitted proposals for or manufactured the components." (*Id.*) Relevant here, Elgin contends the establishment of consumer confusion creates a presumption of irreparable injury. *See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 939 (4th Cir. 1995) (recognizing that "irreparable injury regularly follows from trademark infringement"). However, it is not axiomatic that such a presumption arises solely from a finding of infringement. *See id.* ("[E]ven without the aid of any presumption, Plaintiffs have produced adequate evidence of irreparable injury by demonstrating actual consumer confusion, specific instances of customer complaints from the confusion, and reasonable responses to these complaints."). Elgin has not produced adequate evidence to demonstrate that Dillon's conduct has led to actual consumer confusion. Accordingly, the Court does not presume irreparable injury as to Elgin's "reverse passing off" claim.

As to its breach of contract claims, Elgin further argues that the stipulations provided in the APC and Employment Agreements regarding irreparable harm "alone suffice to establish that element for the purpose of issuing . . . injunctive relief." (*See* Document 37 at 38 (internal citation omitted).) The relevant provision of the APC Agreement provides:

> 8.2. Remedies. Except as expressly provided in this Agreement, any Person having any rights under any provision of this Agreement will be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by Law. Except as expressly provided in this Agreement, all such rights and remedies will be cumulative and non-exclusive, and may be exercised singularly or concurrently. The parties acknowledge that any breach of this Agreement *may* cause substantial irreparable harm to the other party. Therefore, this Agreement *may* be enforced in equity by specific performance, temporary restraining order and/or injunction. *The rights to such equitable remedies will be in addition to all other rights or remedies which a party may have under this Agreement or under applicable Law*.

(Document 21-1 at 33 (emphasis added).) The relevant provision of the Employment Agreement similarly provides:

> (e) Remedies. It is expressly agreed that the Company including its affiliates, will or would suffer irreparable injury if Employee were to violate any of these Confidential Information, Non-Competition and Non-Solicitation Terms and that the Company and/ or any of its affiliates will by reason of such violation be entitled to injunctive relief, without the requirement of posting of a bond, in a court of competent jurisdiction and Employee further consents and stipulates to the entry of such injunctive relief in such a court prohibiting Employee from so violating the terms of this agreement.

(Document 21-2 at 9.) Assuming, *arguendo*, that Delaware law applies to interpret both contracts, the Court does not find irreparable harm is established by the inclusion of the above provisions alone. As to the APC Agreement, the parties do not stipulate that money damages are not a sufficient remedy to any breach. Indeed, they stipulate that any non-breaching party *will* be entitled to recover damages, but that the Agreement *may also* be enforced in equity. *See Martin*

*Marietta Materials, Inc. v. Vulcan Materials Co.*, 68 A.3d 1208, 1226 (Del. 2012), *as corrected* (July 12, 2012) (finding irreparable harm established where the parties stipulated that "money damages would not be [a] sufficient remedy for any breach" and that "any breach . . . shall entitle[ ]" the non-breaching party "to equitable relief"). As to the Employment Agreement, Dillon has made assurances that it has readily searched for, identified, and returned all Elgin drawings in its possession and has since only used readily available OEM drawings or drawings reverse engineered by Ritchie. (Document 41-2 at 2.) Such cooperation undercuts a finding of irreparable harm where the injunctive relief available has previously been attained. *See, e.g.*, *Zahodnick v. Int'l Bus. Machines Corp.*, 135 F.3d 911, 915 (4th Cir. 1997) (on defendant's counterclaim for breach of confidentiality, district court did not err either in enjoining plaintiff from disclosing defendant's confidential materials to third parties or in ordering plaintiff to return all confidential materials to defendant); *Haught v. Louis Berkman LLC*, 417 F. Supp. 2d 777, 788 (N.D. W. Va. 2006) (employer entitled to injunctive relief restraining former employee from further disclosing confidential information and trade secrets and directing return of certain misappropriated documents); *Midwest Sign & Screen Printing Supply Co. v. Dalpe*, 386 F. Supp. 3d 1037, 1056 (D. Minn. 2019) (no irreparable harm found in misappropriation case where, in part, defendants "provided sworn assurances that mitigate[d] the risk of irreparable harm"); *Am. Airlines, Inc. v. Imhof*, 620 F. Supp. 2d 574, 580 (S.D.N.Y. 2009) (irreparable harm not found where defendant "offered to return or destroy all copies of [the] materials" at issue and defendant's new employer "made clear that it would not receive these materials"). Further, inasmuch as the Employment Agreement entitles Elgin to injunctive relief for any violation thereof, the evidence presented does not clearly demonstrate that Elgin is likely to succeed on the merits of its breach

claim. Notably, in addition to Dillon's cooperation in identifying and returning all Elgin material in its possession, the record does not clearly show at this stage that Dillon solicited any Elgin employees or engaged in prohibited competitive conduct during the one-year non-competition period.

Further, there is not sufficient evidence in the record to demonstrate that the Defendants' conduct damaged Elgin's goodwill or reputation among its customers. *See All Pro Maids, Inc. v. Layton*, No. CIV.A. 058-N, 2004 WL 1878784, at *5 (Del. Ch. Aug. 9, 2004), *aff'd,* 880 A.2d 1047 (Del. 2005) ("[A]n employer has an interest in the goodwill created by its sales representatives and other employees, which is vulnerable to misappropriation if the employer's former employees are allowed to solicit its customers shortly after changing jobs.") (internal citation omitted). Elgin argues it has lost business to Dillon, but to the extent such loss amounts to lost profits, the Court reiterates its finding that such economic loss "does not, in and of itself, constitute irreparable harm." *Henderson*, 208 F. Supp. at 770. Nonetheless, the Court recognizes that "[e]ven if a loss can be compensated by money [or other] damages . . ., extraordinary circumstances may give rise to the irreparable harm required for a preliminary injunction." *Hughes*, 17 F.3d at 694. "But such 'extraordinary circumstances' are designed to be rarely invocable exceptions." *Henderson*, 208 F. Supp. 3d at 772. For example, our Court of Appeals has explained that such circumstances may exist where "the moving party's business cannot survive absent a preliminary injunction or where damages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected." *Hughes*, 17 F.3d at 694 (internal quotation marks and alterations omitted). However, the evidence

presented does not indicate that either of these drastic consequences is expected to befall Elgin, a company engaged in "both nationwide and global" business. (Document 43 at 17.)[3]

Likewise, Elgin claims that it will sustain irreparable harm as a result of Dillon's misappropriation of Elgin's trade secrets. Elgin contends it "need not independently show it has suffered harm" because "[b]y statutory definition, trade secret misappropriation *is* harm." (Document 37 at 20 (quoting *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 913 (3d Cir. 2021) (vacating district court's final order of dismissal and remanding for further proceedings)).) The Defendants dispute whether Elgin drawings are trade secrets but acknowledge that they took and used Elgin drawings to obtain initial quotes for parts. "The disclosure of trade secrets establishes immediate irreparable harm because 'a trade secret, once lost is, of course, lost forever.'" *Home Funding Grp., LLC v. Myers*, No. 1:06CV1400 JCC, 2006 WL 6847953, at *2 (E.D. Va. Dec. 14, 2006) (quoting *Acierno v. New Castle Co.*, 40 F.3d 645, 647 (3d Cir.1994)). Indeed, courts in this circuit have concluded that evidence suggesting a defendant has "attempted both to access [a former employer's] confidential information and to solicit a number of [its] employees to join [his new employer] after he left" supports a finding of irreparable harm to the movant "in the loss of its clients, employees, good will, and confidential information." *See E. Coast Fire Prot., Inc. v. Muhammad*, No. 3:08CV511-HEH, 2008 WL 11389214, at *3 (E.D. Va. Sept. 18, 2008). However, the record in this case does not demonstrate that the Defendants engaged in the type of conduct presented in Elgin's cited authority, and they have since sought to remedy any potential harm. Moreover, inasmuch as a finding of irreparable harm requires a determination of Elgin's likelihood of success on the merits of its trade secrets claims, the Court finds the record is not

3 Dillon Industries currently employs 21 full time employees, all at its facility in Eleanor, West Virginia. (Document 41-1 at 1). It appears unlikely that Dillon will cause Elgin to become insolvent.

sufficiently developed at this stage to suggest that readily available drawings based on decades-old equipment—no matter their format—constitute trade secrets subject to protection. Although there may be inferences supporting such a conclusion, there remain questions concerning the trade practices of the parties' particular business that are relevant to the ultimate finding and which should not be decided on such an expedited basis.

Thus, the Court finds Elgin has not established a likelihood of irreparable harm in the absence of preliminary relief. And there the inquiry ends. *Real Truth*, 575 F.3d at 346 ("All four elements must be established by a 'clear showing' before the injunction will issue."); *Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023) ("[A] district court is entitled to deny preliminary injunctive relief on the failure of any single *Winter* factor, without fully evaluating the remaining factors.").

**CONCLUSION**

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that the Plaintiffs' *Motion for Preliminary Injunction* (Document 24) be **DENIED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER: October 13, 2023

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA