**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

ELGIN SEPARATION SOLUTIONS, LLC, et al.,

                    Plaintiffs,

v.                                CIVIL ACTION NO.   2:23-cv-00440

DAVID CHADWICK DILLON, et al.,

                    Defendants.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed *Defendant Donald Ritchie's Motion for Summary Judgment* (Document 157), the *Memorandum of Law in Support of Defendant Donald Ritchie's Motion for Summary Judgment* (Document 158), the *Plaintiffs' Response in Opposition to Defendant Donald Ritchie's Motion for Summary Judgment* (Document 169), and *Defendant Donald Ritchie's Reply to Plaintiffs' Response in Opposition to Defendant Donald Ritchie's Motion for Summary Judgment* (Document 173), as well as all attached exhibits.

The Court has further reviewed *Defendant David Chadwick Dillon and Dillon Industries, Inc.'s Motion for Summary Judgment* (Document 159), the *Memorandum in Support of Motion for Summary Judgment for Chad Dillon and Dillon Industries ("Dillon Defendants")* (Document 160), the *Plaintiffs' Response in Opposition to Defendants David Chadwick Dillon and Dillon Industries' Motion for Summary Judgment* (Document 170), and the *Reply in Support of Motion for Summary Judgment for Chad Dillon and Dillon Industries ("Dillon Defendants")* (Document

176), as well as all exhibits.   For the reasons stated herein, the Court finds that the motions should be granted in part and denied in part.

## FACTS

The Plaintiffs are Elgin Separation Solutions, LLC, and CMS/CSI LLC, formerly known as Centrifugal Services, LLC (collectively, "Plaintiffs" or "Elgin").   The Defendants are Dillon Industries, Inc., its owner Chad Dillon (collectively, "Dillon Defendants"), and employee Don Ritchie.   Dillon and Mr. Ritchie are former Elgin employees.   Mr. Dillon left Elgin to form his company, Dillon Industries; Mr. Ritchie left to work at Dillon Industries.   Although not the sole focus of their work, Elgin and Dillon Industries are both in the business of repairing and manufacturing specialized processing equipment; specifically, decanter centrifuges.

Decanter centrifuges are mechanical devices used to separate solids from slurries in industrial processes, including coal mining and rendering.   The decanter centrifuges that Dillon Industries and Elgin repair are often decades old.   Accordingly, Elgin and Dillon Industries repair and build new decanter centrifuges based on designs, or drawings, created by other companies often referred to as Original Equipment Manufacturers ("OEM").   For example, Elgin produces "BYRD Style Centrifuges," which are based on equipment originally designed and manufactured by Bird Machine Company ("Bird"), an OEM, in the 1960s.   Elgin is not alone.   Several companies in the Kanawha Valley, where Elgin and Dillon Industries are based, have also repaired, manufactured, or supplied parts for Bird centrifuges.   As a result, the Dillon Defendants contend OEM drawings and other companies' drawings of Bird centrifuges are readily available throughout the area.   Drawings are not required, but often used, to perform repairs and build new decanter centrifuges because they describe the location and size of the parts making up the decanter

centrifuge. If OEM or similar drawings are not available, a drawing can be created by reverse engineering the equipment. This involves taking apart the existing decanter centrifuge, measuring the parts, and creating a new drawing. Dillon asserts that this is a common industry practice used by both Elgin and Dillon Industries. Elgin claims that, as part of this practice, it improves upon equipment in order to outperform its peers. Although Elgin acknowledges that redesigning and improving upon competitor products is common in the industry, Elgin maintains the exact manner in which it conducts its redesign process, which includes the use of commercial software to create drawings in various electronic file types, is confidential and proprietary.

Dillon became involved in the business of repairing decanter centrifuges at an early age when he began working at his father's business, Industrial Process Equipment, in St. Albans, West Virginia. He eventually joined the family business full time and took it over in 2010, expanding it significantly. Dillon attributes his success in the industry to his management skills and relationships with customers and employees.

In 2013, Dillon sold the family business to Centrifugal Services, an Elgin subsidiary. At that time, the parties entered into two contracts: (1) an Asset Purchase and Contribution Agreement (the "APC Agreement") governing the sale of the business, and (2) an Employment Agreement governing Dillon's employment with Elgin. Following the sale, Dillon continued running the business as President of Elgin's Poca, West Virginia, division. In this position, he oversaw all facility operations, including the development and maintenance of customer relationships, defining the roles and responsibilities of the workforce, recruitment and hiring, and ensuring compliance with industry and customer standards. As a result, Elgin asserts that it came to entrust Dillon with its confidential information, customers, and suppliers.

In November 2021, Dillon decided to leave Elgin with the intention of starting his own competing business. Elgin's President at the time, Michael Anderson, requested that Dillon stay on until Elgin found a suitable replacement, to which Dillon agreed with the understanding that the one-year non-competition and non-solicitation provisions in his Employment Agreement would begin to run from the effective date of his resignation, December 14, 2021. During this period, Dillon maintains that he prepared to compete with Elgin by arranging office space, equipment, and financing for his new business, but was careful not to compete with Elgin or solicit Elgin employees. Elgin disputes this assertion and points to testimony indicating that at least one Elgin employee was approached about a job at Dillon Industries prior to the expiration of Dillon's restrictive period. (*See* Harron Aff.) (Document 170-11.) Dillon admits that he executed purchase orders for some Elgin customers, but maintains the orders were for shafts, a product Elgin does not sell. Elgin maintains that, had it been presented with this kind of opportunity, it would have taken it. (*See* Henley Aff. at ¶ 60) (Document 170-12.) In April 2022, Dillon forwarded an email from his Elgin email account to his Dillon Industries email account which contained a copy of a 24x60 Manual which Elgin had previously prepared in response to a customer request. Dillon asserts that he has never used the Manual in his work at Dillon Industries. The Plaintiffs contend a forensic examination of Dillon's computer files remains ongoing, which may reveal use of the Manual. (*See* Lindsay Aff. at 3) (Document 170-13.) Upon later discovering this email, Elgin initiated the process of registering its copyright in the 24x60 Manual. Two days after the United States Copyright Office granted Elgin's application, Elgin initiated this litigation.

Around October or December 2022, Elgin found a suitable replacement for Dillon in Chris Henley, and Dillon left his employment with Elgin. On December 14, 2022, the one-year

restrictive covenant period expired.    Dillon Industries placed an ad for employment on ZipRecruiter the next day.    The parties dispute whether Elgin employees learned about this ad at the time it was placed or at some time earlier.    Dillon hired some of the Elgin employees who applied.    In January 2023, Dillon received a call from Elgin's CEO with a request to cease hiring Elgin employees.    Dillon completed the hiring of two Elgin employees to whom he had previously extended offers but otherwise ceased his hiring efforts.

Mr. Ritchie is a machinist by trade and is proficient in the use of computer-aided drawing programs, such as AutoCAD.    He previously worked for a company called Control Point where he acquired and created drawings of decanter centrifuges.    In 2018, Ritchie began working at Elgin's Poca Division and claims he brought with him many of the drawings he created at Control Point.    Ritchie's job duties at Elgin involved creating and modifying drawings, assisting in the drafting of maintenance and operations manuals, procurement, and issuing work orders. Following Dillon's departure, Ritchie testified that he found the Poca Division to be a difficult place to work.    According to Ritchie, business was disorganized, and customers were unhappy. Consequently, he claims he reached out to Dillon and asked to work for Dillon Industries.    Dillon initially considered Ritchie as a possible replacement for him at Elgin and noted his inability to pay Ritchie the same salary and benefits at Dillon Industries.    However, Dillon eventually agreed, and Ritchie left Elgin in January 2023 to work for Dillon Industries.    Upon his resignation, Ritchie returned one external hard drive to Elgin.    Prior to leaving, however, he downloaded drawings and emailed other information to Dillon which Elgin claims is proprietary and trade secret.    Elgin represents that a forensic investigation reveals that Ritchie connected numerous external drives to

his work computer.   Ritchie maintains that he diligently searched for these devices and returned all of those in his possession to Elgin for further examination.

In March 2023, Elgin, through counsel, sent a cease-and-desist letter to Dillon demanding he cease competing with Elgin, soliciting Elgin employees, and using Elgin's confidential information.   Dillon disputed these allegations but contends he cooperated in the identification, return, and destruction of such information.   Dillon advised Elgin that Dillon Industries had initially used relabeled Elgin drawings to obtain quotes for parts, but further assured Elgin that Dillon Industries had since ceased using any Elgin drawings in its business dealings.   The parties have since been engaged in an agreed remediation process by which Elgin can locate any of its information remaining on Dillon Industries' computer system and erase it.   Despite the Defendants' assurances to the contrary, Elgin maintained that they were still in possession of Elgin's confidential information.   Accordingly, Elgin initiated the instant matter.

The Amended Verified Complaint asserts the following causes of action: Count I: Violation of the Defend Trade Secrets Act; Count II: Violation of the West Virginia Uniform Trade Secrets Act; Count III: Copyright Infringement (as to Dillon and Dillon Industries); Count IV: Breach of Contract – APC Agreement (as to Dillon); Count V: Breach of Contract – Employment Agreement (as to Dillon); Count VI: Breach of Fiduciary Duty (as to Dillon); Count VII: Tortious Interference (as to Dillon); Count VIII: Breach of Fiduciary Duty (as to Mr. Ritchie); and Count IX: False Designation of Origin – Lanham Act.

## STANDARD OF REVIEW

The well-established standard in consideration of a motion for summary judgment is that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as

6

to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a)–(c); *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Hoschar v.

Appalachian Power Co.*, 739 F.3d 163, 169 (4th Cir. 2014).  A "material fact" is a fact that could

affect the outcome of the case.  *Anderson*, 477 U.S. at 248; *News & Observer Publ'g Co. v.

Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).  A "genuine issue" concerning

a material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict

in the nonmoving party's favor.  *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013); *News &

Observer*, 597 F.3d at 576.

The moving party bears the burden of showing that there is no genuine issue of material

fact, and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp.*,

477 U.S. at 322–23.  When determining whether summary judgment is appropriate, a court must

view all of the factual evidence, and any reasonable inferences to be drawn therefrom, in the light

most favorable to the nonmoving party.  *Hoschar*, 739 F.3d at 169.  However, the nonmoving

party must offer some "concrete evidence from which a reasonable juror could return a verdict in

his favor."  *Anderson*, 477 U.S. at 256.  "At the summary judgment stage, the non-moving party

must come forward with more than 'mere speculation or the building of one inference upon

another' to resist dismissal of the action."  *Perry v. Kappos*, No.11-1476, 2012 WL 2130908, at

*3 (4th Cir. June 13, 2012) (unpublished decision) (quoting *Beale v. Hardy*, 769 F.2d 213, 214

(4th Cir. 1985)).

In considering a motion for summary judgment, the court will not "weigh the evidence and

determine the truth of the matter," *Anderson*, 477 U.S. at 249, nor will it make determinations of

7

credibility.  *N. Am. Precast, Inc. v. Gen. Cas. Co. of Wis.*, 2008 WL 906334, *3 (S.D. W. Va. Mar. 31, 2008) (Copenhaver, J.) (citing *Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir. 1986).   If disputes over a material fact exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate.  *Anderson*, 477 U.S. at 250.   If, however, the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment should be granted because "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 322–23.

## DISCUSSION

### A.    *The Dillon Defendants*

The Dillon Defendants assert that they are entitled to summary judgment as to all claims against them.   The Plaintiffs withdrew their claim for breach of the APC Agreement as alleged in Count IV,[1] (*See* Pls.' Resp. to Dillon Defs.' Mot. for Summ. J. at 2 n.1), but otherwise maintain that summary judgment is inappropriate or premature as to their remaining claims.

### 1.    Counts I & II – Violation of Federal & State Trade Secrets Acts

The Dillon Defendants assert that they are entitled to summary judgment as to the Plaintiffs' claims for misappropriation of trade secrets in violation of the Defend Trade Secrets Act (DTSA) and the West Virginia Uniform Trade Secrets Act (WVUTSA).   While the Dillon Defendants concede that they used Elgin's information, they contend the Plaintiffs have failed to demonstrate that any such information constitutes trade secrets.

---

1 Inasmuch as the Plaintiffs abandon this claim, the Court will simply dismiss Count IV.

The Plaintiffs argue that the record shows that "Elgin's Drawings, Inspection Report, and Compilation of Photographs are independently valuable, well safeguarded trade secrets." (Pls.' Resp. to Dillon Defs.' Mot. for Summ. J. at 1–2) (Document 170.) Accordingly, they contend issues of fact preclude summary judgment on Counts I and II because a reasonable jury could find based on the record that the relevant Drawings, Inspection Report, and Photographs are trade secrets and that the Defendants misappropriated them. (*See id.* at 16.)

The West Virginia and federal definitions of "trade secret" are consistent and apply to all material—including information and compilations of information—bearing two characteristics. First, a trade secret must "[d]erive[ ] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." W. Va. Code § 47-22-1(d)(1); *accord* 18 U.S.C. § 1839(3)(B) (containing materially identical language). Second, it must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Id.* § 47-22-1(d)(2); *accord* 18 U.S.C. § 1839(3)(A) (requiring that "the owner thereof has taken reasonable measures to keep such information secret").

Because the West Virginia and federal statutes are materially similar, the Court finds additionally instructive the six-factor test adopted by the West Virginia Supreme Court of Appeals in *State ex rel. Johnson v. Tsapis*, 419 S.E.2d 1, 1 (W. Va. 1992). *See IVS Hydro, Inc. v. Robinson*, 93 Fed.Appx. 521, 527 (4th Cir. 2004) (unpublished) (opining that the West Virginia Supreme Court would also apply *Tsapis* to determine the existence of a trade secret). The *Tsapis* factors include:

(1) the extent to which the information is known outside of the [Plaintiffs'] business;

9

(2) the extent to which it is known by employees and others involved in the [Plaintiffs'] business;
(3) the extent of the measures taken by the [Plaintiffs] to guard the secrecy of the information;
(4) the value of the information to the [Plaintiffs] and competitors;
(5) the amount of effort or money expended by the [Plaintiffs] in developing the information; and
(6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Tsapis*, 419 S.E.2d at 3; *see McGough v. Nalco Co.*, 496 F.Supp.2d 729, 739–40 (N.D.W. Va. 2007) (Goodwin, J.) (applying the *Tsapis* factors). "[T]he absence of evidence as to any one factor does not necessarily preclude a finding that a trade secret exists. The factors should be viewed as instructive guidelines, weighed together in making that determination." *McGough*, 496 F.Supp.2d at 740 (citation omitted).

Misappropriation occurs when a trade secret is acquired by improper means, or when it is disclosed or used by someone who knows or has reason to know that the trade secret was "[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." W. Va. Code § 47–22–1(b). "Failing to prove the existence of a 'trade secret' dooms a misappropriation claim." *Synopsys, Inc v. Risk Based Sec., Inc.*, 70 F.4th 759, 769 (4th Cir. 2023) (citing *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 661 (4th Cir. 1993)). "Although the existence of a trade secret 'ordinarily presents a question of fact to be determined by the fact finder from the greater weight of the evidence,' … summary judgment can still be appropriate when the record does not create a genuine issue of material fact as to the necessary elements." *Id.* (quoting *MicroStrategy Inc. v. Li*, 601 S.E.2d 580, 589 (Va. 2004) (discussing the Virginia Uniform Trade Secrets Act, which is materially similar to the West Virginia and federal Acts)).

The Defendants argue that the Plaintiffs have not shown the independent economic value of their alleged trade secrets or explained how that value is tied to their secrecy. Elgin identifies its purported trade secrets as "the Drawings, Inspection Report and underlying methodology, and Photographs." (*Id.* at 17.) The Drawings and Photographs are identified as those for "the 18x50, 18x42, 24x60, 24x38, Lynx 40, 2612 Hammer Mill Machine, and 2612 DIG Hammer Mill Machine." (*Id.*) The Inspection Report "is a large Excel workbook with 21 worksheets corresponding to each centrifuge subpart" which Elgin represents "memorializes Elgin's methodology and provides an analysis of the critical surfaces and mating functions, the causes for failures, the wear on the machine, and the repair processes used." (*Id.* at 20.) The Plaintiffs contend their Drawings, Inspection Report, and Photographs "provide Elgin a competitive advantage and have economic value." (Plfs.' Resp. to Dillon Defs.' Mot. for Summ. J. at 18.) Generally, they assert that Elgin "invested significant time and resources to develop" each, and that "a competitor could not create similar tools without investing substantial time and treasure." (*Id.*) They maintain that "customers choose Elgin" because of this information. The Defendants do not engage with the Plaintiffs' arguments concerning whether each category of information constitutes a trade secret, but reiterate that, generally, Elgin has failed to demonstrate independent economic value tied to secrecy. The Court will examine each category.

### a.    *Elgin's Drawings*

The Court finds that the Plaintiffs have offered sufficient evidence to demonstrate a material issue of fact as to whether Elgin's Drawings constitute trade secrets that were misappropriated. Regarding independent economic value, the Defendants note that Elgin has not identified an expert witness to opine as to the value of its alleged trade secrets, and that Elgin's

former President Michael Anderson[2] testified that he did not know whether a value had ever been placed on Elgin's alleged trade secrets. (Anderson Dep. at 118) (Document 159-4.) While a monetary valuation would certainly aid in determining any damages related to the misappropriation of individual trade secrets, proof of independent economic value can also include the value competitors could obtain from possessing information previously kept from them. *See Trandes Corp.*, 996 F.2d at 663 ("Because 'other persons [could] obtain economic value' from the disclosure or use of the [plaintiff's] object code, a reasonable jury could conclude that the … code "[d]erives independent economic value ... from not being generally known.") (citing Maryland's Uniform Trade Secrets Act, which is materially similar to both the WVUTSA and DTSA); *Heska Corp. v. Qorvo US, Inc.*, No. 1:19CV1108, 2020 WL 5821078, at *6 (M.D.N.C. Sept. 30, 2020) ("To have independent economic value the secret information must afford the owner a competitive advantage by having value to the owner and potential competitors.") (internal quotation and citations omitted).

Here, Chris Henley attested that all formats of Elgin's Drawings "are uncommon in the industry" (Henley Aff. at ¶ 10), and that

> A competitor would receive a significant bone [sic] if they were able to use Drawings like Elgin's without having to undergo the expense of either (a) paying employees to take these massive machines apart, measure the individual pieces and dimensions, determine how they fit together, hand-draw sketches of the images, or engage in trial-and-error testing of the measurements; or (b) purchasing an expensive software and hiring skilled workers to turn those sketches into various file types, including 2D drawings, 3D models, assembly files, and .DXF files.

---

2 Although the Plaintiffs assert that Mr. Anderson was deposed in his individual capacity and not as a corporate representative of Elgin, and that he has not served as President for over six months, the Court notes that Mr. Anderson verified both the original and amended complaints filed in this action.

(Henley Aff. at ¶ 26.)  "One way to demonstrate individual economic value is to show that time and money would be required of a competitor to develop the same information."  *Heska Corp.*, No. 1:19CV1108, 2020 WL 5821078, at *6 (M.D.N.C. Sept. 30, 2020) (construing the DTSA, Michigan Act, and Minnesota Act).  To the extent that a competitor would have to invest significant time and resources to develop the same or similar versions of Elgin's Drawings, possession of the same effectively "shortcuts" the process of setting up the services Elgin can offer. Accordingly, a reasonable jury could infer that the Drawings have independent economic value.

Thus, the Plaintiffs are obligated at this juncture to come forward with evidence that their alleged trade secrets have value *because they remain secret*.  *See DTM Research, L.L.C.*, 245 F.3d at 332.  "Absolute secrecy is not essential" to finding that a trade secret existed, and limited disclosure does not destroy secrecy.  *Trandes Corp.*, 996 F.2d at 664.  The internal measures Elgin takes to secure its Drawings include requiring "certain high level employees" to execute confidentiality agreements, marking them as "business propriety," password protecting and limiting access to the Elgin equipment on which Elgin maintains electronic Drawing files, and providing paper copies of 2D Drawings to employees on an as-needed basis.  (*See* Henley Aff. at ¶¶ 27–29, 33.)  In addition, Elgin does not distribute 3D Drawings, Assembly Drawings, or .DXF files to customers or suppliers "absent an agreement or course of dealing assuring the confidentiality and use of the electronic file only for the intended purpose."  (*See id.* at ¶¶ 30–31.) PDF versions of Drawings depicting a customer's machine are sometimes provided to that customer, but not other electronic formats.  (*Id.* at ¶ 32.)  The Defendants note that Ritchie, who created the Drawings at issue, never had a confidentiality agreement with Elgin.  In addition, they contend drawings were commonly kept in employees' toolboxes, drawings are freely shared within

13

the industry, and many of Elgin's Drawings came from competing companies. Because "[s]ecrecy is a question of fact," the Court finds, viewing all the evidence and any reasonable inferences therefrom in the light most favorable to the Plaintiffs, that the question of whether Plaintiffs "took reasonable precautions to keep the [alleged trade secrets] secret" may reasonably be resolved in favor of either party. *See Trandes Corp.*, 996 F.2d at 664 (internal citation omitted); *Anderson*, 477 U.S. at 250. Accordingly, summary judgment is inappropriate on Counts I & II as to Elgin's Drawings.

b.     *Elgin's Photographs & Inspection Report*

The Court finds that summary judgment is appropriate as to the Plaintiffs' claim that the Defendants misappropriated their Photographs and Inspection Report because neither qualifies as a trade secret as a matter of law.

Elgin takes photographs of customers' machines "during every stage of the repair process" to ensure the machine "can be repaired, improved, and put back together precisely and efficiently." (Henley Aff. at ¶¶ 42–43.) Chris Henley attested that the Photographs are thus valuable to Elgin because "they permit Elgin to repair a given machine more efficiently and precisely," which "saves Elgin time and resources in two ways." (*Id.* at ¶ 44–46.) First, taking photographs of a customer's machine when it is repaired the first time ensures that "employees put the parts back accurately and make the necessary changes." (*Id.* at ¶ 46.) Second, comparing Photographs of a machine that has been previously serviced by Elgin helps to "speed up the process" of repair. (*See id.*) Mr. Henley further attested that Elgin takes steps to ensure the secrecy of the Photographs. This includes saving the Photographs on Elgin's computers or network, only providing computers or computer access to certain employees, password protecting computers and

requiring use authentication, and only providing Photographs to employees on "a need to know basis" during the repair process.   (*Id.* at ¶ 47.)   In addition, "certain high level employees … who have full access to all of Elgin's information are required to execute confidentiality agreements." (*Id.* at ¶ 48.)   Only small selection of the Photographs is shared with the customer in the Inspection Report.   (*Id.* at ¶ 49.)

Based on the record evidence and taking all reasonable inferences in the Plaintiffs' favor, the Court finds that while the Plaintiffs may value their Photographs, a reasonable jury could not find that photographs of customers' machines rise to the level of a protected trade secret.   *See Synopsys, Inc.*, 70 F.4th at 772 ("Not everything with commercial value constitutes a trade secret.").   Indeed, although the photographs may be useful to Elgin in documenting needed repairs and reassembling a customer's machine, the contents of the Photographs merely reveal the inner workings of Elgin's *customers'* machines, which a jury might find to be proprietary to the customer (or manufacturer) but certainly not to Elgin.   The fact that Elgin does not share all the Photographs with a customer makes sense, as the customer undoubtedly understands how their machine works and would only need documentation of the precise repair it requested.   Further, the fact that Elgin does not share the Photographs with suppliers or competitors is irrelevant.   A reasonable jury could not find that the Photographs would be of particular use to Elgin's suppliers or competitors, who either do not need such information[3] or are likely capable of physically documenting their customers' machines themselves.   Moreover, the internal steps Elgin takes to password protect its computers and require some, but not all, employees with access to the Photographs to execute confidentiality agreements is of minimal value.   The Plaintiffs point to no evidence in the record

---

3 Mr. Henley attested, for example, that if a supplier was contracted to fabricate a part for a customer's machine, Elgin would simply send the supplier a version of the Drawing for that part.   (Henley Aff. at ¶ 31.)

to suggest that the employees who photograph customers' machines are subject to confidentiality agreements or otherwise understand the Photographs to be confidential to Elgin.   At this juncture, the Plaintiffs have failed to make a showing sufficient to establish that the Photographs have any independent economic value to Elgin which is specifically tied to their secrecy, and thus fail to establish the Photographs are trade secrets subject to protection under the federal or West Virginia Act.

Likewise, the Court finds that the Inspection Report does not constitute a trade secret as a matter of law.   The Plaintiffs represent that the Inspection Report is "a large Excel workbook with 21 worksheets corresponding to each centrifuge subpart" that "memorializes Elgin's methodology and provides an analysis of the critical surfaces and mating functions, the causes for failures, the wear on the machine, and the repair processes used."   (Pls.' Resp. to Dillon Defs.' Mot. for Summ. J. at 20; Henley Aff. at ¶ 34.)   The Plaintiffs ostensibly argue that the independent economic value of the Inspection Report is related to its "comprehensive analysis of a machine for the customer" which the Plaintiffs vaguely assert provides "significantly more analysis and objectivity than the reports prepared by Elgin's competitors."   (*See id.* at 20–21.)   They tout the fact that, "[w]hen printed, Elgin's inspection report is 25-30 pages long.   Most of Elgin's competitors use inspection reports that are 2-3 pages long."   (*Id.* at 21; *see* Henley Aff. at ¶ 36.)   Mr. Henley attested that "[s]ome of Elgin's customers … have informed Elgin that this document is extremely useful for them to issue their own purchase orders and know what next steps are needed to maintain or improve a given machine."   (Henley Aff. at ¶ 37.)   Regarding the secrecy of the Inspection Report, Mr. Henley stated that the Excel document carries Elgin's logo and customers and employees working on a particular machine only receive PDF copies of the report, rather than "the

editable [E]xcel document that is the master inspection report" (*id.* at ¶ 41) which the Plaintiffs' counsel further represents "includes Excel utilities like auto-populating fields" (Pls.' Resp. to Dillon Defs.' Mot. for Summ. J. at 23).

Once again, while the Plaintiffs may place commercial value on their Inspection Report, the record sets forth no evidence from which a reasonable jury could infer that a document amounting to a fillable Excel template constitutes a trade secret. Although helpful to anyone filling out the template, Excel's software functionality is certainly not Elgin's own creation. Moreover, the fact that some Elgin customers appreciate the utility of individual completed reports does not support a finding that possession of the blank template provides any competitive advantage. The nature and contents of an individual Inspection Report necessarily change with each associated repair, and the general provision to customers of an inspection report appears to be industry standard. Moreover, the inclusion of Elgin's logo and the requirement that some, but not all, employees with access to the editable master document execute confidentiality agreements (*see* Henley Aff. at ¶¶ 39–40) does not support a finding that Elgin adequately protects the Inspection Report. Accordingly, the Court finds that the record does not show Elgin's Inspection Report derives any independent economic value from its secrecy, and thus it does not constitute a trade secret subject to protection. Inasmuch as Elgin claims misappropriation of the Photographs and Inspection Report as trade secrets, the Defendants are entitled to summary judgment on Counts I and II.[4]

---

4 The Court finds the Plaintiffs' argument that the "record is simply too thin" to decide the issue of trade secrets unavailing. If the Plaintiffs cannot come forward with sufficient evidence at this juncture to demonstrate that the information they seek to protect meets the legal definition of a trade secret, the Court cannot envision how they plan to overcome this obstacle at trial.

2.    Count III – Copyright Infringement

The Defendants contend they are entitled to judgment as a matter of law as to the Plaintiffs' copyright infringement claim because the Plaintiffs are limited to actual damages, and there is no evidence in the record to suggest the existence of actual damages because Dillon never used the Plaintiffs' copyrighted 24x60 Manual and the Dillon Defendants have participated in an agreed remediation protocol to remove the Manual from their computer and email systems.

The Plaintiffs argue that summary judgment is premature as to Count III because their "forensic expert is analyzing Defendants' use—which appears to include accessing the 24x60 Manual." (Pls.' Resp. to Dillon Defs.' Mot. for Summ. J. at 2.)    Counsel for the Plaintiffs attested that "Plaintiffs simply need more time to analyze this information," which was obtained through the parties' aforementioned remediation protocol on May 24, 2024. (*See* Lindsay Aff. at ¶¶ 4–6) (Document 170-13.)    The Plaintiffs have yet to supplement the record with any such information.

The Court previously considered the Plaintiffs' copyright infringement claim on their motion for a preliminary injunction. (Mem. Op. & Order Oct. 13, 2023) (Document 55.) Therein, the Court noted that the Copyright Act, 17 U.S.C. §§ 101 *et seq.*, provides that

> no award of statutory damages or of attorney's fees, as provided by [the Act], shall be made for . . . any infringement of copyright commenced after first publication of the work and before the effective date of its registration, *unless such registration is made within three months after the first publication of the work.*

17 U.S.C. § 412 (emphasis added).    The registration certificate for Elgin's 24x60 Manual indicates a first publication date of April 9, 2022. (Document 21-7.)    Elgin alleges that Dillon sent the 24x60 Manual from his Elgin email account to his Dillon Industries email account in April 2022. (Document 37 at 16.)    Elgin's copyright in the 24x60 Manual was registered on June 14, 2023. (Documents 21-7; 37 at 32.)    Inasmuch as Elgin's copyright was not registered within

three months after the first publication of the 24x60 Manual, the Court previously found that no statutory damages or attorney's fees are available, and Elgin's remedy, if any, is limited to actual damages.  (Mem. Op. & Order Oct. 13, 2023 at 11.)   The Plaintiffs point to no evidence in the record at this juncture indicating that Dillon ever used the 24x60 Manual.   However, to the extent that such failure is due to the ongoing forensic examination of the information remaining on the Defendants' devices, as attested by Plaintiffs' counsel, the Court finds that summary judgment on Count III is premature.  *See* Fed. R. Civ. P. 56(d).   The Plaintiffs are directed to notify the Court by July 30, 2024 regarding their intention to pursue Count III at trial.

### 3.    Count V – Breach of Contract (Employment Agreement)

The Plaintiffs allege that Dillon violated his Employment Agreement by using Elgin's confidential information, as well as by competing with Elgin and soliciting customers and employees in violation of the restrictive covenants set forth therein.

#### a.    Choice of Law

As an initial matter, the parties dispute whether West Virginia or Delaware law should apply to determine the enforceability of the Employment Agreement.   "Because this court is sitting in diversity in West Virginia, [it] will apply West Virginia's choice-of-law principles to determine which state's law to apply to the contract."  *CSS, Inc. v. Herrington*, 306 F. Supp. 3d 857, 879 (S.D.W. Va. 2018) (internal citation omitted).   The Employment Agreement contains a choice-of-law provision identifying Delaware law as controlling.  (Empl. Agreement at 5) (Document 21-2.)   West Virginia's conflict-of-laws jurisprudence provides "that a choice of law provision in a contract will not be given effect when the contract bears no substantial relationship with the jurisdiction whose laws the parties have chosen to govern the agreement[.]"  *Id.* at 879–

19

80 (quoting *Gen. Elec. Co. v. Keyser*, 166 W.Va. 456, 275 S.E.2d 289, 297 (1981)).  Here, the Employment Agreement bears no substantial relationship with Delaware.  Even assuming that Centrifugal Services, LLC, is a citizen of Illinois and Delaware,[5] the Employment Agreement pertains to Dillon's employment and duties as President of the Industrial Process Equipment division located in West Virginia; Dillon's performance and alleged breach of the Employment Agreement occurred in West Virginia; and Dillon is a resident of West Virginia.  Thus, West Virginia law is applicable to the Plaintiffs' breach of contract claim notwithstanding the choice of law provision.

### b.    *Validity of the Employment Agreement*

Under West Virginia law, the Dillon Defendants assert that summary judgment is appropriate as to the Plaintiffs' breach of contract claim for several reasons.  First, they allege the Employment Agreement is unenforceable because it expired.  Second, if the Agreement is enforceable, the Dillon Defendants claim each of its restrictive covenants is facially unreasonable and void and unenforceable.  Third, even if the restrictive covenants are enforceable, the Dillon Defendants assert that Elgin cannot enforce the covenants on behalf of its subsidiary, Centrifugal Services.  Fourth, if Elgin can enforce the covenants, the Dillon Defendants nevertheless maintain that the record shows Dillon did not violate them.

---

5 For purposes of diversity jurisdiction, the citizenship of a limited liability company is determined by the citizenship of every single one of its members.  *Cent. W. Virginia Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011) (citing *Gen. Tech. Applications, Inc. v. Exro Ltda*, 388 F.3d 114, 121 (4th Cir. 2004)); *Capps v. Newmark S. Region, LLC*, 53 F.4th 299, 302 (4th Cir. 2022).  Here, Centrifugal Services, LLC, the corporate signatory to the Employment Agreement and one of the Plaintiffs in this action, is a limited liability company organized under the laws of Illinois and wholly owned by Elgin Separation Solutions.  (First Am. Verified Compl. at ¶ 8) (Document 21.)  Elgin Separation Solutions is a wholly owned subsidiary of Elgin Power and Separation Solutions, LLC, a limited liability company organized under the laws of Delaware.  (*Id.* at ¶ 7.)  It is not clear what citizenship(s) Centrifugal Services maintained at the time the Employment Agreement was executed.

Turning to the validity of the Employment Agreement, in West Virginia, "[a]ny covenant not to compete must first, of course, pass inspection as a provision in a binding contract." *Reddy v. Cmty. Health Found. of Man*, 298 S.E.2d 906, 915 (W. Va. 1982). "[I]f the entire contract fails, for lack of consideration, fraud, duress, adhesion or other contractual excuse, the covenant is also without effect." *Id.* The Employment Agreement provides the following with respect to the duration of Dillon's employment:

> Term. The initial term of employment of Employee hereunder (the "Initial Term") will commence as of the date hereof and continue for a period of twenty-four (24) months unless earlier terminated, or extended pursuant to a written extension amending this Agreement or such other agreement signed by both parties hereto. The Initial Term, together with any renewal term or terms, if applicable, will be defined as the "Term" of the Agreement. In the event that Employee remains employed by the Company after the expiration of the Initial Term, in the absence of a written extension, Employee will be considered an employee at will.

(Empl. Agreement at 1.) The Employment Agreement became effective on November 13, 2013. (*Id.*) The Dillon Defendants argue that the Employment Agreement is no longer binding because it expired in 2015, when the Initial Term ended without a written extension and Dillon's employment became at-will. They contend Dillon's change in status from a term to at-will employee constitutes a "material change" in the employment relationship and that "once Dillon's rights under the Employment Agreement expired, so did his obligations." (Dillon Defs.' Mem. at 25.) The Plaintiffs maintain that the Employment Agreement did not expire and that its terms specifically contemplate Dillon's continued employment subject to the restrictive covenants.

The Court finds that the Employment Agreement and accompanying restrictive covenants did not expire at the conclusion of the Initial Term. The Employment Agreement contemplates the parties' rights and obligations both during the "Initial Term" of Dillon's employment and after

its expiration.[6]  Moreover, the restrictive covenants are subject to terms separate from Dillon's employment status.  The "Confidential Information" covenant applies "without limitation in time."  (Empl. Agreement at 8.)  The Non-Competition and Non-Solicitation covenants each apply "[d]uring the period of Employee's employment by the Company and continuing until the first anniversary *of the date that Employee ceases to be employed* with the Company for any reason (the "Applicable Period")."   (*Id.* (emphasis added).)   Dillon's shift from term to at-will employment as contemplated by the terms of the Employment Agreement does not appear to constitute a material change in the employment relationship which would necessitate a new agreement.  *See Costanzo v. EMS USA, Inc.*, No. 5:16CV168, 2017 WL 4215952, at *3 (N.D.W. Va. Sept. 21, 2017) ("The [employee's] access to confidential information in the course of his employment … appears to provide the consideration necessary to enforce the covenant not to compete, even though the employment was at will.").  Accordingly, the Court finds that the Employment Agreement, on its face, contemplates the parties' rights and obligations beyond the Initial Term of employment, including their rights and obligations under the restrictive covenants.

### c.    *Enforceability of the Restrictive Covenants*

Having found that the Employment Agreement remains valid, the Court turns to the Dillon Defendants' claim that each restrictive covenant therein is facially unreasonable and unenforceable under West Virginia law.  As previously noted, the Employment Agreement contains four restrictive covenants: a "Confidential Information" covenant; a "Non-Competition" covenant; and "Non-Solicitation" covenants relating to customers and suppliers, and to company employees.

---

6 *See, e.g.*, Empl. Agreement at 2 (Salary of $110,000 per year during "Initial Term" is subject to the discretion of the Company if the Employee remains employed after expiration of the Initial Term; Employee only eligible to participate in Company's Annual Incentive Compensation Program during Initial Term; Benefits, Vacation, and Reimbursement of Expenses provisions last for duration of Employee's employment with the Company).

"Before delving into the question of enforceability of the covenant[s], this Court first addresses whether the covenant is ancillary to an employment contract or ancillary to the sale of a business." *Cook v. Robinson*, No. 5:11CV6, 2011 WL 4708855, at *4 (N.D.W. Va. Oct. 4, 2011). The Plaintiffs argue that the less stringent test for covenants ancillary to the sale of a business applies here because the Employment Agreement was executed in conjunction with the sale of Dillon's family business.   (*See* Pls.' Resp. to Dillon Defs.' Mot. for Summ. J. at 30–34.) However, this position ignores the terms of the APC Agreement, which contains its own restrictive covenants specific to the sale.   (*See* APC Agreement at 26–27) (Document 21-1.)   Those covenants include "Confidentiality," "Noncompetition," and "Nonsolicitation and Nonhire" provisions, the latter two of which ran "[f]or a period of five (5) years after the Closing Date" of the sale.   The Court thus finds it axiomatic that the covenants in Dillon's Employment Agreement were entered ancillary to an employment contract, warranting the more stringent test.

Turning to the question of enforceability, the West Virginia Supreme Court of Appeals has adopted the rule of reason to govern the enforcement of restrictive covenants.   *Pancake Realty Co. v. Harber*, 73 S.E.2d 438, 440–43 (W. Va. 1953).   The threshold question is whether the covenant is "reasonable on its face."   *Reddy*, 298 S.E.2d at 915.   "If the covenant is unreasonable on its face, then it is utterly void and unenforceable."   *Id.*   A covenant is unreasonable on its face where "the restriction is excessively broad with respect to time or area, or if in the circumstances the true purpose of the covenant appears to be merely to repress the employee, and prevent him from leaving, rather than to protect the employer's business."   *Id.*   "[A] covenant is reasonable only if it: (1) is no greater than is required for the protection of the employer; (2) does not impose undue hardship on the employee; and (3) is not injurious to the public."   *Corky Wells Elec., Inc.*

*v. Pratt*, No. 1:19-CV-158, 2019 WL 10056967, at *12 (N.D.W. Va. Dec. 5, 2019) (internal quotation and citation omitted).

i.    "Non-Competition" Provision

The Plaintiffs claim that Dillon breached the "Non-Competition" provision of the Employment Agreement "by establishing and operating a company no later than April 2022, which sought to conduct business identical to that of Plaintiffs, namely, the manufacture and repair of industrial centrifuges and hammer mills."  (First Am. Verified Compl. at ¶ 195.)  The "Non-Competition" provision states that

> During the period of Employee's employment by the Company and continuing until the first anniversary of the date that Employee ceases to be employed with the Company for any reason (the "<u>Applicable Period</u>"), Employee will not, directly or indirectly, without the prior written consent of the Company, on behalf of any individual or entity other than the Company and its affiliates, perform services in any capacity (whether as an owner, employee, partner, independent contractor or otherwise, whether with or without compensation) in all or any portion of any business that the Company or any of its affiliates conducts or is developing as of the date of such termination (each such competitor a "<u>Competitor of the Company</u>"); provided, however, that the "beneficial ownership" by Employee, either individually or as a member of a "group" as such terms are used in Rule 13d of the General Rules and Regulations under the Exchange Act, of not more than five percent (5%) of the voting stock of any publicly held corporation will not alone constitute a violation of this paragraph. Employee and the Company acknowledge and agree that the business of the Company extends throughout the world, and that the terms of the non-competition agreement set forth herein will apply (i) on a nationwide basis throughout the United States and (ii) each other country in which the Company has operations or does business.

(Empl. Agreement at 8.)   "Courts have found worldwide restrictions on competition to be reasonable when the business at issue is global."   *JAK Prods., Inc. v. Bayer*, 94 F. Supp. 3d 777, 786 (S.D.W. Va.), *aff'd*, 616 F. App'x 94 (4th Cir. 2015) (collecting cases).   However, as Judge Goodwin noted in *JAK Prods., Inc.*, "[w]hether the West Virginia Supreme Court agrees with this position on worldwide restrictions is unclear.   The West Virginia Supreme Court generally

disfavors employee noncompete covenants." *Id.* (citing *Weaver*, 478 S.E.2d at 367); *see also Cook*, 2011 WL 841287, at \*9 (noting West Virginia public policy "disfavors covenants not to compete and their restraint on the opportunity of employment").

The Court finds that the "Non-Competition" provision's one-year time period is reasonable on its face.   Courts applying West Virginia law have found lengthier restrictions in employment contracts reasonable.   *See, e.g.*, *Panhandle Cleaning & Restoration, Inc. v. Vannest*, No. 5:11CV178, 2012 WL 4757906, at \*4 (N.D. W. Va. Oct. 5, 2012) (two-year restrictive covenant valid and enforceable).

Nevertheless, the Court finds the provision facially unreasonable and thus unenforceable because the restriction is essentially geographically limitless, and the scope of restricted activities is greater than necessary to protect the Plaintiffs' interests.   The Plaintiffs contend the provision is not geographically limitless because it only restricts Dillon's "competitive acts in countries where Centrifugal Services and affiliates operate."   (Pls.' Resp. to Dillon Defs.' Mot. for Summ. J. at 31.)   However, the Plaintiffs do not explain why the provision must apply "on a nationwide basis throughout the United States" and in "each other country in which the Company has operations or does business."   The Plaintiffs do not contend that their business or operations extend to each of the fifty United States, nor do they elaborate as to the extent of their business or operations abroad.   The covenant is inexplicably geographically unbound.   The Plaintiffs likewise maintain that the provision is not unduly burdensome to Dillon because it does not prohibit him from working in any line of business other than centrifuge repair.   This is also not true under the plain language of the Agreement.   The provision restricts Dillon's direct or indirect performance of services "in any capacity," "with or without compensation," "in all or any portion

of *any business* that the Company or any of its affiliates conducts *or is developing*" when the employment relationship is terminated. (Empl. Agreement at 8 (emphasis added).) As it is written, the covenant restricts Dillon's activities so far as to include lines of business in which he has not worked, but which the Company and its affiliates may nevertheless be pursuing. *See McGough*, 496 F. Supp. 2d 729 at 755 (non-compete facially unreasonable and unenforceable where covenant was not limited to the line of business in which employee worked, but rather was "written so expansively to encompass any lines of business" in which the employer was involved); *see also RLM Commc'ns, Inc. v. Tuschen*, 831 F.3d 190, 196 (4th Cir. 2016) ("[R]estrictive covenants are unenforceable where they prohibit the employee from engaging in future work that is distinct from the duties actually performed by the employee.").

Moreover, the covenant applies without regard to whether Dillon is terminated with or without cause. *See Costanzo*, 2017 WL 4215952, at *3 (covenant not to compete appeared reasonable in part where it did not apply if the employee was terminated without cause). Taken together, the restrictions imposed by the "Non-Competition" provision are greater than necessary to protect the Plaintiffs' interests from Dillon's potential competition. Thus, the covenant is unreasonable on its face and "utterly void and unenforceable." *Reddy*, 298 S.E.2d at 915. Accordingly, it is unnecessary to continue the structured analysis developed in *Reddy* by asking if the Plaintiffs have proved they have a protectable business interest. The Court will not "blue pencil" the covenant to conform it with the rule of reason. *See McGough*, 496 F. Supp. 2d at 755.

ii.    "Confidential Information" Provision

The Plaintiffs also claim that Dillon breached the "Confidential Information" provision of his Employment Agreement "by using confidential information within the scope of the

26

Employment Agreement to compete against Plaintiffs." (First Am. Verified Compl. at ¶ 189.) This provision is akin to a covenant not to disclose, or a nondisclosure agreement. "The West Virginia Supreme Court of Appeals has not squarely addressed the enforceability of a nondisclosure agreement." *CSS, Inc.*, 306 F.Supp.3d at 880. In *CSS, Inc. v. Herrington*, Judge Goodwin determined that, nevertheless, such "nondisclosure agreements should be analyzed in the same way as noncompete agreements." *Id.* (citing *McGough v. Nalco Co.*, 496 F.Supp.2d 729, 752 (N.D.W. Va. 2007) (Goodwin, J.)); *see also McGough*, 496 F.Supp.2d at 756 ("Covenants not to disclose and utilize confidential business information are related to general covenants not to compete because of the similar employer interest in maintaining competitive advantage."). Thus, the Court first looks to the Confidential Information provision to determine if it is reasonable on its face.

> In deciding whether restraints on disclosure are reasonable two factors are important: (1) whether the employer is attempting to protect confidential information related to the business, such as trade secrets, methods of operation, names of customers, and personnel data even though the information does not rise to the [status] of a trade secret, and (2) whether the restraint is reasonably related to the protection of the information.

*McGough*, 496 F.Supp.2d at 756 (citing Rest. (First) of Contracts §§ 515(a), 516).

Here, the Confidential Information restriction applies "without limitation in time" (Empl. Agreement at 8) and has no limitation with respect to geographic scope. It specifically prevents the employee from directly or indirectly disclosing or using any of the company's "Confidential Information." (*Id.*) "Confidential Information" includes

> information about the Company, its affiliates, or their respective clients, customers or business relations, that was learned by Employee in the course of Employee's employment by or services for the Company, its affiliates or otherwise, including (without limitation) any proprietary knowledge, trade secrets, data, formulae, information and client and customer lists and all papers, resumes, and records

27

(including, without limitation, computer records) containing such Confidential Information.

(*Id.*)  The only exception is for information that the "Employee can demonstrate" is properly in the public domain, or that "has become available to Employee on a non-confidential basis from a source other than the Company or its affiliates without breach of such source's confidentiality or non-disclosure obligations the Company or any affiliate."  (*Id.*)

This provision "covers virtually all information learned by the employee during his employment."  *CSS, Inc.*, 306 F. Supp. 3d at 880.  In addition, it appears that "[t]he only limitations are that the information is not generally known outside the company, and that the information relates to some aspect of the company (which is hardly a limitation at all)."  *Id.* at 880–81.  Indeed, given Dillon's essentially lifelong employment in the industry, this provision could be construed, for example, as indefinitely barring him from using any information he learned about a particular customer while at Elgin even if that customer were to employ Dillon's services at a separate company following his resignation from Elgin.  Considering that "extraordinarily broad language," and in the "absence of any limitation with respect to time or geographic scope," the Court finds that the restraint is not reasonably related to the protection of confidential information, and thus that this covenant is unreasonable on its face and unenforceable under West Virginia law.  *See id.* at 881; *but see Haught v. Louis Berkman LLC*, 417 F. Supp. 2d 777 (N.D.W. Va. 2006) (employee bound by indefinite confidentiality agreement requiring her to return all confidential information to employer upon termination).

### iii.    "Non-Solicitation" Provisions

Finally, the Plaintiffs claim Dillon breached both "Non-Solicitation" provisions of his Employment Agreement by "contacting, soliciting, recruiting, or encouraging current Elgin

employees to resign their employments with Plaintiffs and join Dillon Industries," (First Am. Verified Compl. at ¶ 191), and by "contacting, soliciting, or encouraging current customers of Plaintiffs and suppliers to cease doing business with Plaintiffs and begin doing business with him and Defendant Dillon Industries" (*id.* at ¶ 193). The "Non-Solicitation" provisions provide, respectively,

> <u>Non-Solicitation of Customers and Suppliers</u>. During the Applicable Period, Employee will not, directly or indirectly, influence or attempt to influence customers or suppliers of the Company or any of its affiliates to divert any of their business to any Competitor of the Company or otherwise away from the Company or its affiliates.

> <u>Non-Solicitation of Employees</u>. Employee recognizes that Employee possesses and will possess Confidential Information about other employees of the Company and its affiliates, relating to their education, experience, skills, abilities, compensation and benefits, and inter-personal relationships with customers of the Company and its affiliates. Employee recognizes that the information Employee possesses and will possess about these other employees is not and will not be generally known, is of substantial value to the Company and/or its affiliates in developing their business and in securing and retaining customers and has been and will be acquired by Employee because of Employee's business position with the Company and its affiliates. Employee agrees that, during the Applicable Period, Employee will not directly or indirectly, solicit, recruit, induce, or encourage or attempt to solicit, recruit, induce, or encourage any employee of the Company or its affiliates (i) for the purpose of being employed by him or by any Competitor of the Company on whose behalf Employee is acting as an agent, representative, employee or other capacity or (ii) to terminate Employee's or his or her employment or any other relationship with the Company or its affiliates. Employee also agrees that Employee will not convey any such Confidential Information or trade secrets about other employees of the Company or its affiliates to any other person or entity.

(Empl. Agreement at 9.)  West Virginia distinguishes between non-competition and non-solicitation provisions in an employment contract.  *See Wood v. Acordia of W. Virginia, Inc.*, 618 S.E.2d 415, 422 (W. Va. 2005) ("Although both covenants not to compete and non-[solicitation] provisions are utilized to safeguard an employer's protectable business interests, non-[solicitation] provisions, which ordinarily do not include territorial limits, are less restrictive on the employee

and the economic forces of the marketplace.").   Accordingly, in West Virginia, "although a non-[solicitation] provision in an employment agreement may appear reasonable on its face," courts must ultimately consider:

> (1) whether the employer has a protectable business interest to be safeguarded in relation to the employee, (2) the extent to which the non-[solicitation] provision reasonably and fairly protects that interest and (3) whether the non-[solicitation] provision unjustly restricts the employee from engaging in the business activity he or she seeks to pursue.

*Id.*   The employer has the burden of satisfying the first two factors, while the burden is on the employee regarding the third factor.   *Id.*

The Plaintiffs contend their protectable business interests amount to "customer, supplier, and employee relationships—the lifeblood of any company," and that both non-solicitation provisions are "narrowly drafted to protect these interests."   (Pls.' Resp. to Dillon Defs.' Mot. for Summ. J. at 32.)   They also note that Dillon's position as "President of Elgin gave him access to customer, supplier, and employee information—including price structures, amount of business generated for customers, compensation and benefit information for employees, context about an employee's personality and work skills."   (*Id.* at 32–33.)   Dillon contends the provisions are unreasonable on their face because they expressly include the same "directly or indirectly" language deemed overbroad in the Non-Competition provision, and the provisions rely upon terms "defined in the other covenants that are facially overbroad themselves," such as "Confidential Information" and "Competitor of the Company."   (Dillon Defs.' Mem. at 32.)

The Court finds that, while the Plaintiffs certainly have protectable business interests to be safeguarded in relation to Dillon and his position as President of Elgin's Poca Division, the non-solicitation provisions are overly broad and unreasonable in the extent to which they seek to protect

those interests.   The Plaintiffs maintain that Dillon agreed "not to solicit or ask" customers and suppliers to divert their business to any competitor or otherwise away from the company or its affiliates.   (Pls.' Resp. to Dillon Defs.' Mot. for Summ. J. at 32.)   But the restriction goes further than that.   It prevents Dillon from engaging in such conduct "directly *or indirectly*" with "customers or suppliers of the Company *or any of its affiliates*."   (Empl. Agreement at 8 (emphasis added).)   Indirect solicitation is theoretically limitless, and the restriction on any contact with customers or supplier of the Company's affiliates likewise fails to narrow the scope of impermissible solicitation as needed to safeguard the Plaintiffs' business interests "in relation to [Dillon]."   *See Wood*, 618 S.E.2d at 422.   The provision regarding solicitation of employees is unreasonably broad for the same reason.   Its restriction on direct *or indirect* solicitation, recruitment, or encouragement of "any employee of the Company *or its affiliates*" goes beyond safeguarding the Plaintiffs' protectable business interests in relation to Dillon, which, based on the evidentiary record, are limited to Elgin's Poca, West Virginia, Division.   Moreover, the limit on indirect conduct is so broad as to encompass even the innocuous posting of a job opening on a third-party platform or the provision of assistance to a former colleague who wishes to seek employment elsewhere—both hotly contested issues in this case.   The Court finds that the "Non-Solicitation" provisions are also unreasonable and unenforceable.   Thus, no genuine issue of material fact remains as to Count V, and summary judgment is appropriate.

### 4.   Count VI – Breach of Fiduciary Duty

The Plaintiffs claim that Dillon breached fiduciary duties to Elgin by (1) "secretly usurping Elgin's business strategies and valuable property and using these assets to compete against Elgin through Dillon Industries," and "secretly soliciting Elgin's employees to leave, join him and Dillon

Industries, and compete against Elgin through Dillon Industries." (First Am. Verified Compl. at ¶¶ 202, 204.) The Defendants contend they are entitled to summary judgment on this claim because it lacks merit, and it is barred by the gist of the action doctrine as Dillon's rights and obligations regarding solicitation and competition are spelled out in the employment contracts between him and Elgin.

Under West Virginia law, the gist of the action doctrine is intended "to prevent the recasting of a contract claim as a tort claim." *Gaddy Eng'g Co. v. Bowles Rice McDavid Graff & Love, LLP*, 746 S.E.2d 568, 577 (W. Va. 2013). The doctrine "requires plaintiffs seeking relief in tort to identify a non-contractual duty breached by the alleged tortfeasor." *Dan Ryan Builders, Inc. v. Crystal Ridge Dev., Inc.*, 783 F.3d 976, 980 (4th Cir. 2015). Accordingly, recovery in tort is barred under the gist of the action doctrine in the following scenarios:

> (1) where liability arises solely from the contractual relationship between the parties; (2) when the alleged duties breached were grounded in the contract itself; (3) where any liability stems from the contract; and (4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim.

*Gaddy Eng'g Co.*, 746 S.E.2d at 577.

The Plaintiffs claim that Dillon breached a fiduciary duty of loyalty to Elgin. "The precise contours of the duty of loyalty in West Virginia are not entirely clear." *CSS, Inc.*, 306 F. Supp. 3d at 882. "However, what is clear is that West Virginia does recognize the breach of the duty of loyalty as an independent cause of action." *Id.* at 882–83 (citing *Timberline Four Seasons Resort Mgmt. Co. v. Herlan*, 679 S.E.2d 329, 338 (W. Va. 2009)). In *CSS, Inc.*, Judge Goodwin looked to the Restatement, "[a]s the West Virginia courts often do," for guidance concerning the elements of this claim. *Id.* The Restatement of Employment Law provides that

> (a) Except as otherwise provided in subsections (b) and (c), an employee breaches the duty of loyalty to the employer if, without the employer's express or implied consent, the employee, while employed by the employer, works for a competitor or otherwise competes with the employer.
>
> (b) Competition with the employer under subsection (a) includes solicitation of the employer's customers to divert their business to a competitor and recruitment of other employees to work for a competitor, but does not include reasonable preparation by an employee or group of employees to compete with the employer.

Rest. Empl. Law § 8.04.   Here, the Plaintiffs allege that Dillon usurped Elgin's business strategies and valuable property to compete against Elgin and solicited Elgin's employees to join him and compete against Elgin through Dillon Industries while he was still employed with Elgin.   While the Employment Agreement includes non-competition and non-solicitation provisions, the Restatement provides the additional consideration of whether an employee's conduct constitutes reasonable preparation to compete.   Moreover, the Court has determined that the restrictive covenants in the Employment Agreement are void and unenforceable.   *See Aarow Elec. Sols. v. Tricore Sys., LLC*, 693 F. Supp. 3d 525, 547 (D. Md. 2023) (Under Maryland law, "[a] direct corollary of this general principle of loyalty is that a corporate officer or other high-echelon employee is barred from actively competing with his employer during the tenure of his employment, even in the absence of an express covenant so providing.").   The Plaintiffs have offered evidence that, if credited, could permit a jury to find that Dillon's conduct while still employed as a higher-ranking employee with Elgin exceeded reasonable preparation to compete. Therefore, drawing all reasonable inferences in favor of the Plaintiffs, the Court finds that there is a genuine dispute as to material facts relevant to the Plaintiffs' breach of fiduciary duty claim. Accordingly, summary judgment should be denied as to Count VI.

5.    Count VII – Tortious Interference

The Plaintiffs allege that Dillon intentionally interfered with Elgin's "contractual or business relationships with its existing employees and customers, as well as potential customers" by, among other things,[7] "soliciting Elgin's existing employees to resign their employments and join Dillon Industries and enticing existing Elgin employees to breach their fiduciary duties to Elgin by disclosing Elgin's trade secrets and other confidential information."   (First Am. Verified. Compl. at ¶ 209.)

The Defendants likewise contend they are entitled to summary judgment on Count VII because it is barred by the gist of the action doctrine and, alternatively, because there is no evidence to support the Plaintiffs' claims that Dillon improperly solicited Elgin employees or enticed them to disclose trade secrets to him.    The Plaintiffs maintain that their tortious interference claim arises independent from their contract claim and that issues of fact preclude summary judgment.    They argue that Dillon "solicit[ed] Elgin employees to work at Dillon Industries, entic[ed] Elgin employees … to breach their fiduciary obligations to Elgin by delivering Elgin's trade secret and confidential information to Dillon Industries, and intercept[ed] Elgin business opportunities with Elgin's customers."   (Pls.' Resp. to Dillon Defs.' Mot. for Summ. J. at 39.)   They assert that "[n]o contract is needed" to support these allegations, and that the evidence in the record supports a jury finding in their favor.   (*See id.*)

"To establish prima facie proof of tortious interference, a plaintiff must show: (1) existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm

---

7  In addition to the solicitation and enticement of employees, the Plaintiffs' First Amended Verified Complaint simply refers to Dillon's "conduct described above" without further reference to specific Counts or allegations.

sustained; and (4) damages."   Syl. Pt. 2, *Torbett v. Wheeling Dollar Sav. & Tr. Co.*, 314 S.E.2d 166 (W. Va. 1983).   The Plaintiffs rely on *Backwater Properties, LLC. v. Range Res.-Appalachia, LLC*, No. 1:10CV103, 2011 WL 1706521, at *8 (N.D.W. Va. May 5, 2011).   There, Judge Keeley found that the gist of the action doctrine did not bar a tortious interference claim where the factual allegations in the plaintiff's amended complaint indicated that the claim was based on false representations made by the defendant's landmen, "not any contract between the parties."   *Id.* at *8.   Here, however, the Plaintiffs' tortious interference claim is based on the same alleged misconduct underlying their claim for breach of the Employment Agreement.   Notably, the restrictive covenants in the Employment Agreement applied "[d]uring the period of Employee's employment by the Company" in addition to continuing for one year following Dillon's termination.   The Plaintiffs do not argue that a tortious interference claim may be pursued in lieu of a breach of contract claim.   Instead, they argue without relevant support that "[n]o contract is needed" to support this claim.   (Pls.' Resp. to Dillon Defs.' Mot. for Summ. J. at 39.) Accordingly, the Court finds that the Plaintiffs' tortious interference claim is barred by the gist of the action doctrine and summary judgment is appropriate as to Count VII.

6.    Count IX – False Designation of Origin (Lanham Act)

Finally, the Defendants assert that they are entitled to summary judgment on the Plaintiffs' "reverse passing off" Lanham Act claim because the Plaintiffs have failed to discover any vendors or customers that were confused by Dillon's use of relabeled Elgin drawings to obtain quotes for parts, and Dillon has since returned and replaced the relabeled drawings with drawings of its own.

The Plaintiffs contend issues of fact preclude summary judgment on this claim because the Dillon Defendants "admit they falsely designated the origin of their products," and thus the

likelihood of consumer confusion may be presumed.   (Pls.' Resp. to Dillon Defs.' Mot. for Summ. J. at 39–40.)   In support of their claim, the Plaintiffs assert that the evidence shows Dillon, "acting as President of Elgin and Manager for Dillon Industries, communicated with Elgin customers through the phone and email address he used for Elgin business, used Elgin Drawings [] stamped as [belonging to] Dillon Industries, and had Dillon Industries orders delivered by Elgin drivers on Elgin trucks with Elgin deliveries."   (*Id.* at 40.)   Nevertheless, they further argue that the issue of consumer confusion is not ripe for review because third party depositions have yet to be taken, which Elgin ostensibly believes will support the allegations in Count IX.[8]   (*See id.* at 40.)

The Defendants respond that Dillon's conduct in using Elgin Drawings "to obtain quotes for parts from vendors (not consumers)" and subsequent return of the Elgin Drawings and provision to vendors of new Dillon Industries drawings "so the parts could be manufactured" does not meet the necessary elements of a "reverse passing off" claim under the Lanham Act.   (Dillon Reply at 19.)   To the extent that Dillon concedes the conduct described above, the Defendants maintain that they have not admitted to falsely designating the origin of their products as the Plaintiffs claim.   (*See id.* at 19 n.8.)   They likewise argue that the Lanham Act applies only to "goods and services" sold to consumers, not to the use of the Plaintiffs' Drawings, "which are not goods or services offered for sale."   (*Id.* at 19 n.9.)

The Lanham Act prohibits a "false designation of origin" that is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association … or as to the origin" of "goods, services, or commercial activities."   *Universal Furniture Int'l, Inc. v.*

---

8 The Court notes that the Plaintiffs represented in their responsive briefing that such depositions were scheduled to take place on June 11, 2024.   However, they have not sought to supplement the record or otherwise notify the Court regarding the outcome of such depositions, and whether the same yielded evidence pertinent to the pending dispositive motions.

*Collezione Europa USA, Inc.*, 618 F.3d 417, 438 (4th Cir. 2010), *as amended* (Aug. 24, 2010) (quoting 15 U.S.C. § 1125(a)(1)(A)).   The Plaintiffs claim that the false designation of origin at issue here is a "reverse passing off," which occurs when a "producer misrepresents someone else's goods or services as his own."   *See id.* (quoting *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28 n.1 (2003)).   A reverse passing off claim requires the plaintiff to prove four elements: "(1) that the work at issue originated with the plaintiff; (2) that origin of the work was falsely designated by the defendant; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that the plaintiff was harmed by the defendant's false designation of origin."   *Id.* (quoting *Syngenta Seeds, Inc. v. Delta Cotton Coop., Inc.*, 457 F.3d 1269, 1277 (Fed. Cir. 2006)).

Although the "origin" of a product "may also encompass 'the trademark owner who commissioned or assumed responsibility for ("stood behind") production of the physical product,'" the Court finds that the Plaintiffs cannot even be said to be the "origin" of a product for purposes of demonstrating their reverse passing off claim.   *See id.* (quoting *Dastar*, 539 U.S. at 31–32). The Plaintiffs do not claim that they are in the business of manufacturing or even designing the parts depicted in the Drawings.   Indeed, they describe the Defendants' use of the Drawings ultimately as a "stolen shortcut" to setting up their competing business.   (Pls.' Resp. to Dillon Defs.' Mot. for Summ. J. at 40.)   However, Elgin does not sell or otherwise distribute the Drawings to customers in the manner contemplated by the Lanham Act, nor do they claim that the parts depicted therein are subject to protection. *See Dastar*, 539 U.S. at 32 ("But as used in the Lanham Act, the phrase 'origin of goods' is in our view incapable of connoting the person or entity that originated the ideas or communications that 'goods' embody or contain.").   Fatally, they point

to no authority suggesting that a reverse passing off claim might survive on these facts. Accordingly, the Court finds that the Plaintiffs fail to satisfy even the first element of their reverse passing off claim, and thus the Defendants are entitled to judgment on Count IX as a matter of law.

### B.    Donald Ritchie

Defendant Donald Ritchie contends summary judgment is appropriate as to Counts I, II, and VIII.[9]   As to Counts I and II, Mr. Ritchie joins the Dillon Defendants in arguing that the Plaintiffs have failed to demonstrate that "any of the information, data or documents used by Defendants constitute a 'trade secret' entitled to any legal protection on behalf of Plaintiffs." (Ritchie Mot. for Summ. J. at 2) (Document 157.)   He maintains that "the subject drawings were either publicly available or subject to re-creation by reverse engineering by anyone with those skills."   (*Id.*)   In addition, he asserts that Count VIII, which alleges a breach of fiduciary duty to the Plaintiffs, should be resolved in his favor at summary judgment because the Plaintiffs have "failed to establish that [Mr. Ritchie] was any more than an at-will employee" while employed by the Plaintiffs and thus he did not owe them a fiduciary duty.   To the extent that Mr. Ritchie owed the Plaintiffs such duty, he contends they have failed to show that he violated the same.

The Plaintiffs maintain that genuine issues of material fact remain, and that a reasonable jury could find in their favor at trial on all Counts against Mr. Ritchie.   They likewise incorporate their arguments regarding trade secrets from their response in opposition to the Dillon Defendants' motion.   As to Count VIII, the Plaintiffs contend Mr. Ritchie owed a duty of loyalty to Elgin and that, taking all inferences in their favor, a reasonable jury could find that Ritchie's conduct breached such duty.

---

9 As noted above, these Counts represent the entirety of the Plaintiffs' claims against Mr. Ritchie.

1.    Counts I & II – Violation of the Defend Trade Secrets Act & the West Virginia Uniform Trade Secrets Act

Inasmuch as Ritchie adopts the Dillon Defendants' arguments and the Plaintiffs incorporate their response to the same, the Court finds, for the foregoing reasons stated herein, that Ritchie is entitled to summary judgment as to the Plaintiffs' claims that their Photographs and Inspection Report constitute trade secrets, but that summary judgment is not appropriate as to the Plaintiffs' claims regarding Elgin's Drawings.

2.    Count VIII – Breach of Fiduciary Duty

The Plaintiffs claim that while Ritchie was still employed with Elgin, he breached fiduciary duties to Elgin "by secretly usurping Elgin's valuable intellectual property and aiding in Dillon's use of these assets to compete against Elgin through Dillon Industries."  (First Am. Verified Compl. at ¶ 217.)

West Virginia recognizes breach of fiduciary duty as an independent cause of action.  *CSS, Inc.*, 306 F. Supp. 3d at 882–83.   "The fiduciary duty … is the highest standard of duty implied by law."  *Elmore v. State Farm Mut. Auto. Ins. Co.*, 504 S.E.2d 893, 898 (W. Va. 1998) (internal citations and quotations omitted).   "In West Virginia, in order to prevail on a breach of fiduciary duty claim, a plaintiff must show: (1) the existence of a fiduciary relationship; (2) a breach; and (3) damage proximately caused by the breach."  *State ex rel. Affiliated Const. Trades Found. v. Vieweg*, 205 W. Va. 687, 701–02 (1999) (Workman, J., concurring).

The parties characterize the alleged fiduciary relationship between Elgin and Richie as one of loyalty between an employee and employer.   Courts in West Virginia "look to the Restatement for guidance concerning the elements" of a breach of the duty of loyalty.   *CSS, Inc.*, 306 F. Supp.

3d at 883 (citing the Restatement of Employment Law).    Thus, the Court looks to the Restatement

to determine whether Ritchie owed the Plaintiffs a duty of loyalty in his position at Elgin.    *See*

Syl. Pt. 5, *Aikens v. Debow*, 541 S.E.2d 576 (W. Va. 2000) ("[T]he determination of whether a

plaintiff is owed a duty of care by a defendant must be rendered by the court as a matter of law.").

The Restatement provides that

> Employees in a position of trust and confidence with their employer owe a fiduciary
> duty of loyalty to the employer in matters related to their employment. Other
> employees who come into possession of the employer's trade secrets owe a limited
> fiduciary duty of loyalty with regard to those trade secrets. In addition, employees
> may, depending on the nature of the employment position, owe an implied
> contractual duty of loyalty to the employer in matters related to their employment.

Rest. Empl. Law § 8.01(a) (2015).    The commentary clarifies that,

> As a general matter, the duty of loyalty … has little practical application to the
> employer's "rank-and-file" employees, i.e., employees who are subject to the
> employer's close oversight or supervision, or who are not granted substantial
> discretion in carrying out their work responsibilities. The employees who do owe a
> fiduciary duty of loyalty to their employer are (1) employees who exercise
> substantial discretion and are not subject to close supervision in carrying out their
> managerial, supervisory, professional, or similar highly skilled work
> responsibilities; and (2) the employees who are entrusted with, and the employees
> who come into possession of, the employer's trade secrets. Employees falling
> outside either category do not owe a fiduciary duty of loyalty to their employer but
> may nevertheless owe an implied contractual duty of loyalty if, for example, their
> position gives them the opportunity to misappropriate the employer's property or
> otherwise engage in self-dealing.

*Id.* § 8.01 Comment (a).    The Plaintiffs claim that Ritchie was "charged with important job duties

regarding Elgin's confidential engineering and redesign projects, including creating Drawings, and

was entrusted with Elgin's confidential information and trade secrets."    (First Am. Verified

Compl. at ¶ 214.)    Ritchie was hired at Elgin as a centrifuge designer.    (Ritchie Dep. at 21::16-

18.)    He never had an employment contract with Elgin, never served as an officer or director of

Elgin, and remained under Dillon's supervision from the time he joined Elgin in September 2018

until Dillon departed Elgin in October 2022.   (Dillon Dep. at 361::3–23; 362::4–11.)   It appears undisputed that Ritchie's initial employment status never changed, inasmuch as he never received a formal promotion, new job title, or a pay raise while at Elgin.   However, his role as centrifuge designer involved reverse engineering and making drawings of parts to repair or manufacture centrifuges, as well as sourcing material from vendors to supply customers with new centrifuges. (*See* Ritchie Dep. at 21:16–23:13.)   He made all the drawings which are at issue here.   (*Id.* at 23::16–19.)   Although the issue of whether Elgin's Drawings are trade secret has been left for the jury, the Court finds that, for purposes of summary judgment, Ritchie owed at least an implied contractual duty of loyalty to Elgin because his position gave him access to, and thus the opportunity to misappropriate, Elgin's property or otherwise engage in self-dealing.

Turning to whether Ritchie breached any fiduciary duty of loyalty to Elgin, the Court again looks to the Restatement, which further provides that

> (a) Except as otherwise provided in subsections (b) and (c), an employee breaches the duty of loyalty to the employer if, without the employer's express or implied consent, the employee, while employed by the employer, works for a competitor or otherwise competes with the employer.

> (b) Competition with the employer under subsection (a) includes solicitation of the employer's customers to divert their business to a competitor and recruitment of other employees to work for a competitor but does not include reasonable preparation by an employee or group of employees to compete with the employer.

Rest. Empl. Law § 8.04 (2015).   It is undisputed that in the period leading up to Ritchie's departure, he communicated with Dillon regarding Dillon Industries at times throughout the day when he would typically be clocked in at Elgin and using his Elgin email account.   These communications included forwarding documents available to Ritchie through Elgin's server to Dillon, sending pricing information for equipment requested by Dillon for Dillon Industries,

receiving quotes and packing slips from Dillon related to Dillon Industries' projects, and creating and sending drawings to Dillon for use in its projects. Ritchie testified that on one occasion he also printed copies of two packing slips for Dillon Industries and handed them off to Elgin's delivery driver at Dillon's request. (*See* Ritchie Dep. at 139:13–145:2.) He maintains that he was assisting Dillon in reasonably preparing to compete, and that the Plaintiffs cannot show that his conduct "took any significant amount of time away from [his] job responsibilities" or that the content of such emails contained Elgin's confidential information. (Ritchie Mem. at 7–8.) However, having determined that Ritchie owed Elgin a duty of loyalty during his employment, and viewing the evidence in a light most favorable to the Plaintiffs, the Court finds that the Plaintiffs have submitted sufficient evidence to create material questions of fact regarding whether Ritchie breached a duty of loyalty to Elgin by assisting Dillon in preparing to compete with Elgin.

To the extent that the Plaintiffs claim Ritchie orchestrated a "mass resignation," however, the Court finds that no genuine factual dispute remains regarding whether Ritchie impermissibly recruited Elgin employees to work for Dillon, and Ritchie is entitled to judgment as a matter of law. Ritchie testified that he never recruited for Dillon, and that he only shared information about the job posting for Dillon Industries after learning about it from another coworker. (*See* Ritchie Dep. at 91::2–16; 122:14–123:6; 148:22–149:10; 150:3–152:8.) Elgin identifies no evidence in the record to contradict Ritchie's account. Indeed, former Elgin employees testified that they left on their own accord, making decisions based on their own interests after learning of the job posting or initiating a conversation with Dillon about job opportunities. (*See* Kelley Dep. at 65:10–67:10, 71:21–72:3) (Document 159-8) (spoke with Dillon about a job after quitting Elgin); (Carter Dep. at 46:10–48:10) (Document 159-12) (applied to work for Dillon in person after learning that his

retention bonus potential had been lowered); (Fledderman Dep. at 45:9–18; 53:7–54:5; 55:8–17; 70::3–5; 71:20–73:11) (Document 159-6) (applied to Dillon via online job posting but resigned from Elgin before receiving a job offer.)  Elgin argues that a reasonable jury could infer that Ritchie "not only told the Elgin employees that the application was up, but that Dillon was looking for more than mechanics and would offer benefits and pay comparable to Elgin" because 11 Elgin employees resigned within weeks of hearing about the Dillon Industries job posting.  (Pls.' Resp. to Ritchie Mot. for Summ. J. at 16.)  This amounts to nothing more than "the building of one inference upon another" and is thus insufficient to defeat summary judgment.  *See Perry*, 2012 WL 2130908, at *3 (quoting *Beale*, 769 F.2d at 214).

Viewing all evidence and drawing all reasonable inferences therefrom in the light most favorable to the Plaintiffs, the Court finds that material questions of fact remain as to whether Ritchie breached a duty of loyalty to the Plaintiffs by assisting Dillon in preparing to compete. However, the Plaintiffs fail to raise a genuine issue as to whether Ritchie impermissibly recruited Elgin employees to work for Dillon.  Thus, summary judgment should be granted in part and denied in part as to Count VIII.

## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that *Defendant Donald Ritchie's Motion for Summary Judgment* (Document 157) be **GRANTED in part and DENIED in part.**  Specifically, the motion is **GRANTED** to the extent Counts I and II allege Ritchie misappropriated Elgin's Photographs and Inspection Report and to the extent that Count VIII alleges Ritchie orchestrated a mass resignation.   The motion is **DENIED** to the extent

Counts I and II allege misappropriation of Elgin's Drawings and to the extent Count VIII alleges impermissible competition.

The Court further **ORDERS** that *Defendant David Chadwick Dillon and Dillon Industries, Inc.'s Motion for Summary Judgment* (Document 159) be **GRANTED in part and DENIED in part.**  Specifically, the motion is **GRANTED** as to Counts V, VII and IX and **GRANTED** to the extent Counts I and II allege Dillon misappropriated Elgin's Photographs and Inspection Report. The motion is **DENIED** as to Counts III and VI and **DENIED** to the extent Counts I and II allege misappropriation of Elgin's Drawings.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER:      July 25, 2024

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA

44